ORAL ARGUMENT NOT YET SCHEDULED

**Case No. 13-5228**

---

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**TRUMPETER SWAN SOCIETY, et al.**
**Appellants,**

**v.**

**ENVIRONMENTAL PROTECTION AGENCY, et al.**
**Appellees**

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

**OPENING BRIEF OF APPELLANTS**

---

William J. Snape, III
    (DC Bar No. 455266)
CENTER FOR BIOLOGICAL
DIVERSITY
1411 K Street NW, Suite 1300
Washington, DC 20005
Telephone: 202-536-9351
Facsimile: 415-436-9683
billsnape@earthlink.net

Adam F. Keats (CA Bar No. 191157)
CENTER FOR BIOLOGICAL
DIVERSITY
351 California Street, Suite 600
San Francisco, CA 94104
Telephone: 415-436-9682 x304
Facsimile: 415-436-9683
akeats@biologicaldiversity.org

Dated: November 27, 2013

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

In accordance with Federal Rule of Appellate Procedure 26.1, and D.C. Circuit Rules 26.1 and 28(a)(1), Appellants hereby certify as follows:

## A.    Parties and Amici

### 1.    Appellants (Including Corporate Disclosure Statement)

Appellants The Trumpeter Swan Society, Cascades Raptor Center, Center for Biological Diversity, Loon Lake Loon Association, Preserve Our Wildlife Organization, Tennessee Ornithological Society, and Western Nebraska Resources Council, were all Plaintiffs in the District Court.

Appellant The Trumpeter Swan Society has no parent companies and there are no companies with a 10 percent or greater ownership interest in The Trumpeter Swan Society.  The Trumpeter Swan Society is a 501(c)(3) non-profit corporation founded in 1968 and based in Minnesota that works throughout North America to assure the vitality and welfare of wild Trumpeter swans.

Appellant Cascades Raptor Center has no parent companies and there are no companies with a 10 percent or greater ownership interest in Cascades Raptor Center.  Cascades Raptor Center is a non-profit 501(c)(3) nature center and wildlife hospital based in Oregon, specializing in birds of prey (raptors).

Appellant Center for Biological Diversity has no parent companies and there are no companies with a 10 percent or greater ownership interest in Center for

Biological Diversity. Center for Biological Diversity is a non-profit 501(c)(3) corporation that works throughout the United States and the world to protect endangered species and wild places through science, policy, education, citizen activism, and environmental law.

Appellant Loon Lake Loon Association has no parent companies and there are no companies with a 10 percent or greater ownership interest in Loon Lake Loon Association. Loon Lake Loon Association is a non-profit 501(c)(3) corporation dedicated to protecting the common loon and other waterbird species, such as the red-necked grebe, at Loon Lake, Washington.

Appellant Preserve Our Wildlife Organization has no parent companies and there are no companies with a 10 percent or greater ownership interest in Preserve Our Wildlife Organization. Preserve Our Wildlife Organization is a non-profit unincorporated organization based in Sarasota, Florida, that works toward the protection and preservation of all wildlife species and their habitats through the production and distribution of educational DVDs, articles, and other media and through giving educational presentations throughout the U.S.

Appellant Tennessee Ornithological Society has no parent companies and there are no companies with a 10 percent or greater ownership interest in Tennessee Ornithological Society. Tennessee Ornithological Society is a 501(c)(3) non-profit organization based in Tennessee that seeks to promote the science of

ornithology in Tennessee, to publish the results of its investigations, to advocate for the passage and enforcement of wise and judicious laws for bird protection, and to promote bird study and protection.

Appellant Western Nebraska Resources Council has no parent companies and there are no companies with a 10 percent or greater ownership interest in Western Nebraska Resources Council. Western Nebraska Resources Council is a 501(c)(3) non-profit organization formed in 1983 that is dedicated to preserving the quality of watersheds and native biomes while maintaining a healthy lifestyle in Western Nebraska.

### 2. Appellees

Appellees Environmental Protection Agency and Lisa P. Jackson, in her official capacity as Administrator of the Environmental Protection Agency, were each defendants in the District Court. Appellees National Shooting Sports Foundation, Inc., Association of Battery Recyclers, Inc., National Rifle Association of America, and Safari Club International were all intervenor-defendants in the District Court.

### 3. Amici

There are no amici in this action as of this date.

## B. Ruling Under Review

Appellants appeal the decision of the Honorable Emmet G. Sullivan of the U.S. District Court for the District of Columbia, dated July 22, 2013, granting motions by defendants and intervenor-defendants to dismiss plaintiffs' complaint and dismissing plaintiffs' complaint. District Court Docket Doc. No. 44.

## C. Related Cases

This case has neither been before this Court nor any other United States Court of Appeals. There are no pending related cases. The case is related to a previously-dismissed case filed in the U.S. District Court for the District of Columbia titled *Center for Biological Diversity, et al. v. Lisa P. Jackson*, Case No. 10-2007. *Center for Biological Diversity v. Jackson*, 815 F. Supp. 2d 85 (D.C. Dist. 2011).

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

TABLE OF CONTENTS ....................................................................................v

TABLE OF AUTHORITIES ............................................................................ vi

GLOSSARY ................................................................................................... ix

STATEMENT OF JURISDICTION ..................................................................1

STATEMENT OF ISSUES ...............................................................................1

STATUTES AND REGULATIONS ..................................................................1

STATEMENT OF FACTS ................................................................................1

SUMMARY OF ARGUMENT .........................................................................4

STANDING .......................................................................................................5

ARGUMENT .....................................................................................................6

    A.    Statutory Background and Standard of Review ...................................6

    B.    The Plain Language of TSCA Requires EPA to either Grant or Deny a Petition for Rulemaking ........................................................................9

        1.    TSCA's Plain Language is Unequivocally Clear on Its Face ...................9

        2.    EPA's Past Practices Support TSCA's Plain Language .........................10

        3.    The Congressional Intent Behind TSCA Petitions Supports the Plain Language ......................................................................................................12

    C.    EPA Abused Any Discretion it Possessed in Redefining the Petition ........14

        1.    Different Relief Requested .....................................................................16

        2.    Identity of the Requesting Parties ..........................................................18

        3.    Temporal Relationship Between Submissions ........................................19

        4.    Presence of New Information ..................................................................20

    D.    EPA Has the Authority to Regulate Bullets and Shot Under TSCA ..........22

CONCLUSION .................................................................................................26

# TABLE OF AUTHORITIES

## CASES

*American Horse Protection Ass'n v. Lyng*, 812 F.2d 1 (D.C. Cir. 1987)........... 9, 10

\* *Barnhart v. Sigmon Coal Co.*, 122 S.Ct. 941 (2002) ..............................................12

*Barr v. Clinton*, 370 F.3d 1196 (D.C. Cir. 2004) ....................................................7

*Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044 (D.C. Cir. 1997).....................................8

*Califano v. Sanders*, 430 U.S. 99 (1977) ................................................................10

\* *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842 (1984) ..................... 7, 8, 17

*Citizens for a Better Env't v. Reilly*, 33 ERC (BNA) 1460, 1991 U.S. Dist. LEXIS 7203, 1991 WL 95040 (N.D. Ill. May 24, 1991) ......................................... 13, 14

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ................10

*City of Arlington, Texas v. Federal Communications Commission*, (U.S. S.Ct., May 20, 2013 slip op.) .............................................................................................9

*Ctr. for Biological Diversity v. Jackson*, 815 F. Supp. 2d 85 (D.D.C. 2011)........4, 8

*Defenders of Wildlife v. Gutierrez*, 532 F.3d 913 (D.C. Cir. 2008) .......................10

*Duncan v. Walker*, 533 U.S. 167 (2001)..................................................................12

*Engine Mfrs. Assn. v. S. Coast Air Quality Mgt. Dist.*, 541 U.S. 246 (2004)..........11

*Envtl. Def. Fund v. EPA*, 636 F.2d 1267 (D.C. Cir. 1980) ......................................15

\* *Envtl. Def. Fund v. Reilly*, 909 F.2d 1497, 1499 (D.C. Cir. 1990) .........................16

\* *Envtl. Def. Fund v. Thomas*, 657 F. Supp. 302 (D.D.C. 1987) ...................... 6, 7, 16

**Authorities upon which we chiefly rely are marked with asterisks.**

*Food & Commercial Workers v. Brown Group*, 537 U.S. 544 (1996)...................12

*Keating v. FERC*, 569 F.3d 427 (D.C. Cir. 2009) ...................................18

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................5

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ..........................................10

*Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745 (D.C. Cir. 2007 .............9

*Nat'l Mining Ass'n v. Office of Hearings & Appeals*, 2011 U.S. Dist. LEXIS 41051 (D.D.C. 2011) ......................................................................10

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189 (1985) ................11

*Pub. Emps. for Envtl. Responsibility v. U.S. Dept. of the Interior*, No. Civ.A. 10-1274 ESH, 2011 WL 6812854 (D.D.C. Dec. 28, 2011)..................................9

*Scheduled Airlines Traffic Offices, Inc. v. Dep't of Defense*, 87 F.3d 1356 (D.C. Cir. 1996) ........................................................................30

*Serono Labs., Inc. v. Shalala*, 158 F.3d 1313 (D.C. Cir. 1998) ...................8

*Shays v. FEC*, 414 F.3d 76 (D.C. Cir. 2005) .....................................8

\* *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) ......................... 9, 13

*United States v. Mead Corp.*, 533 U.S. 218 (2000) ...............................9

\* *Walker v. EPA*, 802 F. Supp. 1568, 1573, 1579 (S.D. Texas 1992) .... 15, 19, 22, 23

**STATUTES**

5 U.S.C. § 553...................................................................7
5 U.S.C. § 702...................................................................1
5 U.S.C. § 706(2)(A)............................................................7
15 U.S.C. § 2602(2)............................................................22
15 U.S.C. § 2602(2)(A).........................................................22
\* 15 U.S.C. § 2602(2)(B)(v).................................................. 22, 24
15 U.S.C. § 2605 (a)..........................................................17

15 U.S.C. § 2605(a) ........................................................ 6, 17, 22
15 U.S.C. § 2605(a)(2)(A)(i) ................................................ 17, 22
15 U.S.C. § 2620(a) ............................................................. 6, 17
\* 15 U.S.C. § 2620(b)(1) ...................................................... 6, 10
\* 15 U.S.C. § 2620(b)(3) .............................................. 4, 6, 9, 10
\* 15 U.S.C. § 2620(b)(4) ......................................................1, 6
15 U.S.C. § 2620(b)(4)(A) ...................................................1
26 U.S.C. § 4181 .............................................................23

## OTHER AUTHORITIES

47 Fed. Reg. 37258 ...........................................................12
47 Fed. Reg. 46723 ...........................................................12
49 Fed. Reg. 43764 ...........................................................11
50 Fed. Reg. 30517 ...........................................................11
50 Fed. Reg. 462825-28 .......................................................14
59 Fed. Reg. 48436 ...........................................................12
75 Fed. Reg. 58377 ......................................................... 3, 20
75 Fed. Reg. 58378 ...........................................................11
75 Fed. Reg. 70246 ............................................................3
75 Fed. Reg. 70247 ...........................................................11
ATTORNEY GENERAL'S MANUAL ON THE ADMINISTRATIVE PROCEDURE ACT 38
    (1947) ...................................................................14
H.R. Rep. No 94-1341, at 10 .................................................24
H.R. Rep. No. 79-313 at 711 (1976).........................................13
H.R.4089 RH, 112th Congress (2011-2012) ...........................24
Office of Mgnt. & Budget, *How to File a Petition for Rulemaking*, *available at*
    http://www.foreffectivegov.org/node/4061 (last visited Oct. 30, 2013)..............15

## RULES

Fed. R. Civ. P. 12(b)(1).....................................................5, 6
Fed. R. Civ. P. 12(b)(6).......................................................6
IRS Rev. Rule 68-463, 1968-2 C.B. 507 ................................ 25, 26

## REGULATIONS

27 C.F.R. § 53.61(b)(1).......................................................23

# GLOSSARY

## Abbreviation

APA       Administrative Procedures Act

EPA       Environmental Protection Agency

TSCA     Toxic Substances Control Act

## STATEMENT OF JURISDICTION

Appellants alleged jurisdiction in the District Court under the Toxic Substances Control Act, 15 U.S.C. § 2620(b)(4)(A), and the Administrative Procedures Act, 5 U.S.C. § 702. The District Court entered a final judgment on July 22, 2013. District Court Docket Doc. No. 44. Appellants filed a timely notice of appeal on July 22, 2013. District Court Docket Doc. No. 43. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1) Did Defendant-Appellee Federal Agency, Environmental Protection Agency, violate the clear Congressional language of the Toxic Substances Control Act when it neither granted nor denied Plaintiffs-Appellants' rulemaking petition?

2) If the Congressional language of the Toxic Substances Control Act pertaining to petition processing is somehow ambiguous, did the Environmental Protection Agency act in an arbitrary, capricious or unlawful manner when it neither granted nor denied Plaintiffs-Appellants' rulemaking petition?

## STATUTES AND REGULATIONS

The statutes and regulations pertinent to this brief and case are set forth in the Addendum following the body of the argument below.

## STATEMENT OF FACTS

In March 2012, over one-hundred scientific, conservation and citizen organizations filed a petition under the Toxic Substances Control Act ("TSCA") with the Environmental Protection Agency ("EPA"), requesting that EPA *initiate*

*a rulemaking to regulate* bullets and shot containing lead used in hunting and shooting sports." Docket No. 27-4 (Petition to the Environmental Protection Agency to Regulate Lead Bullets and Shot Under the Toxic Substances Control Act, March 13, 2012 (Exhibit 3 to EPA Motion to Dismiss) ("2012 Petition") (emphasis added). On April 9, 2012, EPA responded by letter, stating that it "does not consider the 2012 submission to be a new petition cognizable under section 21." Docket No. 27-5 at p.1 (Letter from EPA, April 9, 2012 (Exhibit 4 to EPA Motion to Dismiss). EPA found the 2012 Petition to be "substantially the same" as a petition submitted by one of the seven appellants in this action in 2010. *Id.*; *see* Docket No. 27-2 (Petition to the Environmental Protection Agency to Ban Lead Shot, Bullets, and Fishing Sinkers Under the Toxic Substances Control Act, August 3, 2010 (Exhibit 1 to EPA Motion to Dismiss) ("2010 Petition").

Further, EPA noted that if the petition were a request for reconsideration, EPA would deny it for failing to present "significant newly discovered, non-cumulative material." Docket No. 27-5 at p.2. Alternatively, EPA stated that if the petition was a new petition under TSCA, EPA would deny it for the same reasons that it denied the 2010 Petition. *Id.* EPA never published in the Federal Register the reasons for any alleged denial, or any other disposition, of the 2012 Petition.

The substance of the 2012 Petition was noteworthy in several respects. First, rarely have so many diverse and venerable organizations – including The Trumpeter Swan Society, Cornell Laboratory of Ornithology, and American Eagle Foundation – submitted a petition under TSCA. For example, the lead appellant in this action, The Trumpeter Swan Society, founded in 1968, partners with many state and federal agencies in achieving its multi-pronged and well-established conservation goals. Second, the relief requested in the 2012 Petition was quite broad, namely "that the EPA evaluate and consider a range of alternatives that could eliminate the potential for harmful lead exposure to wildlife and humans."

(Docket No. 27-4 at p. 2). Third, the 2012 Petition presented new information never before submitted to EPA about the toxicity of lead bullets, including studies from the U.S. Fish and Wildlife Service and the Raptor Research Foundation.

On July 22, 2013, U.S. District Court Judge Emmet Sullivan ordered that EPA's and Intervenors' motions to dismiss be granted, and that plaintiffs-appellants' amended complaint be dismissed. In his one page opinion, the district court judge gave his reasons for this decision as "stated on the record during a hearing held on May 23, 2013." Docket No. 44. A timely appeal was filed with this Court on August 22, 2013.

In 2010, five organizations, including one of the current appellants, submitted a different petition under both TSCA and the Administrative Procedure Act ("APA"), with a demand that EPA "adopt regulations *prohibiting* the manufacture, processing, and distribution in commerce of lead shot, lead bullets, lead fishing sinkers, and other lead-containing fishing gear." Docket No. 27-2 at p. 7 (emphasis added). EPA denied the lead shot and bullet portion of the 2010 Petition on August 27, 2010, and denied the lead tackle portion on November 4, 2010. Docket No. 27-3. Both decisions were separately published in the Federal Register. *See Lead in Ammunition and Fishing Sinkers; Disposition of TSCA Section 21 Petition,* 75 Fed. Reg. 58377 (Sept. 24, 2010); *Lead Fishing Sinkers; Disposition of TSCA Section 21 Petition,* 75 Fed. Reg. 70246 (Nov. 17, 2010). Indeed, both EPA Federal Register responses in 2010 directly precipitated significant changes in the subsequent 2012 Petition.

On November 23, 2010, the 2010 petitioners filed a complaint before District Court for the District of Columbia seeking review of EPA's denial. *See Ctr. for Biological Diversity v. Jackson*, 815 F. Supp. 2d 85 (D.D.C. 2011). The court dismissed the claim regarding lead in ammunition, finding it to be time-barred, specifically due to the agency's unique "segmenting" of a single petition

into two responses. *Id.* at 94. The 2010 petitioners subsequently dismissed their remaining claims. The district court never reached the merits of the 2010 Petition.

## SUMMARY OF ARGUMENT

The plain language of TSCA requires the EPA to either grant or deny a petition for rulemaking. 15 U.S.C. § 2620(b)(3). This plain language is supported by the EPA's past practices and by the Congressional intent behind TSCA. By failing to grant or deny the 2012 Petition, the EPA denied Appellants their Congressionally-provided right to a *de novo* decision by the district court on the substance of the petition.

Even if the language of TSCA regarding submitted petitions is found to be ambiguous, the EPA abused its discretion in considering Appellants' 2012 Petition as a resubmission or a request for reconsideration of the earlier 2010 Petition, as the 2012 Petition requested different relief than the 2010 Petition, the identity of the petitioners was different between each petition, the 2012 Petition was filed nineteen months after the 2010 Petition, and the 2012 Petition contained new information not contained in the 2010 Petition.

The EPA's failure to grant or deny the 2012 Petition resulted in real and significant harm to Appellants, as the substance of the 2012 Petition – that lead bullets and shot should be regulated by the EPA in order to protect wildlife and the environment – has never been reviewed by a federal court and has never been properly considered by the agency. Under the EPA's logic for its refusal to either grant or deny the 2012 Petition, the six Appellants, the 101 petitioners, and even possibly *any other member of the public* could be forever barred from their right to

be heard by both the agency and reviewing courts on the question of the regulation of lead bullets and shot.[1]

## STANDING

This is an appeal of a district court order granting a motion to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction due to the complaint having not been timely filed.  District Court Transcript, p. 47-48, 50.  As such, this Court must accept the factual allegations set forth in Appellants' complaint in determining whether they have standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim."  (internal quotation marks omitted)).

Appellants' complaint makes clear that Appellants' members have suffered concrete injury by EPA failing to either grant or deny their petition for rulemaking under TSCA.  Docket No. 12, at p. 4-9, ¶¶ 15-23 (Amended Complaint). Appellants detailed their members' interests in preventing lead poisoning of wildlife, including their scientific, recreational, conservation, and aesthetic benefits derived from their researching, observing, studying, and hunting species affected by lead poisoning caused by hunter-shot bullets and shot, poisoning that goes unabated because of EPA's refusal to consider Appellants' petition for rulemaking. *Id.*

---

[1] As the district court poignantly asked:  Page 5, lines 15-18, "COURT: The question is, if they are not properly before the agency now, how in the world do they ever properly get before the agency again with this issue? That is the question." Page 9, lines 12-14, "COURT: I'm just trying to determine how these folks ever get their day before the agency. All they want is consideration by the agency."  Transcript, p. 5, lines 15-18; p. 9, lines 12-14.

These harms can be redressed by a favorable decision on the merits because such decision will a) require EPA to consider the merits of the 2012 Petition, and b) require *de novo* review of the petition on its merits by the U.S. District Court if it is denied by EPA.  15 U.S.C. § 2620(b)(4).

## ARGUMENT

### A.    Statutory Background and Standard of Review

TSCA, 15 U.S.C. §§ 2601 – 2695, was enacted in an effort to provide a "comprehensive frame work for regulating toxic chemicals." *Envtl. Def. Fund v. Thomas*, 657 F. Supp. 302, 304 (D.D.C. 1987).  TSCA grants EPA the authority to apply a wide range of controls on chemical substances which "present or will present an unreasonable risk of injury to health or the environment."  15 U.S.C. § 2605(a).  Section 21 of TSCA authorizes citizens to petition EPA for the initiation of proceedings for the issuance, amendment or repeal of a rule under TSCA.  *Id.* § 2620(a).  Such a petition must set forth the facts which it claims establishes that it is necessary to issue, amend, or repeal a rule or order.  *Id.* § 2620(b)(1).  EPA must respond by granting or denying such petitions within 90 days of its filing.  *Id.* § 2620(b)(3).  If the agency denies a petition, it "shall" publish its reasons for doing so in the Federal Register.  *Id.*  In such cases, or where EPA has failed to respond to a petition within the 90-day time frame, the petitioner may seek *de novo* review of the denial in federal district court.  *Id.* § 2620(b)(4).  Review must be sought within 60 days of the date of denial or expiration of the 90-day period.  *Id.* Because the district court dismissed appellants' complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), this Court reviews this matter *de novo*, construing the complaint "liberally" and granting plaintiffs-appellants "the benefit of all inferences that can be derived from the facts alleged."  *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004)(citations and quotations omitted).

While the denial of a petition for rulemaking under TSCA is subject to *de novo* review, other agency actions for which no particular standard of review is stated are reviewable under the Administrative Procedure Act of 1946 ("APA"), 5 U.S.C. §§ 500 *et seq.* *See Thomas*, 657 F. Supp. at 311 (finding that *de novo* review was appropriate for denials of petitions for rulemaking under section 21 and APA review available for other agency actions).  The APA instructs courts to "hold unlawful and set aside agency action" which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

When assessing the validity of an agency's interpretation of a statute, a court must first determine "whether Congress has directly spoken to the precise question at issue."  *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842 (1984).  "If the intent of Congress is clear," as it is in this case, "that is the end of the matter."  *Id.* "Courts use 'traditional tools of statutory construction' to determine whether Congress has unambiguously expressed its intent," *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1319 (D.C. Cir. 1998) (quoting *Chevron*, 467 U.S. at 843 n.9), including an examination of the statute's text, structure, purpose, and legislative history.  *See Shays v. FEC*, 414 F.3d 76, 105 (D.C. Cir. 2005); *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997); *Ctr. for Biological Diversity v. Jackson*, 815 F. Supp. 2d at 90.

Courts give more deference to an agency's determination when the statute is silent or ambiguous with respect to the specific issue and the agency's answer is based on its construction of the statute.  *See Chevron,* 467 U.S. at 843.  Under *Chevron's* part-two analysis, courts generally defer to an agency's interpretation of a statute when ambiguity exists and the agency's interpretation is reasonable.  *Id.* However, where an agency's determination is decided outside the requirements of notice and comment rulemaking under the APA, 5 U.S.C. § 553, less deference is

appropriate. *See Pub. Emps. for Envtl. Responsibility v. U.S. Dept. of the Interior*, No. Civ.A. 10-1274 ESH, 2011 WL 6812854 (D.D.C. Dec. 28, 2011). Thus, "if the agency enunciates its interpretation through informal action that lacks the force of law, [a court must] accept the agency's interpretation only if it is persuasive." *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 754 (D.C. Cir. 2007) (citing *United States v. Mead Corp*., 533 U.S. 218 (2000). Under this less-deferential standard, an agency's interpretation of a statute is entitled to deference only to the extent that it has the "power to persuade." *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). *See also City of Arlington, Texas v. Federal Communications Commission*, (U.S. S.Ct., May 20, 2013 slip op.) (Courts must apply a Chevron framework to an agency's interpretation of a statutory ambiguity that concerns the scope of the agency's statutory authority).

A deferential standard of review does not obviate the basic APA requirement that "the court must assure itself that the agency considered the relevant factors, that it explained the facts and policy concerns relied on, and that the facts have some basis in the record." *American Horse Protection Ass'n v. Lyng*, 812 F.2d 1, 5 (D.C. Cir. 1987) (citation omitted) (applying this standard to a refusal to initiate rulemaking); *Defenders of Wildlife v. Gutierrez***,** 532 F.3d 913, 919 (D.C. Cir. 2008) (even under the deferential standard for failures to initiate rulemaking, court must satisfy itself that the facts relied on have some basis in the record); *Nat'l Mining Ass'n v. Office of Hearings & Appeals*, 2011 U.S. Dist. LEXIS 41051 *30-*31 (D.D.C. 2011) (deferential standard for refusal to initiate rulemaking "does not mean that the court does not have an obligation to conduct a 'thorough, probing, in-depth review.'") (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, (1971), *overturned on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)). In *American Horse*, the D.C. Circuit struck down a refusal to initiate rulemaking that the agency justified by conclusory statements that were

"insufficient to assure a reviewing court that the agency's refusal to act was the product of reasoned decisionmaking." 812 F.2d at 6. More recently, the Supreme Court struck down EPA's denial of a petition for rulemaking because "EPA has offered no reasoned explanation for its refusal to decide whether greenhouse gases cause or contribute to climate change." *Massachusetts v. EPA*, 549 U.S. 497, 534 (2007) (citation omitted).

**B.     The Plain Language of TSCA Requires EPA to either Grant or Deny a Petition for Rulemaking**

**1.     TSCA's Plain Language is Unequivocally Clear on Its Face**

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. Assn. v. S. Coast Air Quality Mgt. Dist.*, 541 U.S. 246, 252 (2004) (quoting *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)). Section 21 of TSCA provides unambiguous instructions to EPA for processing petitions: "the Administrator shall either grant or deny the petition." 15 U.S.C. § 2620(b)(3). Nowhere does the statute permit EPA to redefine on its own a submitted petition as a "submission," a "request for reconsideration," or a "resubmittal." It instead instructs EPA to either grant or deny the petition, which then gives petitioners the extraordinary opportunity to have their petition reviewed by the district court *de novo*. "We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, the first canon is also the last: judicial inquiry is complete." *Barnhart v. Sigmon Coal Co.*, 122 S.Ct. 941, 956 (2002).[2]

---

[2] "Speculation loses, for the more natural reading of the statute's text, which would give effect to all of its provisions, always prevails over a mere suggestion to disregard or ignore duly enacted law as legislative oversight. *Food & Commercial*

TSCA contains two specific requirements in order for a petition to be considered by the agency:

> Such petition shall be filed in the principal office of the Administrator and shall set forth the facts which it is claimed establish that it is necessary to issue, amend, or repeal a rule under section 4, 6, or 8 …or an order under section 5(e), 6(b)(1)(A), or 6(b)(1)(B)…

15 U.S.C. §§ 2620(b)(1).  The statute is clear that if these conditions are met—(i) that the petition be filed in the principal office of EPA and (ii) that it set forth specific facts—EPA "*shall* either grant or deny the petition."  15 U.S.C. § 2620(b)(3) (emphasis added).  TSCA requires nothing more by a petitioner in order for its petition to be considered by the agency, and then either granted or denied.

Here, EPA created a third way of acting not authorized by the statute when it defined the 2012 Petition as a "submission" that was not "cognizable" under TSCA and then failed to grant or deny it.  Docket No. 27-5 at p. 1.  But this is a decision for Congress, not the agency.  If EPA had reasons not to like or accept the petition, it had only one choice: *deny* the petition and publish the denial in the Federal Register as Congress has clearly commanded.  15 U.S.C. § 2620(b)(3).  Congress wrote the law as it did to prevent the agency from unreasonably and unfairly restricting the public's access to the rulemaking process.  TSCA's language on petition processing is clear and plain, and does not lead to untenable results.  It must be respected.

### 2.     EPA's Past Practices Support TSCA's Plain Language

EPA's past practices in responding to TSCA petitions support the plain language that the agency shall either grant or deny a petition—nothing more and nothing less.  Such past practices can help demonstrate the persuasiveness of an

---

*Workers v. Brown Group*, 537 U.S. 544, 550 (1996).  Numerous other Supreme Court decisions confirm this "cardinal principle of statutory construction." *Duncan v. Walker*, 533 U.S. 167, 174 (2001).

agency's decisions. *See Skidmore*, 323 U.S. at 140. Indeed, in its denial of the 2010 Petition, the agency stated in the Federal Register: "EPA is required to grant or deny the petition ..." 75 Fed. Reg. 70247; 75 Fed. Reg. 58378. EPA has previously accepted and addressed subsequent petitions on the same topic, containing similar requests, without requiring that they not be "substantially the same" or that they present "significant newly discovered, non-cumulative material." *See Citizens for a Better Env't v. Reilly*, 33 ERC (BNA) 1460, 1991 U.S. Dist. LEXIS 7203, 1991 WL 95040 (N.D. Ill. May 24, 1991) ("*Citizens*"). In *Citizens*, plaintiffs filed a section 21 petition on July 27, 1984, seeking a rule that would remedy what they believed to be an unreasonable risk to health and the environment in Southeast Chicago. *Id.* The EPA rejected the petition, and plaintiffs again petitioned EPA for rulemaking on April 23, 1985, less than one year from the date of their first petition. *Id.* The two petitions appear to differ only in the level of specificity of the request; while the first petition sought a "field investigation" and then a general rulemaking to remedy an unreasonable risk to health and the environment, the second petition sought specific testing and then "such other and further rules and orders as may be allowed under the Act in order to reduce health and environmental risks."[3] Nowhere in its response did EPA require a standard that the second petition not be "substantially the same" or that it present "significant newly discovered, non-cumulative material," and petitioners were allowed to go forward with a challenge to the denial of their second petition under a newly tolled statute of limitations. *See Citizens*, 33 ERC (BNA) 1460, 1991 U.S. Dist. LEXIS 7203, 1991 WL 95040.

_____

[3] *Compare* Investigation and Rulemaking Action Concerning Southeast Chicago; Denial of Citizens' Petition, 49 Fed. Reg. 43764 (Oct. 31, 1984) *with* Testing Requirement Rule for Certain Toxic Chemical Substances and Mixtures Found in Southeast Chicago Denial of Citizens' Petition, 50 Fed. Reg. 30517 (July 26, 1985).

EPA has also explicitly invited petitioners to resubmit their petitions without applying additional standards and without requiring that they not be substantially the same. *See* Polychlorinated Biphenyls (PCBs); Denial of Citizen's Petition, 47 Fed. Reg. 46723 (Oct. 20, 1982) (stating that General Electric may "resubmit its petition or submit another petition" if it is unsatisfied with the outcome of rulemaking governing PCBs); *see also* Polychlorinated Biphenyls (PBCs); Denial of Citizen's Petition, 47 Fed. Reg. 37258 (Aug. 25, 1982) (inviting Dow Chemical to do the same). In both cases, chemical manufacturers had petitioned for the exclusion of particular chemicals from EPA's PCB regulations. *See*, *e.g.*, 47 Fed. Reg. 46723 (GE). Finding that a parallel rulemaking required by the court in *Envtl. Def. Fund v. EPA*, 636 F.2d 1267 (D.C. Cir. 1980), would likely address the issues raised by both manufacturers, EPA denied the petitions and invited the chemical companies to resubmit if the rulemaking "does not address all of [their] concerns." *Id*.

Even when a petition raised issues outside the scope of TSCA and sought relief unavailable under the statute, EPA still responded by publishing a denial in the Federal Register. *See* 59 Fed. Reg. 48436, TSCA Section 21 Petition; Response to Citizen's Petition (denying petition which "does not expressly request any action, but instead recounts Petitioner's experiences in seeking relief from a chronically overflowing drainage ditch"). *See also Walker v. EPA*, 802 F. Supp. 1568, 1573, 1579 (S.D. Texas 1992) (involving three petitions, the third of which was considered and denied even though it was "similar" to the previously denied petition and did not contain "newly discovered, noncumulative material").

3. **The Congressional Intent Behind TSCA Petitions Supports the Plain Language**

In treating the 2012 Petition as a resubmittal or request for reconsideration, EPA acted contrary to the congressional intent behind TSCA. The legislative

history of TSCA makes it clear that, in adopting section 21, Congress wanted citizens to have a strong influence on the regulation of toxic chemicals and to be able ensure that EPA fulfills its duties under the statute. "Miserly construction[s] of section 21" which run counter to this intent have been afforded little deference by the D.C. courts. *See Envtl. Def. Fund v. Thomas*, 657 F. Supp. 302, 307 (D.D.C. 1987)

In *Thomas*, the court rejected an interpretation of section 21's statute of limitations which "would punish the intended beneficiaries of the statute's action-forcing mechanism." *Id*. In affirming *Thomas*, the D.C. Circuit in *Envtl. Def. Fund v. Reilly* noted that "[c]itizen participation is broadly permitted to 'ensure that bureaucratic lethargy does not prevent the appropriate administration'" of EPA's regulatory authority under TSCA. *Envtl. Def. Fund v. Reilly*, 909 F.2d 1497, 1499 (D.C. Cir. 1990) (quoting 122 Cong. Rec. 32,857 (1976) (statement of Sen. Tunney)). Further, as *Reilly* notes, petitions for rulemaking, as opposed to petitions to amend or repeal a rule receive more hospitable treatment through *de novo* review. *Id.* at 1503. This further establishes Congress's intent that concerned citizens be able to freely petition for rulemaking without arbitrary obstruction by EPA.

The conference report for TSCA demonstrates Congress's intent to prevent EPA from "avoid[ing] any judicial review," primarily through the inclusion of section 21's requirement that EPA respond to petitions within 90 days. H.R. Rep. No. 79-313 at 711 (1976) (Committee print). "The responsiveness of government is a critical concern and the citizens' petition provision will help to protect against lax administration of the bill." *Id.* at 169.

A distinction must be made between petitions to *amend* or *repeal* an existing rule under TSCA, and petitions to *initiate* a rule. *See Envtl. Def. Fund v. Reilly*, 909 F.2d at 1503. The Congressional record demonstrates a concern with EPA

being "subject to constant petitions challenging rules or orders," *id.* at 712, and thus Congress allowed review of such denials only under the more deferential APA. But no similar changes were made to prevent similar issues with citizen petitions asking EPA to commence rulemaking, despite explicit concerns on the issue raised at the time. *See id.* at 521 (Comments of Rep. McCollister, requesting that section 21 be removed so as to not burden "the workload of the agencies, [or] the caseload of the Federal courts"). Congress explicitly made it very easy for the public to petition EPA to issue rules protecting health and the environment; if this meant that the agency might be subject to additional work—even onerous work— challenging its decisions on these petitions, Congress determined that *access* was paramount. Where an agency's interpretation "appears from the statute or its legislative history [not to be] one that Congress would have sanctioned," courts must not accommodate it. *Chevron*, 467 U.S. at 845 (quoting *United States v. Shimer*, 367 U.S. 374, 382 (1961)).

## C.     EPA Abused Any Discretion it Possessed in Redefining the Petition

Even if the Court determines that TSCA's petition provision[4] is somehow ambiguous, EPA's treatment of the 2012 Petition, with no notice and/or comment

---

[4] EPA does not appear to have either defined "petition", or established any rules or policies on them. The *Attorney General's Manual on the APA* advises that every agency with rulemaking authority should establish and publish procedural rules governing the receipt, consideration, and disposition of rulemaking petitions. ATTORNEY GENERAL'S MANUAL ON THE ADMINISTRATIVE PROCEDURE ACT 38 (1947). However, EPA published a guidance document that provides interested parties specific recommendations on how to prepare a TSCA Section 21 petition. Envtl. Prot. Agency, *Guidance for Petitioning the Environmental Protection Agency Under Section 21 of the Toxic Substances Control Act*, 50 Fed. Reg. 462825-28 (Nov. 13, 1985). This Guidance Document suggests petitioners include information about the petitioners; description of relief sought; and description of the problem including information on the degree of harm the chemicals of concern present or may present. Petitioners here easily satisfied these guidelines.

process, and a complete absence of any public explanation in the Federal Register for its decision, merits deference only if rational under the APA. Any reasonable examination of the facts demonstrates that the 2010 and 2012 petitions were significantly different. The agency's unjustified shell game with the 2012 Petition is the definition of arbitrary and capricious as EPA is unable to articulate "a rational connection between the facts found and the choice made." *Keating v. FERC*, 569 F.3d 427, 433 (D.C. Cir. 2009).

EPA chose to not regard the 2012 Petition as a petition at all under section 21 because it determined that it was "substantially the same" as the 2010 Petition, that it "contained no new information that was not previously available" to the petitioners, and that in reaching its decision on the 2010 Petition, EPA "was aware of, and considered," the legislative history cited in the 2012 Petition. EPA admitted that there are differences between the petitions, but disregarded these differences as being "a distinction without a substantive difference" given that EPA's original decision was that it could not grant relief of *any* kind. Docket No. 27-4 at p. 1.

Under EPA's logic, any petition[5] that seeks any regulation of lead bullets and shot—no matter how different the petition, the parties, or the relief requested—would be "virtually identical" in EPA's eyes because the agency had already determined that it lacked the authority to act. This is simply not the standard under TSCA. What makes one petition different from another is not EPA's response, but what is contained in the petition. Here, the 2012 Petition

---

[5] The petition at issue is clearly a petition. The Office of Management and Budget (OMB) defines a petition for rulemaking as "the mechanism by which individuals, public interest groups, and private enterprise can argue in favor of changes or new rules for ensuring the general welfare of the nation." Office of Mgmt. & Budget, *How to File a Petition for Rulemaking*, *available at* http://www.foreffectivegov.org/node/4061 (last visited Oct. 30, 2013).

sought dramatically different remedies than the 2010 Petition. It was brought by 98 more parties than the earlier petition, contained new scientific evidence, and new legal support. The two petitions were not "virtually identical" and they were not "substantially the same."

This Court should look to the substance and content of the petitions when determining whether they are the same or not, not the agency's response. *See Walker*, 802 F. Supp. 1568. In *Walker*, the court noted that it had "previously stated that the determination whether a submission is sufficiently different from a previous submission 'to qualify as a separate petition *rests on the content of each*. In making this determination, consideration must be given to the relief sought, the identity of the requesting parties, the temporal relationship between submissions, and the presence of new information.'" *Id.* at 1573 n.6 (emphasis added).

### 1.     Different Relief Requested

The 2010 Petition sought a complete prohibition on "the manufacture, processing, and distribution in commerce of lead shot [and] lead bullets," with no exceptions. Specifically, the 2010 Petition formally requested:

> ...that the EPA issue a proposed rule under section 6(a) of TSCA to prohibit the manufacturing, processing, and distribution in commerce in the United States of lead ammunition (including bullets and shotgun pellets)…

> Docket No. 27-2 at p. 7.

In contrast, the 2012 Petition sought markedly different relief: "*regulations that adequately protect* wildlife, human health and the environment against the unreasonable risk of injury from bullets and shot containing lead *used in hunting and shooting sports, which have the potential to cause harmful lead exposure to*

16

*wildlife and humans.*"  Docket 27-4 at p 67.  Specifically, the 2012 Petition formally requested that the EPA:

1) evaluate the risk of injury to the environment, human health and wildlife from lead bullets and shotgun pellets, used in hunting and shooting sports, which have the potential to cause harmful lead exposure; and
2) initiate a proceeding for the issuance of a rulemaking under Section 6(a) of TSCA to adequately protect against such risks (15 U.S.C. § 2620(a)); 15 U.S.C. § 2605(a)(2)(A)(i)).

*Id*.

The 2012 Petition did not seek a ban on lead bullets and shot at all,[6] but rather left the scope of the action open to the agency to determine after a rulemaking proceeding, leaving open the very real possibility that some regulation less than a ban could be enacted.  Rather than requesting a ban on *all* lead bullets and shot, the 2012 Petition focused only on selective regulation of bullets and shot used in hunting and shooting sports that have the potential to cause harmful lead exposure, again allowing the possibility that some lead bullets and shot would continue to be permitted, even in hunting and shooting sports, if it could be shown that the regulations would adequately protect wildlife, human health, and the environment.

This fundamental difference in the relief requested in the two petitions was stark, and directly responsive to the agency's concerns.[7]  In fact, beyond the question of the toxicity of lead bullets and shot in general, the issue of the scope of the ban raised perhaps the biggest concern with the public and directly challenged

---

[6] The 2012 Petition also did not address fishing sinkers.  Docket No. 27-4 at p. 18.
[7] The statute itself specifically contemplates seven different forms of regulation, each with their own subsection, based upon the agency's determination of "least burdensome requirements." 15 U.S.C. § 2605 (a).

a core aspect of the 2010 Petition's body of evidence, as many commenters pointed out that the 2010 Petition's proposed ban would increase the costs and burden to military and law enforcement agencies without a sufficient demonstration that those uses of lead bullets and shot were causing unreasonable harm. *See*, *e.g.*, Docket No. 30-1 at p. 4, 6 (Declaration of Adam Keats in Support of Opposition to Motion to Dismiss, Exhibits 1 and 2). The issue was also repeatedly raised in the press. *See*, *e.g.*, *id.* at p. 8-10, 12-13, 15-20 (Declaration of Adam Keats in Support of Opposition to Motion to Dismiss, Exhibits 3-5). And by all appearances, the scope of the relief requested was a consideration of EPA in its decisionmaking process, as the agency stated in its letter denying the 2010 Petition that "EPA has determined that TSCA does not provide the Agency with authority to address lead shot and bullets *as requested in your petition* due to the exclusion found in TSCA § 3(2)(B)(v)." Docket No. 27-3.

### 2. Identity of the Requesting Parties

In addition to the differences between the requested remedies described above, the parties requesting relief were significantly different between each petition, satisfying the second factor of the *Walker* test. *See Walker,* 802 F. Supp. at 1573 n.6. While two of the five petitioners from the 2010 Petition were also petitioners in the 2012 Petition, and the Center for Biological Diversity was a petitioner in both petitions and a party to both lawsuits, this ignores the fact that the 2012 Petition was submitted by 98 organizations who had never before petitioned EPA on this issue. EPA provides no reasoning for why the presence of two repeat petitioners in a petition by 101 distinct organizations could support its decision that the two petitions are identical, or even similar enough to disqualify the 2012 Petition from any consideration whatsoever.

The fact that 98 organizations that had not participated in the 2010 Petition joined in the 2012 Petition is a highly significant fact, and comports with TSCA's

emphasis on open access to the public for the rulemaking process. The value of this factor is focused on whether any other person or organization cares enough about the issue and desires the remedy enough to petition the agency for relief. Congress drafted TSCA in such a way as to ensure that these organizations would have a voice, and their day in court if necessary.

### 3. Temporal Relationship Between Submissions

The third factor identified by the *Walker* court is the temporal relationship between submissions. *Walker,* 802 F. Supp. at 1573 n.6. The *Walker* court did not define what qualified as a minimal temporal relationship between submissions in order for them to be found identical. In the three petitions discussed in *Walker*, the second petition (that was regarded as a motion for reconsideration, not a petition) was submitted just over four months after the first, while the third (accepted) petition was submitted just over forty-two months after the second. *Id*. at 1572-73. Similarly, the second petition was submitted just over a month after the first petition's denial, while the third petition was submitted less than four months after a court ruled the second petition to be time-barred as a resubmittal. *Walker,* 802 F. Supp. at 1573. In other words, for the EPA and the court in *Walker*, four months between submissions might be insufficient, while forty-two months is apparently sufficient. Similarly, one month between final denial of one petition and the submission of another might be insufficient, while four months is apparently sufficient.

Here, the 2012 Petition was submitted nineteen months after submittal and nearly six months after the disposal of the 2010 Petition. The EPA has not provided any reasoned explanation for how either of these timeframes are insufficient, or how they would contribute to a finding that the 2012 Petition is a resubmittal of the first. The important fact, though, is that nineteen months – and even six months – is more than enough time for 100 motivated organizations to

form a coalition, determine that they wish to petition for different relief than that sought in prior petitions, review recent scientific literature, and then draft a new and different petition.

### 4.    Presence of New Information

The fourth prong of the *Walker* test is the presence of new information. *Walker,* 802 F. Supp. at 1573, n.6.  The 2012 Petition introduced "significant new information regarding the toxic effects of lead ammunition on wildlife, the toxic effects of lead on human health, the availability and performance of alternatives to lead ammunition, and the effectiveness of lead ammunition regulations."  Docket No. 27-4 at p. 4.  The 2012 Petition also discussed the Senate and House reports on the legislative history and intent of TSCA—information not included in the 2010 Petition.  *Id.* at p. 55-56.

In its letter responding to the 2012 Petition, EPA dismissed the legislative history information as having been "information previously available" to the two petitioners common to both petitions.  As discussed above, by doing so, EPA imposed a standard that is not present in TSCA and is in excess of the law's requirements.  Moreover, the fact that the legislative history information was previously available to some of the petitioners does not prevent it from being "new information" under the *Walker* test.  The information was not presented to EPA in the 2010 Petition, and EPA did not cite it in either its denial letter or its Federal Register notice.  Docket No. 27-3; 75 Fed. Reg. 58377 (Sept. 24, 2010).

EPA acknowledged that the 2012 Petition contained citations to at least 20 new scientific articles and papers, but dismissed this new information because "only six" of the citations appeared to EPA to post-date the 2010 Petition.  Docket No. 27-5 at p.2.  The question is not whether the new information post-dated the 2010 Petition, but whether the information was presented to the agency during its

review of the 2010 Petition.  EPA makes no showing that any of these 20 new citations were actually presented or reviewed with the earlier petition.

EPA also claimed that the 2012 Petition presented "almost verbatim the same information regarding toxicity and exposure with respect to lead bullets and shot as the 2010 petition," but this assertion is again not supported by any facts and ignores the new information that was presented.  As discussed above, the 2012 Petition presented and discussed new information regarding the toxic effects of lead ammunition on wildlife and human health, the availability and performance of alternative ammunition, and the effectiveness of lead ammunition regulations. This was important new scientific information that, under EPA's theory of TSCA, will never be considered by the agency due to its denial of the 2010 Petition.  It includes three new studies not cited in the 2010 Petition on population level effects on two species of wildlife (condors and eiders) from chronic lead poisoning (Finkelstein et al. 2011; Raptor Research Foundation 2011; United States Fish and Wildlife Service 2011); three new studies not in the 2010 Petition on the effectiveness of California regulations banning lead ammunition in the condor range on reducing blood lead levels in California condors, golden eagles and turkey vultures (California Department of Fish and Game 2009, 2010; Kelly et al. 2011); and four new studies not in the 2010 Petition providing additional evidence that spent lead ammunition is the primary route of lead exposure for California condors, bald eagles, golden eagles and turkey vultures (Finkelstein et al. 2011; Kelly and Johnson 2011; Kelly et al. 2011; Raptor Research Foundation 2011). All of this information would be invaluable to appellants in showing there existed "a reasonable basis to conclude that the issuance of such a rule or order is necessary to protect health or the environment against an unreasonable risk of injury to health or the environment," as required by TSCA.  (15 U.S.C. § 2601 et seq.).

EPA's argument that the "information regarding the toxicity and exposure with respect to lead bullets and shot" presented in the 2012 Petition is "almost verbatim" as that presented in the 2010 Petition is thus flat-out incorrect. As the 2012 Petition sought a markedly different remedy, was submitted by 98 new petitioners, was submitted over a year and a half after the 2010 Petition, contained important and relevant new scientific information, and presented legislative history that was previously not presented or considered, EPA's conclusion that the 2012 Petition was "substantially the same" as the 2010 Petition is the height of irrationality.

**D.     EPA Has the Authority to Regulate Bullets and Shot Under TSCA**

EPA argues that TSCA denies EPA the authority to regulate lead bullets and shot. But, again, a plain reading of TSCA -- and the Internal Revenue Code, on which TSCA relies -- belies these claims. A discussion of the substance of these issues is important at the very least to demonstrate the rights the agency continues to deny multiple petitioners who have never had their day in court, and who may never have an opportunity to be rationally responded to by the agency.

TSCA authorizes EPA to prohibit "the manufacturing, processing, or distribution in commerce" of a chemical substance for a particular use or uses. 15 U.S.C. § 2605(a)(2)(A)(i). The term "chemical substance" means "any organic or inorganic substance of a particular molecular identity, including (i) any combination of such substances occurring in whole or in part as a result of a chemical reaction or occurring in nature and (ii) any element or uncombined radical." 15 U.S.C. § 2602(2)(A). It is beyond dispute that EPA already regulates lead as a chemical substance under TSCA.

Congress' expansive definition of "chemical substance," however, is limited by definition in several ways. 15 U.S.C. § 2602(2). In particular, TSCA section 2602(2)(B)(v)  states the term "chemical substance" does not include:

any article the sale of which is subject to the tax imposed by section 4181 of the Internal Revenue Code of 1954 (determined without regard to any exemptions from such tax provided by section 4182 or 4221 or any other provision of such Code)…

Section 4181 of the Internal Revenue Code, in turn, states that:

There is hereby imposed upon the sale by the manufacturer, producer, or importer of the following articles a tax equivalent to the specified percent of the price for which so sold:
    Articles taxable at 10 percent--
      Pistols.
      Revolvers.
    Articles taxable at 11 percent--
      Firearms (other than pistols and revolvers).
      Shells, and cartridges.

26 U.S.C. 4181.

Section 4181of the Internal Revenue Code quite specifically refers only to "shells" and "cartridges," which are articles, either finished or in "knockdown condition" that include all of the component parts, which for a shell or cartridge includes a case, gunpowder, and a projectile. For shells, the projectiles are normally shot, while for cartridges, the projectiles are normally bullets. 27 C.F.R. § 53.61(b)(1).

A bullet is not the same as a cartridge. Likewise, shot is not the same as a shell. The words are not only different, they describe different things. If appellants had petitioned EPA to regulate lead shells and cartridges, EPA would be justified in claiming that it lacks the authority to regulate such products. However, appellants petitioned EPA to regulate lead *in* bullets and shot,[8] and specifically not

---

[8] Alternatives to lead bullets and shot readily exist. As the 2012 Petition stated, "a rapidly increasing number and range of bullets in all calibers are available in non-lead forms, and demonstrated technology indicates that hunting and shooting sport products could be produced in non-lead alternatives within a short period of time if

shells and cartridges per se. Neither bullets nor shot (or their chemical components) are mentioned in TSCA or section 4181 of the Internal Revenue Code as excluded items, and are therefore included in TSCA's inclusive definition of a "chemical substance." This is not mere semantics to skirt the intention of the law, in fact, it is the intention of the law. The legislative history confirms the clear intent of the statute:

> Although the language of the bill is clear on its face as to the exemption for pistols, revolvers, firearms, shells, and cartridges, the Committee wishes to emphasize that it does not intend that the legislation be used as a vehicle for gun control. Consequently the Administrator has no authority to regulate *ammunition* as an unreasonable risk because it injures people when fired from a gun. However, the Committee does not exclude from regulation under the bill chemical components of ammunition which could be hazardous because of their chemical properties.

H.R. Rep. No 94-1341, at 10, *reprinted in* Legislative History of the Toxic Substances Control Act, 1976, at 418 (1976) ("House Rep.") (emphasis added). Thus, under TSCA, EPA unquestionably has the authority to regulate lead bullets and shot.[9]

In fact, the purpose of the parenthetical in section 2602(2)(B)(v) is to prevent the definition of "chemical substance" from being unduly imposed on an article that would in most circumstances not qualify as such. For example, shells and cartridges "purchased with funds appropriated for the military department" are not taxed under I.R.C. § 4181 pursuant to I.R.C. § 4182. Thus, the parenthetical in section 2602(2)(B)(v) prevents shells and cartridges from qualifying as "chemical

---

manufacturers are provided a transition period for expanding upon current designs and stocks of ammunition." Docket No. 27-4 at p. 57-61.

[9] Several bills in Congress have tried (but failed) to amend TSCA to prevent EPA from regulating "components" of bullets and shot. *See, e.g.,* H.R.4089, 112th Congress.

substances" subject to regulation under TSCA just when they are purchased with Defense Department funds or sold by small manufacturers. Shells and cartridges are never considered chemical substances, even if they are sometimes taxed and sometimes not, because TSCA is only concerned with the specific articles that are listed in section 4181. This parenthetical illustrates TSCA's interest and focus on the items themselves (rather than the details of the transaction or their tax status).

EPA argues that when shells and cartridges are sold in knockdown form (unassembled cartridges or shells complete as to all component parts), they are still subject to the tax in section 4181. IRS Rev. Rule 68-463, 1968-2 C.B. 507; EPA Mot. to Dismiss at 24-25. However, this rule does not describe an exemption to the tax for bullets and shot when sold separately, as EPA argues. Nor does it create a situation where bullets and shot are themselves taxed. Rather, it further clarifies the definition of cartridges and shells by specifying that the tax in I.R.C. § 4181 cannot be evaded by selling the cartridge or shell as an unassembled kit. If all the parts are sold together but unassembled, it is still considered a cartridge or shell under section 4181 and taxed accordingly. Bullets and shot are never taxed, not even under this rule. IRS Rev. Rule 68-463, 1968-2 C.B. 507 ("No tax is imposed by section 4181…on the sale of parts…of…shells[] and cartridges when sold separately… The tax does attach, however, to sale of completed…shells[] and cartridges, *and to the sale of such articles that*, although in knockdown form, *are complete* to all component parts." (emphasis added)). "Such articles" clearly refers to shells and cartridges—not bullets or shot.

EPA dismisses IRS Rev. Rule 68-463 as being merely "one IRS ruling," ignoring the fact that this rule was issued eight years prior to the passage of TSCA. Congress was surely aware of this rule, and thus fully aware that components of bullets and shot would be subject to regulation under TSCA since they were not included in section 4181 of the Internal Revenue Code. IRS Rev. Rule 68-463,

1968-2 C.B. 507. Moreover, the IRS ruling is of great importance here, for the Treasury Department warrants deference in its interpretation of I.R.C. § 4181, not EPA. *Scheduled Airlines Traffic Offices, Inc. v. Dep't of Defense*, 87 F.3d 1356, 1361 (D.C. Cir. 1996).

## CONCLUSION

This case should be remanded back to the District Court with instructions to order the agency to comply with TSCA's petition provisions and either grant or deny appellants' petition. If the petition is denied, the agency must issue a notice in the Federal Register as Congress has strictly commanded. Multiple new petitioners, who have never had their day before the agency or a reviewing court, must be heard as required by statute. This Court should find that EPA does not have the authority to disregard such a petition, or otherwise redefine it as a resubmission or request for reconsideration in order to avoid making a decision on the petition which would then allow petitioners to seek de novo review in federal district court. The agency is required to either grant or deny the petition so that a reviewing court can finally adjudicate the merits of the serious issues raised by the petition at hand.

DATED: November 27, 2013        BY: ___/s/_____
                                         William J. Snape III
                                         Attorney for Appellants

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 27, 2013, I electronically transmitted the documents described below to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to CM/ECF registrants listed below.

**Opening Brief of Appellants**

**For Appellees Environmental Protection Agency and Lisa P. Jackson:**

Jennifer Scheller Neumann                    John David Gunter, II
Jennifer.neumann@usdoj.gov                   David.Gunter2@usdoj.gov
efile_app.enrd@usdoj.gov                     efile_eds.enrd@usdoj.gov

**For Appellees National Shooting Sports Foundation, Inc.:**

Roger R. Martella, Jr.                       Christopher L. Bell
rmartella@sidley.com                         cbell@sidley.com

**For Appellees American Battery Recyclers:**

Michael Steven Snarr                         Robert N. Steinwurtzel
msnarr@bakerlaw.com                          rsteinwurtzel@bakerlaw.com

**For Appellees Safari Club International and National Rifle Association, Inc.**

Anna Margo Seidman
aseidman@safariclub.org


DATED: November 27, 2013          BY:   ___/s/_____

                                        Adam Keats

# ADDENDUM


# STATUTES AND REGULATIONS

# ADDENDUM TABLE OF CONTENTS

5 U.S.C. § 553 .................................................................................................... ADDENDUM 2

5 U.S.C. § 702 .................................................................................................... ADDENDUM 3

5 U.S.C. § 706 .................................................................................................... ADDENDUM 4

15 U.S.C. § 2602 ............................................................................................... ADDENDUM 5

15 U.S.C. § 2605 ............................................................................................... ADDENDUM 7

15 U.S.C. § 2620 ............................................................................................. ADDENDUM 13

26 U.S.C. § 4181 ............................................................................................. ADDENDUM 15

27 C.F.R. 53.61 ............................................................................................... ADDENDUM 16

TITLE 5. GOVERNMENT ORGANIZATION AND EMPLOYEES
PART I. THE AGENCIES GENERALLY
CHAPTER 5. ADMINISTRATIVE PROCEDURE
SUBCHAPTER II. ADMINISTRATIVE PROCEDURE

**5 U.S.C. § 553**

§ 553.  Rule making

(a) This section applies, according to the provisions thereof, except to the extent that there is involved--
   (1) a military or foreign affairs function of the United States; or
   (2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include--
   (1) a statement of the time, place, and nature of public rule making proceedings;
   (2) reference to the legal authority under which the rule is proposed; and
   (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply--
   (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or
   (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this *title [5 USCS §§ 556* and *557]* apply instead of this subsection.

(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except--
   (1) a substantive rule which grants or recognizes an exemption or relieves a restriction;
   (2) interpretative rules and statements of policy; or
   (3) as otherwise provided by the agency for good cause found and published with the rule.

(e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

ADDENDUM 2

TITLE 5. GOVERNMENT ORGANIZATION AND EMPLOYEES
PART I. THE AGENCIES GENERALLY
CHAPTER 7. JUDICIAL REVIEW

**5 U.S.C. § 702**

§ 702.  Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided,* That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

TITLE 5. GOVERNMENT ORGANIZATION AND EMPLOYEES
PART I. THE AGENCIES GENERALLY
CHAPTER 7. JUDICIAL REVIEW

**5 U.S.C. § 706**

§ 706.  Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
  (1) compel agency action unlawfully withheld or unreasonably delayed; and
  (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
    (B) contrary to constitutional right, power, privilege, or immunity;
    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
    (D) without observance of procedure required by law;
    (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
    (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**15 U.S.C. § 2602**

§ 2602.  Definitions

As used in this Act [*15 USCS §§ 2601* et seq.]:

  (1) the [The] term "Administrator" means the Administrator of the Environmental Protection Agency.

  (2)

    (A) Except as provided in subparagraph (B), the term "chemical substance" means any organic or inorganic substance of a particular molecular identity, including--

      (i) any combination of such substances occurring in whole or in part as a result of a chemical reaction or occurring in nature, and

      (ii) any element or uncombined radical.

    (B) Such term does not include--

      (i) any mixture,

      (ii) any pesticide (as defined in the Federal Insecticide, Fungicide, and Rodenticide Act [*7 USCS §§ 136* et seq.]) when manufactured, processed, or distributed in commerce for use as a pesticide,

      (iii) tobacco or any tobacco product,

      (iv) any source material, special nuclear material, or byproduct material (as such terms are defined in the Atomic Energy Act of 1954 [*42 USCS §§ 2011* et seq.] and regulations issued under such Act),

      (v) any article the sale of which is subject to the tax imposed by *section 4181 of the Internal Revenue Code of 1954* [1986] [*26 USCS § 4181*] (determined without regard to any exemptions from such tax provided by section 4182 or 4221 [*26 USCS § 4182* or *4221*] or any other provision of such Code), and

      (vi) any food, food additive, drug, cosmetic, or device (as such terms are defined in section 201 of the Federal Food, Drug, and Cosmetic Act [*21 USCS § 321*]) when manufactured, processed, or distributed in commerce for use as a food, food additive, drug, cosmetic, or device.

    The term "food" as used in clause (vi) of this subparagraph includes poultry and poultry products (as defined in sections 4(e) and 4(f) of the Poultry Products Inspection Act [*21 USCS § 453(e)* and 4(f)]), meat and meat food products (as defined in section 1(j) of the Federal Meat Inspection Act [*21 USCS § 601(j)*]), and eggs and egg products (as defined in section 4 of the Egg Products Inspection Act [*21 USCS § 1033*]).

  (3) The term "commerce" means trade, traffic, transportation, or other commerce (A) between a place in a State and any place outside of such State, or (B) which affects trade, traffic, transportation, or commerce described in clause (A).

  (4) The terms "distribute in commerce" and "distribution in commerce" when used to describe an action taken with respect to a chemical substance or mixture or article containing a substance or mixture mean to sell, or the sale of, the substance, mixture, or article in commerce; to introduce or deliver for introduction into commerce, or the introduction or delivery for

introduction into commerce of, the substance, mixture, or article; or to hold, or the holding of, the substance, mixture, or article after its introduction into commerce.

(5) The term "environment" includes water, air, and land and the interrelationship which exists among and between water, air, and land and all living things.

(6) The term "health and safety study" means any study of any effect of a chemical substance or mixture on health or the environment or on both, including underlying data and epidemiological studies, studies of occupational exposure to a chemical substance or mixture, toxicological, clinical, and ecological studies of a chemical substance or mixture, and any test performed pursuant to this Act [*15 USCS §§ 2601* et seq.].

(7) The term "manufacture" means to import into the customs territory of the United States (as defined in general note 2 of the Harmonized Tariff Schedule of the United States), produce, or manufacture.

(8) The term "mixture" means any combination of two or more chemical substances if the combination does not occur in nature and is not, in whole or in part, the result of a chemical reaction; except that such term does include any combination which occurs, in whole or in part, as a result of a chemical reaction if none of the chemical substances comprising the combination is a new chemical substance and if the combination could have been manufactured for commercial purposes without a chemical reaction at the time the chemical substances comprising the combination were combined.

(9) The term "new chemical substance" means any chemical substance which is not included in the chemical substance list compiled and published under section 8(b) [*15 USCS § 2607(b)*].

(10) The term "process" means the preparation of a chemical substance or mixture, after its manufacture, for distribution in commerce--

(A) in the same form or physical state as, or in a different form or physical state from, that in which it was received by the person so preparing such substance or mixture, or

(B) as part of an article containing the chemical substance or mixture.

(11) The term "processor" means any person who processes a chemical substance or mixture.

(12) The term "standards for the development of test data" means a prescription of--

(A) the--

(i) health and environmental effects, and

(ii) information relating to toxicity, persistence, and other characteristics which affect health and the environment,

for which test data for a chemical substance or mixture are to be developed and any analysis that is to be performed on such data, and

(B) to the extent necessary to assure that data respecting such effects and characteristics are reliable and adequate--

(i) the manner in which such data are to be developed,

(ii) the specification of any test protocol or methodology to be employed in the development of such data, and

(iii) such other requirements as are necessary to provide such assurance.

(13) The term "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Canal Zone, American Samoa, the Northern Mariana Islands, or any other territory or possession of the United States.

(14) The term "United States", when used in the geographic sense, means all of the States.

TITLE 15. COMMERCE AND TRADE
CHAPTER 53. TOXIC SUBSTANCES CONTROL
CONTROL OF TOXIC SUBSTANCES

**15 U.S.C. § 2605**

§ 2605.  Regulation of hazardous chemical substances and mixtures

(a) Scope of regulation.  If the Administrator finds that there is a reasonable basis to conclude that the manufacture, processing, distribution in commerce, use, or disposal of a chemical substance or mixture, or that any combination of such activities, presents or will present an unreasonable risk of injury to health or the environment, the Administrator shall by rule apply one or more of the following requirements to such substance or mixture to the extent necessary to protect adequately against such risk using the least burdensome requirements:

  (1) A requirement (A) prohibiting the manufacturing, processing, or distribution in commerce of such substance or mixture, or (B) limiting the amount of such substance or mixture which may be manufactured, processed, or distributed in commerce.

  (2) A requirement--

    (A) prohibiting the manufacture, processing, or distribution in commerce of such substance or mixture for (i) a particular use or (ii) a particular use in a concentration in excess of a level specified by the Administrator in the rule imposing the requirement, or

    (B) limiting the amount of such substance or mixture which may be manufactured, processed, or distributed in commerce for (i) a particular use or (ii) a particular use in a concentration in excess of a level specified by the Administrator in the rule imposing the requirement.

  (3) A requirement that such substance or mixture or any article containing such substance or mixture be marked with or accompanied by clear and adequate warnings and instructions with respect to its use, distribution in commerce, or disposal or with respect to any combination of such activities. The form and content of such warnings and instructions shall be prescribed by the Administrator.

  (4) A requirement that manufacturers and processors of such substance or mixture make and retain records of the processes used to manufacture or process such substance or mixture and monitor or conduct tests which are reasonable and necessary to assure compliance with the requirements of any rule applicable under this subsection.

  (5) A requirement prohibiting or otherwise regulating any manner or method of commercial use of such substance or mixture.

  (6) (A) A requirement prohibiting or otherwise regulating any manner or method of disposal of such substance or mixture, or of any article containing such substance or mixture, by its manufacturer or processor or by any other person who uses, or disposes of, it for commercial purposes.

    (B) A requirement under subparagraph (A) may not require any person to take any action which would be in violation of any law or requirement of, or in effect for, a State or political subdivision, and shall require each person subject to it to notify each State and political subdivision in which a required disposal may occur of such disposal.

  (7) A requirement directing manufacturers or processors of such substance or mixture (A) to give notice of such unreasonable risk of injury to distributors in commerce of such substance or

mixture and, to the extent reasonably ascertainable, to other persons in possession of such substance or mixture or exposed to such substance or mixture, (B) to give public notice of such risk of injury, and (C) to replace or repurchase such substance or mixture as elected by the person to which the requirement is directed.

Any requirement (or combination of requirements) imposed under this subsection may be limited in application to specified geographic areas.

(b) Quality control.  If the Administrator has a reasonable basis to conclude that a particular manufacturer or processor is manufacturing or processing a chemical substance or mixture in a manner which unintentionally causes the chemical substance or mixture to present or which will cause it to present an unreasonable risk of injury to health or the environment--
   (1) the Administrator may by order require such manufacturer or processor to submit a description of the relevant quality control procedures followed in the manufacturing or processing of such chemical substance or mixture; and
   (2) if the Administrator determines--
      (A) that such quality control procedures are inadequate to prevent the chemical substance or mixture from presenting such risk of injury, the Administrator may order the manufacturer or processor to revise such quality control procedures to the extent necessary to remedy such inadequacy; or
      (B) that the use of such quality control procedures has resulted in the distribution in commerce of chemical substances or mixtures which present an unreasonable risk of injury to health or the environment, the Administrator may order the manufacturer or processor to (i) give notice of such risk to processors or distributors in commerce of any such substance or mixture, or to both, and, to the extent reasonably ascertainable, to any other person in possession of or exposed to any such substance, (ii) to give public notice of such risk, and (iii) to provide such replacement or repurchase of any such substance or mixture as is necessary to adequately protect health or the environment.
   A determination under subparagraph (A) or (B) of paragraph (2) shall be made on the record after opportunity for hearing in accordance with *section 554 of title 5, United States Code*. Any manufacturer or processor subject to a requirement to replace or repurchase a chemical substance or mixture may elect either to replace or repurchase the substance or mixture and shall take either such action in the manner prescribed by the Administrator.

(c) Promulgation of subsection (a) rules.
   (1) In promulgating any rule under subsection (a) with respect to a chemical substance or mixture, the Administrator shall consider and publish a statement with respect to--
      (A) the effects of such substance or mixture on health and the magnitude of the exposure of human beings to such substance or mixture,
      (B) the effects of such substance or mixture on the environment and the magnitude of the exposure of the environment to such substance or mixture,
      (C) the benefits of such substance or mixture for various uses and the availability of substitutes for such uses, and
      (D) the reasonably ascertainable economic consequences of the rule, after consideration of the effect on the national economy, small business, technological innovation, the environment, and public health.

If the Administrator determines that a risk of injury to health or the environment could be eliminated or reduced to a sufficient extent by actions taken under another Federal law (or laws) administered in whole or in part by the Administrator, the Administrator may not promulgate a rule under subsection (a) to protect against such risk of injury unless the Administrator finds, in the Administrator's discretion, that it is in the public interest to protect against such risk under this Act [*15 USCS §§ 2601* et seq.]. In making such a finding the Administrator shall consider (i) all relevant aspects of the risk, as determined by the Administrator in the Administrator's discretion, (ii) a comparison of the estimated costs of complying with actions taken under this Act [*15 USCS §§ 2601* et seq.] and under such law (or laws), and (iii) the relative efficiency of actions under this Act [*15 USCS §§ 2601* et seq.] and under such law (or laws) to protect against such risk of injury.

(2) When prescribing a rule under subsection (a) the Administrator shall proceed in accordance with *section 553 of title 5, United States Code* (without regard to any reference in such section to sections 556 and 557 of such title), and shall also (A) publish a notice of proposed rulemaking stating with particularity the reason for the proposed rule; (B) allow interested persons to submit written data, views, and arguments, and make all such submissions publicly available; (C) provide an opportunity for an informal hearing in accordance with paragraph (3); (D) promulgate, if appropriate, a final rule based on the matter in the rulemaking record (as defined in section 19(a) [*15 USCS § 2618(a)*]), and (E) make and publish with the rule the finding described in subsection (a).

(3) Informal hearings required by paragraph (2)(C) shall be conducted by the Administrator in accordance with the following requirements:

(A) Subject to subparagraph (B), an interested person is entitled--

(i) to present such person's position orally or by documentary submissions (or both), and

(ii) if the Administrator determines that there are disputed issues of material fact it is necessary to resolve, to present such rebuttal submissions and to conduct (or have conducted under subparagraph (B)(ii)) such cross-examination of persons as the Administrator determines (I) to be appropriate, and (II) to be required for a full and true disclosure with respect to such issues.

(B) The Administrator may prescribe such rules and make such rulings concerning procedures in such hearings to avoid unnecessary costs or delay. Such rules or rulings may include (i) the imposition of reasonable time limits on each interested person's oral presentations, and (ii) requirements that any cross-examination to which a person may be entitled under subparagraph (A) be conducted by the Administrator on behalf of that person in such manner as the Administrator determines (I) to be appropriate, and (II) to be required for a full and true disclosure with respect to disputed issues of material fact.

(C) (i) Except as provided in clause (ii), if a group of persons each of whom under subparagraphs (A) and (B) would be entitled to conduct (or have conducted) cross-examination and who are determined by the Administrator to have the same or similar interests in the proceeding cannot agree upon a single representative of such interests for purposes of cross-examination, the Administrator may make rules and rulings (I) limiting the representation of such interest for such purposes, and (II) governing the manner in which such cross-examination shall be limited.

(ii) When any person who is a member of a group with respect to which the Administrator has made a determination under clause (i) is unable to agree upon group representation with the other members of the group, then such person shall not be denied under the authority of clause (i)

the opportunity to conduct (or have conducted) cross-examination as to issues affecting the person's particular interests if (I) the person satisfies the Administrator that the person has made a reasonable and good faith effort to reach agreement upon group representation with the other members of the group and (II) the Administrator determines that there are substantial and relevant issues which are not adequately presented by the group representative.

(D) A verbatim transcript shall be taken of any oral presentation made, and cross-examination conducted in any informal hearing under this subsection. Such transcript shall be available to the public.

(4) (A) The Administrator may, pursuant to rules prescribed by the Administrator, provide compensation for reasonable attorneys' fees, expert witness fees, and other costs of participating in a rulemaking proceeding for the promulgation of a rule under subsection (a) to any person--

(i) who represents an interest which would substantially contribute to a fair determination of the issues to be resolved in the proceeding, and

(ii) if--

(I) the economic interest of such person is small in comparison to the costs of effective participation in the proceeding by such person, or

(II) such person demonstrates to the satisfaction of the Administrator that such person does not have sufficient resources adequately to participate in the proceeding without compensation under this subparagraph.

In determining for purposes of clause (i) if an interest will substantially contribute to a fair determination of the issues to be resolved in a proceeding, the Administrator shall take into account the number and complexity of such issues and the extent to which representation of such interest will contribute to widespread public participation in the proceeding and representation of a fair balance of interests for the resolution of such issues.

(B) In determining whether compensation should be provided to a person under subparagraph (A) and the amount of such compensation, the Administrator shall take into account the financial burden which will be incurred by such person in participating in the rulemaking proceeding. The Administrator shall take such action as may be necessary to ensure that the aggregate amount of compensation paid under this paragraph in any fiscal year to all persons who, in rulemaking proceedings in which they receive compensation, are persons who either--

(i) would be regulated by the proposed rule, or

(ii) represent persons who would be so regulated,

may not exceed 25 per centum of the aggregate amount paid as compensation under this paragraph to all persons in such fiscal year.

(5) Paragraph (1), (2), (3), and (4) of this subsection apply to the promulgation of a rule repealing, or making a substantive amendment to, a rule promulgated under subsection (a).

(d) Effective date.

(1) The Administrator shall specify in any rule under subsection (a) the date on which it shall take effect, which date shall be as soon as feasible.

(2) (A) The Administrator may declare a proposed rule under subsection (a) to be effective upon its publication in the Federal Register and until the effective date of final action taken, in accordance with subparagraph (B), respecting such rule if--

(i) the Administrator determines that--

(I) the manufacture, processing, distribution in commerce, use, or disposal of the chemical substance or mixture subject to such proposed rule or any combination of such

activities is likely to result in an unreasonable risk of serious or widespread injury to health or the environment before such effective date; and

(II) making such proposed rule so effective is necessary to protect the public interest; and

(ii) in the case of a proposed rule to prohibit the manufacture, processing, or distribution of a chemical substance or mixture because of the risk determined under clause (i)(I), a court has in an action under section 7 [*15 USCS § 2606*] granted relief with respect to such risk associated with such substance or mixture.

Such a proposed rule which is made so effective shall not, for purposes of judicial review, be considered final agency action.

(B) If the Administrator makes a proposed rule effective upon its publication in the Federal Register, the Administrator shall, as expeditiously as possible, give interested persons prompt notice of such action, provide reasonable opportunity, in accordance with paragraphs (2) and (3) of subsection (c), for a hearing on such rule, and either promulgate such rule (as proposed or with modifications) or revoke it; and if such a hearing is requested, the Administrator shall commence the hearing within five days from the date such request is made unless the Administrator and the person making the request agree upon a later date for the hearing to begin, and after the hearing is concluded the Administrator shall, within ten days of the conclusion of the hearing, either promulgate such rule (as proposed or with modifications) or revoke it.

(e) Polychlorinated biphenyls.

(1) Within six months after the effective date of this Act [*15 USCS § 2601* effective date note] the Administrator shall promulgate rules to--

(A) prescribe methods for the disposal of polychlorinated biphenyls, and

(B) require polychlorinated biphenyls to be marked with clear and adequate warnings, and instructions with respect to their processing, distribution in commerce, use, or disposal or with respect to any combination of such activities.

Requirements prescribed by rules under this paragraph shall be consistent with the requirements of paragraphs (2) and (3).

(2) (A) Except as provided under subparagraph (B), effective one year after the effective date of this Act [*15 USCS § 2601* effective date note] no person may manufacture, process, or distribute in commerce or use any polychlorinated biphenyl in any manner other than in a totally enclosed manner.

(B) The Administrator may by rule authorize the manufacture, processing, distribution in commerce or use (or any combination of such activities) of any polychlorinated biphenyl in a manner other than in a totally enclosed manner if the Administrator finds that such manufacture, processing, distribution in commerce, or use (or combination of such activities) will not present an unreasonable risk of injury to health or the environment.

(C) For the purposes of this paragraph, the term "totally enclosed manner" means any manner which will ensure that any exposure of human beings or the environment to a polychlorinated biphenyl will be insignificant as determined by the Administrator by rule.

(3) (A) Except as provided in subparagraphs (B), (C), and (D)--

(i) no person may manufacture any polychlorinated biphenyl after two years after the effective date of this Act [*15 USCS § 2601* effective date note], and

(ii) no person may process or distribute in commerce any polychlorinated biphenyl after two and one-half years after such date [*15 USCS § 2601* effective date note].

(B) Any person may petition the Administrator for an exemption from the requirements of subparagraph (A), and the Administrator may grant by rule such an exemption if the Administrator finds that--

(i) an unreasonable risk of injury to health or environment would not result, and

(ii) good faith efforts have been made to develop a chemical substance which does not present an unreasonable risk of injury to health or the environment and which may be substituted for such polychlorinated biphenyl.

An exemption granted under this subparagraph shall be subject to such terms and conditions as the Administrator may prescribe and shall be in effect for such period (but not more than 1 year from the date it is granted, except as provided in subparagraph (D)) as the Administrator may prescribe.

(C) Subparagraph (A) shall not apply to the distribution in commerce of any polychlorinated biphenyl if such polychlorinated biphenyl was sold for purposes other than resale before two and one half years after the date of enactment of this Act [enacted Oct. 11, 1976].

(D) The Administrator may extend an exemption granted pursuant to subparagraph (B) that has not yet expired for a period not to exceed 60 days for the purpose of authorizing the Secretary of Defense and the Secretaries of the military departments to provide for the transportation into the customs territory of the United States of polychlorinated biphenyls generated by or under the control of the Department of Defense for purposes of their disposal, treatment, or storage in the customs territory of the United States if those polychlorinated biphenyls are already in transit from their storage locations but the Administrator determines, in the sole discretion of the Administrator, they would not otherwise arrive in the customs territory of the United States within the period of the original exemption. The Administrator shall promptly publish notice of such extension in the Federal Register.

(4) Any rule under paragraph (1), (2)(B), or (3)(B) shall be promulgated in accordance with paragraphs (2), (3), and (4) of subsection (c).

(5) This subsection does not limit the authority of the Administrator, under any other provision of this Act [*15 USCS §§ 2601* et seq.] or any other Federal law, to take action respecting any polychlorinated biphenyl.

(f) Mercury.

(1) Prohibition on sale, distribution, or transfer of elemental mercury by federal agencies. Except as provided in paragraph (2), effective beginning on the date of enactment of this subsection [enacted Oct. 14, 2008], no Federal agency shall convey, sell, or distribute to any other Federal agency, any State or local government agency, or any private individual or entity any elemental mercury under the control or jurisdiction of the Federal agency.

(2) Exceptions. Paragraph (1) shall not apply to--

(A) a transfer between Federal agencies of elemental mercury for the sole purpose of facilitating storage of mercury to carry out this Act [*15 USCS §§ 2601* et seq.]; or

(B) a conveyance, sale, distribution, or transfer of coal.

(3) Leases of Federal coal. Nothing in this subsection prohibits the leasing of coal.

**15 U.S.C. § 2620**

§ 2620. Citizens' petitions

(a) In general.  Any person may petition the Administrator to initiate a proceeding for the issuance, amendment, or repeal of a rule under section 4, 6, or 8 [*15 USCS § 2603*, *2605*, or *2607*] or an order under section 5(e) or (6)(b)(2) [*15 USCS § 2604(e)* or *2605(b)(2)*].

(b) Procedures.
  (1) Such petition shall be filed in the principal office of the Administrator and shall set forth the facts which it is claimed establish that it is necessary to issue, amend, or repeal a rule under section 4, 6, or 8 [*15 USCS § 2603*, *2605*, or *2607*] or an order under section 5(e), 6(b)(1)(A), or 6(b)(1)(B) [*15 USCS § 2604(e)*, *2605(b)(1)(A)*, or (B)].
  (2) The Administrator may hold a public hearing or may conduct such investigation or proceeding as the Administrator deems appropriate in order to determine whether or not such petition should be granted.
  (3) Within 90 days after filing of a petition described in paragraph (1), the Administrator shall either grant or deny the petition. If the Administrator grants such petition, the Administrator shall promptly commence an appropriate proceeding in accordance with section 4, 5, 6, or 8 [*15 USCS § 2603-2605*, or *2607*]. If the Administrator denies such petition, the Administrator shall publish in the Federal Register the Administrator's reasons for such denial.
  (4) (A) If the Administrator denies a petition filed under this section (or if the Administrator fails to grant or deny such petition within the 90-day period) the petitioner may commence a civil action in a district court of the United States to compel the Administrator to initiate a rulemaking proceeding as requested in the petition. Any such action shall be filed within 60 days after the Administrator's denial of the petition or, if the Administrator fails to grant or deny the petition within 90 days after filing the petition, within 60 days after the expiration of the 90-day period.
  (B) In an action under subparagraph (A) respecting a petition to initiate a proceeding to issue a rule under section 4, 6, or 8 [*15 USCS § 2603*, *2605*, or *2607*] or an order under section 5(e) or 6(b)(2) [*15 USCS § 2604(e)* or *2605(b)(2)*], the petitioner shall be provided an opportunity to have such petition considered by the court in a de novo proceeding. If the petitioner demonstrates to the satisfaction of the court by a preponderance of the evidence that--
    (i) in the case of a petition to initiate a proceeding for the issuance of a rule under section 4 [*15 USCS § 2603*] or an order under section 5(e) [*15 USCS § 2604(e)*]--
      (I) information available to the Administrator is insufficient to permit a reasoned evaluation of the health and environmental effects of the chemical substance to be subject to such rule or order; and
      (II) in the absence of such information, the substance may present an unreasonable risk to health or the environment, or the substance is or will be produced in substantial quantities and it enters or may reasonably be anticipated to enter the environment in substantial quantities or there is or may be significant or substantial human exposure to it; or

(ii) in the case of a petition to initiate a proceeding for the issuance of a rule under section 6 or 8 [*15 USCS § 2605 or 2607*] or an order under section 6(b)(2) [*15 USCS § 2605(b)(2)*], there is a reasonable basis to conclude that the issuance of such a rule or order is necessary to protect health or the environment against an unreasonable risk of injury to health or the environment.[;]

the court shall order the Administrator to initiate the action requested by the petitioner. If the court finds that the extent of the risk to health or the environment alleged by the petitioner is less than the extent of risks to health or the environment with respect to which the Administrator is taking action under this Act [*15 USCS §§ 2601* et seq.] and there are insufficient resources available to the Administrator to take the action requested by the petitioner, the court may permit the Administrator to defer initiating the action requested by the petitioner until such time as the court prescribes.

(C) The court in issuing any final order in any action brought pursuant to subparagraph (A) may award costs of suit and reasonable fees for attorneys and expert witnesses if the court determines that such an award is appropriate. Any court, in issuing its decision in an action brought to review such an order, may award costs of suit and reasonable fees for attorneys if the court determines that such an award is appropriate.

(5) The remedies under this section shall be in addition to, and not in lieu of, other remedies provided by law.

**26 U.S.C. § 4181**

§ 4181.  Imposition of tax.

There is hereby imposed upon the sale by the manufacturer, producer, or importer of the following articles a tax equivalent to the specified percent of the price for which so sold:

  Articles taxable at 10 percent--
    Pistols.
    Revolvers.
  Articles taxable at 11 percent--
    Firearms (other than pistols and revolvers).
    Shells, and cartridges.

TITLE 27 -- ALCOHOL, TOBACCO PRODUCTS AND FIREARMS
CHAPTER I -- ALCOHOL AND TOBACCO TAX AND TRADE BUREAU,
DEPARTMENT OF THE TREASURY
SUBCHAPTER C -- FIREARMS
PART 53 -- MANUFACTURERS EXCISE TAXES -- FIREARMS AND AMMUNITION
SUBPART G -- TAX RATES

**27 C.F.R. 53.61**

§ 53.61 Imposition and rates of tax.


(a) Imposition of tax. Section 4181 of the Code imposes a tax on the sale of the following articles by the manufacturer, producer, or importer thereof:

(1) Pistols;

(2) Revolvers;

(3) Firearms (other than pistols and revolvers); and

(4) Shells and cartridges.

(b) Parts or accessories. (1) In general. No tax is imposed by section 4181 of the Code on the sale of parts or accessories of firearms, pistols, revolvers, shells, and cartridges when sold separately or when sold with a complete firearm for use as spare parts or accessories. The tax does attach, however, to sales of completed firearms, pistols, revolvers, shells, and cartridges, and to sale of such articles that, although in knockdown condition, are complete as to all component parts.

(2) Component parts. Component parts are items that would ordinarily be attached to a firearm during use and, in the ordinary course of trade, are packaged with the firearm at the time of sale by the manufacturer or importer. All component parts for firearms are includible in the price for which the article is sold.

(3) Nontaxable parts. Parts sold with firearms that duplicate component parts that are not includible in the price for which the article is sold.

(4) Nontaxable accessories. Items that are not designed to be attached to a firearm during use or that are not, in the ordinary course of trade, provided with the firearm at the time of the sale by the manufacturer or importer are not includible in the price for which the article is sold.

(5) Examples. (i) In general. The following examples are provided as guidelines and are not meant to be all inclusive.

(ii) Component parts. Component parts include items such as a frame or receiver, breech mechanism, trigger mechanism, barrel, buttstock, forestock, handguard, grips, buttplate, fore end cap, trigger guard, sight or set of sights (iron or optical), sight mount or set of sight mounts, a choke, a flash hider, a muzzle brake, a magazine, a set of sling swivels, and/or an attachable ramrod for muzzle loading firearms when provided by the manufacturer or importer for use with the firearm in the ordinary course of commercial trade. Component parts also include any part

provided with the firearm that would affect the tax status of the firearm, such as an attachable shoulder stock.

(iii) Nontaxable parts. Nontaxable parts include items such as extra barrels, extra sights, optical sights and mounts (in addition to iron sights), spare magazines, spare cylinders, extra choke tubes, and spare pins.

(iv) Nontaxable accessories. Nontaxable accessories include items such as cleaning equipment, slings, slip on recoil pads (in addition to standard buttplate), tools, gun cases for storage or transportation, separate items such as knives, belt buckles, or medallions. Nontaxable accessories also include optional items purchased by the customer at the time of retail sale that do not change the tax classification of the firearm, such as telescopic sights and mounts, recoil pads, slings, sling swivels, chokes, and flash hiders/muzzle brakes of a type not provided by the manufacturer or importer of the firearm in the ordinary course of commercial trade.

(c) Rates of tax. Tax is imposed on the sale of the articles specified in section 4181 of the Code at the rates indicated below.

|                                                  | Percent |
|--------------------------------------------------|---------|
| (1) Pistols                                      | 10      |
| (2) Revolvers                                    | 10      |
| (3) Firearms (other than pistols and revolvers)  | 11      |
| (4) Shells and cartridges                        | 11      |

(d) Computation of tax. The tax is computed by applying to the price for which the article is sold the applicable rate. For definition of the term "price" see section 4216 of the Code and the regulations contained in Subpart J of this part.

(e) Liability for tax. The tax imposed by section 4181 of the Code is payable by the manufacturer, producer, or importer making the sale.