ORAL ARGUMENT NOT YET SCHEDULED

**Case No. 13-5228**

---

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**TRUMPETER SWAN SOCIETY, et al.**
**Appellants,**

**v.**

**ENVIRONMENTAL PROTECTION AGENCY, et al.**
**Appellees**

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

**JOINT APPENDIX**

---

William J. Snape, III
    (DC Bar No. 455266)
CENTER FOR BIOLOGICAL
DIVERSITY
1411 K Street NW, Suite 1300
Washington, DC 20005
Telephone: 202-536-9351
Facsimile: 415-436-9683
billsnape@earthlink.net

Adam F. Keats (CA Bar No. 191157)
CENTER FOR BIOLOGICAL
DIVERSITY
351 California Street, Suite 600
San Francisco, CA 94104
Telephone: 415-436-9682 x304
Facsimile: 415-436-9683
akeats@biologicaldiversity.org

Dated: March 25, 2014

# TABLE OF CONTENTS

I.  **Docket Entries from U.S. District Court for the District of Columbia Case No. 12-00929**

**Civil Docket** .....................................................................................JA 001

**Docket Entry #10-3:** 6/25/2012 Motion to Intervene, Exhibit 3: Declaration of Lawrence G. Keane ...........................................JA 010

**Docket Entry #12:** 7/10/2012 Amended Complaint Against Environmental Protection Agency, et al ................................... JA 013

**Docket Entry #27-2:** 8/3/2010 Exhibit 1: Petition to the Environmental Protection Agency to Ban Lead Shot, Bullets, and Fishing Sinkers Under the Toxic Substances Control Act....................................JA 020

**Docket Entry #27-3:** 8/27/2010 Exhibit 2: Letter from Environmental Protection Agency ....................................................................JA 042

**Docket Entry #27-4:** 3/13/2012 Exhibit 3: Petition to the Environmental Protection Agency to Regulate Lead Bullets and Shot Under the Toxic Substances Control Act .............................................................JA 043

**Docket Entry #27-5:** 4/9/2012 Exhibit 4: Letter from Environmental Protection Agency ....................................................................JA 150

**Docket Entry #27-8:** 8/31/2012 Exhibit 7: Manufacturer's Report – Preliminary Assessment Information ........................................JA 152

**Docket Entry #30-1:** 9/13/2012 Attachment: Declaration by Adam Keats in Support of Opposition to Motion to Dismiss...............JA 156

**Docket Entry #44:** 7/22/2013 Order Dismissing Case .................JA 169

**Docket Entry #46:** 11/13/2013 Pages from the Transcript of Proceedings held on 5/23/2013 .....................................................................JA 170

APPEAL,CLOSED,TYPE–C

## U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:12–cv–00929–EGS

TRUMPETER SWAN SOCIETY et al v. ENVIRONMENTAL PROTECTION AGENCY et al
Assigned to: Judge Emmet G. Sullivan
Case in other court:  13–05228
Cause: 15:2620 Toxic Substances Control Act

Date Filed: 06/07/2012
Date Terminated: 05/23/2013
Jury Demand: None
Nature of Suit: 893 Environmental Matters
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**TRUMPETER SWAN SOCIETY**  represented by  **William J. Snape , III**
LAW OFFICES OF WILLIAM J. SNAPE III
5268 Watson Street, NW
Washington, DC 20016
(202) 536–9351
Fax: (415) 436–9683
Email: billsnape@earthlink.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam F. Keats**
CENTER FOR BIOLOGICAL DIVERSITY
351 California Street
Suite 600
San Francisco, CA 94104
Email: akeats@biologicaldiversity.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jaclyn Lopez**
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 2155
St. Petersburg, FL 33731
(727) 490–9190
Fax: (415) 436–9683
Email: jlopez@biologicaldiversity.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CASCADES RAPTOR CENTER**  represented by  **William J. Snape , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam F. Keats**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jaclyn Lopez**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

represented by

**JA 001**

**CENTER FOR BIOLOGICAL DIVERSITY**

**William J. Snape , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam F. Keats**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jaclyn Lopez**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**LOON LAKE LOON ASSOCIATION**   represented by   **William J. Snape , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam F. Keats**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jaclyn Lopez**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PRESERVE OUR WILDLIFE ORGANIZATION**   represented by   **William J. Snape , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam F. Keats**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jaclyn Lopez**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TENNESSEE ORNITHOLOGICAL SOCIETY**   represented by   **William J. Snape , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam F. Keats**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jaclyn Lopez**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JA 002**

**Plaintiff**

**WESTERN NEBRASKA**
**RESOURCES COUNCIL**

represented by **William J. Snape , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam F. Keats**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jaclyn Lopez**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**UNITED STATES**
**ENVIRONMENTAL PROTECTION**
**AGENCY**

represented by **Justin D. Heminger**
U.S. DEPARTMENT OF JUSTICE
Environmental &Natural Resources
Division
601 D Street, NW
Suite 8000
Washington, DC 20004
(202) 514–2689
Fax: (202) 514–8865
Email: justin.heminger@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Madeline P. Fleisher**
U.S. DEPARTMENT OF JUSTICE
P.O. Box 23986
Washington, DC 20026–3986
(202) 514–0242
Email: madeline.fleisher@usdoj.gov
*TERMINATED: 05/13/2013*

**Defendant**

**LISA P. JACKSON**
*Administrator, Environmental Protection*
*Agency*

represented by **Justin D. Heminger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Madeline P. Fleisher**
(See above for address)
*TERMINATED: 05/13/2013*

**Intervenor**

**NATIONAL SHOOTING SPORTS**
**FOUNDATION, INC.**

represented by **Christopher L. Bell**
SIDLEY AUSTIN LLP
600 Travis Street
Suite 3100
Houston, TX 77002
(713) 315–9008
Fax: (713) 315–9199
Email: cbell@sidley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Roger R. Martella , Jr.**
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
202−736−8097
Fax: 202−736−8711
Email: rmartella@sidley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor**

**ASSOCIATION OF BATTERY RECYCLERS, INC.**  represented by  **Michael Steven Snarr**
BAKER HOSTETLER LLP
1050 Connecticut Avenue, NW
Suite 1100
Washington, DC 20036
(202) 861−1710
Fax: (202) 861−1783
Email: msnarr@bakerlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert N. Steinwurtzel**
BAKER &HOSTETLER LLP
1050 Connecticut Avenue, NW
Suite 1100
Washington, DC 20036
(202) 861−1708
Fax: (202) 861−1783
Email: rsteinwurtzel@bakerlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas Edward Hogan**
BAKER &HOSTETLER LLP
1050 Connecticut Avenue, NW
Suite 1100
Washington, DC 20004−2401
(202) 861−1577
Fax: (202) 861−1783
Email: thogan@bakerlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor**

**NATIONAL RIFLE ASSOCIATION OF AMERICA**  represented by  **Anna Margo Seidman**
SAFARI CLUB INTERNATIONAL
501 Second Street, NE
Washington, DC 20002
(202) 543−8733
Fax: (202) 543−1205
Email: aseidman@safariclub.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor**

**SAFARI CLUB INTERNATIONAL**  represented by  **Anna Margo Seidman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JA 004**

| Date Filed | # | Docket Text |
|---|---|---|
| 06/07/2012 | 1 | COMPLAINT *with injunctive relief* against All Defendants ( Filing fee $ 350 receipt number 0090–2961176) filed by TENNESSEE ORNITHOLOGICAL SOCIETY, CENTER FOR BIOLOGICAL DIVERSITY, WESTERN NEBRASKA RESOURCES COUNCIL, CASCADES RAPTOR CENTER, LOON LAKE LOON ASSOCIATION, TRUMPETER SWAN SOCIETY, PRESERVE OUR WILDLIFE ORGANIZATION. (Attachments: # 1 Civil Cover Sheet, # 2 Summons jackson, # 3 Summons epa)(Snape, William) (Entered: 06/07/2012) |
| 06/07/2012 | 2 | NOTICE *of additional summons* by CASCADES RAPTOR CENTER, CENTER FOR BIOLOGICAL DIVERSITY, LOON LAKE LOON ASSOCIATION, PRESERVE OUR WILDLIFE ORGANIZATION, TENNESSEE ORNITHOLOGICAL SOCIETY, TRUMPETER SWAN SOCIETY, WESTERN NEBRASKA RESOURCES COUNCIL re 1 Complaint, (Attachments: # 1 Summons Summons for AG and US Attorney for complaint filed today)(Snape, William) (Entered: 06/07/2012) |
| 06/07/2012 | 3 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by CASCADES RAPTOR CENTER, CENTER FOR BIOLOGICAL DIVERSITY, LOON LAKE LOON ASSOCIATION, PRESERVE OUR WILDLIFE ORGANIZATION, TENNESSEE ORNITHOLOGICAL SOCIETY, TRUMPETER SWAN SOCIETY, WESTERN NEBRASKA RESOURCES COUNCIL (Snape, William) (Entered: 06/07/2012) |
| 06/07/2012 | 4 | NOTICE OF RELATED CASE by CASCADES RAPTOR CENTER, CENTER FOR BIOLOGICAL DIVERSITY, LOON LAKE LOON ASSOCIATION, PRESERVE OUR WILDLIFE ORGANIZATION, TENNESSEE ORNITHOLOGICAL SOCIETY, TRUMPETER SWAN SOCIETY, WESTERN NEBRASKA RESOURCES COUNCIL. Case related to Case No. 10–2007. (Snape, William) (Entered: 06/07/2012) |
| 06/07/2012 | 5 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Adam Keats, :Firm– CBD, :Address– 351 California St, Suite 600, San Francisco, CA 94104. Phone No. – 415–436–9682. Fax No. – 415–436–9683 by CASCADES RAPTOR CENTER, CENTER FOR BIOLOGICAL DIVERSITY, LOON LAKE LOON ASSOCIATION, PRESERVE OUR WILDLIFE ORGANIZATION, TENNESSEE ORNITHOLOGICAL SOCIETY, TRUMPETER SWAN SOCIETY, WESTERN NEBRASKA RESOURCES COUNCIL (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Snape, William) (Entered: 06/07/2012) |
| 06/07/2012 | 6 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Jaclyn Lopez, :Firm– CBD, :Address– PO Box 2155, St. Petersburg, FL 33731. Phone No. – 727–490–9190. by CASCADES RAPTOR CENTER, CENTER FOR BIOLOGICAL DIVERSITY, LOON LAKE LOON ASSOCIATION, PRESERVE OUR WILDLIFE ORGANIZATION, TENNESSEE ORNITHOLOGICAL SOCIETY, TRUMPETER SWAN SOCIETY, WESTERN NEBRASKA RESOURCES COUNCIL (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Snape, William) (Entered: 06/07/2012) |
| 06/07/2012 | | Case Assigned to Judge Emmet G. Sullivan. (sth) (Entered: 06/07/2012) |
| 06/07/2012 | 7 | Electronic Summons (3) Issued as to ENVIRONMENTAL PROTECTION AGENCY, LISA P. JACKSON and the U.S. Attorney. (Attachments: # 1 Summons, # 2 Summons, # 3 Summons)(sth) (Entered: 06/07/2012) |
| 06/13/2012 | 8 | NOTICE of Appearance by Madeline P. Fleisher on behalf of ENVIRONMENTAL PROTECTION AGENCY, LISA P. JACKSON (Fleisher, Madeline) (Main Document 8 replaced on 6/14/2012) (jf, ). (Entered: 06/13/2012) |
| 06/14/2012 | 9 | ELECTRONIC SUMMONS(1) Issued as to U.S. Attorney General. (jeb, ) (Entered: 06/14/2012) |
| 06/18/2012 | | MINUTE ORDER granting 5 plaintiffs' motion for leave to appear pro hac vice. Adam Keats is hereby admitted pro hac vice in this action. Signed by Judge Emmet G. Sullivan on June 18, 2012. (lcegs6) (Entered: 06/18/2012) |

**JA 005**

| 06/18/2012 | | MINUTE ORDER granting 6 plaintiffs' motion for leave to appear pro hac vice. Jaclyn Lopez is hereby admitted pro hac vice in this action. Signed by Judge Emmet G. Sullivan on June 18, 2012. (lcegs6) (Entered: 06/18/2012) |
|---|---|---|
| 06/25/2012 | 10 | MOTION to Intervene as a Plaintiff by NATIONAL SHOOTING SPORTS FOUNDATION, INC. (Attachments: # 1 Exhibit 1 – Proposed Complaint, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Text of Proposed Order, # 5 Corporate Disclosure Statement)(znmw, ) (Entered: 06/25/2012) |
| 07/05/2012 | | MINUTE ORDER granting 10 National Shooting Sports Foundation's unopposed motion to intervene. It is FURTHER ORDERED that defendant–intervenor National Shooting Sports Foundation shall respond to the complaint on or before the date on which defendants Environmental Protection Agency and Lisa P. Jackson are required to respond. Signed by Judge Emmet G. Sullivan on July 5, 2012. (lcegs6) (Entered: 07/05/2012) |
| 07/05/2012 | 11 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests NONE by NATIONAL SHOOTING SPORTS FOUNDATION, INC. (jf, ) (Entered: 07/06/2012) |
| 07/10/2012 | 12 | AMENDED COMPLAINT against ENVIRONMENTAL PROTECTION AGENCY, LISA P. JACKSON filed by TENNESSEE ORNITHOLOGICAL SOCIETY, CENTER FOR BIOLOGICAL DIVERSITY, WESTERN NEBRASKA RESOURCES COUNCIL, CASCADES RAPTOR CENTER, LOON LAKE LOON ASSOCIATION, TRUMPETER SWAN SOCIETY, PRESERVE OUR WILDLIFE ORGANIZATION.(nmw, ) (Entered: 07/11/2012) |
| 07/11/2012 | 13 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. ENVIRONMENTAL PROTECTION AGENCY served on 6/29/2012 (Keats, Adam) (Entered: 07/11/2012) |
| 07/11/2012 | 14 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. LISA P. JACKSON served on 6/29/2012 (Keats, Adam) (Entered: 07/11/2012) |
| 07/11/2012 | 15 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 07/02/2012. (Keats, Adam) (Entered: 07/11/2012) |
| 07/11/2012 | 16 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 7/2/2012. Answer due for ALL FEDERAL DEFENDANTS by 8/31/2012. (Keats, Adam) (Entered: 07/11/2012) |
| 07/12/2012 | 17 | Unopposed MOTION to Intervene by ASSOCIATION OF BATTERY RECYCLERS, INC. (Attachments: # 1 Memorandum in Support, # 2 Declaration, # 3 Text of Proposed Order)(Steinwurtzel, Robert) (Entered: 07/12/2012) |
| 07/12/2012 | 18 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by ASSOCIATION OF BATTERY RECYCLERS, INC. (Steinwurtzel, Robert) (Entered: 07/12/2012) |
| 07/12/2012 | 19 | NOTICE of Appearance by Thomas Edward Hogan on behalf of ASSOCIATION OF BATTERY RECYCLERS, INC. (Hogan, Thomas) (Entered: 07/12/2012) |
| 07/12/2012 | 20 | NOTICE of Appearance by Robert N. Steinwurtzel on behalf of ASSOCIATION OF BATTERY RECYCLERS, INC. (Steinwurtzel, Robert) (Entered: 07/12/2012) |
| 07/12/2012 | 21 | NOTICE of Appearance by Michael Steven Snarr on behalf of ASSOCIATION OF BATTERY RECYCLERS, INC. (Snarr, Michael) (Entered: 07/12/2012) |
| 07/13/2012 | | NOTICE OF ERROR re 17 Motion to Intervene; emailed to rsteinwurtzel@bakerlaw.com, cc'd 11 associated attorneys –– The PDF file you docketed contained errors: 1. Counsel is reminded any filings requiring adding parties are to be sent the generic ecf e–mail accou (jf, ) (Entered: 07/13/2012) |
| 07/13/2012 | | MINUTE ORDER granting 17 Association of Battery Recyclers, Inc.'s unopposed motion to intervene. It is FURTHER ORDERED that defendant–intervenor Association of Battery Recyclers, Inc. shall respond to the complaint on or before the date on which defendants and defendant–intervenor National Shooting Sports |

| | | Foundation are required to respond. Signed by Judge Emmet G. Sullivan on July 13, 2012. (lcegs6) (Entered: 07/13/2012) |
|---|---|---|
| 07/30/2012 | 22 | MOTION to Intervene by NATIONAL RIFLE ASSOCIATION OF AMERICA, SAFARI CLUB INTERNATIONAL (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Text of Proposed Order, # 8 Certificate of Service, # 9 Corporate Disclosure Statement – NRA, # 10 Corporate Disclosure Statement – SCI)(znmw, ) (Entered: 07/31/2012) |
| 07/31/2012 | | MINUTE ORDER granting 22 National Rifle Association of America and Safari Club International's unopposed motion to intervene. It is FURTHER ORDERED that defendant–intervenors National Rifle Association of America and Safari Club International shall respond to the amended complaint on or before the date on which defendants and the other defendant–intervenors are required to respond. Signed by Judge Emmet G. Sullivan on July 31, 2012. (lcegs6) (Entered: 07/31/2012) |
| 07/31/2012 | 23 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by NATIONAL RIFLE ASSOCIATION OF AMERICA (znmw, ) (Entered: 08/01/2012) |
| 07/31/2012 | 24 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by SAFARI CLUB INTERNATIONAL (znmw, ) (Entered: 08/01/2012) |
| 08/30/2012 | 25 | MOTION to Dismiss by NATIONAL SHOOTING SPORTS FOUNDATION, INC. (Attachments: # 1 Memorandum in Support Memorandum, # 2 Exhibit Exhibit 1 – EPA Letter, # 3 Exhibit Exhibit 2 – Walker Decision, # 4 Text of Proposed Order Proposed Order)(Martella, Roger) (Entered: 08/30/2012) |
| 08/30/2012 | 26 | MOTION to Dismiss by ASSOCIATION OF BATTERY RECYCLERS, INC. (Steinwurtzel, Robert) (Entered: 08/30/2012) |
| 08/31/2012 | 27 | MOTION to Dismiss for Lack of Jurisdiction , MOTION to Dismiss *for Failure to State a Claim* by ENVIRONMENTAL PROTECTION AGENCY, LISA P. JACKSON (Attachments: # 1 Text of Proposed Order, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7)(Fleisher, Madeline) (Entered: 08/31/2012) |
| 08/31/2012 | 28 | MOTION to Dismiss by NATIONAL RIFLE ASSOCIATION OF AMERICA, SAFARI CLUB INTERNATIONAL (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Seidman, Anna) (Entered: 08/31/2012) |
| 09/04/2012 | 29 | NOTICE of Appearance by Christopher L. Bell on behalf of NATIONAL SHOOTING SPORTS FOUNDATION, INC. (Bell, Christopher) (Entered: 09/04/2012) |
| 09/13/2012 | 30 | Memorandum in opposition to re 28 MOTION to Dismiss , 27 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss *for Failure to State a Claim*, 25 MOTION to Dismiss , 26 MOTION to Dismiss filed by CASCADES RAPTOR CENTER, CENTER FOR BIOLOGICAL DIVERSITY, LOON LAKE LOON ASSOCIATION, TENNESSEE ORNITHOLOGICAL SOCIETY, TRUMPETER SWAN SOCIETY, WESTERN NEBRASKA RESOURCES COUNCIL. (Attachments: # 1 Declaration by Adam Keats in Support, # 2 Text of Proposed Order)(Keats, Adam) (Entered: 09/13/2012) |
| 09/20/2012 | 31 | REPLY to opposition to motion re 28 MOTION to Dismiss filed by NATIONAL RIFLE ASSOCIATION OF AMERICA, SAFARI CLUB INTERNATIONAL. (Seidman, Anna) (Entered: 09/20/2012) |
| 09/24/2012 | 32 | REPLY to opposition to motion re 27 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss *for Failure to State a Claim* filed by ENVIRONMENTAL PROTECTION AGENCY, LISA P. JACKSON. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Fleisher, Madeline) (Entered: 09/24/2012) |
| 09/24/2012 | 33 | REPLY to opposition to motion re 26 MOTION to Dismiss filed by ASSOCIATION OF BATTERY RECYCLERS, INC.. (Steinwurtzel, Robert) (Entered: 09/24/2012) |

**JA 007**

| 09/24/2012 | 34 | ENTERED IN ERROR.....REPLY to opposition to motion re 25 MOTION to Dismiss filed by NATIONAL SHOOTING SPORTS FOUNDATION, INC.. (Wedeking, James) Modified on 9/25/2012 (zjf, ). (Entered: 09/24/2012) |
| 09/25/2012 | | NOTICE OF ERROR re 34 Reply to opposition to Motion; emailed to jwedeking@sidley.com, cc'd 15 associated attorneys –– The PDF file you docketed contained errors: 1. Invalid attorney signature, 2. Please refile document, 3. Filing attorney not listed on the docket or no appearance (zjf, ) (Entered: 09/25/2012) |
| 09/25/2012 | | NOTICE OF ERROR re 34 Reply to opposition to Motion; emailed to jwedeking@sidley.com, cc'd 15 associated attorneys –– The PDF file you docketed contained errors: 1. Please refile document, 2. Document needs to be refiled by signing attorney login/password (zjf, ) (Entered: 09/25/2012) |
| 09/25/2012 | 35 | REPLY to opposition to motion re 25 MOTION to Dismiss by NATIONAL SHOOTING SPORTS FOUNDATION, INC (jeb, ) (Entered: 09/25/2012) |
| 09/25/2012 | | NOTICE OF CORRECTED DOCKET ENTRY: re 35 Reply to opposition to Motion was entered corrected to reflect that the opposition was to entry number 25 not 27 (jeb, ) (Entered: 09/25/2012) |
| 04/22/2013 | | MINUTE ORDER. The Court, sua sponte, schedules a hearing on 25 , 26 , 27 , 28 defendant and defendant–intervenors' motions to dismiss the amended complaint. The hearing will take place on May 23, 2013 at 2:00 p.m. in Courtroom 24A. Signed by Judge Emmet G. Sullivan on April 22, 2013. (lcegs1) (Entered: 04/22/2013) |
| 04/23/2013 | | Set/Reset Hearings: Motion Hearing set for 5/23/2013 02:00 PM in Courtroom 24A before Judge Emmet G. Sullivan. (clv, ) (Entered: 04/23/2013) |
| 05/13/2013 | 36 | NOTICE OF SUBSTITUTION OF COUNSEL by Justin D. Heminger on behalf of LISA P. JACKSON, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY Substituting for attorney Madeline Fleisher (Heminger, Justin) (Entered: 05/13/2013) |
| 05/20/2013 | 37 | NOTICE OF SUPPLEMENTAL AUTHORITY by CASCADES RAPTOR CENTER, CENTER FOR BIOLOGICAL DIVERSITY, LOON LAKE LOON ASSOCIATION, PRESERVE OUR WILDLIFE ORGANIZATION, TENNESSEE ORNITHOLOGICAL SOCIETY, TRUMPETER SWAN SOCIETY, WESTERN NEBRASKA RESOURCES COUNCIL (Keats, Adam) (Entered: 05/20/2013) |
| 05/21/2013 | | MINUTE ORDER. The Court, sua sponte, orders the government to respond to 37 plaintiffs' notice of supplemental authority by no later than 12:00 p.m. on May 22, 2013. Signed by Judge Emmet G. Sullivan on May 21, 2013. (lcegs1) (Entered: 05/21/2013) |
| 05/22/2013 | | Set/Reset Deadlines: government response to plaintiffs' notice of supplemental authority due by 12:00 p.m. on 5/22/2013 (clv, ) (Entered: 05/22/2013) |
| 05/22/2013 | 38 | ENTERED IN ERROR.....NOTICE OF SUPPLEMENTAL AUTHORITY by LISA P. JACKSON, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY (Heminger, Justin) Modified on 5/22/2013 (jf, ). (Entered: 05/22/2013) |
| 05/22/2013 | 39 | ENTERED IN ERROR.....NOTICE OF SUPPLEMENTAL AUTHORITY by NATIONAL SHOOTING SPORTS FOUNDATION, INC. (Martella, Roger) Modified on 5/23/2013 (jf, ). (Entered: 05/22/2013) |
| 05/22/2013 | 40 | RESPONSE re 37 NOTICE OF SUPPLEMENTAL AUTHORITY, filed by LISA P. JACKSON, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY. (jf, ) (Main Document 40 replaced on 5/22/2013) (jf, ). (Main Document 40 replaced on 5/23/2013) (td, ). (Entered: 05/22/2013) |
| 05/22/2013 | 41 | RESPONSE re 37 NOTICE OF SUPPLEMENTAL AUTHORITY, filed by NATIONAL SHOOTING SPORTS FOUNDATION, INC.. (jf, ) (Entered: 05/23/2013) |
| 05/23/2013 | | MINUTE ORDER. For the reasons stated on the record during the hearing held on May 23, 2013, the Court hereby grants 25 , 26 , 27 , and 28 defendants |

| | | |
|---|---|---|
| | | ENVIRONMENTAL PROTECTION AGENCY and LISA P. JACKSON and defendant–intervenors NATIONAL SHOOTING SPORTS FOUNDATION, INC, ASSOCIATION OF BATTERY RECYCLERS, NATIONAL RIFLE ASSOCIATION, and SAFARI CLUB INTERNATIONAL motions to dismiss the amended complaint. Signed by Judge Emmet G. Sullivan on May 23, 2013. (lcegs1) (Entered: 05/23/2013) |
| 05/23/2013 | | Minute Entry for proceedings held before Judge Emmet G. Sullivan.Motion Hearing held on 5/23/2013 re 28 MOTION to Dismiss filed by NATIONAL RIFLE ASSOCIATION OF AMERICA, SAFARI CLUB INTERNATIONAL, 27 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss *for Failure to State a Claim* filed by LISA P. JACKSON, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, 25 MOTION to Dismiss filed by NATIONAL SHOOTING SPORTS FOUNDATION, INC., and 26 MOTION to Dismiss filed by ASSOCIATION OF BATTERY RECYCLERS, INC. (Court Reporter SUSAN TYNER.) (mac) (Entered: 05/24/2013) |
| 07/09/2013 | 42 | NOTICE *of Request for Entry of Judgment* by CASCADES RAPTOR CENTER, CENTER FOR BIOLOGICAL DIVERSITY, LOON LAKE LOON ASSOCIATION, PRESERVE OUR WILDLIFE ORGANIZATION, TENNESSEE ORNITHOLOGICAL SOCIETY, TRUMPETER SWAN SOCIETY, WESTERN NEBRASKA RESOURCES COUNCIL re Order on Motion to Dismiss,, Order on Motion to Dismiss/Lack of Jurisdiction,,,,,,, (Keats, Adam) (Entered: 07/09/2013) |
| 07/22/2013 | 43 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to Order on Motion to Dismiss,, Order on Motion to Dismiss/Lack of Jurisdiction,,,,,,, by CASCADES RAPTOR CENTER, CENTER FOR BIOLOGICAL DIVERSITY, LOON LAKE LOON ASSOCIATION, PRESERVE OUR WILDLIFE ORGANIZATION, TENNESSEE ORNITHOLOGICAL SOCIETY, TRUMPETER SWAN SOCIETY, WESTERN NEBRASKA RESOURCES COUNCIL. Filing fee $ 455, receipt number 0090–3408395. Fee Status: Fee Paid. Parties have been notified. (Keats, Adam) (Entered: 07/22/2013) |
| 07/22/2013 | 44 | ORDER granting 25 , 26 , 27 , and 28 defendants' and defendant–intervenors' motions to dismiss. Signed by Judge Emmet G. Sullivan on July 22, 2013. (lcegs1) (Entered: 07/22/2013) |
| 07/23/2013 | 45 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date re 43 Notice of Appeal to DC Circuit Court,. (jf, ) (Entered: 07/23/2013) |
| 07/26/2013 | | USCA Case Number 13–5228 for 43 Notice of Appeal to DC Circuit Court, filed by CASCADES RAPTOR CENTER, TENNESSEE ORNITHOLOGICAL SOCIETY, TRUMPETER SWAN SOCIETY, PRESERVE OUR WILDLIFE ORGANIZATION, LOON LAKE LOON ASSOCIATION, CENTER FOR BIOLOGICAL DIVERSITY, WESTERN NEBRASKA RESOURCES COUNCIL. (jf, ) (Entered: 07/26/2013) |
| 11/13/2013 | 46 | TRANSCRIPT OF PROCEEDINGS before Judge Emmet G. Sullivan held on 5/23/13; Page Numbers: 78. Court Reporter/Transcriber susan tyner, Telephone number 2023543267, Court Reporter Email Address : susan_tyner@dcd.uscourts.gov.<P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<P>NOTICE RE REDACTION OF TRANSCRIPTS: The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at ww.dcd.uscourts.gov.<P></P> Redaction Request due 12/4/2013. Redacted Transcript Deadline set for 12/14/2013. Release of Transcript Restriction set for 2/11/2014.(Tyner, Susan) (Entered: 11/13/2013) |

**JA 009**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE TRUMPETER SWAN SOCIETY, *et al.*, ) | Case No. 1:12-cv-929 (EGS) |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| ENVIRONMENTAL PROTECTION ) | |
| AGENCY, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## DECLARATION OF LAWRENCE G. KEANE

I, Lawrence G. Keane, declare as follows:

1.      I am Senior Vice President, Assistant Secretary, and General Counsel to the National Shooting Sports Foundation, Inc. ("NSSF").

2.      I make this Declaration in support of NSSF's Motion to Intervene in *The Trumpeter Swan Society v. Environmental Protection Agency* (Case No. 1:12-cv-929 (EGS)) (the "*Trumpeter Swan Litigation*"). Unless otherwise stated, I make this Declaration based on my personal knowledge, or on information and belief relying on information collected by NSSF.

3.      Formed in 1961, NSSF is a Connecticut non-profit tax-exempt corporation with a membership of more than 7,000 federally-licensed firearms manufacturers, distributors, and retailers; companies manufacturing, distributing, and selling shooting and hunting-related goods and services; sportsmen's organizations; public and private shooting ranges; gun clubs; publishers; and individual recreational target shooters and hunters. NSSF's mission is to promote, protect and preserve hunting and the shooting sports, and support America's traditional hunting heritage and firearms freedoms.

4.      NSSF's members, and the ammunition and firearms industry as a whole, provide approximately 210,000 jobs in the U.S., and have an overall annual economic impact of almost $32 billion. More than 50 million hunters and target shooters in America purchase and use

traditional ammunition containing lead components.

5.    NSSF's members manufacture, distribute, sell, and use traditional ammunition made with lead components (the ammunition that a consumer purchases is made of a primer, propellant, the projectile (shot or bullet), and the casing).  Approximately 95% of the domestically manufactured ammunition is traditional ammunition made with lead bullets or shot, and over 90% of that domestically manufactured traditional ammunition is manufactured by NSSF members.

6.    NSSF's members' economic and legal interests will be directly affected by the outcome of the *Trumpeter Swan Litigation*.  Plaintiffs seek to use the Toxic Substances Control Act ("TSCA") to force the U.S. Environmental Protection Agency ("EPA") to prohibit or significantly restrict the manufacture and use of traditional ammunition.  This will significantly and negatively impact the interests of NSSF's members in at least the following ways:

a.    Domestic ammunition manufacturers will be required – at great cost – to re-design their products, retool or purchase new manufacturing equipment, and significantly change their manufacturing processes.  Ammunition is produced in high speed and high volume automated processes using expensive, close-tolerance, and purpose-built machinery.  Ammunition production relies on manufacturing know-how honed by decades of experience.  Each of the major manufacturers produces several million cartridges of traditional ammunition a day.  It is not possible to simply replace lead with alternative raw material in existing ammunition manufacturing processes.  Further, the efficacy, consumer acceptance and environmental, health, and safety impacts of substitutes would have to be evaluated in order to determine if a switch to alternative ammunition is even feasible.

b.    Domestic ammunition manufacturers operate in a very competitive economic environment, with very low profit margins.  Even if adequate alternatives for traditional ammunition were available and capable of being mass-produced, domestic manufacturers might not be able to obtain the capital needed, particularly in the current economic climate, to accomplish such a radical change to their ammunition manufacturing processes.

c. Assuming that alternative materials could be found for traditional mass-produced shot and bullets, such alternatives will be more expensive than existing ammunition. Based on research by organization, my understanding is that banning traditional ammunition will increase the cost of ammunition, on average, up to 190%. Such price increases will impose a burden on NSSF members, including sports shooters and hunters (and thus decrease the number of hunters), firearms dealers, shooting ranges, Federal and State law enforcement, and the U.S. military. Higher prices will not only mean reduced sales and the loss of related jobs, it will also cause a reduction in the collection of the Federal Firearms and Ammunition and Excise Tax ("FAET") (11% on taxable ammunition sales), which is a primary source of wildlife conservation funding in the U.S. All of the FAET goes to the U.S. Fish and Wildlife Service, which then distributes the funds to the States for wildlife and sport fish restoration.

d. Approximately 20% of the domestic ammunition market is currently held by imports from non-U.S. manufacturers. Since, under TSCA, EPA cannot regulate imported finished ammunition, non-U.S. manufacturers would still be able to sell into the U.S. market traditional ammunition even if the plaintiffs prevail in this litigation. This imported traditional ammunition will also be less costly to produce than the alternative ammunition that the plaintiffs demand EPA require of domestic manufacturers. Imposing restrictions on domestically manufactured ammunition that will not be applicable to imported ammunition will result in an increased market share for non-U.S. manufacturers and the loss of American jobs at NSSF member companies.

7. For these reasons, the economic and legal interests of NSSF and its members are directly at issue in this litigation, and will be significantly affected by its outcome.

Respectfully Submitted,

Lawrence G. Keane

3

**JA 012**

## INTRODUCTION

1.      Plaintiffs THE TRUMPETER SWAN SOCIETY, CASCADES RAPTOR CENTER, CENTER FOR BIOLOGICAL DIVERSITY, LOON LAKE LOON ASSOCIATION, PRESERVE OUR WILDLIFE ORGANIZATION, TENNESSEE ORNITHOLIGICAL SOCIETY, and WESTERN NEBRASKA RESOURCES COUNCIL (collectively "Plaintiffs") bring this civil action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq*, for review of the decision by Federal Defendants ENVIRONMENTAL PROTECTION AGENCY and LISA P. JACKSON, Administrator of the Environmental Protection Agency (collectively "the EPA") to regard Plaintiffs' petition to initiate a rulemaking proceeding under the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2601 *et seq*. for toxic lead bullets and shot ("Petition") as not cognizable under TSCA.  To the extent that the EPA's action constituted a denial of the Petition, or to the extent that the EPA's action constituted a failure to either grant or deny the Petition, Plaintiffs bring this action under Section 21 of TSCA 15 U.S.C. § 2620(b)(4)(B), for *de novo* review of the Petition.  This Amended Complaint amends, pursuant to Rule 15(a)(1)(A) of the Federal Rule of Civil Procedure, Plaintiffs' earlier complaint dated June 7, 2012.

2.      TSCA grants the EPA the broad authority to regulate chemical substances that "present an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2601.  The EPA may regulate the manufacture, processing, distribution, use or disposal of such chemical substances.  The EPA has already declared that lead is a toxic substance, and although it has implemented some regulations to reduce lead exposure, lead still remains widely distributed in the environment in the form of spent lead bullets and shot and regularly encountered by wildlife leading to harmful lead exposure.

3.      On March 13, 2012, Plaintiffs, along with 94 other organizations, submitted a petition to the EPA to initiate a rulemaking pursuant to Section 21 of TSCA. Petitioners submitted the petition because of the unreasonable risk posed by lead bullets

Amended Complaint for Declaratory and Injunctive Relief                                    Page 1
*The Trumpeter Swan Society et al. v. Environmental Protection Agency, et al.*  Case No. 12-CV-00929 EGS

**JA 013**

and shot, the widespread availability of alternatives to lead bullets and shot, and the EPA's authority to regulate these substances.  The Petition requested that the EPA initiate a rulemaking for regulations that adequately protect wildlife, human health and the environment against the unreasonable risk of injury from bullets and shot containing lead used in hunting and shooting sports, which have the potential to cause harmful lead exposure to wildlife and humans.

4.       By letter dated April 9, 2012, the EPA informed the petitioners that the EPA "does not consider the 2012 submission to be a new petition cognizable under section 21."  The EPA stated that it regarded the 2012 petition as substantially the same as a petition dated August 10, 2010, seeking the ban of lead shot, bullets, and fishing sinkers and claimed that to the extent there were differences between the two petitions, they were not substantive.

5.       In its April 9, 2012, letter, the EPA also stated that "even if the 2012 submission could be considered to be a request for reconsideration, EPA would deny it because the 2012 submission does not present significant newly discovered, non-cumulative material."

6.       The EPA further stated in its April 9, 2012, letter that "even if the 2012 submission were considered to be a new or different petition cognizable under section 21 of TSCA, EPA would deny it for the same reasons it denied the 2010 petition," citing 75 Fed. Reg. 58,377 at 58,378 (Sept. 24, 2010).

7.       The EPA took no other action than its April 9, 2012, letter to either grant or deny the Petition within the 90 days specified in Section 21 of TSCA. 15 U.S.C. § 2620(b)(3).

8.       The EPA wrongfully determined the Petition was not "cognizable" under TSCA and thus wrongfully disregarded it.  The EPA's actions were contrary to the plain language of TSCA, which requires the EPA to either grant or deny a petition within 90 days of its filing. 15 U.S.C. § 2620(b)(3).  TSCA does not authorize the EPA to redefine

Amended Complaint for Declaratory and Injunctive Relief                                    Page 2
*The Trumpeter Swan Society et al. v. Environmental Protection Agency, et al.*  Case No. 12-CV-00929 EGS

**JA 014**

Therefore, Plaintiffs ask that the Court order the EPA to initiate a rulemaking proceeding to develop and implement regulations that adequately protect wildlife, human health and the environment against the unreasonable risk of injury from bullets and shot containing lead used in hunting and shooting sports, which have the potential to cause harmful lead exposure to wildlife and humans.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction in this matter pursuant to 5 U.S.C. § 702 ("APA") and 15 U.S.C. § 2620(b)(4)(A) ("TSCA").

13.     Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e), because the Defendant resides in this district and a substantial part of the events and omissions which gave rise to this action occurred in this district.

## RELATED CASE

14.     Pursuant to Local Rule 40.5, this action is related to a previous action filed by one of the present Plaintiffs, Center for Biological Diversity, against the same Defendants in this action.  The previous action, *Center for Biological Diversity, et al. v. Jackson, et al.*, 10-CV-2007 (EGS), was dismissed by court order on April 30, 2012.  The previous action was brought under TSCA and concerned the EPA's denial of the 2010 petition.

## PARTIES

15.     Plaintiff THE TRUMPETER SWAN SOCIETY ("TTSS") is a 501(c)(3) non-profit corporation founded in 1968 and based in Minnesota.  TTSS works throughout North America to assure the vitality and welfare of wild Trumpeter Swans.  Trumpeter Swans are the largest species of waterfowl in the world and occur naturally only in North America.  By the 1930's Trumpeters were headed for extinction with fewer than 90 remaining in the United States, confined to the Greater Yellowstone area.  The efforts of conservation groups, private citizens, and public agencies have resulted in significant recovery of Trumpeters.  However, Trumpeter numbers are still well below pre-

Amended Complaint for Declaratory and Injunctive Relief                                          Page 4
*The Trumpeter Swan Society et al. v. Environmental Protection Agency, et al.*  Case No. 12-CV-00929 EGS
**JA 015**

nonetheless provides EPA with the authority to regulate bullet and shot.  While the 2012 submission does argue the issue of EPA's statutory authority slightly differently (including references to the legislative history from 1976), on this issue, the 2012 submission contains no new information that was not previously available to CBD and Project Gutpile."

63.     The EPA further stated in its letter that "the 2012 submission presents almost verbatim the same information regarding toxicity and exposure with regards to lead bullets and shot as the 2010 petition," and that "[o]verall, with respect to the more than 400 separate citations, only 20 citations were not included in the 2010 petition, and, of those, only six citations appear to post-date the 2010 petition.

64.     The EPA acknowledged in its letter that the 2012 petition requested different relief than that requested in the 2010 petition, but the EPA determined that because the basis for the rejection of the 2010 petition was the EPA's assessment that it did not have the authority to take any regulatory action regarding lead bullets and shot, the distinction in the requested relief between the two petitions was "a distinction without a substantial difference."

65.     Other than its April 9, 2012, letter, the EPA took no other action on the Petition, and failed to either grant or deny the Petition within 90 days.

66.     The EPA never published reasons for its denial of the petition (to the extent it meant its April 9, 2012, letter to be a denial) in the Federal Register.

## FIRST CAUSE OF ACTION

### (Violation of APA, 5 U.S.C. § 500 *et seq.*)

67.     Plaintiffs re-allege, as if fully set forth therein, each and every allegation contained in the preceding and subsequent paragraphs.

68.     The EPA's decision that the Petition was not cognizable under TSCA was contrary to the plain language of TSCA, ran counter to TSCA's legislative intent, and applied a standard for petitions in excess of that established by TSCA.

Amended Complaint for Declaratory and Injunctive Relief                                    Page 18
*The Trumpeter Swan Society et al. v. Environmental Protection Agency, et al.*  Case No. 12-CV-00929 EGS

**JA 016**

69.     The EPA's decision that the Petition was not cognizable under TSCA was arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with the law, in violation of the APA.

## SECOND CAUSE OF ACTION

### (Violation of TSCA, 15 U.S.C. § 2601 *et seq.*)

70.     Plaintiffs re-allege, as if fully set forth therein, each and every allegation contained in the preceding and subsequent paragraphs.

71.     As detailed above, the Petition provided a reasonable basis to conclude that the issuance of a rule to prevent the poisoning of wildlife by lead bullets and shot is necessary to protect health and the environment against an unreasonable risk of injury. The authority of the EPA to act was clearly described.  To the extent the EPA denied the Petition, it did so wrongfully and failed to give an adequate reason for doing so, in violation of TSCA.

72.     TSCA provides that if a petitioner demonstrates to a court by a preponderance of evidence that there is reasonable basis to conclude that the issuance of such a rule or order is necessary to protect health or environment against an unreasonable risk of injury, then the court shall order the defendants to initiate the petitioned action. 15 U.S.C. § 2620(b)(4)(B)(ii).

73.     Therefore, to the extent that the Court determines that the EPA denied the Petition, Plaintiffs are entitled to a *de novo* judicial review of the Petition.

## THIRD CAUSE OF ACTION

### (Violation of TSCA, 15 U.S.C. § 2601 *et seq.*)

74.     Plaintiffs re-allege, as if fully set forth therein, each and every allegation contained in the preceding and subsequent paragraphs.

75.     The EPA failed to either grant or deny the Petition within 90 days as required by Section 21(b)(3) of TSCA. 15 U.S.C. § 2620(b)(3).

Amended Complaint for Declaratory and Injunctive Relief                                        Page 19
*The Trumpeter Swan Society et al. v. Environmental Protection Agency, et al.*  Case No. 12-CV-00929 EGS

**JA 017**

76.     To the extent the EPA intended for its April 9, 2012, letter to be a denial of the Petition, it failed to publish its reasons for the denial in the Federal Register as required by Section 21(b)(3) of TSCA. 15 U.S.C. § 2620(b)(3).

77.     As detailed above, the Petition provided a reasonable basis to conclude that the issuance of a rule to prevent the poisoning of wildlife by lead bullets and shot is necessary to protect health and the environment against an unreasonable risk of injury. The authority of the EPA to act was clearly described.  To the extent the EPA neither granted nor denied the Petition within 90 days it did so wrongfully and in violation of TSCA.

78.     TSCA provides that if a petitioner demonstrates to a court by a preponderance of evidence that there is reasonable basis to conclude that the issuance of such a rule or order is necessary to protect health or environment against an unreasonable risk of injury, then the court shall order the defendants to initiate the petitioned action. 15 U.S.C. § 2620(b)(4)(B)(ii).

79.     Therefore, to the extent that the Court determines that the EPA neither granted nor denied the Petition within 90 days, Plaintiffs are entitled to a *de novo* judicial review of the Petition.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs respectfully request relief as follows:

A.     On the First Cause of Action, that the Court declare the EPA's decision that the Petition was not cognizable under TSCA to be arbitrary, capricious, and abuse of discretion, and/or otherwise a violation of law, that the Court set aside the EPA's decision to disregard the Petition, and that the Court order the EPA to properly consider the Petition and either grant or deny it on its merits;

B.     Alternatively, on the Second Cause of Action, that the Court declare that the EPA denied the Petition and that the Court find that there is a reasonable basis for concluding that a rule or order is necessary to protect health or the environment against

Amended Complaint for Declaratory and Injunctive Relief                                    Page 20
*The Trumpeter Swan Society et al. v. Environmental Protection Agency, et al.*  Case No. 12-CV-00929 EGS

**JA 018**

an unreasonable risk of injury to health or the environment and direct the EPA to initiate

rulemaking proceedings in order to develop and implement regulations that adequately

protect wildlife, human health and the environment against the unreasonable risk of

injury from bullets and shot containing lead used in hunting and shooting sports, which

have the potential to cause harmful lead exposure to wildlife and humans;

C.      Alternatively, on the Third Cause of Action, that the Court declare that the

EPA failed to either grant or deny the Petition within 90 days and that the Court find that

there is a reasonable basis for concluding that a rule or order is necessary to protect health

or the environment against an unreasonable risk of injury to health or the environment

and direct the EPA to initiate rulemaking proceedings in order to develop and implement

regulations that adequately protect wildlife, human health and the environment against

the unreasonable risk of injury from bullets and shot containing lead used in hunting and

shooting sports, which have the potential to cause harmful lead exposure to wildlife and

humans;

D.      On all three Causes of Action, for costs incurred herein, including

reasonable attorneys' fees; and

E.      For all such other equitable or legal relief that the Court considers just and

proper.


Respectfully submitted,


Dated: July 10, 2012             ___/s/_____
                                 Adam Keats (Cal. Bar No. 191157) (*pro hac vice*)
                                 351 California St., Suite 600
                                 San Francisco, CA 94104
                                 Telephone: 415-436-9682
                                 Facsimile: 415-436-9683
                                 akeats@biologicaldiversity.org

                                 William J. Snape, III (DC Bar No. 455266)
                                 CENTER FOR BIOLOGICAL DIVERSITY
                                 5268 Watson Street, NW
                                 Washington, DC 20016

Amended Complaint for Declaratory and Injunctive Relief                          Page 21
*The Trumpeter Swan Society et al. v. Environmental Protection Agency, et al.*  Case No. 12-CV-00929 EGS
**JA 019**

# PETITION TO THE ENVIRONMENTAL PROTECTION AGENCY TO BAN LEAD SHOT, BULLETS, AND FISHING SINKERS UNDER THE TOXIC SUBSTANCES CONTROL ACT



Lead-poisoned bald eagle, photo credit U.S. Fish and Wildlife Service, Dr. Rhoda M. Ralston

## PETITIONERS
CENTER FOR BIOLOGICAL DIVERSITY
AMERICAN BIRD CONSERVANCY
ASSOCIATION OF AVIAN VETERINARIANS
PROJECT GUTPILE
PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY

## PETITION FOR RULEMAKING
### UNDER THE TOXIC SUBSTANCES CONTROL ACT

**August 3, 2010**

JA 020

**EXECUTIVE SUMMARY**

Pursuant to the Toxic Substances Control Act ("TSCA", 15 U.S.C. § 2601 *et seq.*), Petitioners Center for Biological Diversity, American Bird Conservancy, Association of Avian Veterinarians, Project Gutpile and Public Employees for Environmental Responsibility hereby petition the Environmental Protection Agency ("EPA") to revise rules governing toxic substances to ban the manufacture, processing and distribution in commerce of lead shot, bullets, and fishing sinkers. Petitioners request that the EPA consider this rulemaking pursuant to section 6(a) of TSCA.

Based on information extending back to Roman times more than 2,000 years ago, lead has long been identified as a highly toxic substance with lethal properties and numerous pathological effects on living organisms. Health effects from lead exposure can run the gamut from acute, paralytic poisoning and seizures to subtle, long-term mental impairment, miscarriage and impotence. Lead is a cumulative metabolic poison affecting a large number of biological functions including reproduction, growth, development, behavior and survival. Even low levels of exposure to lead can cause neurological damage, and there may be no safe level of lead in the body tissues of fetuses and young. Despite this knowledge, lead continues to be used in manufactured products, many of which are sources of toxic lead exposure to wildlife and to human beings.

In recent decades the federal government has begun to implement regulations to reduce the exposure of human beings to lead in drinking water, paint, gasoline, toys, toxic dumps, lead wheel balancing weights and both indoor and outdoor shooting ranges. Strict recycling regulations have been imposed on disposal of lead-acid batteries. However, spent lead ammunition and lost lead fishing tackle are uncontrolled and lead remains widely encountered and distributed in the environment from these sources. The continued availability of traditional lead bullets and shot exposes any animal that preys or scavenges on targeted wildlife to lead's toxic effects. Particularly susceptible are avian scavengers that encounter lead in carcasses left in the wild, in gut piles (viscera) from animals cleaned in the wild, and in wounded prey species that survive hunting and carry lead ammunition in their bodies. Sensitive species such as bald and golden eagles and endangered California condors are frequently killed by lead poisoning or suffer chronic sublethal effects of lead poisoning from scavenging meat containing lead fragments from ammunition. Lead shotgun pellets and lead fishing tackle accumulate in both aquatic and terrestrial habitats, where animals encounter and ingest these lead items, often mistaking them for food, grit or bone fragments. More than 130 species of animals (including mammals, upland birds, raptors, waterfowl, amphibians and reptiles) have been reported in scientific literature as being exposed or killed by ingesting lead shot, bullets, bullet fragments, fishing tackle or prey contaminated with lead ammunition.

Ducks, geese and swans have received protection from hunting sources of lead poisoning since 1991 by a federal requirement to use only nontoxic shot for hunting waterfowl, but similar restrictions in terrestrial habitats are scattered and localized. Data now show that over 75 terrestrial species of birds are known to be poisoned by spent lead from ammunition. Mourning doves are particularly susceptible to ingesting lead shot pellets,

**JA 021**

and lead poisoning may kill as many as 20 million doves per year in the United States. Lead fishing sinkers and jigs continue to cause the needless deaths of waterfowl species such as trumpeter swans, ducks, geese and loons.

Ammunition and tackle manufacturers now market a wide variety of non-lead, nontoxic bullets, shotgun pellets and fishing tackle that can replace lead projectiles and weights. There is no technological or commercial reason why nontoxic ammunition and fishing tackle with comparable effectiveness should not be substituted for their lead counterparts. Several states have mandated nontoxic shotgun ammunition for upland game bird hunting, and states in the Northeast have begun to require non-lead fishing weights and lures in an effort to protect loons and other wildlife. Those states with only a partial ban, such as California's requirement for big game hunting with nontoxic ammunition within the eight-county range of California condors, continue to have high rates of lead poisoning in wildlife.

The EPA has long held that whenever a toxic substance customarily used in the manufacture of commercial products can be replaced by a nontoxic substitute, articles made of the toxic substance should be removed from the market. All hunting and fishing gear containing lead could economically be replaced with effective, nontoxic alternatives, thus making a strong argument for EPA regulatory action.

TSCA grants the EPA the broad authority to regulate chemical substances that "present an unreasonable risk of injury to health or the environment" (15 U.S.C. § 2061). The EPA may regulate the manufacture, processing, distribution, use or disposal of such chemical substances. Specific control mechanisms include: prohibitions on an entire or certain use of a chemical substance; limitations on allowable concentration levels; labeling or recordkeeping requirements; and obligations to issue notice of risks of injury (15 U.S.C. § 2605(a)). The EPA has already declared that lead is a toxic substance, and has removed nearly all products containing lead from the market. The requirement for nontoxic shotgun shot, bullets, and fishing gear may be achieved with the EPA prohibiting the manufacture, processing, or distribution in commerce of a chemical substance for a particular use (15 U.S.C. § 2605(a)(2)(A)(i)). The EPA is specifically prohibited from regulating ammunition or firearms under TSCA, but toxic components of ammunition can be regulated if nontoxic alternatives are commercially available. The petitioners have waited until nontoxic alternatives have become available to submit this petition in an effort to clearly indicate that this petition is not an attempt to regulate ammunition or firearms.

States that have mandated nontoxic shotgun ammunition for upland game bird hunting and nontoxic fishing gear continue to have active hunting and fishing communities that have successfully transitioned away from lead products. Market forces in these states have caused a full line of nontoxic replacement products to be made available to the public, demonstrating that commercially available alternatives exist and the economic consequences of removing lead from the environment will be minimal. The EPA is compelled under TSCA to grant this petition and develop regulations to require nontoxic alternatives to lead sporting products.

JA 022

## II.     NATURE OF THE REQUESTED ACTION

Petitioners Center for Biological Diversity, American Bird Conservancy, Association of
Avian Veterinarians, Project Gutpile and Public Employees for Environmental
Responsibility request that the EPA adopt regulations prohibiting the manufacture,
processing, and distribution in commerce of lead shot, lead bullets, lead fishing sinkers,
and other lead-containing fishing gear, pursuant to TSCA (15 U.S.C. § 2605(a)(2)(A)(i)).
Such regulations are needed to protect vulnerable wildlife species from the ongoing threat
of lead poisoning, as well as to safeguard human health.

TSCA mandates that the EPA must regulate chemical substances where there is a
"reasonable basis to conclude" that such substances "present an unreasonable risk of
injury to health and or the environment" (15 U.S.C. § 2605(a)). TSCA authorizes the
EPA to prohibit "the manufacturing, processing, or distribution in commerce" of a
chemical substance for a particular use or uses (15 U.S.C. § 2605(a)(2)(A)(i)).

Lead used in shot, bullets, and fishing sinkers is a "chemical substance" falling within the
scope of TSCA. As defined by the Act, "Except as provided in subparagraph (B), the
term "chemical substance" means any organic or inorganic substance of a particular
molecular identity, including (i) any combination of such substances occurring in whole
or in part as a result of a chemical reaction or occurring in nature and (ii) any element or
uncombined radical" (15 U.S.C. § 2602(2)(A)).

Most other uses of lead, such as lead-based paints, plumbing pipe and fixtures, and
leaded gasoline, are already subject to strict regulation (15 U.S.C. §§ 2681-2692). In
January 2008, lead and lead compounds were added to the Priority Testing List (40
C.F.R. 716.120; *see also* 15 U.S.C. § 2603(e)), requiring certain lead manufacturers to
submit unpublished health and safety reports to the EPA (73 Fed. Reg. 5109-5115; Jan.
29, 2008). Automobile wheel balancing weights will be phased out with an EPA
proposed rule scheduled for 2011. Manufacturers of consumer products intended for use
by children who also manufacture lead or lead compounds are required to report certain
health and safety data to the EPA. However, there is currently no specific regulation of
lead shot, bullets or fishing sinkers under TSCA.

JA 023

*Terrestrial Environments*

The most significant lead exposures and effects are due to direct ingestion of spent lead shot and bullet fragments by waterfowl (Sanderson and Bellrose 1986) and certain upland game species (Kendall et al. 1996, Schulz et al. 2006). Secondary poisoning of birds consuming wounded or dead prey contaminated with lead ammunition and scavenging of gut piles with spent lead ammunition or fragments is a significant source of toxic exposure to predatory and scavenging birds, with particularly deadly effects on bald eagles and California condors (Pattee and Hennes 1983; Kramer and Redig 1997; Meretsky et al. 2000; Church et al. 2006; Hunt et al. 2006; Pauli and Buskirk 2007). The recent use of stable lead isotope ratios has provided evidence that ammunition sources are responsible for lead exposure in wild birds (Scheuhammer and Templeton 1998; Scheuhammer et al. 2003a; Church et al. 2006, Finkelstein et al. 2010).

Granivorous (seed-eating) bird species may ingest lead shot as grit, or perhaps mistaking it for berries, which may be similar in appearance after drying and falling (Calvert 1876; Campbell 1950; Hunter and Rosen 1965; Fimreite 1984; Best 1992; Scheuhammer et al. 1999; Lewis et al. 2001; Potts 2004; Butler 2005a, 2005b; Rodrigue et al. 2005). Lead exposure has been documented in doves foraging at intensive hunting or target-shooting areas (Fisher et al. 2006 Schulz et al. 2002). Species that forage primarily on seeds on the ground may have higher risk, but even bird species with very different foraging strategies, such as woodpeckers, can acquire lead - presumably by ingesting lead fragments embedded in trees or on the ground (Mörner and Peterson 1999). Of birds and mammals examined in a firearm shooting field, 33% were found to have elevated lead tissue levels and 17% to have potential subclinical or clinical lead exposure (Lewis et al. 2001). Deer are thought to ingest lead fragments on the ground at shooting ranges because of the taste of lead salts on oxidized fragment surfaces (Lewis et al. 2001).

Animals that scavenge hunter-killed carcasses are at the highest risk of encountering severely toxic concentrations of lead. A recent study by Hunt et al. (2006, 2009) evaluated radiographic evidence of lead fragments in 38 deer killed by licensed hunters using center fire rifles with lead-based copper jacketed, soft point bullets in Arizona from 2002 to 2004. Metal fragments were found to be broadly distributed along wound channels, 94% of samples of deer killed with lead-based bullets contained fragments and 18 out of 20 (90%) offal piles contained lead fragments. The authors concluded that the data demonstrated a high potential for scavenger exposure to lead. Meanwhile, the carcasses and gut piles from deer killed by non-lead copper expanding bullets (or "Xbullets") showed little evidence of fragmentation (Hunt et al. 2006, 2009).

Reports from experimental and field observations conclude that all bird species would be susceptible to lead poisoning after ingesting and retaining shot in the gastrointestinal system (Fisher et al. 2006). Raptor and scavenger species that feed on animals killed with lead ammunition would be at high risk for exposure to lead in this way. Animals that consume lead particles that have fragmented in hunter-killed carcasses may be at particular risk because the small size and irregular shape of fragments make them more absorbable in the digestive process.

**JA 024**

Fisher et al. (2006) listed fifty-nine terrestrial bird species worldwide that have been exposed to lead from ammunition sources, including raptors, galliforms, gruiforms, columbiforms, and gulls. Vyas et al. (2000, 2001) identified lead in song birds resident on a shotgun trap and skeet range. Fisher et al. (2006) reviewed published literature on lead poisoning of 32 species of wild birds in the United States from spent lead ammunition. Documented cases of ingestion and poisoning by lead from ammunition in terrestrial birds globally include 33 raptor species and 30 species from *Gruiformes*, *Galliformes* and various other avian taxa, including ten globally threatened or near threatened species (Pain et al. 2009). Lead poisoning is of particular conservation concern in long-lived slow breeding species, especially those with initially small populations. A recent review by the Minnesota Department of Natural Resources found over 130 species of animals (including upland birds, raptors, waterfowl, and reptiles) have been reported in scientific literature as being exposed or killed by ingesting lead shot, bullets, bullet fragments, or prey contaminated with lead ammunition (Tranel and Kimmel 2009). In the United States, Kendall et al. (1996) found that upland game birds ingest substantial amounts of lead shotgun pellets and deduced that raptors must incur secondary ingestion of pellets because their prey ingested it. Rifle-shot prairie dogs and ground squirrels may contain fragmented lead particles that could be ingested by scavengers or raptors (Knopper et al. 2006; Pauli and Buskirk 2007). Kramer and Redig (1997) compiled data on more than 2,000 bald eagles, demonstrating that lead shot pellets, likely from crippled waterfowl and lead fragments in offal and unrecovered deer carcasses, were responsible for elevated lead levels in more than 98% of birds admitted to a veterinary hospital and raptor center. Recently, Church et al. (2006) and Chesley et al. (2009) linked isotopically labeled lead in California condors with rifle bullets sold in the same region, substantiating that condors were ingesting lead and were dying and suffering sublethal effects from bullet fragments.

Terrestrial birds are exposed to lead mainly through ingestion. Galliforms and doves probably ingest spent shot as grit which is retained in their gizzards, although there is considerable uncertainty as to why doves ingest lead and steel shot pellets (Schulz et al. 2002). Approximately 2.5% of hunter-shot doves contained lead shot in their digestive system, giving a rough estimate of the proportion of doves that ingest shot. A similar percentage of doves collected on fields where hunters used steel shot ingested steel shot. Estimates of the 2005 U.S. dove population are 350-600 million birds (Dunks et al. 1982; Schulz et al. 2006), and experimental studies indicate that nearly all doves that ingest shot will die as a result of this ingestion. Schulz et al. (2006) estimated that from 8.8 to 15 million doves may be killed each year from ingesting lead shot pellets. If scavengers consume these poisoned doves and secondarily consume the lead pellets, it is estimated that up to one million scavenging birds and mammals could die annually from ingesting poisoned doves alone.

Raptors and other scavenging birds are usually poisoned through ingesting lead shot or bullet fragments in dead or injured prey or gut piles (Friend 1987; Kendall et al. 1996). Common ravens have been shown to have elevated blood lead levels during hunting season due to ingestion of lead in rifle-shot big game offal piles (Hatch 2006; Craighead

**JA 025**

and Bedrosian 2007, 2008). In Canada, upland game birds and mammals, the primary food source of many raptors, are now more likely to contain lead shot than waterfowl, as lead shot is prohibited for waterfowl hunting (Clark and Scheuhammer 2003).

### D.     Toxic Effects of Lead Ammunition on Wildlife

Lead has long been recognized as a poison to living organisms (Grinnell 1894; Engsted 1932; Horton 1933), with negative effects on general health, reproduction, and behavior (Ris et al. 2004). Lead was highlighted as an important cause of mortality in wildlife populations in the late 1950s, when ingestion of spent hunting lead pellets or fishing sinkers was recognized to cause death in a wide range of wild waterfowl (Bellrose 1959). Reports of poisoned wildlife have continued frequently since that time (e.g. Bates et al. 1968; Irwin and Karstad 1972; Sanderson and Bellrose 1986; Kramer and Redig 1997; Schulz et al. 2006).

It is well recognized that lead fragments can be absorbed from the gastrointestinal tract of birds and mammals, cause damage in various organs, and result in behavioral changes, significant illness, and even death depending on the amount ingested (Reiser and Temple 1981; Kramer and Redig 1997; Fisher et al. 2006).

Lead fragments or pellets ingested by birds may be rapidly regurgitated (in the pellets of raptors, for example), retained for varying periods, or completely dissolved with the resulting lead salts absorbed into the bloodstream. The likelihood of a bird becoming poisoned is related to the retention time of lead items, frequency and history of exposure to lead, and factors such as nutritional status and environmental stress (Pattee and Pain 2003). A proportion of exposed birds will die, and mortality can occur following the ingestion of just one pellet of lead shot (Pain and Rattner 1988). Ingestion of lead particles usually results in some absorption, and in cases where sufficient lead is absorbed, poisoning ensues. Lead concentrations are generally highest in the blood directly after absorption, and in liver and kidneys for days to months after absorption. Lead deposited in bone can remain for years, and reflects lifetime exposure (Pain 1996). Lead is a non-essential element and the activity of blood enzymes appears to be affected by extremely low concentrations. Other than in cases of point source contamination, high concentrations of lead in the tissues of birds result primarily from the ingestion of lead ammunition or fishing weights.

Various authors have attempted to define tissue concentrations in birds indicative of excessive lead exposure, sub-lethal poisoning and acute poisoning (Franson et al. 1996; Pain 1996), but there is no definitive consensus on "background" lead levels for wild birds. Environmental sources of lead are almost exclusively anthropogenic, with a small contribution from natural sources such as volcanoes. Lead is rarely found in nature in its elemental metal form, and the most common source is galena or PbS, which has a very low solubility in water. Wildlife can get low level exposure to lead from unknown sources, including natural accumulation in plants and ingestion by herbivores, and deposition by leaded gasoline exhaust, now attenuated with regulation. "Baseline" lead concentrations in wildlife can vary between taxa, and the diagnosis of poisoning is

usually based on signs of poisoning in combination with blood lead levels in live birds, and on tissue concentrations, sometimes in combination with evidence of exposure to lead in dead birds. For example, the Diagnostic Center for Population and Animal Health (Michigan State University, Lansing MI) defined background blood lead levels as <35 µg/dL for eagles (W. Rumbeiha, pers. comm.), while Pattee et al. (1990) defined background levels as <20 µg/dL, and Feierabend and Myers (1984) defined them as <10 µg/dL. The generally accepted blood lead levels for wild birds have been <20 µg/dL as background; 20 to <50 µg/dL indicating subclinical poisoning; 50 to 100 µg/dL indicating clinical poisoning; and >100 µg/dL representing severe clinical poisoning (Friend 1985, 1999; Franson 1996; Pain 1996; Pattee and Pain 2003). For condors, blood lead levels above 10 µg/dl, rather than 20 µg/dl, could have detrimental effects on condors and ought to be considered the beginning of toxic exposure (Fry et al. 2009). The background levels of 20ug/dl are now understood to indicate significant exposure, because animals held in captivity usually have background levels of 4 µg/dl or less (Walters et al. 2010).

A threshold toxic level for wildlife is difficult to measure because the effects on the nervous system at low doses can be subtle and difficult to detect without specific quantifiable behaviors. In addition, predisposition and susceptibility to lead can vary between individuals within a species (Pattee et al. 1981, Carpenter et al. 2003). There is probably no toxic lead threshold for any animal, as lead is a neurotoxin with no biological function. Lead salts are rarely encountered in the environment, and animals do not have well established metabolic or detoxification mechanisms to biochemically protect themselves from adverse effects of exposure. Even a minor decrease in fitness to a bird surviving in a hostile and competitive environment caused by small amounts of lead ingestion may result in a proximate death from many causes. In long-lived bird species, such as condors, eagles, and ravens, this has the potential to skew the normal age structure toward younger and non-breeding birds and negatively influence long-term population viability. As the duration of periodic and chronic exposure increases in the condor population so does the likelihood of death by lead-poisoning. It is unknown whether wildlife species sustain sublethal effects on coordination and cognitive behaviors similar to those demonstrated in humans, but it is likely that repetitive sub-lethal exposures to lead will cause permanent neurological and behavioral decrements in all species of wildlife (Canfield et al. 2003; Lanphear et al. 2003; Ris et al. 2004).

Lead is a non-specific poison affecting all body systems. Birds can suffer from both acute and chronic lead poisoning (Bellrose 1959; Redig 1985; Sanderson and Bellrose 1986; Eisler 1988; Scheuhammer and Norris 1996). Birds with acute lead poisoning can appear normal, but experience massive tissue destruction to internal organs and death within a few days (Sanderson and Bellrose 1986). Birds with chronic lead poisoning may develop appetite loss, anemia, anorexia, reproductive or neurological impairment, immune suppression, weakness, and susceptibility to predation and starvation (Grandy et al. 1968; Kimball and Munir 1971; Finley and Deiter 1978; Hohman et al. 1995).

The effects of toxicosis in birds commonly include distension of the proventriculus, green watery feces, weight loss, anemia and drooping posture (Hanzlik 1923; Quortrup and

JA 027

Shillinger 1941; Redig et al. 1980; Reiser and Temple 1981; Franson et al. 1983; Custer et al. 1984; Sanderson and Bellrose 1986; Mateo 1998). Sub-lethal toxic effects are exerted on the nervous system, kidneys and circulatory system, resulting in physiological, biochemical and behavioral changes (Scheuhammer 1987). Vitamin metabolism can be affected (Baski and Kenny 1978) and birds can go blind (Pattee et al. 1981). Lead toxicosis depresses the activity of certain blood enzymes, such as delta aminolevulinic acid dehydratase, essential for cellular energy and hemoglobin production, and may impair immune function (Redig et al. 1991; Grasman and Scanlon 1995). Over longer periods, haematocrit and hemoglobin levels are often reduced. Finkelstein et al. (2010) found that sub-lethal concentrations of lead in blood (20 µg/dL), resulted in a 60% decrease in the levels of aminolevulinic acid dehydratase in condors.

As a result of physiological and behavioral changes, birds may become increasingly susceptible to predation, starvation and infection by disease, increasing the probability of death from other causes (Scheuhammer and Norris 1996). Lead can also affect reproductive success (Cheatum and Benson 1945; Elden 1954; Buerger 1984; Buerger et al. 1986). Grandjean (1976) showed a correlation between thin eggshells and high concentrations of lead in European kestrels (*Falco tinnunculus*). Lead poisoning significantly decreased egg production in captive Japanese quail, *Coturnix japonica* (Edens and Garlich 1983). In ringed turtle doves (*Streptopelia risoria*), significant testicular degeneration has been reported in adults following shot ingestion and seminiferous tubules may be devoid of sperm (Kendall and Scanlon 1981; Veit et al. 1982). Experimental studies on Cooper's hawks (*Accipiter cooperii*) showed detectable amounts of lead in eggs when adults had high levels in their blood (Snyder et al. 1973). In nestlings of altricial species, such as the American kestrel (*Falco sparverius*), body length, brain, liver and kidney weights can be depressed (Hoffman et al. 1985a), along with reduced survival and disrupted brain, liver and kidney function (Hoffman et al. 1985b).

Under some circumstances, there may be sex differences in the probability of exposure to or poisoning by lead, at least in western marsh-harriers (*Circus aeruginosus*), as significantly more females than males trapped had elevated lead concentrations, for unexplained reasons (Pain et al. 1993). Lead exposure may also reduce the likelihood of birds returning to an area to breed (Mateo et al. 1999). Locke and Friend (1992) concluded from their wide-ranging study that all bird species would be susceptible to lead poisoning after ingesting and retaining shot. All raptor species that feed on game could potentially be exposed at some time to lead ingestion, the likelihood varying according to the proportion of game in the diet, the size of game taken, the season, and the local hunting intensity (Pain et al. 1993).

Burger and Gochfeld (2000) found that chronic lead exposure resulted in delayed behavioral response time in both laboratory and wild herring gulls (*Larus argentatus*). Kelly and Kelly (2005) documented moderately elevated blood lead levels increased the risk of collision with overhead power lines for mute swans (*Cygnus olor*). Mallards (*Anas platyrhynchos*) experimentally fed lead exhibited hemolytic anemia during the first week of exposure and neurological impairment during the second week (Mateo et al. 2003). In

**JA 028**

experimentally fed turkey vultures (*Cathares aura*) and bald eagles (*Haliaeetus luecocephalus*), lead ingestion decreased weight and muscle mass and caused blindness (Pattee et al. 1981, 2003). Blood pressure increases and renal damage have also been observed in rodents after experimental lead exposure (Victery 1988; Staessen et al. 1994). Bagchi and Preuss (2005) found that acute lead exposure had lasting effects including lowered bone density and increased blood pressure one year after exposure in laboratory rats.

In spite of the abundance of evidence that lead is toxic to wildlife, poisoning rates are not well understood. While massive die-offs are readily visible, daily losses of individual animals are more difficult to detect. This is because sick animals will often isolate themselves, and then are quickly predated upon after death. In one study, observers were given 30 minutes to discover 100 placed carcasses and only found 6 (Stutzenbaker et al. 1983). In another study in which researchers planted carcasses, over 60% of the carcasses were gone within 3 days and over 90% were gone within 8 days (Humburg et al. 1983; Stutzenbaker et al. 1983).

Sub-lethal lead poisoning may weaken raptors and leave them unable to hunt, or make them more susceptible to mortality from vehicles, power lines, and steel traps (Redig et al. 1980; Fry and Maurer 2003). It has also been suggested that raptors intoxicated with lead may suffer impaired hunting ability and may scavenge to a greater extent or be less selective in their choice of prey (Pain et al. 1993). Sampling methods to determine the exposure to lead intoxication in wildlife have inherent biases as with any wildlife health assessment in the field.

Long-lived species are particularly susceptible to bioaccumulation of lead in bone tissues, and repeated lead ingestion and accumulation in long-lived species can reduce bone mineralization, which could mean an increase in bone fragility (Gangoso et al. 2009). . Gangoso et al. (2009) found unusually high level of frequency of fractures and even leg amputations in an Egyptian vulture (*Neophron percnopterus*) population with high exposure to ingestion of lead ammunition.

The non-lethal effects of lead toxicosis may be difficult to recognize at a distance in free-ranging wild animals. Subtle neurological signs are easy to miss even in domesticated animals that can be physically examined. Wild animals that have died from or have been debilitated by lead poisoning may elude capture due to behavioral or physiological changes, or be removed from the population if lead exposure is associated with high levels of mortality (Miller et al. 1998).

Lead poisoning due to ingestion of spent shot or bullet fragments has had population-level effects for some bird species with low recruitment rates, depressed populations, or in recovery, such as the California condor, bald eagle, trumpeter swan, sandhill crane, and spectacled eider (Hennes 1983; Grand et al. 1998; Church et al. 2006).

JA 029

### E.   Lead Ammunition Poisonings by Species

Information on lead poisoning of wildlife species in the United States from lead ammunition is detailed below. Information on lead poisoning of wildlife species in Canada and other countries is included in some instances where there is additional research on the effects and prevalence of lead toxicosis for certain species.

### 1.   California Condor (*Gymnogyps californianus*)

The potential effects of lead ammunition in non-waterfowl hunting practices has now received national attention in part because of recent documentation of harmful levels of lead exposure in the endangered California condor population. Elevated blood lead levels in free-flying California condors have been well described (Locke et al.1969; Wiemeyer et al. 1986; Janssen et al. 1986; Pattee et al. 1990; Meretsky et al. 2000; Fry and Maurer 2003; Redig et al. 2003; Woods et al. 2006; Hunt et al. 2006; Sullivan et al. 2006; Parish et al. 2006; Church et al. 2006). Wild condors in California are captured once or twice per year, and blood samples are taken as part of an extensive lead monitoring program for the reintroduced population. Condors with concentrations below 20 μg/dl in blood are considered to have only background exposure, concentrations between 20–59 μg/dl indicate elevated exposure to lead, concentrations between 60–99 μg/dl suggest birds may be clinically affected, and levels above 100 μg/dl indicate acute toxicity (Redig et al. 1983). Fry and Maurer (2003) and Fry et al. (2009) report that since blood monitoring was implemented in California in 1997, 83% of all free-flying condors tested have had detectable exposure to lead. A recent review of medical records from captive condors at the San Diego Wild Animal Park was conducted to identify blood lead reference ranges for condors not exposed to lead sources in the wild (Dujowich et al. 2005). Among 95 captive born condors tested, all had blood lead levels below detection limits of 6 μg/dl with one exception testing at 11.0 μg/dl (Dujowich et al. 2005).

For the condors released in southern California (Ventura, Santa Barbara and San Luis Obispo counties) since 1992, blood lead concentrations were evaluated in 214 samples from 44 individuals (Hall et al. 2007). Forty-four percent (95/214) of these blood samples obtained during captures from 1997 to 2004 had lead concentrations consistent with elevated levels of exposure (>20 μg/dl), with 8% (18/214) at clinically significant concentrations and 3% (7/214) at acutely toxic concentrations (Hall et al. 2007). Seventy seven percent of the individual condors tested (34/44) showed elevated exposure; 32% of condors (14/44) had concentrations considered to be clinically significant, and 14% (6/44) had concentrations consistent with acute toxicity in at least one of their samples. Half of the individuals had elevated levels in multiple samples suggesting repeated exposure events (Hall et al. 2007). Subadults (age 4-5 years) in this cohort had higher exposure than adults classified as 6 years and older (Hall et al. 2007). Condors were found to have increased blood lead concentrations the second year after release reaching a peak 4 years post-release and then generally declining (Hall et al. 2007). Highest lead concentrations coincide with the age class most likely to forage widely, but detailed comparisons of condor movements and lead concentrations have not been done on a large scale for the California population.

JA 030

The frequency of elevated blood lead concentrations reported for the condors released in southern California is higher than that observed in the condors released by the Ventana Wildlife Society in Big Sur, California. Since 1997, 33 condors released in Big Sur were repeatedly sampled to produce a total of 126 independent measurements of blood lead concentration. This group reports 21% (27/126) of samples to be above background levels, with only 3% (4/126) of samples at clinically significant levels and only 2% (2/126) indicative of acute toxicity (Sorenson and Burnett 2007). Condor lead concentrations were significantly higher in year 6 and year 8 post-release (Sorenson and Burnett 2007). Most of the birds released at Big Sur (21/33) visited southern California at some point, and for those that did so, they did this on average 2 years post release (Sorenson and Burnett 2007). The authors attributed the lower prevalence of lead exposure in the Big Sur population to their finding that out of 26 observed feeding events on wild prey, 20 were California sea lions in contrast to only 3 observations of condors feeding on deer, which were far more likely to be hunter-shot (Sorenson and Burnett 2007).

Petterson et al. (2009) collected 63 blood samples from 20 condors at Pinnacles National Monument from 2003 to 2007 and compared blood lead values before and after release. Of 63 post-release samples, 24 (38%) were above background (20–59 µg/dL), two (3.2%) were clinically affected (60–99 µg/dL), and two more (3.2%) were indicative of acute toxicity (≥100 µg/dL). Fifteen (75%) of individuals sampled were exposed at least once and eight (40%) were exposed on two or more occasions. Petterson et al. (2009) found a significant difference comparing samples collected before release and within one year after release from the same individuals, revealing that even young, inexperienced condors in this area are vulnerable to lead exposure.

A complete recount on lead intoxication events of wild and captive-reared condors in California and Arizona (1992 to 2002) was compiled by Fry in 2003 with information from the Condor Recovery Program. Currently, condors with greater than 40 µg/dl lead in blood measured with a portable lead analyzer in the field are brought into captivity for chelation treatment to reduce blood lead concentrations. Among condors released in southern California, at least 8 had been brought back into captivity and received emergency chelation therapy as of 2007 (Hall et al. 2007). Four of these birds had lead levels exceeding 180 µg/dl and were likely to have died or been severely debilitated without emergency intervention (Hall et al. 2007).

Free-flying condors are also captured once or twice per year in Arizona to measure lead exposure. Out of a total of 437 samples, 31% (137/437) had elevated lead concentrations (15-59 µg/dl), and 9% (39/437) exceeded 60µg/dl (Parish et al. 2006). Chelation therapy was administered 66 times to a total of 28 individuals from 1996 to 2005 in Arizona (Parish et al. 2006).

In addition to capture and treatment of condors found with high lead levels, management practices in both California and Arizona include supplemental feeding to reduce lead exposure. Several reports suggest that the condor mortality due to lead would be much

**JA 031**

higher if the free-flying population were not intensively managed by supplemental feeding and chelation treatment to minimize the impact of lead exposure events (Fry and Maurer 2003; Woods et al. 2006; Pattee et al. 2006; Hall et al. 2007; Mee and Snyder 2007).

Causes of condor mortality were reviewed in detail for 41 free flying condors that died in California and Arizona between 1992 and 2002 (Fry and Maurer 2003). Of the 41 condor carcasses found and examined, lead toxicity was documented as the cause of death in 12% (5/41) (Meretsky et al. 2000; Fry and Maurer 2003). Predation (22%; 9/41) and power line electrocutions and collisions (20%; 8/41) were identified as the leading causes of reintroduced condor mortality in California and Arizona during this time frame (Fry and Maurer 2003). While power line collisions and electrocutions were particularly problematic for the early condor releases in California, mortality due to this cause has been reduced substantially in recent years since power line aversion training was instituted as part of the reintroduction program (Mee and Snyder 2007). The coarse terrain and wide-ranging movements of the condor make it difficult to find deceased animals within a timeframe that allows for the accurate determination of causes of death. Unless carcasses are recovered in fresh post-mortem condition, it can be exceedingly difficult to identify causes of death that are only recognizable by microscopic examination of tissues or laboratory analyses of samples. It can also be difficult to distinguish whether or not disease or intoxications have altered an individual's behavior and initiated a chain of events leading to trauma or some other cause of death. The exceedingly high blood lead levels reported in some free-flying condors suggest that these birds may have compromised abilities to avoid hazards. Therefore, cause of death could not be accurately determined for 20% (8/41) of recovered condor carcasses. An additional 11 condors were lost to follow up during this time period. While likely dead, these condors were never recovered.

A more recent review of the 66 condors released in southern California found that among the 34 condors that died in this area from 1992-2005, exact cause of death could be determined for 18 birds (Hall et al. 2007). Lead toxicity is believed to be the primary cause of death in 3 of these birds (17%). Ages at death for the three condors with lead poisoning were 1.7, 2.5 and 4.8 years. Condor deaths due to lead toxicity have not been reported for the 33 condors released in Big Sur, California (Sorenson and Burnett 2007). Out of a total of 26 condor deaths observed in Arizona between 1996 and 2005, at least 6 and perhaps as many as 8 (23-31%) died from lead poisoning (Woods et al. 2006; Parish et al. 2006). Mainly because of a marked recent increase in the number of lead-related mortalities in condors released in Arizona, lead poisoning is now the leading known cause of death in free-flying condors. Data presented in these reports do not include the additional 5 released condors in California and 3 condors in Arizona that have died due to lead poisoning from lead ammunition since 2007 (Peregrine Fund 2010; VWS 2010). At least 30 condors in California and Arizona have now died from lead exposure proven or thought to be from ingestion of lead ammunition fragments or lead shot, with many more deaths suspected to involve lead poisoning.

**JA 032**

Chronic and frequent sub-lethal lead exposure for condors has been well-documented. A disturbing number of the released condors must undergo frequent chelation therapy to save their lives from lead poisoning due to continual exposure to lead. In 2006 alone, 95% of all Arizona condors had lead exposure and 70% of the Arizona population had to receive life-saving chelation treatment. In 2007 there were 50 cases of lead exposure in Arizona condors, and although data have not been released for 2008 and 2009, the Peregrine Fund reported having to treat "a large portion" of the wild Arizona condor population with chelation therapy for increased lead levels during the winter of 2008 and a "significant amount" of lead exposure to condors in the winter of 2009 (Peregrine Fund 2010). In June of 2008, 7 condors fell ill from lead poisoning in one feeding event near or on Tejon Ranch, the highest lead exposure event in Southern California in 10 years. In 2008 the blood lead levels of 72 free-flying condors in California were tested; from January to June, 59 percent of the condors sampled had blood lead levels that were considered above background (>10 micrograms/deciliter) levels; 45 percent of condors exhibited blood lead levels above background levels during July-December 2008 (CFGC 2009).

Lead poisoning has begun to interfere with the first breeding of released condors in the wild; one of the lead poisoning deaths in California in 2008 was a parent with a chick in the nest; in 2009 a breeding condor died of lead poisoning; and in December 2008 the first condor female to successfully hatch, and fledge, a wild-produced condor in Arizona in close to a century died of lead poisoning, as did her wild-produced offspring. In early 2010, the first California condor chick to hatch inside a national park in more than a century was severely lead poisoned, likely from eating carrion contaminated with fragments of lead bullets. The condor chick and its male parent had to be taken from the nest at Pinnacles National Monument for treatment and the chick could suffer lasting neurological damage as a result.

If lead exposure is not high enough to cause acute intoxication and death or to impair survival skills, lead should be eliminated from the body gradually through natural processes. Fry and Maurer (2003) calculated an average depuration rate (or half-time for lead elimination from blood) of 13.34±2.87 days. This finding, along with the high proportion of samples with elevated blood levels (see Fry et al. 2009), suggest that condors are frequently and repeatedly exposed to lead in the wild. The clinical consequences of recurrent lead poisoning are uncertain, but will likely result in long-term neurological injury (Fry et al. 2009). Fry et al. (2009) analyzed 469 blood samples taken from 95 different condors in California since 2000, and found that 79 of these condors (83%) have had at least one significant lead exposure incident, and some condors have been intoxicated multiple times (up to 13 times for one condor). There were 276 separate documented incidents of blood lead levels in excess of 10 µg/dL; and 27 poisonings in excess of 50 µg/dL that required emergency clinical care to prevent permanent injury or death. Similar observations of high lead levels in blood and tissues of sympatric species, such as vultures, eagles, hawks and ravens in the condor range support the conclusion that environmental lead is widely available to scavenging birds (Wiemeyer et al. 1988; Pattee et al. 1990).

JA 033

Many studies have attributed lead exposure in condors to lead bullet fragment ingestion when eating hunted animal carcasses (Locke et al. 1969; Janssen et al. 1986; Meretsky et al. 2000; Fry and Maurer 2003; Hunt et al. 2006; Woods et al. 2006; Church et al. 2006). Lead from environmental sources, such as air and water pollution, may accumulate in animals, but environmental exposure is not likely to result in levels high enough to cause mortality (Pattee et al. 1990). The very high level of lead detected in most individuals of the free-flying condor population is consistent with a highly concentrated source of exposure not typically found in air, water or soil unless in an area contaminated from lead mining and smelting activities.

Condors are exclusively carrion feeders, and the condor diet includes deer, sea lions, whales, squirrels, rabbits, skunks, coyotes, pigs and cattle. The relative proportion of these various components in condor diet is very hard to assess given the difficulties involved in directly observing condor feeding behavior in the wild. Observed condor feeding behavior in southern California, although sporadic, has most commonly involved deer and cow or calf carcasses (Hopper Mountain NWR unpublished data). Intensive monitoring of the condors released in Arizona has resulted in the documentation of condors feeding on 78 deer, 42 elk, 10 coyotes, 51 domestic livestock and 16 miscellaneous animals (Hunt et al. 2007). Condors released in Big Sur are the only population with a diet that includes marine mammals. Out of 26 feeding observations made on condors released in Big Sur, 77% involved sea lion carcasses and only 15% involved deer and elk carcasses (Sorenson and Burnett 2007). In 1984, Wiemeyer et al. evaluated environmental contaminants including biologically incorporated lead in condor prey species, testing muscle, fat and placenta from cattle, sheep and mule deer (*Odocoileus hemionus*). Lead levels in these potential food items were low in all but one muscle sample from the head of a hunter killed deer (17.5 parts per million, ppm) and one cattle placenta sample (1.82 ppm; Wiemeyer et al. 1984).

Deer killed by hunters, predation, vehicular collisions, fire and disease are potential food sources for condors. Condors have been directly observed feeding on deer killed by hunters, and there are several observations of multiple condors feeding on deer offal piles in California (Hopper Mountain NWR unpublished data) and Arizona (Hunt et al. 2007). In the Kaibab Plateau in Arizona 15 of the 55 deer carcasses involved in condor foraging events were hunter-killed (Hunt et al. 2007). Animal carcasses that have been shot with lead ammunition are likely to contain fragments of lead even if the bullet passed through the carcass or if the primary shot fragment has been removed (Hunt et al. 2006). Offal piles left in the field are also very likely to contain lead fragments, since these piles usually contain thoracic organs and hunters often aim for the thorax when targeting large mammals (Hunt et al 2006).

Inter-annual variation and seasonal trends in lead exposure have been observed in all condor populations. The 44 condors released in southern California showed substantial inter-annual variation in blood lead concentrations with samples from 2001-2004 having a significantly lower mean than samples from 1997-2000 (Hall et al. 2007). This temporal trend has been explained by a move in release, food provisioning and trapping (sampling) location from the Sierra Madre Mountains to Hopper Mountain NWR in

JA 034

2001. Condors trapped at the Sierra Madre site had a significantly higher mean lead concentration than condors trapped at Hopper Mountain. The Sierra Madre site is characterized by greater public access and hunting activity than the Hopper Mountain site (Hall et al. 2007). Increases in blood lead levels in condors tested during the deer hunting season have also been reported by Hall et al (2007), but sampling effort was not distributed evenly in all seasons. In fact, sampling between January and May was very limited (with only 20/214 samples in these months). This study noted that while mean lead concentration was significantly higher in condors sampled during deer hunting season, elevated lead exposure was detected at other times of the year with 38% (20/53) of blood samples collected in June having lead concentrations exceeding 20 μg/dl. Blood samples in the 33 condors at Big Sur also showed inter-annual and seasonal variation in lead concentration with samples obtained in 2005 and samples obtained in September and October showing the highest mean concentration of lead (Sorenson and Burnett 2007). This peak in lead concentrations in the Big Sur condor population does correspond with the time period in which hunter-shot deer are most prevalent in the coast range (Fry and Maurer 2003).

The studies conducted on the introduced condor population in Arizona by Hunt et al. (2006) show correlations between increased lead exposure and foraging in deer hunting areas during and just following the hunting season. Spikes in blood lead levels of condors during November and December correspond with the deer hunting seasons and condor movement to deer hunting areas (Parish et al. 2009). Since condors began foraging in the Kaibab Plateau in 2002, detected lead exposures have been temporally and spatially clustered and highly predictable (Hunt et al. 2007). Blood lead levels in condors visiting the Kaibab Plateau were significantly higher than condors not visiting this intensively hunted area, and evidence of lead intoxication in live and dead condors have peaked annually in November and December from 2002 to 2004, coincident with the deer hunting season (Hunt et al. 2007). Increased proficiency of condors at finding carrion in the wild corresponds with a greater incidence of lead exposure, and information collected on food types supports the hypothesis that lead ammunition residues in rifle- and shotgun-killed animals are the principle source of lead contamination among condors in northern Arizona and southern Utah (Parish et al. 2009). Chesley et al. (2009) evaluated lead isotopic ratios from blood samples of 47 condors in Arizona over 3 years and collected 12 metal fragments from 6 birds with elevated blood lead levels, directly linking ingested lead ammunition fragments to lead in the blood of Arizona condors. Lead poisoning has been the leading cause of death among reintroduced condors in Arizona from 1996 to 2007 (Parish et al. 2009).

Condor lead intoxications reported in both California and Arizona during non-deer hunting seasons suggest that deer hunting practices are not the only potential source of lead for condors. Firearms are used in the California condor range year-round for taking non-game animals, such as ground squirrels and coyotes, which are typically left in the field and available for scavenging species (Pattee et al.1990). Rabbits, squirrels, coyotes, and pigs shot with lead ammunition likely pose a similar risk for exposure as do hunter-killed deer carcasses, and these animals are more likely to be left in the field if they are not a food source or trophy for hunters. Condors have been observed feeding on hunted

**JA 035**

pigs at private dumps and piles of dead ground squirrels shot for pest control (Johnson et al. 2007). Two rifle-killed coyotes were observed as a food source for condors in Arizona, and hunted coyotes have been suggested as a potential source for summer lead exposure in condors (Parish et al. 2006, Hunt et al. 2007).

Direct evidence of consumption of ammunition by condors is extremely difficult to obtain given the lag time between likely ingestion/exposure and debilitation or death. In addition, ingested lead fragments can pass through the digestive tract or be completely digested and absorbed if very small. Radiographs are unlikely to detect radio-opaque particles less than 1 mm in diameter, and similarly sized particles may be easily missed at surgery or necropsy. Nonetheless, physical evidence of ammunition inside the stomachs of individual condors that have died or have been diagnosed with high blood lead levels, have occurred in 14 cases in Arizona (Parrish et al. 2006). Of these 14 condors, 7 (3 alive, 4 dead) had shotgun pellets and 7 (6 alive, 1 dead) had spent rifle bullets in their digestive tracts either on radiographs or during necropsy (Parish et al. 2006). In California, from 1984 to 2002, 7 condors had metal detected in their gastro-intestinal tracts, but identification of fragments and analysis of samples for lead content were not performed (Fry and Maurer 2003).

Ammunition was implicated as the main source of lead exposure in released condors in recent studies by Church et al. (2006) and Chesley et al. (2009). The Church et al. (2006) study compared lead isotopic ($207^{Pb}/206^{Pb}$) ratios in blood samples from released free-flying condors in Central California and prerelease condors in Southern California; tissue samples from possible condor diet items (calves, road-killed deer and a sea lion); and samples from ammunition sold for bird and mammal hunting at stores within the condor range. The lead isotope ratios in free-flying condors differed significantly from those in captive pre-release condors providing further evidence that the sources of exposure for free-flying condors were different from the sources causing background levels of exposure in captive condors. Furthermore, the low background concentrations of lead detected in non-hunter killed condor diet samples had isotopic ratios similar to those described for environmental lead in rivers, lakes, atmospheric dust and urban aerosols. These findings provided evidence that "environmental" sources of lead, such as background levels in water, soil and non-hunter killed carcasses, were not responsible for the elevated lead exposures observed in free-flying condors in California. The lead isotopic ratios in the elevated free-flying condor samples were similar to those found in the ammunition samples tested (Church et al. 2007).

The lead isotope ratio technique has been also recently applied as a forensics tool to trace lead sources involved in condor deaths. A feather from one condor (#165) released in Arizona and found dead nearly 3 years later (June 2000) from acute lead poisoning with 16-17 shotgun pellets in its stomach was analyzed for lead concentration and lead isotope composition (Church et al. 2006). The lead isotopic ratio in the feather from this condor (in the area of the rachis and vane with most recent growth) closely matched that detected in ammunition samples from stores in California (Church et al. 2006). Further analysis of concentrations of total lead in the bones of three other dead condors (#132, 175 and 181) strongly suggest that lead poisoning or debilitation induced by lead contributed to their

**JA 036**

deaths, but the isotopic ratio in tissues from condors #175 and #181 were unlike those of the ammunition samples tested to date. However, the isotope ratio in tissues from condor #132 closely matched that of the ammunition samples tested in the study by Church et al (2006).

Finkelstein et al. (2010) compared blood and feather lead isotopic composition in lead-poisoned condors to spent ammunition from a recovered pig carcass fed upon by the birds to provide irrefutable evidence for exposure to lead-based ammunition. Finkelstein et al. (2010) also analyzed lead isotope ratios in 65 released California condors and demonstrated that lead in the condors (isotope ratio values of between 0.81 and 0.83) is within the range of that found in bullet samples, most of which were turned in by hunters in California. Pre-release birds had lower concentrations of lead in their blood, and their isotopic ratios were higher (0.83 to 0.85). Parmentier et al. (2009) showed that the lead concentration and isotopic composition of condor feathers examined changed following a documented ammunition-exposure event, arriving at values that matched exactly the isotopic composition of recovered ammunition.

Further lead isotopic analyses of ammunition and other potential point sources in the condor's habitat, along with bones, feathers and blood of other condors have developed a more conclusive association between ammunition-derived lead intoxications and condor mortalities. Feathers are a particularly instructive forensic tool to reconstruct lead poisoning in California condors. Finkelstein et al. (2010) used sequential feather sampling and analysis to show that feather lead concentrations can help estimate annual lead exposure risk and give better long-term monitoring of lead exposure. Sampling two or more growing primary feathers over a year will provide a time series of lead exposure and capture 60% of a bird's annual lead exposure history, compared to only 10% of an annual exposure history reflected in one or two blood samples collected over the same time period.

Parmentier et al. (2009) demonstrated from evaluating lead concentration and stable isotopic measurements in growing condor feathers that lead-exposed condors are suffering sub-clinical toxicity, based on δ-aminolevulinic acid dehydratase (ALAD) inhibition by lead. Preliminary results of nine condors with blood lead concentrations ranging between 1.9-64.0 μg/dL show a significant inverse relationship between blood lead concentration and ALAD activity, indicating significant inhibition of ALAD at blood lead levels below those where clinical chelation treatment is indicated. Church et al. (2009) showed increases in phosphorus and enzymes in condors with high blood lead levels that may be indicative of lead-induced nerve tissue damage or renal disease and kidney dysfunction.

The population-level impact of condor exposure to lead may be difficult to quantify but is clearly significant. For small populations in particular, increased adult bird mortality at any measurable rate is likely to affect population dynamics (Westemeier et al. 1998; Fisher et al. 2006). Re-introduced condor populations are currently being intensively managed to reduce lead exposure, and the proportionate mortality due to lead exposure would almost certainly be higher if individual animal interventions ceased. While

JA 037

intensive management has been an important component of condor recovery efforts to date, its practicality in the long term is questionable as the condor population grows in size. More importantly, such close monitoring and frequent recapturing are counterproductive to the establishment of a behaviorally normal self-sustaining wild condor population (Condor Recovery Team, Lead Exposure Reduction Steering Committee, 2003). In order to ensure the recovery of the California condor, lead ammunition must cease being one of the species' greatest threats.

### 2. Bald Eagle (*Haliaeetus leucocephala*), Golden Eagle (*Aquila chrysaetos*), and Other Eagles

Bald eagles share some demographic and ecological factors with free-ranging condors that make this species vulnerable to lead intoxication; they scavenge on carcasses, they are long-lived, they have low recruitment rates, and their numbers have been reduced in recent decades (Pattee et al. 1990). Bald eagles that ingest lead shot embedded in the tissues or the intestinal tract of waterfowl demonstrate acute and chronic symptoms of lead poisoning (Hoffman et al. 1981; Miller et al. 2001). The experimental intoxication of bald eagles with lead shot conducted by Pattee et al. (1981) found that it took between 10 and 133 days (median 20 days) for mortality to occur. The range of time for lead shot retention in the stomach varied between 0.5 and 48 days. Mean lead levels in dead animals were 16.6 ppm (wet weight) in liver and 6.0 ppm (wet weight) in kidney (Pattee et al. 1981). In a complementary study, Hoffmann et al. (1981) report mean blood lead levels in eagles dosed with 10 #4 lead shot (0.21g each) to be 80 µg/dl after 24 hours and 280 µg/dl after 72 hours. Mean blood lead levels as high as 270 µg/dl have been detected in apparently healthy free-ranging bald eagles but subclinical effects may be difficult to document (Reiser and Temple 1981). Foreign bodies, including lead fragments, may be regurgitated by eagles so that fragments may not be detected in the gastrointestinal tract at the time of capture or blood tests, even if the fragments contributed substantially to elevated lead exposure levels prior to being ejected. Mateo et al. (2003) recognized the importance of accounting for this unique physiology in raptors and recommend collecting regurgitated pellets at raptor roosting sites to study the presence, frequency, seasonality and prey associated with the ingestion of lead shot.

The secondary poisoning of bald eagles by lead shot in crippled waterfowl was part of the impetus for the final decision to ban the use of lead for hunting waterfowl (Kendall et al. 1996; Kramer et al. 1997). Coon et al. (1969) reported that 7% of 45 bald eagle carcasses had high enough lead levels to be lethal. Kaiser et al. (1990) reported 9% of 158 bald eagle carcasses had elevated lead levels in the liver. In one study, 97% of bald eagles and 86% of golden eagles had elevated blood levels of lead (Harmata and Restani 1995).

Pattee and Hennes (1983) found that elevated lead levels in bald eagles corresponded well (89%) with late fall and winter waterfowl hunting seasons. However, a study attempting to trace lead poisoning in bald eagles to diet preference did not find significant differences in blood lead levels among eagles feeding on fish and eagles feeding on waterfowl in an area where waterfowl hunting was intensive (Miller et al. 1998). According to the Wisconsin Department of Natural Resources, about 15 to 20 percent of

all bald eagle deaths in that state are due to lead poisoning (Eisele 2008; Strom et al. 2009), usually from eating animals that were wounded with lead ammunition or from scavenging gut piles during and after the deer hunting season. Lead poisoning cases in bald eagles begin to increase in October, peak in December and tail off in late winter, which coincides exactly with Wisconsin's deer hunting seasons, suggesting hunter-crippled game and lead contaminated offal are the cause.

A 16 year review of lead levels in bald and golden eagles in Minnesota and Wisconsin by Kramer and Redig (1997) found that observed blood lead concentrations in both species declined following the ban on lead shot in waterfowl hunting, but there was no change in the prevalence of lead poisoning, attributable in part to continued availability of gut piles from hunter-killed deer. In that study, 21% (138/654) of eagles admitted to the centers had evidence of lead poisoning, and only one had radiographic evidence of lead fragments in the gastro-intestinal tract (Kramer and Redig 1997). Other potential sources of lead, such as fish contaminated with lead fishing sinkers, and hunting activities not included in the lead shot ban were suggested as causes for the substantial number of cases reported during this time period. Clark and Scheuhammer (2003b) found, not surprisingly, that upland game birds and mammals, the primary foods for many raptors, were more likely to contain lead shot than waterfowl 12 years after the ban on lead shot for waterfowl hunting. Lead shot from upland game hunting and lead bullet fragments from big game hunting and "varmint" shooting are a significant cause of continued lead toxicity for bald and golden eagles (Harmata and Restani 1995; Fisher et al. 2006; Hunt et al. 2006; Pauli and Buskirk 2007).

Golden eagles share some feeding ecology and behaviors with California condors and bald eagles and therefore may be exposed to some of the same factors that predispose condors to lead intoxication. In the study by Pattee et al. (1990) on the lead hazards within the California condor range, golden eagles were suggested as a model species to assess lead exposure in California condors because they are abundant in the condor range and they have been observed feeding on the same carcasses as condors. Between 1985 and 1986, 36% of the 162 golden eagles evaluated within the California condor range had elevated blood lead levels, and 2.5% had levels greater than 100ug/dl, indicative of clinical lead poisoning. This study also reported seasonal trends in lead levels in tissues of golden eagles within the California condor range which coincided with the deer hunting season (Pattee et al. 1990).

Wildlife rehabilitators in Iowa began gathering lead poisoning information on bald eagles in 2004, analyzing blood, liver, or bone samples for 62 eagles (Neumann 2009). Thirty-nine eagles showed lead levels in their blood above 0.2 ppm or lead levels in their liver above 6 ppm, which could be lethal poisoning without chelation treatment. Seven eagles showed exposure levels of lead (between 0.1 ppm and 0.2 ppm in blood samples, between 1 ppm and 6 ppm in liver samples, and between 10 ppm and 20 ppm in bone). Several of the eagles admitted with traumatic injuries showed underlying lead exposure or poisoning. Over fifty percent of the eagles being admitted to Iowa wildlife rehabilitators have ingested lead. Behavioral observations, time-of-year data analysis, and x-ray information point to lead shrapnel left in slug-shot white-tailed deer (*Odocoileus*

**JA 039**

*virginianus*) carcasses to be a source of this ingested lead (Neumann 2009). Thousands of bald eagles winter in Iowa, up to one fifth of the lower 48 states population.

The Washington Department of Fish and Wildlife conducted a four-year study of golden eagles in Washington that showed increased lead levels in golden eagles.

Spring migrating eagles sampled in west-central Montana between 1983 and 1985 showed elevated blood-lead levels in 85% of 86 golden eagles and 97% of 37 bald eagles, with the source thought to be shot from waterfowl hunting and fragmented lead-core rifle bullets in ground squirrels (Harmata and Restani 1995). Domenech and Langner (2009) sampled blood from 42 golden eagles in Montana captured on migration during the fall of 2006 and 2007 and found that 58% had elevated blood-lead levels, attributed to ingestion of lead-tainted carcasses or offal piles. Of the eagles evaluated by Domenech and Langner (2009), 18 contained background lead levels of 0–10 µg/dL, 19 eagles were considered sub-clinically exposed at 10–60 µg/dL, two birds were clinically exposed (60–100 µg/dL), and three exhibited acute exposure of >100 µg/dL. Eagles with lower, but detectable blood lead levels may have had earlier exposure with the majority of the lead already deposited in other organs and bone.

Bedrosian and Craighead (2009) measured blood lead levels of 47 bald eagles and 16 golden eagles in the southern Yellowstone Ecosystem around Grand Teton National Park, Wyoming during and after large-game hunts for two years. They found a median blood lead level of 41.0 µg/dL (range = 3.2–523 µg/dL), 74.9% of all birds tested exhibited elevated lead levels (>20 µg/dL), and 14.3% exhibited levels associated with clinical poisoning (>100 µg/dL). The median blood lead levels for eagles during the hunting season was significantly higher than the non-hunting season (56.0 vs. 27.7 µg/dL, respectively; $P = 0.01$). The magnitude of lead in the blood of Wyoming eagles is extremely high and likely results in the death of some individuals (Bedrosian and Craighead 2009).

Lead poisoning is a significant cause of death in some upland-foraging raptors in Canada (such as golden eagles) that may feed on dead or wounded upland prey with embedded lead shot or bullet fragments (Scheuhammer 2009).

Kurosawa (2000) first reported lead poisoning in sea eagles in Japan, and Saito (2009) reported on 129 mortalities of Steller's sea-eagles (*Haliaeetus pelagicus*) and white-tailed eagles (*Haliaeetus albicilla*) on the island of Hokkaido, Japan from 1996 to 2007 diagnosed as lead poisoning fatalities. Necropsies and radiographs revealed lead fragments from rifle bullets and from shotgun slugs in the digestive tracts of poisoned eagles, providing evidence that a source of lead was spent ammunition from lead-contaminated Sika deer carcasses, which are a major food source for wintering eagles. Post mortem examinations of more than 390 white-tailed sea eagles (*Haliaeetus albicilla*) in Germany, an umbrella species for other scavenging birds, have shown that lead poisoning is the most significant cause (23% of mortality) of death (Krone et al. 2009). Krone (2004) also reported lead poisoning of seal eagles in Greenland. Potential sources of lead were waterfowl such as geese and carcasses of game animals or their remains (gut

**JA 040**

piles) shot with lead-containing bullets. Captured geese and shot game animals examined by radiograph revealed embedded shot pellets and large numbers of lead particles.

### 3.    Turkey Vulture (*Cathartes aura*) and other Vultures

While mortality due to lead exposure in turkey vultures is not well documented, dead turkey vultures sampled within the condor range have been documented as having elevated lead exposure (Weimeyer et al. 1988). Experimental lead intoxication studies in turkey vultures suggest that vultures can succumb to lead poisoning, although studies have demonstrated that turkey vultures are able to tolerate very highly elevated lead concentrations in blood. One experimental intoxication study, conducted by Carpenter et al. (2003), administered turkey vultures daily oral doses of one, three or ten BB-sized lead shot (0.35 to 0.45 grams) over a six month observation period. While most measured parameters were similar to those reported for other avian species, survival time (143 to 211 days), even at the higher level of exposure, was much longer than reported for other species, suggesting turkey vultures may be less sensitive to the deleterious effects of lead ingestion (Carpenter et al. 2003). In a separate experimental trial by Reiser and Temple (1981), one turkey vulture was more susceptible to lead intoxication than two red-tailed hawks (it is difficult to generalize to the species level and rule out individual responses with this sample size).

Additional reports on individual cases of lead toxicosis in turkey vultures have been published. Clark and Scheuhammer (2002) evaluated 184 raptors (16 different species) in Canada and the highest bone lead concentration was found in a turkey vulture, suggesting this bird was likely exposed to a series of sublethal doses of lead in carrion. Platt et al. (1999) observed histopathological peripheral neuropathy in a turkey vulture with toxic blood lead concentrations. Another case report describes a griffon vulture (*Gyps fulvus*) evaluated at a wildlife rescue hospital in Spain that was clinically ill and died after eight days of supportive care with one 0.4 gram lead shot fragment found in its gizzard (Mateo et al. 1997).

Gangoso et al. (2009) examined the sub-lethal effects of lead contamination on Egyptian vultures (*Neophron percnopterus*), comparing two populations in Spain with differing exposures to the ingestion of lead ammunition. Blood lead levels were higher in the Canary Island population than the Iberian Peninsula population, showing clear seasonal trends peaking during the Canary Island hunting season. Bone lead concentration increased with age, reflecting a bioaccumulation effect. The bone composition was significantly altered by this contaminant: the mineralization degree decreased as lead concentration levels increased (Gangoso et al. 2009).

### 4.    Other Raptors

Lethal effects from ingestion of lead shot by predatory and scavenging raptors feeding on hunter-killed carcasses have been documented in red-tailed hawks (*Buteo jamaicensis*), northern goshawks (*Accipiter gentilis*), and great horned owls (*Bubo virginianus*). Pain

JA 041



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C.  20460

AUG 2 7 2010

OFFICE OF CHEMICAL SAFETY
AND POLLUTION PREVENTION

Mr. Michael Fry
Director of Conservation Advocacy
American Bird Conservancy
1731 Connecticut Ave., N.W.
Washington, DC  20009

Dear Mr. Fry:

We received your August 3, 2010, petition requesting that the EPA take action under the Toxic Substances Control Act (TSCA) to prohibit the manufacture, processing, and distribution in commerce of lead shot, bullets, and fishing sinkers.

After careful review, EPA has determined that TSCA does not provide the Agency with authority to address lead shot and bullets as requested in your petition, due to the exclusion found in TSCA § 3(2)(B)(v).  Consequently, we are denying that portion of your petition.

We are reviewing the request in the petition regarding lead fishing sinkers and will respond to you when we have made a determination on that matter.

Sincerely,

Stephen A. Owens
Assistant Administrator

# PETITION TO THE
# ENVIRONMENTAL PROTECTION AGENCY
# TO REGULATE LEAD BULLETS AND SHOT UNDER
# THE TOXIC SUBSTANCES CONTROL ACT



Bald eagle suffering from lead poisoning. Photo courtesy The Raptor Center, University of Minnesota

## PETITIONERS
CENTER FOR BIOLOGICAL DIVERSITY
CORNELL LABORATORY OF ORNITHOLOGY
PROJECT GUTPILE
LOON PRESERVATION COMMITTEE
THE TRUMPETER SWAN SOCIETY
AMERICAN EAGLE FOUNDATION
*AND 95 OTHER ORGANIZATIONS*

**PETITION FOR RULEMAKING UNDER THE TOXIC SUBSTANCES CONTROL ACT**

**March 13, 2012**

JA 043

**EXECUTIVE SUMMARY**

Pursuant to the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2601 *et seq.*, the 101 petitioning organizations herein formally petition the Environmental Protection Agency ("EPA") to initiate a proceeding for the issuance of a rule under Section 6 of TSCA to regulate bullets and shot containing lead used in hunting and shooting sports (such as target and skeet shooting), which have the potential to cause harmful lead exposure to wildlife and humans. The petitioners request a rulemaking which adequately protects against the unreasonable risk of injury to the environment and human health posed by toxic lead bullets and shot. Although the petitioners advocate for a rule implementing a nationwide ban on the use of bullets and shot containing lead for use in hunting and shooting sports, with explicit exceptions for military and law enforcement uses, the petitioners also request that the EPA evaluate and consider a range of alternatives that could eliminate the potential for harmful lead exposure to wildlife and humans.

Based on information extending back to Roman times more than 2,000 years ago, lead has long been identified as a highly toxic substance with lethal properties and numerous pathological effects on living organisms. Health effects from lead exposure can run the gamut from acute, paralytic poisoning and seizures to subtle, long-term mental impairment, miscarriage and impotence. Lead is a cumulative metabolic poison affecting a large number of biological functions including reproduction, growth, development, behavior and survival. Even low levels of exposure to lead can cause neurological damage, and there may be no safe level of lead in the body tissues of fetuses and young. Despite this knowledge, lead continues to be used in manufactured products, many of which are sources of toxic lead exposure to wildlife and to human beings.

In recent decades the federal government has begun to implement long-overdue regulations to reduce the exposure of humans to lead in drinking water, paint, gasoline, toys, toxic dumps, lead wheel balancing weights and both indoor and outdoor shooting ranges. Strict recycling regulations have been imposed on disposal of lead-acid batteries. However, spent lead ammunition is uncontrolled and lead remains widely encountered and distributed in the environment from hunting and sport shooting sources. The continued use of lead bullets and shot exposes any animal that preys or scavenges on targeted wildlife to lead's toxic effects. Particularly susceptible are avian scavengers that encounter lead in carcasses left in the wild, in gut piles (viscera) from animals cleaned in the wild, and in wounded prey species that survive hunting and carry lead bullets, shot or fragments in their bodies. Sensitive wildlife such as bald and golden eagles and endangered California condors are frequently killed by lead poisoning or suffer chronic sublethal effects of lead poisoning from scavenging meat containing lead fragments from ammunition. Another source of significant lead exposure is from spent lead shotgun pellets, which accumulate in both aquatic and terrestrial habitats, where animals encounter and ingest them, often mistaking them for food, grit or bone fragments. More than 130 species of animals (including mammals, upland birds, raptors, waterfowl, amphibians and reptiles) have been reported in scientific literature as being exposed or

**JA 044**

killed by ingesting lead shot, bullets, bullet fragments or prey contaminated with lead ammunition.

Ducks, geese and swans have received protection from hunting sources of lead poisoning since 1991 by a federal requirement to use only non-lead shot for hunting waterfowl, but similar restrictions in terrestrial habitats are scattered and localized. Data show that over 75 terrestrial species of birds are known to be poisoned by spent lead from ammunition. Mourning doves are particularly susceptible to ingesting lead shot pellets, and lead poisoning may kill as many as 20 million doves per year in the United States.

Ammunition manufacturers now market a wide variety of non-lead or less toxic bullets and shotgun pellets that can replace lead projectiles. There is no technological or commercial reason why non-lead ammunition with comparable effectiveness should not be substituted for the lead counterparts. Several states have mandated non-lead shotgun ammunition for upland game bird hunting. Those states with only a partial ban, such as California's requirement for big game hunting with non-lead ammunition within the eight-county range of California condors, continue to have high rates of lead poisoning in wildlife.

The EPA has long held that whenever a toxic substance customarily used in the manufacture of commercial products can be replaced by a nontoxic or less toxic substitute, articles made of the toxic substance should be removed from the market. All ammunition containing lead could economically be replaced with effective, non-lead alternatives that are nontoxic or less toxic, thus making a strong argument for EPA regulatory action.

TSCA grants the EPA the broad authority to regulate chemical substances that "present an unreasonable risk of injury to health or the environment" (15 U.S.C. § 2061). The EPA may regulate the manufacture, processing, distribution, use or disposal of such chemical substances. Specific control mechanisms include: prohibitions on an entire or certain use of a chemical substance; limitations on allowable concentration levels; labeling or recordkeeping requirements; and obligations to issue notice of risks of injury (15 U.S.C. § 2605(a)). The EPA has already declared that lead is a toxic substance, and has removed nearly all products containing lead from the market. Regulations to address the unreasonable risk of injury to human health or the environment from toxic lead shot and bullets may be achieved through a range of alternatives, up to and including the EPA prohibiting the manufacture, processing, or distribution in commerce of a lead for a particular use (15 U.S.C. § 2605(a)(2)(A)(i)). Although the EPA is specifically prohibited from regulating ammunition or firearms under TSCA, the toxic components of ammunition can be regulated if nontoxic or less toxic alternatives are commercially available. This petition is clearly not an attempt to regulate ammunition or firearms, but rather the toxic components of lead ammunition for which non-lead and nontoxic or less toxic alternatives have become widely available.

This petition differs from a TSCA petition submitted to the EPA in 2010 seeking a complete ban on all lead ammunition. The current petition seeks different relief under

JA 045

TSCA, asking the EPA to initiate a rulemaking for regulations that adequately protect wildlife, human health and the environment against the unreasonable risk of injury from bullets and shot containing lead used in hunting and shooting sports, which have the potential to cause harmful lead exposure to wildlife and humans. This current petition is brought by a different and much larger group of petitioners. The petition introduces significant new information regarding the toxic effects of lead ammunition on wildlife, the toxic effects of lead on human health, the availability and performance of alternatives to lead ammunition, and the effectiveness of lead ammunition regulations.

This petition also provides significant new information repudiating the EPA's conclusion that TSCA does not provide the agency with authority to address lead shot and bullets. In denying the 2010 TSCA petition, the EPA stated that "TSCA does not provide the agency with authority to address lead shot and bullets as requested in your petition, due to the exclusion found in TSCA § 3(2)(B)(v)." However, the plain language of TSCA, as well as the Senate and House reports on the legislative history and intent of TSCA, runs counter to the EPA's interpretation that the agency lacks regulatory authority. According to the House report on the history and intent of TSCA, "the Committee does not exclude from regulation under [TSCA] chemical components of ammunition which could be hazardous because of their chemical properties."

States that have mandated non-lead ammunition requirements for specific hunting activities have active hunting communities that have successfully transitioned away from lead products. Market forces in these states have caused a full line of non-lead replacement products to be made available to the public, demonstrating that commercially available alternatives exist and the economic consequences of removing lead from the environment can be minimal. The EPA is compelled under TSCA to grant this petition and initiate a proceeding for the issuance of a rule under Section 6 to develop regulations to protect wildlife, human health and the environment from unreasonable risk of lead poisoning from lead ammunition.

JA 046

**TABLE OF CONTENTS**

EXECUTIVE SUMMARY ...................................................................................2

I.      PETITIONERS AND STANDING TO FILE ......................................6

II.     NATURE OF THE REQUESTED REGULATION..........................16

III.    PREVIOUS EFFORTS TO REGULATE ........................................18

IV.     REASON FOR THE REQUEST........................................................19
        A.      Introduction............................................................................19
        B.      Sources and Quantities of Lead in the Environment from Hunting
                and Shooting Sports.............................................................21
        C.      Pathways of Lead Exposure................................................22
        D.      Toxic Effects of Lead on Wildlife ........................................25
        E.      Lead Ammunition Poisonings by Species ...........................29
                1.      California Condor.....................................................29
                2.      Bald Eagle and Golden Eagle ................................38
                3.      Turkey Vulture.........................................................41
                4.      Other Raptors...........................................................41
                5.      Waterfowl.................................................................41
                6.      Game Birds...............................................................45
                7.      Cranes and Rails ......................................................46
                8.      Corvids.....................................................................46
                9.      Song Birds................................................................47
                10.     Mammals..................................................................48
                11.     Amphibians and Reptiles ........................................48
        F.      Toxic Effects of Lead Ammunition on Humans....................48

V.      AUTHORITY TO ACT.....................................................................55

VI.     ALTERNATIVES TO LEAD AMMUNITION ...............................57

VII.    EXISTING FEDERAL AND STATE REGULATIONS ..................62
        A.      Effectiveness of Lead Ammunition Regulations ..................64

VIII.   DESCRIPTION OF FEDERAL REGULATIONS REQUESTED................67

IX.     CONCLUSION ................................................................................68

X.      REFERENCES..................................................................................70

JA 047

1.      **PETITIONERS AND STANDING TO FILE**

Section 21 of the Toxic Substances Control Act ("TSCA" or the "Act", 15 U.S.C. § 2601 *et seq.*) provides that "any person" may petition the Environmental Protection Agency Administrator ("EPA") to initiate a proceeding for the "issuance, amendment, or repeal of a rule" (15 U.S.C. § 2620(b)(3)). Petitioners therefore have standing to petition the EPA to initiate proceedings to regulate lead shot and bullets under section 2605 of TSCA.

Lead petitioner Center for Biological Diversity is a non-profit organization that works to protect endangered species and wild places through science, policy, education, citizen activism, and environmental law. The Center has an ongoing interest in protecting wildlife from lead poisoning. Since 2004, the Center has taken action through a "Get the Lead Out" campaign to change policies regulating lead to prevent toxic lead from entering the food chain and has been a leading proponent of federal regulations on lead ammunition to protect endangered California condors, bald and golden eagles, and other wildlife species at risk from lead poisoning.

Petitioner Adirondack Wildlife is a nonprofit rehabilitation and education organization, working with local veterinarians and volunteers, whose mission is to take in, rehabilitate and, whenever possible, return to the wild, injured or otherwise disabled wildlife.

Petitioner Alabama Ornithological Society works to foster a greater knowledge of birds and to promote conservation of all natural resources.

Petitioner Alameda Creek Alliance is a California nonprofit conservation organization that works to protect and restore the natural ecosystems of the Alameda Creek watershed.

Petitioner American Eagle Foundation is a nonprofit organization of concerned citizens and professionals founded in 1985 to develop and conduct bald eagle and environmental recovery programs in the United States and to assist private, state and federal projects that do the same.

Petitioner Arizona Zoological Society is a nonprofit organization engaged in the conservation of wildlife and habitat, and operates the Phoenix Zoo as a zoological garden and recreation destination that engenders affection for and appreciation of nature.

Petitioner Arroyo Colorado Audubon Society is a South Texas organization working to promote an understanding of the unique and important natural habitats of the Lower Rio Grande Valley, the birds and other wildlife they support, and their benefits to humans.

Petitioner Ascutney Mountain Audubon Society in Vermont works to promote the enjoyment, appreciation, and conservation of nature through education, habitat protection and advocacy for the benefit of our communities and all living things.

JA 048

Petitioner Audubon Nebraska works to conserve and restore natural ecosystems, focusing on birds, other wildlife, and their habitats for the benefit of humanity and the earth's biological diversity.

Petitioner Audubon Society of New Hampshire is a statewide nonprofit organization dedicated to protecting New Hampshire's environment through active programs in environmental education, conservation science, land protection, and advocacy.

Petitioner Badger Run Wildlife Rehab is a nonprofit organization in Oregon dedicated to the care and treatment of injured and orphaned wildlife.

Petitioner Biodiversity Conservation Alliance is a nonprofit organization dedicated to protecting wildlife and wild places in Wyoming and surrounding states, primarily on public lands.

Petitioner Bird Conservation Network is a coalition of 18 organizations with an interest in the conservation of birds in northeast Illinois, southern Wisconsin and northwestern Indiana.

Petitioner Blue Ridge Wildlife Center is a non-profit wildlife conservation organization located in Virginia that rehabilitates injured, orphaned, and sick native wildlife, and monitors health threats to wildlife populations.

Petitioner Brainerd Lakes Area Audubon Society is an independent chapter of the Audubon Society that advocates for conservation and restoration of bird populations and other wildlife and their habitat, encourages grassroots action on conservation issues, and develops and implements educational programs, with special emphasis on the aquatic resources of the great Brainerd Lakes Area.

Petitioner Braveheart Raptor Rehabilitation Center is a nonprofit organization in Michigan involved in rehabilitation of injured and sick raptors, as well public education.

Petitioner Bridgerland Audubon Society is a Northern Utah chapter of the Audubon Society that works to conserve and restore natural ecosystems, focusing on birds, other wildlife, and their habitats for the benefit of humanity and the earth's biological diversity.

Petitioner Carolina Raptor Center is dedicated to environmental stewardship and the conservation of birds of prey through education, research, and the rehabilitation of injured and orphaned raptors.

Petitioner Cascades Raptor Center is a nonprofit nature center and wildlife hospital in Oregon that works to foster a connection between people and birds of prey through wildlife rehabilitation and public education.

Petitioner Cascadia Wildlands works to protect and restore Cascadia's wild ecosystems as well as protect the most threatened wild places and wildlife from Oregon to Alaska.

JA 049

Petitioner Center for Sierra Nevada Conservation is a nonprofit organization in California that works for sound management of our public lands and wise government land use policies.

Petitioner Clean Economy Coalition of Corpus Christi is a group of concerned citizens in and around the Corpus Christi region in Texas concerned with pollution from existing and proposed energy and industrial facilities.

Petitioner CORALations is a nonprofit conservation organization based in Puerto Rico.

Petitioner Cornell Laboratory of Ornithology is a world leader in the study, appreciation, and conservation of birds. The laboratory, founded in 1915, is a non-profit, membership-supported academic center within Cornell University, working to advance the understanding of nature and to engage people of all ages in learning about birds and protecting the planet.

Petitioner Delaware Valley Ornithological Club is an organization for birders and bird enthusiasts in the Delaware Valley region of Pennsylvania.

Petitioner Eagle Valley Raptor Center is a Kansas nonprofit organization that provides food, shelter and vet care for injured and orphaned Kansas birds of prey so they may return back to the wild. The Center also conducts guided educational tours and offers offsite programs to teach the important role these birds play in our environment.

Petitioner Elisha Mitchell Audubon Society is a North Carolina chapter of the Audubon Society that works to promote awareness and appreciation of nature, preserve and protect wildlife and natural ecosystems, and encourage responsible environmental stewardship.

Petitioner Endangered Habitats League is a nonprofit organization dedicated to the protection of the diverse ecosystems of Southern California and to sensitive and sustainable land use for the benefit of all the region's inhabitants.

Petitioner Environmental Action Committee of West Marin is a California nonprofit grassroots group working to protect West Marin's natural environment and rural character.

Petitioner Four Harbors Audubon Society is a New York chapter of the Audubon Society that advocates for education and conservation efforts for the enjoyment, preservation and restoration of birds, wildlife and habitat in Long Island communities.

Petitioner Freedom Center for Wildlife is a nonprofit organization working to increase public knowledge and appreciation for conservation, protection and preservation of native New Jersey habitats and animals through rehabilitation, education, and research programs.

JA 050

Petitioner Friends of Dyke Marsh is a volunteer group dedicated to preserving and enhancing Dyke Marsh, the last enduring substantial freshwater tidal marsh in the Washington, D.C. area.

Petitioner Friends of Living Oregon Waters works to protect Oregon waters through public oversight, legal education, and field monitoring.

Petitioner Golden Gate Audubon Society is an independent, nonprofit organization dedicated to protecting birds, other wildlife, and their natural habitats in the San Francisco Bay Area.

Petitioner Grand Canyon Wildlands Council is an Arizona organization that works to create and apply a dynamic conservation area network that ensures the existence, health, and sustainability of all native species and natural ecosystems in the Grand Canyon ecoregion.

Petitioner Gratiot Lake Conservancy is a nonprofit organization working to conserve and protect Gratiot Lake and the land within the Gratiot Lake watershed in the Upper Peninsula of Michigan.

Petitioner Great Old Broads for Wilderness is a national organization that uses the voices and activism of elders to preserve and protect wilderness and wild lands. Conceived by older women who love wilderness, it gives voice to the millions of older Americans who want to protect their public lands as wilderness for this and future generations.

Petitioner Great Salt Lake Audubon is a nonprofit environmental organization affiliated with the National Audubon Society, dedicated to protecting and enhancing habitat for wild birds, animals and plants, and to maintaining healthy and diverse environments for wildlife and people throughout Utah.

Petitioner Hawk Mountain Sanctuary Association is a non-profit raptor conservation organization that runs a wildlife sanctuary, scientific research center, international conservation training site and learning facility in Pennsylvania.

Petitioner Hilton Pond Center for Piedmont Natural History works to conserve plants, animals, habitats, and other natural components of the Piedmont Region of the eastern United States through observation, scientific study, and education for students of all ages. The Center also conducts research on migrant birds that breed in the Piedmont and overwinter in the Neotropics and seeks to protect birds and their habitats along and on both ends of their migratory routes.

Petitioner Houston Audubon Society is a Texas chapter of National Audubon Society working to promote the conservation and appreciation of birds and wildlife habitat.

Petitioner Howard County Bird Club is a local chapter of the Maryland Ornithological Society, a nonprofit organization that works to educate people about avifauna and related

habitat; preserve, restore, and improve habitat for birds; and help collect and develop scientifically useful records and data.

Petitioner Indian Peaks Group of the Sierra Club is part of the Rocky Mountain Chapter of the Sierra Club, with a mission to explore, enjoy and protect the planet.

Petitioner Indigenous Youth Foundation is a California Native American cultural and environmental non-profit organization that works to preserve, restore and distribute Chumash culture. The Chumash people have lived for centuries in the condor range and have a long history of interaction with the California condor for a variety of purposes, including religious and ceremonial, and have a strong cultural interest in the recovery of the California condor.

Petitioner International Wildlife Rehabilitation Council is a nonprofit organization dedicated to providing science-based education and information to promote wildlife conservation and welfare worldwide.

Petitioner Iowa Association of Naturalists is a professional organization that promotes the development of skills and education within the art of interpreting natural and cultural resources. IAN members are planting the seed of environmental stewardship by communicating the meanings and relationships of the natural world.

Petitioner Jayhawk Audubon Society works to encourage enjoyment, promote understanding and advocate conservation of the natural world.

Petitioner Juniata Valley Audubon Society is a Pennsylvania chapter of the National Audubon Society dedicated to the conservation and restoration of natural ecosystems, focusing on birds, other wildlife, and their habitats for the benefit of humanity and the Earth's biological diversity.

Petitioner Kittitas Audubon Society is a chapter of the Audubon Society serving the communities of Kittitas County, Washington, working to develop an appreciation of nature through education and conservation with a focus on birds.

Petitioner Lahontan Audubon Society is a Nevada chapter of Audubon Society that seeks to help restore, preserve, and improve habitat for birds and other wildlife and to provide education about birds and their habitats in Nevada.

Petitioner Lane County Audubon Society is an Oregon chapter of the Audubon Society and a non-profit organization dedicated to the conservation of and education about our natural environment, with a primary focus on birds, other wildlife, and their habitats.

Petitioner Lehigh Valley Audubon Society has a mission to help people gain an appreciation and understanding of the natural world around them, to provide educational services on local wildlife to our community, and protect local habitats that are critical to local wildlife populations.

JA 052

Petitioner Loon Lake Loon Association is a nonprofit organization concerned about the common loon in the Pacific Northwest. The association works to protect the common loon, preserve their habitat and educate the public.

Petitioner Loon Preservation Committee works to restore and maintain a healthy population of loons throughout New Hampshire, monitor the health and productivity of loon populations as sentinels of environmental quality, and promote a greater understanding of loons and the larger natural world.

Petitioner LoonWatch is a program of the Sigurd Olson Environmental Institute that protects common loons and their aquatic habitats in Wisconsin and the Upper Great Lakes region through education, monitoring, and research.

Petitioner Los Padres Forest Watch is a community-based nonprofit organization that is leading efforts to protect the Los Padres National Forest and other public lands along California's Central Coast.

Petitioner Madison Audubon Society is a Wisconsin Audubon chapter that educates about the natural world and threats that natural systems are facing, engages in advocacy to preserve and protect these systems, and develops and maintains sanctuaries to save and restore habitat.

Petitioner Maricopa Audubon Society is an Arizona chapter of the Audubon Society dedicated to the protection of the natural world through public education and advocacy for the wiser use and preservation of land, water, air, and other irreplaceable natural resources.

Petitioner Marin Audubon Society is a California chapter of the Audubon Society that works to conserve and restore natural ecosystems, focusing on birds, other wildlife, and their habitats, for the benefit of humanity and the Earth's biological diversity.

Petitioner Maryland Ornithological Society is a state-wide nonprofit organization devoted to the study and conservation of birds. Maryland Ornithological Society maintains a system of sanctuaries to encourage the conservation of birds and bird habitat, and helps record and publish observations of bird life.

Petitioner Mobile Bay Audubon Society is an Alabama chapter of the Audubon Society working to promote the conservation of Earth's biological diversity by encouraging an appreciation of birds and other wildlife, along with an understanding of the ecological requirements necessary for their survival.

Petitioner Monmouth County Audubon Society's mission is to promote the awareness, appreciation and conservation of natural resources through activism and educational outreach and by representing the National Audubon Society in Monmouth County, New Jersey.

JA 053

Petitioner New York City Audubon is a independent non-profit organization affiliated with the National Audubon Society, working to protect wild birds and habitat in the 30,000 acres of wetlands, forests, and grasslands of New York City.

Petitioner Northcoast Environmental Center is a non-profit organization whose mission is to promote understanding of the relations between people and the biosphere and to conserve, protect, and celebrate terrestrial, aquatic, and marine ecosystems of northern California and southern Oregon.

Petitioner Ojai Raptor Center is a southern California organization dedicated to the rehabilitation and release of injured and orphaned wildlife and to the education through non-releasable birds of prey to educate the public and community about native wildlife.

Petitioner Orange County Audubon Society is a New York chapter of the national Audubon Society that manages 400 acres of wildlife sanctuaries.

Petitioner Palouse Audubon Society is a nonprofit organization raising public awareness about wild birds and their habitat needs in the Palouse region of North Central Idaho and Eastern Washington.

Petitioner Prairie Dog Pals is a New Mexico organization dedicated to the preservation of the species in the region. Prairie Dog Pals does field work during the rescue season to relocate Gunnison's prairie dogs to safe habitat, sustain urban colonies at risk, and perform educational outreach to groups, classrooms, and individuals.

Petitioner Preserve Our Wildlife is a Florida organization dedicated to the protection and defense of all wild animal species, to the conservation of their natural habitats, and to the education of people about these imperative needs.

Petitioner Project Gutpile is an educational organization comprised of hunters/wildlife biologists and anglers that provides educational resources for sportsmen about lead-free hunting and angling. Project Gutpile has been promoting non-lead ammunition and raising awareness about lead in the hunting community since 2002.

Petitioner Raptor Education Group is an organization dedicated to caring for injured or orphaned native bird species, public education on wildlife issues and research on captive behavior, nutrition, husbandry and disease of native avian species.

Petitioner Raptor Services, LLC is a is a Wisconsin-based consulting firm providing data for private and public agencies during the permitting and mitigation process required for land development.

Petitioner Rio Grande Chapter of the Sierra Club is comprised of five local groups working to protect the air, land and water throughout New Mexico and West Texas.

JA 054

Petitioner Rocky Mountain Chapter of the Sierra Club is comprised of nine local groups working to protect the air, land and water throughout Colorado.

Petitioner Rocky Mountain Wild is a nonprofit conservation organization working to protect, connect and restore wildlife and wild lands in the greater Southern Rockies ecoregion of Colorado, southern Wyoming, and eastern Utah.

Petitioner Rogue Valley Audubon Society is a chapter of the National Audubon Society and is a leading voice for birding, nature education, and habitat conservation in southern Oregon.

Petitioner Santa Clara Valley Audubon Society in California works to preserve, enjoy, restore and foster public awareness of native birds and their ecosystems.

Petitioner Sequoia Audubon Society protects native birds and other wildlife and their ecosystems in San Mateo County, California by engaging people of all ages in conservation, education, advocacy and enjoyment.

Petitioner Stream Systems is a San Francisco Bay area research and development company that works closely with government agencies from around the world involved in environmental protection and home land security, offering technical and engineering skills in all disciplines. Stream Systems produces an official testing device used by the U.S. Fish and Wildlife Service and other game officers to aid in the differentiation of lead to non-toxic shot in shotgun shells.

Petitioner Tennessee Ornithological Society is an independent, non-profit, educational and scientific organization devoted to the study and conservation of birds.

Petitioner Teton Raptor Center is an organization of conservation biologists, veterinarians, wildlife rehabilitators, educators, and volunteers working to help birds of prey and promote environmental health through educational programs, conservation initiatives, medical treatment and rehabilitation.

Petitioner The Lands Council is a grassroots nonprofit organization in Washington dedicated to protecting the quality of life in the Inland Northwest.

Petitioner The Trumpeter Swan Society is a non-profit organization based in Minnesota dedicated to assuring the vitality and welfare of wild Trumpeter Swan populations throughout North America.

Petitioner Ventana Wilderness Alliance works to protect, preserve and restore the wilderness qualities and biodiversity of the public lands within California's Northern Santa Lucia Mountains and Big Sur coast.

Petitioner Wachiska Audubon Society is a Nebraska chapter of the Audubon Society that works to preserve and restore native grasslands and other natural ecosystems, promote

JA 055

birding, support native wildlife, provide educational opportunities and advocate on behalf of our natural environment and sustainability.

Petitioner Walden's Puddle is a wildlife rehabilitation and education center that provides care and treatment to more than 2,400 sick, injured and orphaned native Tennessee wild animals annually.

Petitioner Western Cuyahoga Audubon Society is a nonprofit organization in Ohio that works to educate the public about conservation of the natural world.

Petitioner Western Nebraska Resources Council is a non-profit dedicated to preserving the quality of watersheds and native biomes while maintaining the lifestyle of Western Nebraska, accomplished through educating the public and policy makers and hands-on work.

Petitioner Western Wildlife Conservancy is a non-profit organization in Utah that works to protect wildlife and wildlife habitat in the Intermountain West through research, education and advocacy.

Petitioner White Mountain Conservation League is an Arizona nonprofit organization dedicated to sustaining and enhancing the White Mountain ecosystems and communities.

Petitioner WildCare is a California organization that advocates for wildlife for a sustainable world by offering a wide array of programs to help people live well with wildlife. WildCare runs a wildlife hospital and environmental education programs.

Petitioner WildEarth Guardians is a New Mexico nonprofit organization that works to protect and restore the wild places, wildlife and wild rivers of the American West.

Petitioner Wild Equity Institute is a California nonprofit organization that unites the grassroots conservation and environmental justice movements in campaigns that build a healthy and sustainable global community for people and the plants and animals that accompany us on Earth.

Petitioner Wild Heritage Planners, based in Southern California, collaborates with government, industry, and stakeholders as urban planners, transportation advocates, and environmental sustainability consultants, advocating for smart growth and comprehensive planning solutions to pressing issues challenging urban and regional development, energy, and climate stability.

Petitioner Wild Wings, Inc. is a nonprofit educational organization in New York that houses and cares for permanently injured birds of prey which are unable to survive on their own in the wild any more.

JA 056

Petitioner Wild Wings (Old Greenwich) is a nonprofit, all-volunteer, wildlife rehabilitation and environmental education organization in Connecticut dedicated to the preservation and well-being of wildlife and habitats.

Petitioner Wild Wings Raptor Rehabilitation is a non-profit center that provides emergency medical and restorative care to wild native raptor species in Oregon.

Petitioner Wildlife Center of the North Coast is a nonprofit wildlife center that provides rehabilitative care to native wildlife in the central and north Oregon coast and southwest Washington, offers conservation education programs to the region and conducts non-lethal research in wildlife and environmental health.

Petitioner Wisconsin Audubon Council represents and combines the efforts of 15 Audubon chapters, two Audubon nature centers, and Audubon members in Wisconsin. The promotes the conservation, preservation and study of all wildlife, plants, soil, water, air, and other natural resources for the benefit of nature and society.

Petitioner Wisconsin Metro Audubon Society works to inform the public and encourage wise environmental practices through education and conservation, working toward a future when children and adults will respect, appreciate, and protect the environment.

Petitioner Zumbro Valley Audubon Society is a Minnesota chapter of the Audubon Society that brings environmental awareness, appreciation, and advocacy to the community.

TSCA requires that within 90 days after the filing of a petition, the EPA shall either grant or deny the petition (15 U.S.C. § 2620(b)(3)). If the Administrator grants the petition, the Administrator shall promptly commence an appropriate proceeding. If the Administrator denies the petition, the Administrator shall publish in the Federal Register the Administrator's reasons for such denial (15 U.S.C. § 2620(b)(3)).

Contact information for petitioners:

Center for Biological Diversity
351 California Street, Suite 600
San Francisco, CA 94104
Contact: Jeff Miller
Phone: (415) 436-9682 x303
E-mail: jmiller@biologicaldiversity.org

## II.    NATURE OF THE REQUESTED REGULATION

Petitioners request that the EPA initiate a rulemaking to regulate bullets and shot containing lead used in hunting and shooting sports, pursuant to TSCA (15 U.S.C. § 2605(a)(2)(A)(i)). Such regulations are needed to protect vulnerable wildlife species from the ongoing threat of lead poisoning, as well as to safeguard human health. Petitioners believe the necessary and most effective regulation would be a complete ban on bullets and shot containing lead for use in hunting and shooting sports, with specific exceptions for military and law enforcement uses, but also request that the EPA evaluate and consider a range of alternatives to eliminate the potential for harmful lead exposure to wildlife and humans. Petitioners request a rulemaking pursuant to section 6(a) of TSCA.

TSCA grants the EPA broad authority to regulate chemical substances that "present an unreasonable risk of injury to health or the environment" (15 U.S.C. § 2061). The EPA may regulate the manufacture, processing, distribution, use or disposal of such chemical substances. Specific control mechanisms include: prohibitions on an entire or certain use of a chemical substance; limitations on allowable concentration levels; labeling or recordkeeping requirements; and obligations to issue notice of risks of injury (15 U.S.C. § 2605(a)). Regulations to address toxic lead shot and bullets which present an unreasonable risk of injury to human health or the environment may be achieved through a range of alternatives, up to and including the EPA prohibiting the manufacture, processing, or distribution in commerce of a chemical substance for a particular use (15 U.S.C. § 2605(a)(2)(A)(i)).

TSCA mandates that the EPA <u>must</u> regulate chemical substances where there is a "reasonable basis to conclude" that such substances "present an unreasonable risk of injury to health and or the environment" (15 U.S.C. § 2605(a)). Lead used in shot and bullets is a "chemical substance" falling within the scope of TSCA. As defined by TSCA, "Except as provided in subparagraph (B), the term 'chemical substance' means any organic or inorganic substance of a particular molecular identity, including (i) any combination of such substances occurring in whole or in part as a result of a chemical reaction or occurring in nature and (ii) any element or uncombined radical" (15 U.S.C. § 2602(2)(A)).

The EPA has already declared that lead is a toxic substance, and has removed nearly all products containing lead from the market. Most other uses of lead, such as lead-based paints, plumbing pipe and fixtures, and leaded gasoline, are already subject to strict regulation (15 U.S.C. §§ 2681-2692). The EPA has recently initiated additional regulatory actions to reduce lead exposure, for example: lead and lead compounds were added to the Priority Testing List (40 C.F.R. 716.120; *see also* 15 U.S.C. § 2603(e)), requiring certain lead manufacturers to submit unpublished health and safety reports to the EPA (73 Fed. Reg. 5109-5115; Jan. 29, 2008); lead automobile wheel balancing weights will be phased out with an EPA proposed rule; EPA recently solicited comments on a petition to phase out the largest remaining permitted use of leaded gasoline, that for piston-driven aircraft (USEPA 2010); and manufacturers of consumer products intended for use by children who also manufacture lead or lead compounds are required to report

**JA 058**

certain health and safety data to the EPA. However, the EPA currently does not regulate the manufacture, processing, distribution, use or disposal of lead in shot or bullets under TSCA.

**JA 059**

### III.     PREVIOUS EFFORTS TO REGULATE

On August 3, 2010, the American Bird Conservancy, Association of Avian Veterinarians, Center for Biological Diversity, Project Gutpile and Public Employees for Environmental Responsibility submitted a petition to the EPA under TSCA requesting that the EPA issue a proposed rule to prohibit the manufacture, processing, and distribution in commerce in the United States of lead ammunition (including bullets and shotgun pellets) and lead fishing tackle. The EPA denied the petitioners' request for a ban on lead shot and bullets in a letter dated August 27, 2010. The EPA stated in its letter that "EPA has determined that TSCA does not provide the Agency with authority to address lead shot and bullets as requested in your petition, due to the exclusion found in TSCA § 3(2)(B)(v). Consequently, we are denying that portion of your petition."

EPA's denial of the petition notwithstanding, TSCA does in fact provide the EPA with the authority to address lead shot and bullets. While certain substances are excluded from the definition of "chemical substances," the exclusion found in TSCA § 3(2)(B)(v) does not apply to lead shot or bullets. See the discussion in section VI below, Authority to Act.

This current petition before the EPA seeks different relief under TSCA than the 2010 petition, is brought by a different group of petitioners, and introduces new information. This petition provides information repudiating EPA's conclusion that TSCA does not provide the agency with authority to address lead shot and bullets.

This petition does not seek a ban of all lead ammunition used in hunting and shooting sports. It instead asks the EPA to initiate a rulemaking for regulations that adequately protect wildlife, human health and the environment against the unreasonable risk of injury from bullets and shot containing lead used in hunting and shooting sports, which have the potential to cause harmful lead exposure to wildlife and humans. Although the petitioners advocate for a nationwide ban on the use of bullets and shot containing lead for use in hunting and shooting sports, with explicit exceptions for military and law enforcement uses, the EPA has latitude under TSCA to consider a broad range of alternatives for addressing an unreasonable risk of injury and the petitioners request that the EPA evaluate and consider a range of alternatives that could eliminate the potential for harmful lead exposure to wildlife and humans. In doing so, it is EPA's responsibility to determine the least burdensome alternative that adequately addresses the unreasonable risk of injury.

JA 060

## IV.     REASON FOR THE REQUEST

### A.     Introduction

Lead has been used by humankind for millennia. Lead had numerous uses in ancient Egypt and it is believed that toxicity arising from the use of lead in water pipes, pottery, cosmetics, food and wine may have contributed to the fall of the Roman Empire (Hernberg 2000). The properties of lead as a biocide have been well known for hundreds of years. It is now unquestioned scientific knowledge that lead is a toxic substance with potentially lethal as well as numerous pathological effects on living organisms of all sorts. Despite this knowledge, lead has continued to be used in a wide variety of manufactured products, many of which are continued sources of toxic lead exposure to humans and to wildlife.

The use of lead for hunting dates back hundreds of years. The effects of lead in modern shot and bullets on wildlife have been well documented and reviewed (e.g. Pain 1992; Fisher et al. 2006; Rattner et al. 2007). Recognizing these threats, some jurisdictions began placing restrictions on the use of lead ammunition in the 1970s and 1980s. Despite minimal restrictions, significant amounts of lead continue to be deposited in aquatic and upland habitats and enter the food chain from spent lead ammunition. Legal and illegal hunting using lead ammunition may directly or secondarily expose wildlife to lead and deposit bioavailable lead into the environment. Shooting sports such as skeet/trap shooting and target practice activities also deposit significant amounts of lead in geographically localized areas.

Lead can remain in the environment relatively intact and stable for decades, and, under some environmental conditions it can be readily released and taken up by plants or animals (ATSDR 2007). Absorbed or ingested lead can cause a range of biochemical, physiological, and behavioral effects in species of invertebrates, fish, amphibians, reptiles, birds, and mammals. Wildlife can be exposed to lead through feeding in aquatic environments and ingesting contaminated vegetation and sediments, feeding on invertebrates or vertebrates containing lead, or ingesting lead pellets or fragments directly, mistaking them for food, grit, or bone. Although lead is a naturally occurring metal in the environment, for biological systems it is a nonessential metal with no functional or beneficial role at the molecular or cellular level. Ingested lead substitutes in dysfunctional ways for calcium in biochemical interactions, with harmful effects on neurological functions, bone structure, renal function, reproductive functions, pancreatic functions, and muscular functions, among others.

Lead is toxic to organisms at very low levels, and has lethal and severe sublethal effects at higher levels (IPCS 1989; Nordic Council of Ministers 2003). Lead can act as a neurotoxin, and numerous studies indicate that blood lead concentrations even below 10 micrograms per deciliter can have adverse developmental effects on intellectual functioning and social-behavioral conduct in humans (Needleman et al. 1990; Canfield et al. 2003; Ris et al. 2004). Human fetuses and young children are particularly sensitive to even low levels of lead exposure and can easily suffer permanent neurological damage.

**JA 061**

Clinicians now assert that there is no safe level of lead in the body tissues for fetuses and young children (e.g. Canfield et al. 2003; Lanphear et al. 2005, 2006; Carlisle et al. 2009).

In recent decades the federal government has taken various regulatory actions to reduce the exposure of humans to lead in drinking water, paint, gasoline, toys, toxic dumps, automobile wheel balancing weights, and indoor and outdoor shooting ranges. However, other lead sources causing significant contamination are still uncontrolled, and lead exposure to wildlife has been widely documented and is not adequately regulated.

Toxic lead shotgun pellets from hunting accumulate in both aquatic and terrestrial habitats, where animals often eat them because they are mistaken for grit or food (seeds). Birds frequently ingest spent lead shotgun pellets as grit normally consumed to aid grinding of foods in the gizzard during digestion. Spent lead shotgun pellets on the ground in fields where upland game birds are hunted are also ingested by birds as grit making herbivorous birds as well as carnivorous birds victims of lead poisoning. Mourning doves are particularly sensitive to this, as they are hunted in fields where they congregate to feed, and spent lead pellets are the appropriate sized grit for doves. Ducks, geese, and swans have received much protection from this source of lead poisoning since 1991 through the federal requirement to use only non-lead shot for hunting waterfowl, but similar restrictions in terrestrial habitats are few, scattered, and localized. Research has shown that over 75 terrestrial species of birds are known to be poisoned by spent lead ammunition (Eisler 1988; Fisher et al. 2006).

Evidence has accumulated over the past century and it is now incontrovertible fact that lead fragments in the bodies of animals shot with lead bullets or lead shotgun pellets are a serious source of lead exposure to scavenging animals that eat meat containing lead fragments and residue (e.g. Calvert 1876; Holland 1882; Grinnell 1894; Bowles 1908; Pain 1992; Fisher et al. 2006; Rattner et al. 2007). Lead fragments in meat also pose potential health risks to humans who eat lead-tainted game, especially subsistence hunters dependent upon hunted game for food. Critically endangered California condors, bald and golden eagles, ravens, and other scavenging birds are frequently killed or harmed by this source of lead poisoning.

More than 130 species of animals (including upland birds, raptors, waterfowl, mammals and reptiles) have been documented being exposed or killed by ingesting lead shot, bullets, bullet fragments or prey contaminated with lead ammunition (Environment Canada 1995; Tranel and Kimmel 2009). As long as ammunition manufactured with lead projectiles remains available for purchase and use, numerous species of wildlife will continue to be poisoned by lead and human health will be threatened, posing an unreasonable risk of injury to human health and the environment.

**JA 062**

B.     **Sources and Quantities of Lead in the Environment from Hunting and Shooting Sports**

The density of spent lead shot in wetlands or fields is related to hunting intensity. In waterfowl hunting areas, prior to the national requirement for non-lead shot, densities of spent shot from about 50,000 pellets to over 2 million pellets per acre were reported (Bellrose 1959; Pain 1992; Rocke et al. 1997). Areas with regular hunting from fixed position blinds or pits resulted in significant accumulation of spent lead. Prior to the banning of lead shot for waterfowl hunting, an estimated 2,721 metric tons of spent lead shot were deposited in U.S. wetlands each year (Pain 1992), and spent shot accumulated near the surface of sediments in aquatic settings, increasing the amount of lead shot available to waterfowl over time (Pain 1992). The depth of lead fragments in soil and their availability are influenced by land management practices such as cultivation, and lead shot and bullets can persist for decades to hundreds of years (Fredrickson et al. 1977; Jorgensen and Willems 1987; Kendall et al. 1996).

Despite the ban on lead shot for waterfowl hunting, significant lead shot deposition continues today in upland fields used for hunting, where densities of spent lead shot can reach over 400,000 pellets per acre (Schulz et al. 2002). Castrale (1989) estimated densities of 11,000 pellets/acre in a field managed for dove hunting in Indiana. Lewis and Legler (1968) estimated 43,600 pellets/acre in a field managed for dove hunting in Tennessee. Esslinger and Klimstra (1983) estimated 44,000 pellets/acre in a field managed for goose hunting in Illinois. Fredrickson et al. (1977) estimated 122,800 pellets/acre in uncultivated fields near duck blinds in Missouri. Best et al. (1992a) estimated 344,000 pellets/acre in an area frequented by dove and quail hunters in New Mexico. The Washington Fish and Wildlife Nontoxic Shot Working Group in 2001 estimated densities of 188,000 and 344,000 pellets/acre at two pheasant release sites in Washington.

Large amounts of spent lead ammunition also continue to be deposited in the environment through hunting of big game, upland species, furbearers, and from predator control activities (Scheuhammer and Norris 1995; Schulz et al. 2002). Lead from shot, bullets and bullet fragments in tissue or entrails of wounded or dead animals has been increasingly recognized as a threat to many scavenging species (Jannsen et al. 1986; Hunt et al. 2006; Knopper et al. 2006).

To give an idea of the quantity of potentially lead-tainted carcasses available to scavengers, Fry and Maurer (2003) quantified hunter-shot carcasses available to condors in their California range before the California lead ammunition ban went into effect, and concluded that gut piles and whole carcasses left in the field by hunters were a highly significant source of lead within the condor range. From hunting survey data for the eight counties encompassing the condor range in California, Fry and Maurer (2003) estimated an annual average of 36,000 big game animals (17,000 wild pigs, 11,000 coyotes and 8,000 deer) were taken each year by sport hunters in this area. Fry and Maurer (2003) assumed that only a very few gut piles are actually buried, hidden successfully, or removed from the field. Deer and pigs are generally field dressed and gut piles discarded

**JA 063**

in the field; coyotes are generally left in the field intact. The Fry and Maurer (2003) figures do not account for poaching, which likely significantly increases the number of deer carcasses available. The data also do not account for the thousands of pigs and deer shot by ranchers under depredation permits or small game such as ground squirrels shot by varmint hunters. The carcasses of large animals left in the field would be the primary source of hunter-shot food for condors, although condors and other scavengers will eat smaller animals as well. Fry and Maurer (2003) estimated that almost 28,000 tree squirrel, rabbit, and ground squirrel carcasses are left in the field within the condor range annually. Even animals as small as ground squirrels shot with .22 caliber bullets can contain lead fragments at biologically relevant levels that may constitute a lead-hazard for other scavenging birds of prey (Harmata and Restani 1995: Knopper et al. 2006).

Target, trap and skeet shooting can result in substantial accumulation of spent lead in localized areas, and lead from spent shot at shooting ranges can become bioavailable to terrestrial and aquatic plants, invertebrates, and vertebrates (Scheuhammer and Norris 1995). Individual shooting ranges can deposit as much as from 1.4 to 15 tons of lead shot and bullets each year; estimates of the annual amount of lead shot and bullets deposited at the roughly 9,000 outdoor shooting ranges in the U.S. range from 72,600 to 80,000 metric tons (Tanskanen et al. 1991; USEPA 2001; Craig et al. 2002; USGS 2008). Kendall et al. (1996) estimated mean densities of spent lead shot at trap, skeet, and sporting clay ranges in the United States at 3.7 billion pellets/acre. Large concentrations of lead at shooting ranges (up to 17,000 grams per square meter) cluster in small areas because of stationary targets, trajectories of launched targets, and concentration of shooters (Darling and Thomas 2003). Significant amounts of fine particulate lead can concentrate near shooting stations.

Studies of the dissolution of lead from shot at terrestrial shooting ranges suggest that one-half of a lead shot pellet would release into the soil within 40 to 70 years and that the entire lead shot would transform in 100 to 300 years, with mechanical disturbance of soil enhancing transformation rates (Jorgensen and Willems 1987; Scheuhammer and Norris 1995; Hardison et al. 2004). Lead concentrations in soil at shooting ranges have been shown to be up to 55,000 mg/kg, over 10,000 times background levels (Scheuhammer and Norris 1995). Lead leaching into soil or sediment exceeding criteria for hazardous waste and dissolved lead entering surface water and ground water exceeding water quality criteria has been documented at many U.S. shooting ranges (Murray et al. 1997; Bruell et al. 1999; Craig et al. 1999; Rooney et al. 1999; Chen et al. 2002; Cao et al. 2003a, 2003b; Soeder and Miller 2003; Sorvai et al. 2006). One study of shooting ranges over water showed high shot density in the soil/sediment fall zone and lead concentrations in water samples two orders of magnitude above EPA water quality criteria (Stansley et al. 1992).

### C.    Pathways of Lead Exposure

Lead has been widely dispersed throughout the environment from activities such as mining, smelting, manufacturing, and engine combustion. Many historical documented instances of lead exposure among terrestrial wildlife species have been associated with

JA 064

small contaminated areas, such as around metal smelters, shooting ranges, lead paint contaminated buildings, or locations with intense hunting pressure (Blus et al. 1991; Henny et al. 1991; Blus et al. 1995; Sileo et al. 2001; Lewis et al. 2001). Manufacture and uses of leaded gasoline, lead-based paints and pesticides, and use of lead solder in cans has now been nearly eliminated in the U.S. Environmental distribution of lead from hunting and shooting however, is still widespread, although it is difficult to estimate the magnitude of lead exposure compared to other sources, such as legacy residues of leaded gasoline exhaust deposition, emissions from smelters, improper disposal of paint chips and dust, and lead ground to dust from lead wheel weights falling off vehicles.

Lead from shot, bullets and fragments in heavily hunted fields, wetlands, and shooting areas can be directly ingested or solubilized and biologically incorporated into food items (Ma 1989; Stansley and Roscoe 1996; Hui 2002). Studies at shooting ranges have shown increased lead levels in terrestrial and aquatic plants (Manninen and Tanskaanen 1993; Peterson et al. 2993; Mellor and McCartney 1994; Rooney et al. 1999; Hui 2002), and lead concentrations in invertebrates have been shown to be elevated due to uptake of lead near shooting ranges (Hui 2002; Labare et al. 2004).

There is very little information on lead released from spent shot aquatic habitats which could be solubilized and taken up by invertebrates or fish (Stansley et al. 1992; Hui 2002). For reptiles and amphibians near heavily hunted wetlands and shooting ranges, consumption of waterborne lead and ingestion of lead-contaminated sediments and food items are likely exposure pathways (Stansley and Roscoe 1996; Borkowski 1997; Camus et al. 1998; Hammerton et al. 2003; Pattee and Pain 2003; Lance et al. 2006). There is extensive documentation of direct ingestion of lead shot and bullet fragments by dabbling and diving ducks, swans, loons and other water birds, and other marsh birds feeding in wetland areas that are hunted with lead ammunition can ingest spent lead, such as flamingoes, rails, shorebirds, terns and herons (Artman and Martin 1975; Kaiser et al. 1980; Maedgen et al. 1982; Custer and Mulhern 1983; Hall and Fisher 1985; Locke et al. 1991; Beck 1997; Mateo et al. 1997; Acora 2005).

The most significant lead exposures and effects are due to direct ingestion of spent lead shot and bullet fragments by waterfowl (Sanderson and Bellrose 1986) and certain upland game species (Kendall et al. 1996, Schulz et al. 2006). Secondary poisoning of birds consuming wounded or dead prey contaminated with lead ammunition and scavenging of gut piles with spent lead ammunition or fragments is a significant source of toxic exposure to predatory and scavenging birds, with particularly deadly effects on bald eagles and California condors (Pattee and Hennes 1983; Kramer and Redig 1997; Meretsky et al. 2000; Church et al. 2006; Hunt et al. 2006; Pauli and Buskirk 2007). The recent use of stable lead isotope ratios has provided evidence that ammunition sources are responsible for lead exposure in wild birds (Scheuhammer and Templeton 1998; Scheuhammer et al. 2003a; Church et al. 2006, Finkelstein et al. 2010).

Granivorous (seed-eating) bird species may ingest lead shot as grit, or perhaps mistaking it for berries, which may be similar in appearance after drying and falling (Calvert 1876; Campbell 1950; Hunter and Rosen 1965; Fimreite 1984; Best 1992; Scheuhammer et al.

JA 065

1999; Lewis et al. 2001; Potts 2004; Butler 2005a, 2005b; Rodrigue et al. 2005). Significant lead exposure has been documented in doves foraging at intensive hunting or target-shooting areas (Fisher et al. 2006 Schulz et al. 2002). Species that forage primarily on seeds on the ground may have higher risk, but even bird species with very different foraging strategies, such as woodpeckers, can acquire lead - presumably by ingesting lead fragments embedded in trees or on the ground (Mörner and Peterson 1999). Of birds and mammals examined in a firearm shooting field, 33% were found to have elevated lead tissue levels and 17% to have potential subclinical or clinical lead exposure (Lewis et al. 2001). Deer are thought to ingest lead fragments on the ground at shooting ranges because of the taste of lead salts on oxidized fragment surfaces (Lewis et al. 2001).

Animals that scavenge hunter-killed carcasses are at the highest risk of encountering severely toxic concentrations of lead. Recent studies by Hunt et al. (2006, 2009) evaluated radiographic evidence of lead fragments in 38 deer killed by licensed hunters using center fire rifles with lead-based copper jacketed, soft point bullets in Arizona from 2002 to 2004. Ninety-four percent of samples of deer killed with lead-based bullets contained fragments and 18 out of 20 (90%) offal piles contained lead fragments. Metal fragments were found to be broadly distributed along wound channels. The authors concluded that the data demonstrated a high potential for scavenger exposure to lead. Meanwhile, the carcasses and gut piles from deer killed by non-lead copper expanding bullets (or "Xbullets") showed little evidence of fragmentation (Hunt et al. 2006, 2009).

Reports from experimental and field observations conclude that all bird species would be susceptible to lead poisoning after ingesting and retaining shot in the gastrointestinal system (Fisher et al. 2006). Raptor and scavenger species that feed on animals killed with lead ammunition would be at high risk for exposure to lead in this way. Animals that consume lead particles that have fragmented in hunter-killed carcasses may be at particular risk because the small size and irregular shape of fragments make them more absorbable in the digestive process.

Fisher et al. (2006) listed fifty-nine terrestrial bird species worldwide that have been exposed to lead from ammunition sources, including raptors, galliforms, gruiforms, columbiforms, and gulls. Vyas et al. (2000, 2001) identified lead in song birds resident on a shotgun trap and skeet range. Fisher et al. (2006) reviewed published literature on lead poisoning of 32 species of wild birds in the United States from spent lead ammunition. Documented cases of ingestion and poisoning by lead from ammunition in terrestrial birds globally include 33 raptor species and 30 species from *Gruiformes*, *Galliformes* and various other avian taxa, including ten globally threatened or near threatened species (Pain et al. 2009). Lead poisoning is of particular conservation concern in long-lived slow breeding species, especially those with initially small populations. A review by the Minnesota Department of Natural Resources found over 130 species of animals (including upland birds, raptors, waterfowl, and reptiles) have been reported in scientific literature as being exposed or killed by ingesting lead shot, bullets, bullet fragments or prey contaminated with lead ammunition (Tranel and Kimmel 2009). In the United States, Kendall et al. (1996) found that upland game birds ingest substantial amounts of lead shotgun pellets and deduced that raptors must incur secondary ingestion of pellets

**JA 066**

because their prey ingested it. Rifle-shot prairie dogs and ground squirrels may contain fragmented lead particles that could be ingested by scavengers or raptors (Knopper et al. 2006; Pauli and Buskirk 2007). Kramer and Redig (1997) compiled data on more than 2,000 bald eagles, demonstrating that lead shot pellets, likely from crippled waterfowl and lead fragments in offal and unrecovered deer carcasses, were responsible for elevated lead levels in more than 98% of birds admitted to a veterinary hospital and raptor center. Recent studies have definitively linked isotopically labeled lead in California condors with rifle bullets sold in the same region, substantiating the claims that condors are ingesting lead from hunting sources and that condor lead poisoning deaths and sublethal effects are solely from lead bullet fragments (Scheuhammer et al. 2003a; Church et al. 2006; Chesley et al. 2009; Finkelstein et al. 2010).

Terrestrial birds are exposed to lead mainly through ingestion. Galliforms and doves probably ingest spent shot as grit which is retained in their gizzards, although there is considerable uncertainty as to why doves ingest shot pellets (Schulz et al. 2002). Approximately 2.5% of hunter-shot doves examined contained lead shot in their digestive system, giving a rough estimate of the proportion of doves that ingest shot (Schulz et al. 2002). A similar percentage of doves collected on fields where hunters used steel shot ingested steel shot (Schulz et al. 2002). Estimates of the U.S. dove population are 350-600 million birds (Dunks et al. 1982; Schulz et al. 2006), and experimental studies indicate that nearly all doves that ingest shot will die as a result of this ingestion. Schulz et al. (2006) estimated that from 8.8 to 15 million doves may be killed each year from ingesting lead shot pellets. If scavengers consume these poisoned doves and secondarily consume the lead pellets, it is estimated that up to an additional one million scavenging birds and mammals could die annually from ingesting poisoned doves alone.

Raptors and other scavenging birds are usually poisoned through ingesting lead shot or bullet fragments in dead or injured prey or gut piles (Friend 1987; Kendall et al. 1996). Common ravens have been shown to have elevated blood lead levels during hunting season due to ingestion of lead in rifle-shot big game offal piles (Hatch 2006; Craighead and Bedrosian 2007, 2008). In Canada, upland game birds and mammals, the primary food source of many raptors, are now more likely to contain lead shot than waterfowl, as lead shot is prohibited for waterfowl hunting (Clark and Scheuhammer 2003).

### D.    Toxic Effects of Lead on Wildlife

Lead has long been recognized as a poison to living organisms (Grinnell 1894; Engsted 1932; Horton 1933), with negative effects on general health, reproduction, and behavior (Ris et al. 2004). Lead was highlighted as an important cause of mortality in wildlife populations in the late 1950s, when ingestion of spent hunting lead pellets was recognized to cause death in a wide range of wild waterfowl (Bellrose 1959). Reports of poisoned wildlife have continued frequently since that time (e.g. Bates et al. 1968; Irwin and Karstad 1972; Sanderson and Bellrose 1986; Kramer and Redig 1997; Schulz et al. 2006).

JA 067

It is well recognized that lead fragments can be absorbed from the gastrointestinal tract of birds and mammals, cause damage in various organs, and result in behavioral changes, significant illness, and even death depending on the amount ingested (Reiser and Temple 1981; Kramer and Redig 1997; Fisher et al. 2006).

Lead fragments or pellets ingested by birds may be rapidly regurgitated (in the pellets of raptors, for example), retained for varying periods, or completely dissolved with the resulting lead salts absorbed into the bloodstream. The likelihood of a bird becoming poisoned is related to the retention time of lead items, frequency and history of exposure to lead, and factors such as nutritional status and environmental stress (Pattee and Pain 2003). A proportion of exposed birds will die, and mortality can occur following the ingestion of just one pellet of lead shot (Pain and Rattner 1988). Ingestion of lead particles usually results in some absorption, and in cases where sufficient lead is absorbed, poisoning ensues. Lead concentrations are generally highest in the blood directly after absorption, and in liver and kidneys for days to months after absorption. Lead deposited in bone can remain for years, and reflects lifetime exposure (Pain 1996). Lead is a non-essential element and the activity of blood enzymes appears to be affected by extremely low concentrations. Other than in cases of point source contamination, high concentrations of lead in the tissues of birds result primarily from the ingestion of lead ammunition or fishing weights.

Various authors have attempted to define tissue concentrations in birds indicative of excessive lead poisoning, sub-lethal poisoning and acute poisoning (Franson et al. 1996; Pain 1996), but there is no definitive consensus on "background" lead levels for wild birds. Environmental sources of lead are almost exclusively anthropogenic, with a small contribution from natural sources such as volcanoes. Lead is rarely found in nature in its elemental metal form, and the most common source is galena or PbS, which has a very low solubility in water. Wildlife can get low level exposure to lead from unknown sources, including natural accumulation in plants and ingestion by herbivores, and deposition by leaded gasoline exhaust, now attenuated with regulation. "Baseline" lead concentrations in wildlife can vary between taxa, and the diagnosis of poisoning is usually based on signs of poisoning in combination with blood lead levels in live birds, and on tissue concentrations, sometimes in combination with evidence of exposure to lead in dead birds. For example, the Diagnostic Center for Population and Animal Health (Michigan State University, Lansing MI) defined background blood lead levels as <35 µg/dL for eagles (W. Rumbeiha, pers. comm.), while Pattee et al. (1990) defined background levels as <20 µg/dL, and Feierabend and Myers (1984) defined them as <10 µg/dL. Until recently, the generally accepted blood lead levels for wild birds have been <20 µg/dL as background; 20 to <50 µg/dL indicating subclinical poisoning; 50 to 100 µg/dL indicating clinical poisoning; and >100 µg/dL representing severe clinical poisoning (Friend 1985, 1999; Franson 1996; Pain 1996; Pattee and Pain 2003). For condors, blood lead levels above 10 µg/dl, rather than 20 µg/dl, could have detrimental effects on condors and ought to be considered the beginning of toxic exposure (Fry et al. 2009). The background levels of 20ug/dl are now understood to indicate significant exposure, because animals held in captivity usually have background levels of 4 µg/dl or less (Walters et al. 2010).

JA 068

A threshold toxic level for wildlife is difficult to measure because the effects on the nervous system at low doses can be subtle and difficult to detect without specific quantifiable behaviors. In addition, predisposition and susceptibility to lead can vary between individuals within a species (Pattee et al. 1981, Carpenter et al. 2003). There is probably no toxic lead threshold for any animal, as lead is a neurotoxin with no biological function. Lead salts are rarely encountered in the environment, and animals do not have well established metabolic or detoxification mechanisms to biochemically protect themselves from adverse effects of lead exposure. Even a minor decrease in fitness to a bird surviving in a hostile and competitive environment caused by small amounts of lead ingestion may result in death from other causes. In long-lived bird species, such as condors, eagles and ravens, this has the potential to skew the normal age structure toward younger and non-breeding birds and negatively influence long-term population viability. As the duration of periodic and chronic exposure increases in the condor population so does the likelihood of death by lead-poisoning. It is unknown whether wildlife species sustain sublethal effects on coordination and cognitive behaviors similar to those demonstrated in humans, but it is likely that repetitive sub-lethal exposures to lead will cause permanent neurological and behavioral decrements in all species of wildlife (Canfield et al. 2003; Lanphear et al. 2003; Ris et al. 2004).

Lead is a non-specific poison affecting all body systems. Birds can suffer from both acute and chronic lead poisoning (Bellrose 1959; Redig 1985; Sanderson and Bellrose 1986; Eisler 1988; Scheuhammer and Norris 1996). Birds with acute lead poisoning can appear normal, but experience massive tissue destruction to internal organs and death within a few days (Sanderson and Bellrose 1986). Birds with chronic lead poisoning may develop appetite loss, anemia, anorexia, reproductive or neurological impairment, immune suppression, weakness, and susceptibility to predation and starvation (Grandy et al. 1968; Kimball and Munir 1971; Finley and Deiter 1978; Hohman et al. 1995).

The effects of lead toxicosis in birds commonly include distension of the proventriculus, green watery feces, weight loss, anemia and drooping posture (Hanzlik 1923; Quortrup and Shillinger 1941; Redig et al. 1980; Reiser and Temple 1981; Franson et al. 1983; Custer et al. 1984; Sanderson and Bellrose 1986; Mateo 1998). Sub-lethal toxic effects are exerted on the nervous system, kidneys and circulatory system, resulting in physiological, biochemical and behavioral changes (Scheuhammer 1987). Vitamin metabolism can be affected (Baski and Kenny 1978) and birds can go blind (Pattee et al. 1981). Lead toxicosis depresses the activity of certain blood enzymes, such as delta aminolevulinic acid dehydratase, essential for cellular energy and hemoglobin production, and may impair immune function (Redig et al. 1991; Grasman and Scanlon 1995). Over longer periods, haematocrit and hemoglobin levels are often reduced. Finkelstein et al. (2010) found that sub-lethal concentrations of lead in blood (20 μg/dL), resulted in a 60% decrease in the levels of aminolevulinic acid dehydratase in condors.

As a result of physiological and behavioral changes, birds may become increasingly susceptible to predation, starvation and infection by disease, increasing the probability of death from other causes (Scheuhammer and Norris 1996). Lead can also affect

JA 069

reproductive success (Cheatum and Benson 1945; Elden 1954; Buerger 1984; Buerger et al. 1986). Grandjean (1976) showed a correlation between thin eggshells and high concentrations of lead in European kestrels (*Falco tinnunculus*). Lead poisoning significantly decreased egg production in captive Japanese quail, *Coturnix japonica* (Edens and Garlich 1983). In ringed turtle doves (*Streptopelia risoria*), significant testicular degeneration has been reported in adults following shot ingestion and seminiferous tubules may be devoid of sperm (Kendall and Scanlon 1981; Veit et al. 1982). Experimental studies on Cooper's hawks (*Accipiter cooperii*) showed detectable amounts of lead in eggs when adults had high levels in their blood (Snyder et al. 1973). In nestlings of altricial species, such as the American kestrel (*Falco sparverius*), body length, brain, liver and kidney weights can be depressed (Hoffman et al. 1985a), along with reduced survival and disrupted brain, liver and kidney function (Hoffman et al. 1985b).

Under some circumstances, there may be sex differences in the probability of exposure to or poisoning by lead, at least in western marsh-harriers (*Circus aeruginosus*), as significantly more females than males trapped had elevated lead concentrations, for unexplained reasons (Pain et al. 1993). Lead exposure may also reduce the likelihood of birds returning to an area to breed (Mateo et al. 1999). Locke and Friend (1992) concluded from their wide-ranging study that all bird species would be susceptible to lead poisoning after ingesting and retaining shot. All raptor species that feed on game could potentially be exposed at some time to lead ingestion, the likelihood varying according to the proportion of game in the diet, the size of game taken, the season, and the local hunting intensity (Pain et al. 1993).

Burger and Gochfeld (2000) found that chronic lead exposure resulted in delayed behavioral response time in both laboratory and wild herring gulls (*Larus argentatus*). Kelly and Kelly (2005) documented moderately elevated blood lead levels increased the risk of collision with overhead power lines for mute swans (*Cygnus olor*). Mallards (*Anas platyrhynchos*) experimentally fed lead exhibited hemolytic anemia during the first week of exposure and neurological impairment during the second week (Mateo et al. 2003). In experimentally fed turkey vultures (*Cathares aura*) and bald eagles (*Haliaeetus luecocephalus*), lead ingestion decreased weight and muscle mass and caused blindness (Pattee et al. 1981, 2003). Blood pressure increases and renal damage have also been observed in rodents after experimental lead exposure (Victery 1988; Staessen et al. 1994). Bagchi and Preuss (2005) found that acute lead exposure had lasting effects including lowered bone density and increased blood pressure one year after exposure in laboratory rats.

In spite of the abundance of evidence that lead is toxic to wildlife, poisoning rates are not well understood. While massive die-offs are readily visible, daily losses of individual animals are more difficult to detect. This is because sick animals will often isolate themselves, and then are quickly predated upon after death. In one study, observers were given 30 minutes to discover 100 placed carcasses and only found 6 (Stutzenbaker et al. 1983). In another study in which researchers planted carcasses, over 60% of the carcasses

JA 070

were gone within 3 days and over 90% were gone within 8 days (Humburg et al. 1983; Stutzenbaker et al. 1983).

Sub-lethal lead poisoning may weaken raptors and leave them unable to hunt, or make them more susceptible to mortality from vehicles, power lines, and steel traps (Redig et al. 1980; Fry and Maurer 2003). It has also been suggested that raptors intoxicated with lead may suffer impaired hunting ability and may scavenge to a greater extent or be less selective in their choice of prey (Pain et al. 1993). Sampling methods to determine the exposure to lead intoxication in wildlife have inherent biases as does any wildlife health assessment in the field.

Long-lived species are particularly susceptible to bioaccumulation of lead in bone tissues, and repeated lead ingestion and accumulation in long-lived species can reduce bone mineralization, which could mean an increase in bone fragility (Gangoso et al. 2009). Gangoso et al. (2009) found unusually high level of frequency of fractures and even leg amputations in an Egyptian vulture (*Neophron percnopterus*) population with high exposure to ingestion of lead ammunition.

The non-lethal effects of lead toxicosis may be difficult to recognize at a distance in free-ranging wild animals. Subtle neurological signs are easy to miss even in domesticated animals that can be physically examined. Wild animals that have died from or have been debilitated by lead poisoning may elude capture due to behavioral or physiological changes, or be removed from the population if lead exposure is associated with high levels of mortality (Miller et al. 1998).

Lead poisoning due to ingestion of spent shot or bullet fragments has had population-level effects for some bird species with low recruitment rates, depressed populations, or in recovery, such as the California condor, bald eagle, trumpeter swan, sandhill crane, and spectacled eider (Hennes 1983; Grand et al. 1998; Church et al. 2006).

### E.    Lead Ammunition Poisonings by Species

Information on lead poisoning of wildlife species in the United States from lead ammunition is detailed below. Information on lead poisoning of wildlife species in Canada and other countries is included in some instances where there is additional research on the effects and prevalence of lead toxicosis for certain species.

### 1.    California Condor (*Gymnogyps californianus*)

The potential effects of lead ammunition in non-waterfowl hunting practices has now received national attention in part because of extensive documentation of harmful levels of lead exposure in the endangered California condor population. Elevated blood lead levels in free-flying California condors have been well described (Locke et al.1969; Wiemeyer et al. 1986; Janssen et al. 1986; Pattee et al. 1990; Meretsky et al. 2000; Fry and Maurer 2003; Redig et al. 2003; Woods et al. 2006; Hunt et al. 2006; Sullivan et al. 2006; Parish et al. 2006; Church et al. 2006). Wild condors in California are captured

**JA 071**

once or twice per year, and blood samples are taken as part of an extensive lead monitoring program for the reintroduced population. Condors with concentrations below 20 μg/dl in blood are considered to have only background exposure, concentrations between 20–59 μg/dl indicate elevated exposure to lead, concentrations between 60–99 μg/dl suggest birds may be clinically affected, and levels above 100 μg/dl indicate acute toxicity (Redig et al. 1983). Fry and Maurer (2003) and Fry et al. (2009) reported that since blood monitoring was implemented in California in 1997, 83% of all free-flying condors tested have had detectable exposure to lead. A review of medical records from captive condors at the San Diego Wild Animal Park was conducted to identify blood lead reference ranges for condors not exposed to lead sources in the wild (Dujowich et al. 2005). Among 95 captive born condors tested, all had blood lead levels below detection limits of 6 μg/dl with one exception testing at 11.0 μg/dl (Dujowich et al. 2005).

For condors released in southern California (Ventura, Santa Barbara and San Luis Obispo counties), blood lead concentrations were evaluated in 214 samples from 44 individuals (Hall et al. 2007). Forty-four percent (95/214) of these blood samples obtained during captures from 1997 to 2004 had lead concentrations consistent with elevated levels of exposure (>20 μg/dl), with 8% (18/214) at clinically significant concentrations and 3% (7/214) at acutely toxic concentrations (Hall et al. 2007). Seventy seven percent of the individual condors tested (34/44) showed elevated exposure; 32% of condors (14/44) had concentrations considered to be clinically significant, and 14% (6/44) had concentrations consistent with acute toxicity in at least one of their samples. Half of the individuals had elevated levels in multiple samples suggesting repeated exposure events (Hall et al. 2007). Subadults (age 4-5 years) in this cohort had higher exposure than adults classified as 6 years and older (Hall et al. 2007). Condors were found to have increased blood lead concentrations the second year after release reaching a peak 4 years post-release and then generally declining (Hall et al. 2007). Highest lead concentrations coincide with the age class most likely to forage widely, but detailed comparisons of condor movements and lead concentrations have not been done on a large scale for the California population.

The nearly three dozen condors released in Big Sur, California were repeatedly sampled over a decade to produce a total of 126 independent measurements of blood lead concentration. This group reports 21% (27/126) of samples to be above background levels, with only 3% (4/126) of samples at clinically significant levels and only 2% (2/126) indicative of acute toxicity (Sorenson and Burnett 2007). Condor lead concentrations were significantly higher in year 6 and year 8 post-release (Sorenson and Burnett 2007). Most of the birds released at Big Sur (21/33) visited southern California at some point, and for those that did so, they did this on average 2 years post release (Sorenson and Burnett 2007). The authors attributed the lower prevalence of lead exposure in Big Sur condors than in southern California condors to their finding that out of 26 observed feeding events on wild prey, 20 were California sea lions in contrast to only 3 observations of condors feeding on deer, which were far more likely to be hunter-shot (Sorenson and Burnett 2007).

Petterson et al. (2009) collected 63 blood samples from 20 condors at Pinnacles National Monument from 2003 to 2007 and compared blood lead values before and after release.

**JA 072**

Of 63 post-release samples, 24 (38%) were above background (20–59 µg/dL), two (3.2%) were clinically affected (60–99 µg/dL), and two more (3.2%) were indicative of acute toxicity (≥100 µg/dL). Fifteen (75%) of individuals sampled were exposed at least once and eight (40%) were exposed on two or more occasions. Petterson et al. (2009) found a significant difference comparing samples collected before release and within one year after release from the same individuals, revealing that even young, inexperienced condors in this area are vulnerable to lead exposure.

As of 2011, nearly half of the roughly 130 condors released since 1996 along the Arizona-Utah border have died or vanished, with lead poisoning being the leading cause of death.

A recount on lead intoxication events of wild and captive-reared condors in California and Arizona from 1992 to 2002 was compiled by Fry (2003) with information from the Condor Recovery Program. Condors with greater than 40 µg/dl lead in blood measured with a portable lead analyzer in the field were brought into captivity for chelation treatment to reduce blood lead concentrations. Among condors released in southern California, at least 8 had been brought back into captivity and received emergency chelation therapy as of 2007 (Hall et al. 2007). Four of these birds had lead levels exceeding 180 µg/dl and were likely to have died or been severely debilitated without emergency intervention (Hall et al. 2007).

Free-flying condors are also captured once or twice per year in Arizona to measure lead exposure. Out of a total of 437 samples, 31% (137/437) had elevated lead concentrations (15-59 µg/dl), and 9% (39/437) exceeded 60µg/dl (Parish et al. 2006). Chelation therapy was administered 66 times to a total of 28 individuals from 1996 to 2005 in Arizona (Parish et al. 2006).

In addition to capture and treatment of condors found with high lead levels, management practices in both California and Arizona include supplemental feeding to reduce lead exposure. Several reports suggest that the condor mortality due to lead would be much higher if the free-flying population were not intensively managed by supplemental feeding and chelation treatment to minimize the impact of lead exposure events (Fry and Maurer 2003; Woods et al. 2006; Pattee et al. 2006; Hall et al. 2007; Mee and Snyder 2007).

Causes of condor mortality were reviewed in detail for 41 free flying condors that died in California and Arizona between 1992 and 2002 (Fry and Maurer 2003). Of the 41 condor carcasses found and examined, lead toxicity was documented as the cause of death in 12% (5/41) (Meretsky et al. 2000; Fry and Maurer 2003). Predation (22%; 9/41) and power line electrocutions and collisions (20%; 8/41) were identified as the leading causes of reintroduced condor mortality in California and Arizona during this time frame (Fry and Maurer 2003). While power line collisions and electrocutions were particularly problematic for the early condor releases in California, mortality due to this cause has been reduced substantially in recent years since power line aversion training was instituted as part of the reintroduction program (Mee and Snyder 2007). The coarse

terrain and wide-ranging movements of the condor make it difficult to find deceased animals within a timeframe that allows for the accurate determination of causes of death. Unless carcasses are recovered in fresh post-mortem condition, it can be exceedingly difficult to identify causes of death that are only recognizable by microscopic examination of tissues or laboratory analyses of samples. It can also be difficult to distinguish whether or not disease or intoxications have altered an individual's behavior and initiated a chain of events leading to trauma or some other cause of death. The exceedingly high blood lead levels reported in some free-flying condors suggest that these birds may have compromised abilities to avoid hazards. Therefore, cause of death could not be accurately determined for 20% (8/41) of recovered condor carcasses. An additional 11 condors were lost to follow up during this time period. While likely dead, these condors were never recovered.

A more recent review of the 66 condors released in southern California found that among the 34 condors that died in this area from 1992-2005, exact cause of death could be determined for 18 birds (Hall et al. 2007). Lead toxicity is believed to be the primary cause of death in 3 of these birds (17%). Ages at death for the three condors with lead poisoning were 1.7, 2.5 and 4.8 years. Condor deaths due to lead toxicity have not been reported for the 33 condors released in Big Sur, California (Sorenson and Burnett 2007). Out of a total of 26 condor deaths observed in Arizona between 1996 and 2005, at least 6 and perhaps as many as 8 (23-31%) died from lead poisoning (Woods et al. 2006; Parish et al. 2006). Mainly because of a marked recent increase in the number of lead-related mortalities in condors released in Arizona, lead poisoning is now the leading known cause of death in free-flying condors. Data presented in these reports do not include the deaths of additional released condors in California and Arizona that have died due to lead poisoning from lead ammunition since 2007 (Peregrine Fund 2010; VWS 2010). At least three dozen condors in California and Arizona have now died from lead exposure from ingestion of lead ammunition fragments or lead shot, with many, many more deaths suspected to involve lead poisoning.

Chronic and frequent sub-lethal lead exposure for condors has been well-documented. A disturbing number of the released condors must undergo frequent chelation therapy to save their lives from lead poisoning due to continual exposure to lead. In 2006 alone, 95% of all Arizona condors had lead exposure and 70% of the Arizona population had to receive life-saving chelation treatment. In 2007 alone there were 50 cases of lead exposure in Arizona condors. In 2008 and 2009, the Peregrine Fund reported having to treat "a large portion" of the wild Arizona condor population with chelation therapy for increased lead levels during the winter of 2008 and a "significant amount" of lead exposure to condors in the winter of 2009 (Peregrine Fund 2010). In June of 2008, 7 condors fell ill from lead poisoning in just one feeding event on Tejon Ranch, the highest lead exposure event in Southern California in 10 years. In 2008 the blood lead levels of 72 free-flying condors in California were tested; from January to June, 59 percent of the condors sampled had blood lead levels that were considered above background (>10 micrograms/deciliter) levels; 45 percent of condors exhibited blood lead levels above background levels during July-December 2008 (CFGC 2009).

JA 074

Lead poisoning has begun to interfere with the first breeding of released condors in the wild; one of the lead poisoning deaths in California in 2008 was a parent with a chick in the nest; in 2009 a breeding condor died of lead poisoning; and in December 2008 the first condor female to successfully hatch, and fledge, a wild-produced condor in Arizona in close to a century died of lead poisoning, as did her wild-produced offspring. In early 2010, the first California condor chick to hatch inside a national park in more than a century was severely lead poisoned, likely from eating carrion contaminated with fragments of lead bullets. The condor chick and its male parent had to be taken from the nest at Pinnacles National Monument for treatment and the chick could suffer lasting neurological damage as a result.

If lead exposure is not high enough to cause acute intoxication and death or to impair survival skills, lead should be eliminated from condors gradually through natural processes. Fry and Maurer (2003) calculated an average depuration rate (or half-time for lead elimination from blood) of about 11-15 days. This finding, along with the high proportion of samples with elevated blood levels (see Fry et al. 2009), suggest that condors are frequently and repeatedly exposed to lead in the wild. The clinical consequences of recurrent lead poisoning are uncertain, but will likely result in long-term neurological injury (Fry et al. 2009). Fry et al. (2009) analyzed 469 blood samples taken from 95 different condors in California since 2000, and found that 79 of these condors (83%) have had at least one significant lead exposure incident, and some condors have been lead poisoned multiple times (up to 13 times for one bird). There were 276 separate documented incidents of blood lead levels in excess of 10 µg/dL; and 27 poisonings in excess of 50 µg/dL that required emergency clinical care to prevent permanent injury or death. Similar observations of high lead levels in blood and tissues of sympatric species, such as vultures, eagles, hawks and ravens in the condor range support the conclusion that environmental lead is widely available to scavenging birds (Wiemeyer et al. 1988; Pattee et al. 1990).

Many studies have attributed lead exposure in condors to lead bullet fragment ingestion when eating hunted animal carcasses (Locke et al. 1969; Janssen et al. 1986; Meretsky et al. 2000; Fry and Maurer 2003; Hunt et al. 2006; Woods et al. 2006; Church et al. 2006). Lead from environmental sources, such as air and water pollution, may accumulate in animals, but environmental exposure is not likely to result in levels high enough to cause mortality (Pattee et al. 1990). The very high level of lead detected in most individuals of the free-flying condor population is consistent with a highly concentrated source of exposure not typically found in air, water or soil unless in an area contaminated from lead mining and smelting activities.

Condors are exclusively carrion feeders, and the condor diet includes deer, sea lions, whales, squirrels, rabbits, skunks, coyotes, pigs and cattle. The relative proportion of these various components in condor diet is very hard to assess given the difficulties involved in directly observing condor feeding behavior in the wild. Observed condor feeding behavior in southern California, although sporadic, has most commonly involved deer and cow or calf carcasses (Hopper Mountain NWR unpublished data). Intensive monitoring of the condors released in Arizona has resulted in the documentation of

JA 075

condors feeding on 78 deer, 42 elk, 10 coyotes, 51 domestic livestock and 16 miscellaneous animals (Hunt et al. 2007). Condors released in Big Sur are the only population with a diet that includes marine mammals. Out of 26 feeding observations made on condors released in Big Sur, 77% involved sea lion carcasses and only 15% involved deer and elk carcasses (Sorenson and Burnett 2007). In 1984, Wiemeyer et al. evaluated environmental contaminants including biologically incorporated lead in condor prey species, testing muscle, fat and placenta from cattle, sheep and mule deer (*Odocoileus hemionus*). Lead levels in these potential food items were low in all but one muscle sample from the head of a hunter killed deer (17.5 parts per million, ppm) and one cattle placenta sample (1.82 ppm; Wiemeyer et al. 1984).

Deer killed by hunters, predation, vehicular collisions, fire and disease are potential food sources for condors. Condors have been directly observed feeding on deer killed by hunters, and there are several observations of multiple condors feeding on deer offal piles in California (Hopper Mountain NWR unpublished data) and Arizona (Hunt et al. 2007). In the Kaibab Plateau in Arizona 15 of the 55 deer carcasses involved in condor foraging events were hunter-killed (Hunt et al. 2007). Animal carcasses that have been shot with lead ammunition are likely to contain fragments of lead even if the bullet passed through the carcass or if the primary shot fragment has been removed (Hunt et al. 2006). Offal piles left in the field are also very likely to contain lead fragments, since these piles usually contain thoracic organs and hunters often aim for the thorax when targeting large mammals (Hunt et al. 2006).

Inter-annual variation and seasonal trends in lead exposure have been observed in all condor populations. The 44 condors released in southern California showed substantial inter-annual variation in blood lead concentrations with samples from 2001-2004 having a significantly lower mean than samples from 1997-2000 (Hall et al. 2007). This temporal trend has been explained by a move in release, food provisioning and trapping (sampling) location from the Sierra Madre Mountains to Hopper Mountain NWR in 2001. Condors trapped at the Sierra Madre site had a significantly higher mean lead concentration than condors trapped at Hopper Mountain. The Sierra Madre site is characterized by greater public access and hunting activity than the Hopper Mountain site (Hall et al. 2007). Increases in blood lead levels in condors tested during the deer hunting season have also been reported by Hall et al (2007), but sampling effort was not distributed evenly in all seasons. In fact, sampling between January and May was very limited (with only 20/214 samples in these months). This study noted that while mean lead concentration was significantly higher in condors sampled during deer hunting season, elevated lead exposure was detected at other times of the year with 38% (20/53) of blood samples collected in June having lead concentrations exceeding 20 μg/dl. Blood samples in the 33 condors at Big Sur also showed inter-annual and seasonal variation in lead concentration with samples obtained in 2005 and samples obtained in September and October showing the highest mean concentration of lead (Sorenson and Burnett 2007). This peak in lead concentrations in the Big Sur condor population does correspond with the time period in which hunter-shot deer are most prevalent in the coast range (Fry and Maurer 2003).

JA 076

The studies conducted on the introduced condor population in Arizona by Hunt et al. (2006) show correlations between increased lead exposure and foraging in deer hunting areas during and just following the hunting season. Spikes in blood lead levels of condors during November and December correspond with the deer hunting seasons and condor movement to deer hunting areas (Parish et al. 2009). Since condors began foraging in the Kaibab Plateau in 2002, detected lead exposures have been temporally and spatially clustered and highly predictable (Hunt et al. 2007). Blood lead levels in condors visiting the Kaibab Plateau were significantly higher than condors not visiting this intensively hunted area, and evidence of lead intoxication in live and dead condors peaked annually in November and December from 2002 to 2004, coincident with the deer hunting season (Hunt et al. 2007). Increased proficiency of condors at finding carrion in the wild corresponds with a greater incidence of lead exposure, and information collected on food types supports the hypothesis that lead ammunition residues in rifle- and shotgun-killed animals are the principle source of lead contamination among condors in northern Arizona and southern Utah (Parish et al. 2009). Chesley et al. (2009) evaluated lead isotopic ratios from blood samples of 47 condors in Arizona over 3 years and collected 12 metal fragments from 6 birds with elevated blood lead levels, directly linking ingested lead ammunition fragments to lead in the blood of Arizona condors. Lead poisoning has been the leading cause of death among reintroduced condors in Arizona from 1996 to 2007 (Parish et al. 2009).

Condor lead intoxications reported in both California and Arizona during non-deer hunting seasons suggest that deer hunting practices are not the only potential source of lead for condors. Firearms are used in the California condor range year-round for taking non-game animals, such as ground squirrels and coyotes, which are typically left in the field and available for scavenging species (Pattee et al.1990). Rabbits, squirrels, coyotes, and pigs shot with lead ammunition likely pose a similar risk for exposure as do hunter-killed deer carcasses, and these animals are more likely to be left in the field if they are not a food source or trophy for hunters. Condors have been observed feeding on hunted pigs at private dumps and piles of dead ground squirrels shot for pest control (Johnson et al. 2007). Two rifle-killed coyotes were observed as a food source for condors in Arizona, and hunted coyotes have been suggested as a potential source for summer lead exposure in condors (Parish et al. 2006; Hunt et al. 2007).

Direct evidence of consumption of ammunition by condors is extremely difficult to obtain given the lag time between likely ingestion/exposure and debilitation or death. In addition, ingested lead fragments can pass through the digestive tract or be completely digested and absorbed if very small. Radiographs are unlikely to detect radio-opaque particles less than 1 mm in diameter, and similarly sized particles may be easily missed at surgery or necropsy. Nonetheless, physical evidence of ammunition inside the stomachs of individual condors that have died or have been diagnosed with high blood lead levels, have occurred in 14 cases in Arizona (Parrish et al. 2006). Of these 14 condors, 7 (3 alive, 4 dead) had shotgun pellets and 7 (6 alive, 1 dead) had spent rifle bullets in their digestive tracts either on radiographs or during necropsy (Parish et al. 2006). In California, from 1984 to 2002, 7 condors had metal detected in their gastro-intestinal

JA 077

tracts, but identification of fragments and analysis of samples for lead content were not performed (Fry and Maurer 2003).

Ammunition was implicated as the main source of lead exposure in released condors in recent studies by Church et al. (2006) and Chesley et al. (2009). The Church et al. (2006) study compared lead isotopic ($207^{Pb}/206^{Pb}$) ratios in blood samples from released free-flying condors in Central California and prerelease condors in Southern California; tissue samples from possible condor diet items (calves, road-killed deer and a sea lion); and samples from ammunition sold for bird and mammal hunting at stores within the condor range. The lead isotope ratios in free-flying condors differed significantly from those in captive pre-release condors providing further evidence that the sources of exposure for free-flying condors were different from the sources causing background levels of exposure in captive condors. Furthermore, the low background concentrations of lead detected in non-hunter killed condor diet samples had isotopic ratios similar to those described for environmental lead in rivers, lakes, atmospheric dust and urban aerosols. These findings provided evidence that "environmental" sources of lead, such as background levels in water, soil and non-hunter killed carcasses, were not responsible for the elevated lead exposures observed in free-flying condors in California. The lead isotopic ratios in the elevated free-flying condor samples were similar to those found in the ammunition samples tested (Church et al. 2007).

The lead isotope ratio technique has been also recently applied as a forensics tool to trace lead sources involved in condor deaths. A feather from one condor (#165) released in Arizona and found dead nearly 3 years later (June 2000) from acute lead poisoning with 16-17 shotgun pellets in its stomach was analyzed for lead concentration and lead isotope composition (Church et al. 2006). The lead isotopic ratio in the feather from this condor (in the area of the rachis and vane with most recent growth) closely matched that detected in ammunition samples from stores in California (Church et al. 2006). Further analysis of concentrations of total lead in the bones of three other dead condors (#132, 175 and 181) strongly suggest that lead poisoning or debilitation induced by lead contributed to their deaths, but the isotopic ratio in tissues from condors #175 and # 181 were unlike those of the ammunition samples tested to date. However, the isotope ratio in tissues from condor #132 closely matched that of the ammunition samples tested in the study by Church et al (2006).

Finkelstein et al. (2010) compared blood and feather lead isotopic composition in lead-poisoned condors to spent ammunition from a recovered pig carcass fed upon by the birds to provide irrefutable evidence for exposure to lead-based ammunition. Finkelstein et al. (2010) also analyzed lead isotope ratios in 65 released California condors and demonstrated that lead in the condors (isotope ratio values of between 0.81 and 0.83) is within the range of that found in bullet samples, most of which were turned in by hunters in California. Pre-release birds had lower concentrations of lead in their blood, and their isotopic ratios were higher (0.83 to 0.85). Parmentier et al. (2009) showed that the lead concentration and isotopic composition of condor feathers examined changed following a documented ammunition-exposure event, arriving at values that matched exactly the isotopic composition of recovered ammunition. Finkelstein et al. (2011) further analyzed

JA 078

lead isotopes in blood samples from pre-release and free-flying condors in California and compared them with a representative selection of 71 different lead-based ammunition samples, most collected in the field. The lead isotopic signature in free-flying condors, which can scavenge on carcasses tainted with lead ammunition fragments, differs from that in pre-release birds. About 90 percent of blood samples from free-flying condors had an isotopic composition best explained by exposure to lead-based ammunition.

Further lead isotopic analyses of ammunition and other potential point sources in the condor's habitat, along with bones, feathers and blood of other condors have developed a more conclusive association between ammunition-derived lead intoxications and condor mortalities. Feathers are a particularly instructive forensic tool to reconstruct lead poisoning in California condors. Finkelstein et al. (2010) used sequential feather sampling and analysis to show that feather lead concentrations can help estimate annual lead exposure risk and give better long-term monitoring of lead exposure. Sampling two or more growing primary feathers over a year will provide a time series of lead exposure and capture 60% of a bird's annual lead exposure history, compared to only 10% of an annual exposure history reflected in one or two blood samples collected over the same time period.

Parmentier et al. (2009) demonstrated from evaluating lead concentration and stable isotopic measurements in growing condor feathers that lead-exposed condors are suffering sub-clinical toxicity, based on δ-aminolevulinic acid dehydratase ("ALAD") inhibition by lead. Preliminary results of nine condors with blood lead concentrations ranging between 1.9-64.0 µg/dL show a significant inverse relationship between blood lead concentration and ALAD activity, indicating significant inhibition of ALAD at blood lead levels below those where clinical chelation treatment is indicated. Church et al. (2009) showed increases in phosphorus and enzymes in condors with high blood lead levels that may be indicative of lead-induced nerve tissue damage or renal disease and kidney dysfunction. Finkelstein et al. (2011) demonstrated that lead ammunition exposure causes chronic, long-term health effects in condors as well as acute poisonings. Nearly all 100 free-flying condors in California have suffered from severe lead poisoning at least once, and 35 percent of condor blood samples from 2004 to 2009 showed high blood lead levels indicating chronic exposure to potentially lethal lead levels (Finkelstein et al. 2011).

The population-level impact of condor exposure to lead may be difficult to quantify but is clearly significant. For small populations in particular, increased adult bird mortality at any measurable rate is likely to affect population dynamics (Westemeier et al. 1998; Fisher et al. 2006). Re-introduced condor populations are currently being intensively managed to reduce lead exposure, and the proportionate mortality due to lead exposure would almost certainly be higher if individual animal interventions ceased. While intensive management has been an important component of condor recovery efforts to date, its practicality in the long term is questionable as the condor population grows in size. More importantly, such close monitoring and frequent recapturing are counterproductive to the establishment of a behaviorally normal self-sustaining wild condor population (Condor Recovery Team, Lead Exposure Reduction Steering

JA 079

Committee, 2003). In order to ensure the recovery of the California condor, lead ammunition must cease being one of the species' greatest threats.

2. **Bald Eagle (*Haliaeetus leucocephala*) and Golden Eagle (*Aquila chrysaetos*)**

Bald eagles share some demographic and ecological factors with free-ranging condors that make them vulnerable to lead intoxication; they scavenge on carcasses, they are long-lived, they have low recruitment rates, and their numbers have been reduced in recent decades (Pattee et al. 1990). Bald eagles that ingest lead shot embedded in the tissues or the intestinal tract of waterfowl demonstrate acute and chronic symptoms of lead poisoning (Hoffman et al. 1981; Miller et al. 2001). The experimental intoxication of bald eagles with lead shot conducted by Pattee et al. (1981) found that it took between 10 and 133 days (median 20 days) for mortality to occur. The range of time for lead shot retention in the stomach varied between 0.5 and 48 days. Mean lead levels in dead animals were 16.6 ppm (wet weight) in liver and 6.0 ppm (wet weight) in kidney (Pattee et al. 1981). In a complementary study, Hoffmann et al. (1981) report mean blood lead levels in eagles dosed with 10 #4 lead shot (0.21g each) to be 80 µg/dl after 24 hours and 280 µg/dl after 72 hours. Mean blood lead levels as high as 270 µg/dl have been detected in apparently healthy free-ranging bald eagles but subclinical effects may be difficult to document (Reiser and Temple 1981). Foreign bodies, including lead fragments, may be regurgitated by eagles so that fragments may not be detected in the gastrointestinal tract at the time of capture or blood tests, even if the fragments contributed substantially to elevated lead exposure levels prior to being ejected. Mateo et al. (2003) recognized the importance of accounting for this unique physiology in raptors and recommend collecting regurgitated pellets at raptor roosting sites to study the presence, frequency, seasonality and prey associated with the ingestion of lead shot.

The secondary poisoning of bald eagles by lead shot in crippled waterfowl was part of the impetus for the final decision to ban the use of lead for hunting waterfowl (Kendall et al. 1996; Kramer et al. 1997). Coon et al. (1969) reported that 7% of 45 bald eagle carcasses had high enough lead levels to be lethal. Kaiser et al. (1990) reported 9% of 158 bald eagle carcasses had elevated lead levels in the liver. In one study, 97% of bald eagles and 86% of golden eagles tested had elevated blood levels of lead (Harmata and Restani 1995).

Pattee and Hennes (1983) found that elevated lead levels in bald eagles corresponded well (89%) with late fall and winter waterfowl hunting seasons. However, a study attempting to trace lead poisoning in bald eagles to diet preference did not find significant differences in blood lead levels among eagles feeding on fish and eagles feeding on waterfowl in an area where waterfowl hunting was intensive (Miller et al. 1998). According to the Wisconsin Department of Natural Resources, about 15 to 20 percent of all bald eagle deaths in that state are due to lead poisoning (Eisele 2008; Strom et al. 2009), usually from eating animals that were wounded with lead ammunition or from scavenging gut piles during and after the deer hunting season. Wisconsin lead poisoning cases in bald eagles begin to increase in October, peak in December and tail off in late

**JA 080**

winter, which coincides exactly with Wisconsin's deer hunting seasons, suggesting hunter-crippled game and lead contaminated offal are the cause.

A 16 year review of lead levels in bald and golden eagles in Minnesota and Wisconsin by Kramer and Redig (1997) found that observed blood lead concentrations in both species declined following the ban on lead shot in waterfowl hunting, but there was no change in the prevalence of lead poisoning, attributable in part to continued availability of gut piles from hunter-killed deer. In that study, 21% (138/654) of eagles admitted to treatment centers had evidence of lead poisoning, and only one had radiographic evidence of lead fragments in the gastro-intestinal tract (Kramer and Redig 1997). Other potential sources of lead, such as fish contaminated with lead fishing sinkers, and hunting activities not included in the lead shot ban were suggested as causes for the substantial number of cases reported during this time period. Clark and Scheuhammer (2003b) found, not surprisingly, that upland game birds and mammals, the primary foods for many raptors, were more likely to contain lead shot than waterfowl 12 years after the ban on lead shot for waterfowl hunting. Lead shot from upland game hunting and lead bullet fragments from big game hunting and "varmint" shooting are a significant cause of continued lead toxicity for bald and golden eagles (Harmata and Restani 1995; Fisher et al. 2006; Hunt et al. 2006; Pauli and Buskirk 2007).

Golden eagles share some feeding ecology and behaviors with California condors and bald eagles and therefore may be exposed to some of the same factors that predispose condors to lead intoxication. In the study by Pattee et al. (1990) on the lead hazards within the California condor range, golden eagles were suggested as a model species to assess lead exposure in California condors because they are abundant in the condor range and they have been observed feeding on the same carcasses as condors. Between 1985 and 1986, 36% of the 162 golden eagles evaluated within the California condor range had elevated blood lead levels, and 2.5% had levels greater than 100ug/dl, indicative of clinical lead poisoning. This study also reported seasonal trends in lead levels in tissues of golden eagles within the California condor range which coincided with the deer hunting season (Pattee et al. 1990).

Wildlife rehabilitators in Iowa began gathering lead poisoning information on bald eagles in 2004, analyzing blood, liver, or bone samples for 62 eagles (Neumann 2009). Thirty-nine eagles showed lead levels in their blood above 0.2 ppm or lead levels in their liver above 6 ppm, which could be lethal poisoning without chelation treatment. Seven eagles showed exposure levels of lead (between 0.1 ppm and 0.2 ppm in blood samples, between 1 ppm and 6 ppm in liver samples, and between 10 ppm and 20 ppm in bone). Several of the eagles admitted with traumatic injuries showed underlying lead exposure or poisoning. Over half of the eagles being admitted to Iowa wildlife rehabilitators have ingested lead. Behavioral observations, time-of-year data analysis, and x-ray information point to lead shrapnel left in slug-shot white-tailed deer (*Odocoileus virginianus*) carcasses to be a source of this ingested lead (Neumann 2009). Thousands of bald eagles winter in Iowa, up to one fifth of the lower 48 states population.

JA 081

The Washington Department of Fish and Wildlife conducted a four-year study of golden eagles in Washington that showed increased lead levels in golden eagles.

Spring migrating eagles sampled in west-central Montana between 1983 and 1985 showed elevated blood-lead levels in 85% of 86 golden eagles and 97% of 37 bald eagles, with the source thought to be shot from waterfowl hunting and fragmented lead-core rifle bullets in ground squirrels (Harmata and Restani 1995). Domenech and Langner (2009) sampled blood from 42 golden eagles in Montana captured on migration during the fall of 2006 and 2007 and found that 58% had elevated blood-lead levels, attributed to ingestion of lead-tainted carcasses or offal piles. Of the eagles evaluated by Domenech and Langner (2009), 18 contained background lead levels of 0–10 μg/dL, 19 eagles were considered sub-clinically exposed at 10–60 μg/dL, two birds were clinically exposed (60–100 μg/dL), and three exhibited acute exposure of >100 μg/dL. Eagles with lower, but detectable blood lead levels may have had earlier exposure with the majority of the lead already deposited in other organs and bone.

Bedrosian and Craighead (2009) measured blood lead levels of 47 bald eagles and 16 golden eagles in the southern Yellowstone Ecosystem around Grand Teton National Park, Wyoming during and after large-game hunts for two years. They found a median blood lead level of 41.0 μg/dL (range = 3.2–523 μg/dL); 75% of all birds tested exhibited elevated lead levels (>20 μg/dL) and 14.3% exhibited levels associated with clinical poisoning (>100 μg/dL). The median blood lead levels for eagles during the hunting season was significantly higher than the non-hunting season (56.0 vs. 27.7 μg/dL, respectively; $P = 0.01$). The magnitude of lead in the blood of Wyoming eagles is extremely high and likely results in the death of some individuals (Bedrosian and Craighead 2009).

Studies of eagle species in other countries confirms high levels of lead poisoning and lead poisoning from eagles scavenging carcasses tainted with lead ammunition as a significant cause of death. Lead poisoning is a significant cause of death for golden eagles and some other upland-foraging raptors in Canada that may feed on dead or wounded upland prey with embedded lead shot or bullet fragments (Scheuhammer 2009). Kurosawa (2000) first reported lead poisoning in sea eagles in Japan, and Saito (2009) reported on 129 mortalities of Steller's sea-eagles (*Haliaeetus pelagicus*) and white-tailed eagles (*Haliaeetus albicilla*) on the island of Hokkaido, Japan from 1996 to 2007 diagnosed as lead poisoning fatalities. Necropsies and radiographs revealed lead fragments from rifle bullets and from shotgun slugs in the digestive tracts of poisoned eagles, providing evidence that a source of lead was spent ammunition from lead-contaminated Sika deer carcasses, which are a major food source for wintering eagles. Post mortem examinations of more than 390 white-tailed sea eagles (*Haliaeetus albicilla*) in Germany, an umbrella species for other scavenging birds, have shown that lead poisoning is the most significant cause (23% of mortality) of death (Krone et al. 2009). Krone (2004) also reported lead poisoning of seal eagles in Greenland. Potential sources of lead were waterfowl such as geese and carcasses of game animals or their remains (gut piles) shot with lead-containing bullets. Captured geese and shot game animals examined by radiograph revealed embedded lead shot pellets and large numbers of lead particles.

JA 082

### 3.    Turkey Vulture (*Cathartes aura*)

While mortality due to lead exposure in turkey vultures is not well documented, dead turkey vultures sampled within the condor range have been documented as having elevated lead exposure (Weimeyer et al. 1988). Experimental lead intoxication studies in turkey vultures suggest that vultures can succumb to lead poisoning, although studies have demonstrated that turkey vultures are able to tolerate very highly elevated lead concentrations in blood. One experimental intoxication study, conducted by Carpenter et al. (2003), administered turkey vultures daily oral doses of one, three or ten BB-sized lead shot (0.35 to 0.45 grams) over a six month observation period. While most measured parameters were similar to those reported for other avian species, survival time (143 to 211 days), even at the higher level of exposure, was much longer than reported for other species, suggesting turkey vultures may be less sensitive to the deleterious effects of lead ingestion (Carpenter et al. 2003). In a separate experimental trial by Reiser and Temple (1981), one turkey vulture was more susceptible to lead intoxication than two red-tailed hawks (it is difficult to generalize to the species level and rule out individual responses with this sample size).

Kelly and Johnson (2011) found that blood lead levels in free-flying turkey vultures rose during deer hunting season and in areas with wild pig hunts. Kelly and Johnson (2011) compared blood lead concentration in turkey vultures within and outside of the deer hunting season, and in areas with varying wild pig hunting intensity. Lead exposure in turkey vultures was significantly higher during the deer hunting season compared to the off-season, and blood lead concentration was positively correlated with increasing wild pig hunting intensity. Their results link lead exposure in turkey vultures to deer and wild pig hunting activity.

Additional reports on individual cases of lead toxicosis in turkey vultures have been published. Clark and Scheuhammer (2002) evaluated 184 raptors (16 different species) in Canada and the highest bone lead concentration was found in a turkey vulture, suggesting this bird was likely exposed to a series of sublethal doses of lead in carrion. Platt et al. (1999) observed histopathological peripheral neuropathy in a turkey vulture with toxic blood lead concentrations.

### 4.    Other Raptors

Lethal effects from ingestion of lead shot by predatory and scavenging raptors feeding on hunter-killed carcasses have been documented in red-tailed hawks (*Buteo jamaicensis*), northern goshawks (*Accipiter gentilis*), and great horned owls (*Bubo virginianus*).

### 5.    Waterfowl

In North America, ducks and geese for years suffered significant losses from lead poisoning by ingesting spent lead shot on the bottom of ponds and marshes. Grinnell (1894) first reviewed lead poisoning in waterfowl and others documented poisonings

**JA 083**

shortly thereafter (Bowles 1908; McAtee 1908; Wetmore 1919; Munro 1925). It was estimated that from 1.6 to 3.9 million waterfowl died each year in North America from lead poisoning before the national ban on lead shot for waterfowl hunting in 1991 (Bellrose 1959; Feierabend 1983). Lead poisoning from spent lead shot caused an estimated 2 to 3 percent of the annual losses of North American waterfowl between 1938 and 1954 (Bellrose 1959). In Washington, prior to the ban on waterfowl hunting with lead shot, biologists reported that 4.1-4.5% of harvested waterfowl contained ingested lead shot in their digestive tracts (Jeffrey 1977; Driver and Kendall 1984), however the extent of lead poisoning in the entire Washington waterfowl population was unknown. Within six years of the ban, there was an estimated 64% decline in ingestion of lead shot by waterfowl on the Mississippi flyway (Anderson et al. 2000). Of examined ducks whose gizzards contained ingested pellets, 68% of mallards, 45% of ring-necked ducks, 44% of scaup, and 71% of canvasbacks contained only non-lead shot (Anderson et al. 2000). Samuel and Bowers (2000) demonstrated a 44% reduction in lead exposure (defined as >0.2 ppm in blood) of black ducks in Tennessee comparing exposure from 1986-1988 with the post-lead shot ban from 1997-1999. Similar decreases in mean bone lead concentrations in hatch-year ducklings were shown in Canada after implementation of lead shot bans (Stevenson et al. 2005). After non-lead shot regulations for most migratory game birds were established and implemented nationwide from 1990 to 1999 in Canada, the incidence of elevated lead exposure in hatch year ducks declined dramatically, testifying to the effectiveness of the regulations and a generally high compliance by hunters (Scheuhammer 2009).

The effects of ingested lead shot on waterfowl have been well documented (Bellrose 1959; Dieter and Finley 1978; Roscoe et al. 1979; Sanderson and Bellrose 1986; Pain and Rattner 1988; Rattner et al. 1989; Pain 1996; Franson et al. 1996; Friend 1999; Pattee and Pain 2003). As few as one or two ingested lead shot pellets can cause waterfowl to waste away and die over a period of several weeks. Ducks debilitated by lead may be more vulnerable to hunting and may have impaired migratory behavior (Bellrose 1951). Lead shot ingestion rates for waterfowl are related to density of spent shot (Rocke et al. 1997).

*Swans*

Swan lead fatalities from ingestion of spent lead shot have been occurring since at least 1925 (Munro 1925). Some of the most dramatic examples of mass mortality of waterfowl due to ingestion of lead shot involve the deaths of thousands of wintering trumpeter swans and tundra swans in northwestern Washington state and southern British Columbia (Lagerquist et al. 1994; Degernes et al. 2006). Swan mortalities continue to regularly occur although use of lead shot was prohibited in wetland areas over 10 years previously. The use of lead shot for waterfowl hunting was banned in Whatcom County, Washington in 1989 and Sumas Prairie, British Columbia in 1992 but lead shot continues to be permitted for upland hunting and target shooting and for hunting doves, pigeons, and American woodcock. Lagerquist et al. (1994) found that 35% of 110 trumpeter and tundra swan carcasses collected and diagnosed from 1986 to 1992 had lead liver concentrations diagnostic of lead poisoning. Degernes et al. (2006) found that 81% of 400 trumpeter and tundra swans from carcasses collected from 2000 to 2002 died from

**JA 084**

lead poisoning. Swan mortality could be high because swans can forage deeper into bottom sediments than other waterfowl, and be exposed to shot deposited years earlier. Large die-offs or consistent mortality prompt concern that lead poisoning could negatively impact swan populations. From 2000 to 2001, over 300 trumpeter swans died in Whatcom County, Washington alone from ingestion of lead shot (WDFW 2000). The 2001 population of trumpeter swans in this area was 916, so it is likely that lead poisoning is significantly affecting the population in this area.

From 1999 to 2008 more than 2,500 trumpeter (*Cygnus buccinator*) and tundra swans (*Cygnus columbianus*) have died from lead poisoning from ingesting lead shot in northwestern Washington and southwestern British Columbia around just a single lake (Shore 2009; Wilson et al. 2009). Swans at Judson Lake, which straddles the U.S./Canadian border in the Fraser Valley, begin to die from lead poisoning about three weeks after their arrival in November from summer nesting grounds in the Yukon. Swans arrive on the wintering grounds with low blood lead levels, but some birds subsequently become exposed to lead after ingesting lead shot (Smith et al. 2009). Some of the poisoned swans were found to have ingested more than 100 lead shot. Ingestion of only two to three pellets may cause mortality in approximately three weeks. It is unknown whether the swans are ingesting lead shot from feeding on the bottom of the lake, left over from the days before the lead shot ban, or from nearby fields where they also forage, and where lead shot is still legal to use in the hunting of doves and other upland game birds. Relatively high densities of spent lead shot occur in fields and water bodies where hunting and target shooting occur on the U.S. side of Judson Lake (Smith et al. 2009).

Wilson et al. (2009) confirmed lead shot in 80% of intact remains of dead swans from Judson Lake given toxicological testing. A multi-agency working group identified suspected sources of the lead shot, determining the type and size of shot in lead poisoned swans and measuring lead isotope ratios in lead poisoned and non-lead poisoned swans. Patterns of lead ratios in shot from suspected source areas, in shot from gizzards of lead-poisoned swans, and in liver of lead poisoned swans were compared. Swan gizzards had a mix of lead shot sizes typically used for upland game bird hunting (#6) and target shooting (#7.5–8) and predominately non-lead shot sizes typically used for upland game bird hunting (#4–6). Fifty-six percent of the lead ratios measured in the shot collected from sediment/soil fell within the range found for shot collected from the swan gizzards, indicating that swans are not consuming the whole range of shot sizes recovered from agricultural fields and water-bodies. Preliminary results are inconclusive, but Wilson et al. (2009) suspect lead shot for trap or skeet practice in areas frequented by waterfowl may be partially responsible. Two recent tests of hazing or preventing swans from using a major roost site at Judson Lake (2006-2007 and 2007-2008) resulted in a 50% reduction in lead-related swan fatalities, compared to the average of the five previous years (Smith et al. 2009). Judson Lake is a source of the lead shot poisoning swans but it clearly is not the only source.

Efforts to restore trumpeter swans in Wisconsin are also being hampered by persistent die-offs due to lead poisoning, one of the most significant mortality factors for the species. The trumpeter swan was only recently removed from Wisconsin's endangered

species list. According to the Wisconsin Department of Natural Resources ("WDNR"), about 30 percent of all trumpeter swan deaths in Wisconsin are related to lead poisoning from ingesting lead shot or lead fishing sinkers on the bottom of water bodies (Eisele 2008). Of 143 trumpeter swan carcasses submitted to the WDNR for post-mortem examination between 1991 and 2007, 36 deaths (25%) were attributed to lead poisoning. Strom et al. (2009) reported that approximately 25% of trumpeter swan fatalities in Wisconsin have been attributed to lead toxicity, and about 15% of live-sampled trumpeter swans in Wisconsin had blood lead levels above background concentrations (20 µg/dL).

*Loons*

According to the Wisconsin Department of Natural Resources, about 35 percent of all loon deaths in Wisconsin are related to lead poisoning, from picking up lead shot or sinkers on the bottom of water bodies (Eisele 2008). Pokras et al. (2009) demonstrated that common loons in New England ingest spent lead shot through examining lead objects found in 118 of 522 loon carcasses recovered from the six New England states from 1987 to 2000. A total of 222 lead objects were recorded from the loons' gizzards, with 11% of the items recovered being lead ammunition, primarily shotgun pellets, but also one .22 caliber bullet and one .44 –.45 caliber bullet. Evers (2004) reported that in New England, a 14-year study diagnosing causes of mortality in 522 common loons documented that 44% of the breeding adults died from lead toxicosis, from either lead shot or sinkers. Substantial rates of lead-related mortality are also known for loons in Michigan, Minnesota and New Hampshire.

*Eiders*

Lead shot is still used in many parts of rural Alaska for subsistence waterfowl hunting and legal use of lead shot for upland game hunting can occur in waterfowl breeding habitats. Availability of spent shot may be prolonged by permafrost, which frequently underlies wetlands used for breeding and retards the sinking of shot beyond the reach of feeding waterfowl. Lead poisoning of spectacled eiders (*Somateria fischeri*), a federally threatened species, in the Yukon-Kuskokwim Delta of Alaska, has been shown to be due to ingestion of lead shot (Franson et al. 1995; Brown et al. 2006). Spectacled eider breeding pairs on the Yukon-Kuskokwim Delta declined precipitously from about 50,000 in the 1960s to only about 2,000 nesting pairs in 1992 (USFWS 2011).

Radiograph studies showed that nearly 12% of eider adults and 2.5% of eider ducklings had ingested lead shot (Flint et al. 1997; Franson et al. 1998). Adult female eiders died of lead poisoning and predation, and eggs from females exposed to lead survived at much lower rates (Flint and Grand 1997; Grand et al. 1998). More recent studies on the Yukon-Kuskokwim Delta by U.S. Geological Survey and Service biologists revealed that during the breeding season, 36% of adult female spectacled eiders ingested lead shot left in ponds by hunters, and that lead exposure reduced annual eider survival by 50% (USFWS 2011). In some wetland types, lead pellets were still available for birds to eat after more than eight years. The USFWS has ongoing research into whether lead shot is suppressing survival in eiders nesting on the North Slope.

JA 086

Mortality from lead exposure was suggested as a significant impact impeding the recovery of the local spectacled eider populations in the 1990s, which were already depressed (Grand et al. 1998). Matz and Flint (2009) analyzed blood of spectacled eiders (*Somateria fischeri*), king eiders (*S. spectabilis*), common eiders (*S. mollissima*) and long-tailed ducks (*Clangula hyemalis*) on the Yukon-Kuskokwim Delta and the North Slope of Alaska for total lead and lead isotope ratios. Lead shot can have distinct, ore-specific signatures. Isotopic signatures from birds with relatively high blood lead concentrations were most similar to the isotopic signatures of lead shot, while signatures from birds with low blood lead concentrations closely matched those of local sediments. Lead concentrations in sediment samples were very low, making sediments an unlikely source of the high blood lead concentrations.

## 6.    Game Birds

Lead exposure and poisoning from ingesting spent lead shot has been documented in many species of upland game birds such as chukar (*Alectoris chukar*), grey partridge (*Perdix perdix*), ring-necked pheasant (*Phasianus colchicus*), wild turkey (*Meleagris gallopavo*), scaled quail (*Callipepla squamata*), northern bobwhite (*Colinus virginianus*), American woodcock (*Scolopax minor*), ruffed grouse (*Bonasa umbellus*), and mourning dove (*Zenaida macroura*) (Campbell 1950; Damron and Wilson 1975; Best et al. 1992; Yamamoto et al. 1993; Kendall et al. 1996; Akoshegyi 1997; Keel et al. 2002; Battaglia et al. 2005; Butler 2005; Fisher et al. 2006, Schulz et al. 2006).

Mourning doves are particularly at risk for lead poisoning because they frequent and feed at high-risk habitats in terms of high concentrations of spent lead shot (Lewis and Legler 1968; Hass 1977; Kendal and Scanlon 1979a, 1979b; Kendall 1980; Burger et al. 1983; Carrington and Mirarchi 1989; Castrale 1989; Best et al. 1992; Kendall et al. 1996; Burger et al. 1997; Schulz et al. 2002). Portions of the dove populations feeding on these sites ingest lead pellets, and shot ingestion by doves increases during the hunting season (Kendall et al. 1996; Otis et al. 2008; Franson et al. 2009). Virtually all doves that ingest lead pellets succumb to the direct or indirect effects of lead poisoning (Schulz et al. 2006; Schulz et al. 2007). Kendell et al. (2006) identified increased susceptibility to cold as a mortality mechanism caused by lead toxicosis in doves. Spent shot concentrations on managed dove fields have been documented as high as 348,000 pellets per acre (Best et al. 1992).

Sampling and evaluation of lead exposure of hunter-harvested doves is the usual source for estimating lead ingestion (Schulz et al. 2002, 2006) with 2.5- to 45.3% of doves sampled having lead shotgun pellets in their digestive tracts. Schulz et al. (2009) suggested that doves feeding in fields hunted with lead shot that ingest multiple lead pellets may die quickly of acute lead toxicosis and become unavailable to harvest, resulting in an underestimates of lead shot ingestion rates, such as for previous studies finding relatively few doves with ingested lead shot despite feeding in areas with high lead shot availability. Schulz et al. (2007, 2009) administered lead shot to captive doves and confirmed rapid and acute lead toxicosis.

JA 087

Franson et al. (2009) evaluated lead exposure in 4,884 hunter-harvested mourning doves from Arizona, Georgia, Missouri, Oklahoma, Pennsylvania, South Carolina, and Tennessee. The frequency of ingested lead pellets in gizzards of doves on hunting areas where the use of lead shot was permitted was 2.5%. On areas where non-lead shot was required, 2.4% of mourning doves had ingested steel shot. Doves without ingested lead pellets had lower bone lead concentrations in areas requiring the use of non-lead shot than in areas allowing the use of lead shot. Schulz et al. (2006) calculated from comparing hunting statistics and population estimates that nearly as many doves are poisoned lethally by ingesting lead shotgun pellets (8.8 million to15 million per year) as are shot by sport hunters on an annual basis. The number of mourning doves harvested in the U.S. is approximately 20 million birds annually.

Bingham et al. (2009) documented ingestion of lead pellets by hunter-harvested chukars in four counties in western Utah, finding ingested lead pellets in 8.74% of gizzards from 286 birds. Toxicology results show elevated concentrations of lead (>0.5 ppm, ranging from 0.7 to 42.6 ppm) in 50 bird livers (14%). The arid, rocky, and alkaline nature of chukar habitat reduces pellet settlement and dissolution, and the similar appearance of lead pellets to chukar food sources leads to ingestion of lead pellets by chukars.

American woodcock are exposed to lead on their breeding grounds in Wisconsin, resulting in high accumulations of lead in bone tissue (Strom et al. 2009). Bone lead concentrations considered to be toxic in waterfowl were observed in all age classes of woodcock; although stable isotope analysis of bone samples was not able to conclusively identify the source of the lead, the data suggest a local and dietary source (Strom et al. 2009).

### 7.    Cranes and Rails

A number of gruiformes have been shown to ingest lead shot, including greater sandhill cranes (*Grus canadensis tabida*), American coots (*Fulica americana*), clapper rails (*Rallus longirostris*), king rails (*Rallus elegans*), Virginia rails (*Rallus limicola*), and sora (*Porzana carolina*) (Jones 1939; Kennedy et al. 1979; Windingstad et al. 1984; Franson and Hereford 1994; Wingstad 1998; Fisher et al. 2006). The consequences of poisoning incidents for the critically endangered Mississippi sandhill crane (*Grus canadensis pulla*) could be considerable, given a population that has only recently grown to about 100 individuals (Johnsgard 1983; LaRoe et al. 1995). Whether endangered whooping cranes (*Grus americana*) ingest lead pellets during their migration across Canada and the U.S. is unknown.

### 8.    Corvids

Scientists tested blood lead levels in 302 ravens that scavenged on hunter-killed large ungulates and their offal in and around Grand Teton National Park, Wyoming in 2004 and 2005 (Craighead and Bedrosian 2007, 2008). Blood-lead levels of ravens increased dramatically during hunting season, roughly five times higher than the rest of the year,

**JA 088**

likely due to ravens consuming lead bullet fragments left behind in gut piles of hunted elk, deer and moose. Blood samples were taken during a 15-month period spanning two hunting seasons, from mid-September 2004 to mid-December 2005. Forty-seven percent of the ravens tested during the hunting season exhibited elevated blood lead levels ($\geq$10 µg/dL) while only 2% tested during the non-hunting season exhibited elevated lead levels. Offal is the primary food source of ravens during the time of exposure and Craighead and Bedrosian (2007) also identified un-retrieved offal piles of hunter-killed game as a point source for lead contamination in the area. These substantial increases in blood-lead levels correspond almost exactly with the open and close of hunting season. Just after the start of hunting season, blood-lead levels begin to rise. Shortly after the end of hunting season, they return to normal. Blood-lead levels show a spike again in the late spring, when melting snow uncovers gut piles left from the previous hunting season. One hundred percent of the ravens at the study site feed on gut piles at some point throughout the hunting season and get exposed to lead.

Craighead and Bedrosian (2009) collected an additional 237 blood samples from ravens in the same study area spanning an additional two hunting seasons. The samples had a median blood lead level of 10.0 µg/dL with a range of 2.7–51.7 µg/dL. The median blood lead level of 84 additional samples collected during the non-hunting season was only 2.2 µg/dL with a range of 0.0–19.3 µg/dL. Fifty percent of the hunting season samples had blood lead levels >10µg/dL, while only 3% were greater than 10µg/dL during the non-hunting season.

Craighead and Bedrosian also documented that the blood lead levels of ravens around Grand Teton dropped corresponding with increased use of non-lead ammunition by hunters on the National Elk Refuge and in Grand Teton National Park. In fall of 2009 researchers distributed 194 boxes of copper bullets to hunters with permits for the park and the refuge, captured 46 ravens (which typically scavenge the discarded gut piles) during hunting season and tested their blood for lead. An estimated 24% of hunters in the area used copper bullets in 2009, and there was a corresponding 28% drop in blood lead levels in ravens compared with what would have been expected (Hatch 2010).

Research has yet to be done on lead exposure to magpies, which occasionally feed on carrion and could also ingest lead by eating hunter-killed carcasses.

### 9.    Song Birds

Lead poisoning from ingested spent lead ammunition has been documented in several songbird species in the United States, including white-throated sparrow (*Zonotrichia albicollis*), dark-eyed junco (*Junco hyemalis*), brown-headed cowbird (*Molothrus atar*), yellow-rumped warbler (*Dendroica coronata*), brown thrasher (*Toxostoma rufum*) and blue-headed vireo (*Vireo solitarius*) (Vyas et al. 2000, 2001; Lewis et al. 2001).

JA 089

### 10.    Mammals

Elevated levels of lead have been found in several species of small mammals near shooting ranges, such as shrews, mice, voles, and squirrels, hares, opossums and raccoons (Tataruch and Onderscheka 1981; Erickson and Lindsey 1983; Ma 1989; Stansley and Roscoe 1996; Lewis et al. 2001). It was not determined whether elevated blood lead levels were due to direct ingestion of lead particles, or whether plants growing on lead-contaminated soil bioaccumulated lead, which was then ingested by the herbivorous mammals. Woolf et al. (1982) identified lead in liver of wild white-tailed deer (*Odocoileus virginianus*).

Ingestion of lead by carrion scavenging mammals, such as coyotes, grizzly bears, black bears, wolves, wolverines and mountain lions feeding on varmint carcasses, and gut piles and carcasses of big game during the hunting season has rarely been studied. Large carnivores such as black bears (*Ursus americanus*), grizzly bears (*U. arctos)*, wolves (*Canis lupis*) and coyotes (*C. latrans)* scavenge to varying degrees on ungulate offal piles abandoned by hunters. Cougars (*Puma concolor*) may periodically be exposed to lead at biologically significant levels because of the tendency to occasionally scavenge. Rogers et al. (2009) have begun collecting samples of liver, hair, blood, and feces from black and grizzly bears, wolves, coyotes and cougars in Grand Teton, Wyoming, and tested samples for the presence of lead. Rogers et al. (2009) documented elevated lead blood levels in grizzly bears during hunting season, when they scavenge the remains of big game. Preliminary data by Rogers et al. (2009) showed that of 13 Grand Teton grizzly bears sampled during hunting season, 46% showed elevated blood lead levels above 10 µg/dl, while 11 bears sampled outside of hunting season had undetectable lead in their blood. The potential consequences for large mammalian scavengers are as yet unstudied.

### 11.    Amphibians and Reptiles

A few studies have found elevated concentrations of lead in tissues of amphibians and reptiles near shooting ranges and heavily hunted areas (Stansley and Roscoe 1997; Stansley et al. 1997; Hammerton et al. 2003; Pattee and Pain 2003), with exposure presumed to be due to ingestion of lead in food items or dissolved in water, although ingestion of small lead fragments may be possible. Lead poisoning has been shown to cause mortality and to impact egg and tadpole development and growth rates in amphibians (Dilling and Healey 1926; Kaplan et al. 1967; Khangarot et al. 1985; Perez-Coll et al. 1988; IPCS 1989; Stansley et al. 1997; Rice et al. 1999; Sparling et al. 2006). American alligators have been documented ingesting lead bullets after feeding on nutria that had been shot (Camus et al. 1998).

### F.    Toxic Effects of Lead Ammunition on Humans

The toxic effects of lead on humans have been known since Roman times (Nriagu 1983; Needleman 1999; Hernberg 2000; Tong et al. 2000; Nriagu 2009). Lead is an extraordinarily toxic element, and when ingested it attacks organs and many different body systems, including the blood-forming, nervous, urinary, and reproductive systems

**JA 090**

(USDHHS 1999). Lead accumulates in humans mainly in bones, with lead in blood and other tissues reflecting more recent exposure. The effects of lead poisoning can include: damage to the brain and central nervous system; kidney disease; high blood pressure; anemia; and damage to the reproductive system, including decreased sex drive, abnormal menstrual periods, impotence, premature ejaculation, sterility, reduction in number of sperm cells, damage to sperm cells resulting in birth defects, miscarriage, and stillbirth, painful gastrointestinal irritation, diarrhea, loss of appetite, weakness and dehydration, nerve disorders, memory and concentration problems, muscle and joint pain (USDHHS 1999).

In large enough doses, lead can cause brain damage leading to seizures, coma, and death (USDHHS 1999). Chronic overexposure to low levels of lead can cause health impairments to develop over time, and irreversible damage can occur without obvious symptoms (USDHHS 1999). Lead exposure can adversely affect the nervous system (resulting in impaired cognition, reduced motor coordination, and palsy), renal system, and cardiovascular system (IPCS 1977; Needleman et al. 1990; Goyer 1996; Needleman 2004; Khan 2005; Cecil et al. 2008). Lead is also implicated in decreased growth (Hauser et al. 2008), decreased brain volume (Cecil et al. 2008), spontaneous abortion (Borja-Aburto et al. 1999), kidney damage (Ekong et al. 2006), cancer, and cardiovascular disease (Menke et al. 2006, Lustberg and Silbergeld 2002). Lead is especially dangerous to fetuses and young children and poisoning is even more pronounced because the lead is absorbed faster and disrupts development, causing slow growth, development defects, and damage to the brain and nervous system (Schnaas et al. 2006). Some studies link elevated bone or blood lead levels with aggression, delinquent behavior, attention deficit hyperactivity disorder and criminal behavior (Nevin 2000; Needleman et al. 2002; Needleman 2004; Braun et al. 2006; Wright et al. 2008).

Many studies show that lead exposure is harmful and that even very small amounts of lead can have permanent, debilitating, sub-lethal effects. In humans, blood lead concentration of 10 micrograms of lead per deciliter ($\mu$g/dl) is currently considered an elevated level, although some researchers and health professionals have advocated for a threshold of 5 micrograms or even 2 micrograms. In the mid-20th century, the amount of lead in the bloodstream of a child considered in need of medical intervention was considered to be 60 $\mu$g/dl, whereas today it is 10 $\mu$g/dl. The U.S. Department of Health and Human Services has concluded that there is evidence that blood lead levels less than 10 $\mu$g/dl are associated with adverse health effects on development in children and reproduction in adult women, such as delayed puberty, decreased postnatal growth, reduced fetal growth, spontaneous abortion and preterm birth (NTP 2011); and studies show blood lead levels at and below 2 $\mu$g/dl are associated with adverse effects (e.g. Wu et al. 2003; Denham et al. 2005). Children sustain permanent cognitive damage when showing a blood lead average of only 7.5 $\mu$g/dl before the age of five (Lanphear et al. 2005). The consensus among medical researchers is that there is no safe level of lead exposure in young children (CDC 2005).

Human exposure to lead in the United States has decreased as lead plumbing, paint, solder, toys, and gasoline have been phased out and replaced. Public health agencies have

JA 091

regulated lead in industrial activities and consumer products, and have to varying degrees begun to address and remediate lead exposure from shooting ranges, but have focused little attention on hunting or fishing activities that may be an important source of lead exposure in certain communities, occupations or activities.

Hunters who use lead bullets are at risk of lead poisoning in several ways. One exposure mechanism is inhalation of airborne lead created by friction from lead slugs against the gun barrel (KDHE 2004), whereby inhaled lead enters the bloodstream and is distributed throughout the body. Hunters who handle lead bullets are also at risk of ingesting lead residue (KDHE 2004). The most serious exposure is from accidental ingestion of lead shot pellets or lead bullet fragments in the meat (Carey 1977; Tsuji et al. 1997, 1999; Scheuhammer et al. 1998; Johansen et al. 2001, 2004, 2005; Bjerregaard et al. 2004; Mateo et al. 2007). Health effects in human beings following ingestion of whole lead shot pellets have been reported in many cases, and ingestion of meat tissues containing minute flakes or fragments of metallic lead from the passage of lead shot or lead bullet fragments through the tissues is also possible (Scheuhammer and Norris 1995; Khan 2005).

Published literature on lead concentrations and lead isotope patterns from subsistence hunters in the circumpolar North indicates that elevated human lead exposure is correlated with use of lead ammunition (Verbrugge et al. 2009). The mechanisms of exposure include ingestion of lead dust, ammunition fragments, and shot pellets in harvested meat, and inhalation of lead dust during ammunition reloading. Epidemiological studies and risk assessment modeling indicate that regular consumption of game meat harvested with lead ammunition and contaminated with lead residues may cause relatively substantial increases in blood lead compared to background levels, particularly in children (Kosnett 2009). A Canadian study of blood lead levels in hunters (Nieboer 2001) showed that lead pellets from wild game harvested with lead shot is a major source of exposure to lead in Native American communities in Canada. Blood lead levels were demonstrated to be higher in Native hunting communities than in a nearby reference group. Blood lead levels were also higher in men than women, consistent with greater participation of males in hunting and greater consumption of bagged wild fowl. Blood lead levels were shown to increase in male hunters during the hunting season, and one of the measured lead isotope ratios also changed in a manner consistent with exposure to lead derived from leaded ammunition. Of 132 subsistence hunters radiographed, 15% showed ingested lead pellets, with 8% located in the lumen of the digestive tract and 7% in the appendix (Tsuji and Nieboer 1997). Fifteen recent studies in Canada, Greenland, and Russia have linked lead shot found in game animals to higher levels of lead in people who eat those game animals (Carey 1977; Tsuji et al. 1997, 1999; Scheuhammer et al. 1998; Johansen et al. 2001, 2004, 2005; Bjerregaard et al. 2004; Mateo et al. 2007; Tranel and Kimmel 2009). Studies showing significantly higher lead exposure in people from hunting communities have major implications for the public health hazards of lead in ammunition (Dewailley et al. 2001; Levesque et al. 2003).

In Alaska, ammunition-related lead exposures include ingestion of lead fragments in shot game, use of certain indoor firing ranges and melting and casting lead to make bullets. Titus et al. (2009) quantified the population of Alaska at potential risk of lead exposure

JA 092

from eating game shot with lead ammunition. Alaska has 84,000 licensed resident hunters, many of whom rely on wild game for a significant part of their diet. About 29,000 hunters kill about 7,300 moose annually in Alaska. In rural Alaska, where reliance on ungulate meat is high, about 100 kg of moose and caribou meat is consumed per person annually, and small game, marine mammals, and waterfowl harvested with firearms also contribute to the local diet. Sixty percent of households in rural Alaska harvest game animals and 86% consume wild game.

A study of lead concentrations in tissues of waterfowl killed by lead shotgun pellets (Frank 1986) showed high amounts of lead (>100 mg/kg) and confirmed the presence of lead fragments by X-ray. Particles of lead ranged from irregular fragments 1–2 mm in length to very fine dust, resulting from the disruption of lead shot pellets upon collision with bone (Frank 1986). Researchers have also detected lead fragments visible by radiograph in carcasses of squirrels shot with bullets (Harmata and Restani 1995; Knopper et al. 2006). The flesh of any species of game animal killed with lead shot or lead bullets can become contaminated with high concentrations of lead through this mechanism. Studies have demonstrated that lead bullets can shatter into hundreds of fragments when fired from a high-powered rifle (Hunt et al. 2009b; Cornicelli and Grund 2009). Bedrosian and Craighead (2009) showed extensive fragmentation of lead bullets in an elk carcass shot with a .30-06 rifle. In an X-ray of the results, lead fragments appear as white shards spread throughout a large area in the elk's body. Hunt et al. (2009b) found that lead fragments in shot game spread far beyond the internal organs and can move into the meat that humans eat. X-rays of meat from a butchered game animals showed bullet fragments in steaks packaged for human consumption. While most big-game hunters discard "blood-shot" meat that has been pierced by bullet fragments, the California research shows that fragments can be packaged even by experienced butchers.

A study by the Minnesota Department of Natural Resources found that when lead bullets explode inside an animal, imperceptible dust sized particles of lead can infect meat up to a foot and a half away from the bullet wound (Cornicelli and Grund 2009). Cornicelli and Grund (2009) conducted a radiograph study of bullet fragmentation patterns in carcasses to determine the potential risk of lead contamination of deer meat in the Minnesota venison donation program. The study assessed lead levels in deer and domestic sheep shot using different types of bullets and firearms commonly used for hunting in Minnesota, including: a centerfire rifle with lead bullets designed to rapidly expand upon impact used for hunting mid-sized game such as deer, lead bullets designed to retain a high percentage of their weight, and non-lead copper bullets; a shotgun using a 1-ounce Foster lead slug, commonly used throughout the Minnesota shotgun-only zone; and an inline muzzleloader with two common bullets types used during Minnesota's hunting seasons.

Cornicelli and Grund (2009) showed that using bullets with no exposed lead (a copper case completely surrounds the lead core) or bullets made of copper significantly reduce (or eliminate) lead exposure. Non-exposed lead core bullets averaged nine copper fragments in the animal with an average maximum distance from the wound channel of seven inches. By design, copper bullets leave no lead and the few copper fragments that

**JA 093**

were seen on x-ray were less than an inch from the exit wound. Both of these bullet designs fragmented very little and left no lead. Ballistic tip lead bullets (rapid expansion) had the highest fragmentation rate, with an average of 141 lead fragments per carcass and an average maximum distance of 11 inches from the wound channel. In one carcass, a lead fragment was found 14 inches from the exit wound. Soft point lead bullets (rapid expansion) left an average of 86 fragments at an average maximum distance of 11 inches from the wound channel. Bonded lead-core bullets (controlled expansion, exposed lead core) left an average of 82 lead fragments with an average maximum distance of nine inches from the wound. Lead shotgun slugs left an average of 28 lead fragments at an average maximum distance of five inches from the wound channel. Muzzleloader bullets (245-grain and 300-grain respectively) left an average of three and 34 lead fragments, respectively, at an average maximum distances of one and six inches, respectively. Lead fragments were found so far from exit wounds that routine trimming likely would not remove all of the fragments. Only about 30% of fragments were within two inches of the exit wound, and the vast majority were dispersed further from the carcass. In some cases, low levels of lead were detected as far away as 18 inches from the bullet exit hole. Rinsing of a carcass produced mixed results, tending to reduce lead around the wound channel but also transporting lead away from the wound. Lead ammunition shot into the hindquarters of a deer, where heavy bones are found, resulted in extensive fragmentation so pronounced that a hunter would likely not want to utilize this meat as there would be no way to remove all the fragments. Having venison processed at a meat processor will likely result in an increased risk of lead exposure because venison from different hunters is typically mixed during the grinding process and the vast majority of hunting bullets are made from lead. Cornicelli and Grund (2009) found that 27% of the ground venison and 2% of the whole muscle cuts tested had detectable lead fragments.

In a highly publicized recent case, packets of venison shot with lead ammunition and donated by hunters to feed the hungry tested positive for lead contamination. Cornatzer et al. (2009) studied 100 randomly selected ground venison packages donated to the Community Action Food Centers of North Dakota by hunters. The packages were studied by high resolution computerized tomography imaging and x-ray fluoroscopy for detection of metal fragments. Analysis of randomly selected ground venison samples showed 59 packages out of 100 (59%) had one or more visible lead fragments. One sample had 120 ppm lead. Cornatzer et al. (2009) concluded there is a health risk from lead exposure to humans consuming ground venison. Food banks and shelters in North Dakota pulled the meat from their shelves after the report. The Centers for Disease Control and Prevention and the North Dakota Department of Health ran a test to find out the health effects of lead-shot game. The agency compared blood-lead levels of people who regularly eat meat shot with lead bullets with the levels of those who don't eat much wild game. The results were inconclusive. Those who ate the lead-shot meat had slightly higher blood-lead levels than those who did not, but none of the 738 people in the study had levels above the government's threshold for danger. The health department recommended that children younger than 6 and pregnant women stop eating venison shot with lead bullets because those groups are at particular risk for lead poisoning, even at low levels. Avery and Watson (2009a) conducted a survey of all wild game meat donation programs throughout

**JA 094**

the United States to determine the amount of venison and other game donated annually. Venison donation programs operate in all 50 states and in at least four Canadian provinces. For the 2007/2008 hunting season 75 programs reported providing an average of 34,943 pounds of hunted game meat annually, a total of 2.6 million pounds of meat or approximately 10 million meals.

Hunt et al. (2009) radiographed 30 eviscerated carcasses of white-tailed deer (*Odocoileus virginianus*) shot by hunters with standard lead core, copper-jacketed bullets under normal hunting conditions. All deer carcasses brought to processors contained fragments (15–409 fragments counted in radiographs), and despite a high rate of removal of fragments by processors to avoid contamination, 80% were unable to do so entirely. Hunt et al. (2009) demonstrated that people risk exposure to bioavailable lead when they eat venison from deer killed with standard lead-based rifle bullets and processed under normal commercial procedures. Ten million hunters, their families, and low-income beneficiaries of venison donations in the U.S. are at risk. The evidence includes a high proportion (80%) of examined deer showing at least one bullet fragment in one or more ground meat packages, a substantial frequency of contamination (32% of all ground meat packages), a majority (93%) of assayed fragments identified as lead, isotopic homogeneity of bullet lead with that found in the meat, and increased blood lead concentrations in swine fed fragment-containing venison, meaning the lead is bioavailable to humans as well. Hunt et al. (2009) concluded that in a majority of cases, one or more consumers of a hunter-killed, commercially-processed deer will consume toxic lead derived from bullets.

Pain et al. (2010) found that eating the meat of animals hunted using lead ammunition can be more dangerous for health than was previously thought, especially for children and people who consume large quantities. Pain et al. (2010) analyzed the meat of six species of game birds (red partridge, pheasant, wood pigeon, grouse, woodcock and mallard) shot by hunters in the United Kingdom, and found that lead levels in cooked game meat exceeded the maximum allowances set by the European Union, due to the presence of remains of ammunition, even after lead pellets were removed. Depending on the species and type of recipe used, between 20% and 87.5% of the samples analyzed exceeded 100 parts per billion of the fresh weight of meat.

Watson and Avery (2009) assessed the numbers and proportions of state populations that hunt and may be at risk of lead exposure from lead-based ammunition, from handling lead ammunition (hunters who load their own ammunition), inhalation of vapor upon firing, or ingestion of game meat contaminated with bullet fragments and shot. In 2006, 12.5 million people (6% of the population) aged 16 years and older in the United States hunted on 220 million days, including an estimated 1.6 million children aged 6 to 15 years.

Elevated blood lead levels resulting in biochemical effects, disease and neurotoxicity have been documented for people who frequent or work at indoor and outdoor firing ranges (Fischbein et al. 1979; Novotny et al. 1987; Chisholm 1988; Valway et al. 1989; Peddicord and LaKind 2000; Gulson et al. 2002). Exposure may be due to handling lead

**JA 095**

materials during reloading as well as inhalation of lead dust. Sportsmen who reload rifle and pistol ammunition and cast their own lead bullets are at particular risk of exposure to lead.

JA 096

## V.      AUTHORITY TO ACT

In 2010, the EPA denied a petition under the Toxic Substances Contro1 Act ("TSCA") seeking a complete ban on all lead ammunition. In denying that petition, the EPA stated that "TSCA does not provide the agency with authority to address lead shot and bullets as requested in your petition, due to the exclusion found in TSCA § 3(2)(B)(v)."

However, Senate and House reports on the legislative history and intent of TSCA, not included in the 2010 petition and not considered by the EPA in its denial, confirm that the agency indeed does have the regulatory authority to regulate the toxic components of ammunition. According to the House report on the history and intent of TSCA, "the Committee does not exclude from regulation under the bill chemical components of ammunition which could be hazardous because of their chemical properties."

The legislative history of TSCA supports its plain language. Section 2605(a)(2)(A)(i) of TSCA, passed in 1968 as the federal mechanism for regulating toxic substances, allows the EPA to regulate any chemical substance for a particular use, up to and including prohibiting the manufacture, processing or distribution in commerce. Lead is plainly a "chemical substance" falling within the scope of TSCA. Although certain products are excluded from the definition of "chemical substances," none of these exclusions are applicable to lead bullets or shot.

In adopting TSCA, Congress declared its policy that (1) "adequate data should be developed with respect to the effect of chemical substances and mixtures on health and the environment" and (2) "adequate authority should exist to regulate chemical substances and mixtures which present an unreasonable risk of injury to health or the environment."

If "there is a reasonable basis to conclude that the issuance" of a proposed rule "is necessary to protect health or the environment against an unreasonable risk of injury to health or the environment," then the EPA must grant a petition for rulemaking and initiate rulemaking procedures under TSCA section 2605.  (15 U.S.C. § 2620(b)(4)(B)(ii)).  Factual certainty of the magnitude of risk to health and environment is not required; the EPA may base its decision not only on known facts, but also on scientific theories, projections and extrapolations from available data, and modeling using reasonable assumptions (59 Fed. Reg. 11122, 11138, citing H.R. Rep. No. 1341, 94th Cong., 2d Sess. 32 (1976)).

Lead used in shot and bullets is a "chemical substance" falling within the scope of the Act (15 U.S.C. § 2602(2)(A)).[1] Although certain substances are excluded from the definition of "chemical substances," these exclusions do not apply to lead shot or bullets. The relevant section of TSCA, (15 U.S.C. § 2602(B)). Section 2602(B)(v), excludes from

---

[1] "Except as provided in subparagraph (B), the term "chemical substance" means any organic or inorganic substance of a particular molecular identity, including (i) any combination of such substances occurring in whole or in part as a result of a chemical reaction or occurring in nature and (ii) any element or uncombined radical."

JA 097

Act regulation "any article the sale of which is subject to the tax imposed by section 4181 of the Internal Revenue Code of 1986." However, Section 4181 of the Internal Revenue Code only taxes firearms, shells, and cartridges (26 U.S.C. § 4181). Shot and bullets are explicitly not subject to this tax. In fact, a 1968 Revenue Ruling states, "The manufacturers excise tax imposed upon sales of shells and cartridges by section 4181 of the Internal Revenue Code of 1954 *does not apply* to sales of separate parts of ammunition such as cartridge cases, primers, bullets, and powder" (Rev. Rul. 68-463, 1968-2 C.B. 507 (emphasis added)). This ruling has been confirmed by subsequent administrative decisions (See, for example, Fed. Tax Coordinator ¶ W-2911(2d.)). Because shot and bullets, as separate parts of ammunition, are not listed as taxable items in 26 U.S.C. § 4181, and additional evidence affirms they are not implicitly taxed under section 4181, the section 2602(B)(v) exception of TSCA to "chemical substance" does not apply. Thus, lead shot and bullets are properly classified as "chemical substances" subject to TSCA regulation.

The Senate and House reports on the legislative history and intent of TSCA are equally clear and instructive. The House report explicitly states on page 418: "Although the language of this bill is clear on its face as to the exemption for pistols, revolvers, firearms, shells and cartridges, the Committee wishes to emphasize that it does not intend that the legislation be used as a vehicle for gun control…However, *the Committee does not exclude from regulation under the bill chemical components of ammunition which could be hazardous because of their chemical properties*" (emphasis added). The Senate report states, "In addition, the term [chemical substance] does not include pesticides, tobacco, or tobacco products, nuclear material (as defined in the Atomic Energy Act), firearms and ammunition (to the extent subject to taxes imposed under section 4181 of the Internal Revenue Code)…"

The IRS ruling, along with the legislative history of TSCA, makes clear that the component parts of ammunition, namely shot and bullets, may be regulated as chemical substances under TSCA. This petition does not request that the EPA regulate firearms or the manufacture and sale of ammunition, but rather the toxic, separate parts of ammunition, such as bullets and shot.

JA 098

## VI.    ALTERNATIVES TO LEAD AMMUNITION

In reviewing this petition, the EPA is only required to determine whether there is a reasonable basis to conclude that an issuance of such a rulemaking is necessary to protect against an unreasonable risk of injury. However, in promulgating a rule in response to a Section 6 petition, the EPA must consider "the benefits of such substance or mixture for various uses and the availability of substitutes for such uses" as well as "the reasonably ascertainable economic consequences of the rule, after consideration of the effect on the national economy, small business, technological innovation, the environment, and public health" (15 U.S.C. § 2605(c)(1)(C)-(D)). Therefore, this petition identifies commercially available alternatives to rifle bullets, rimfire bullets and shotgun pellets containing lead. Not all products available in lead are currently available as non-lead alternatives, but a rapidly increasing number and range of bullets in all calibers are available in non-lead forms, and demonstrated technology indicates that hunting and shooting sport products could be produced in non-lead alternatives within a short period of time if manufacturers are provided a transition period for expanding upon current designs and stocks of ammunition.

Stroud and Hunt (2009) reviewed basic bullet materials available to bullet manufacturers, which include lead alloys, lead with external copper wash, lead core with copper jacket, pure copper, and bismuth. Lead and bismuth are highly frangible, whereas pure copper bullets tend to remain intact after impact. Bullet fragmentation increases the degree of lead contamination in tissue ingested by scavengers feeding on hunter-killed animal remains. Modern bullet design, velocity, composition, and bone impact are significant factors in the character and distribution of lead particles in carcasses, gut piles, and wound tissue left in the field by hunters. Prior to the 1900s, bullets were made entirely of lead. Their velocities were relatively slow (<2,000 feet per second), and their tendency to fragment was accordingly lower than that of modern ammunition. Development of smokeless powder in the 1890s increased bullet speeds above 2,000 feet (610 m) per second, causing lead bullets to melt in the barrels and produce fouling which reduced accuracy. Copper jacketed lead-core bullets were therefore developed, which permitted velocities that may exceed 3,000 or even 4,000 ft/sec in modern firearms. Standard hunting bullets now typically travel at 2,600 to 3,100 ft/sec, speeds highly conducive to fragmentation. Plastic-tipped "hollow-point bullets" used for varmint hunting are actually designed to completely fragment, leaving the entire mass of the lead bullet to contaminate the carcass.

Although the terms "lead-free," "non-lead" and "nontoxic" are often used interchangeably, they are not equivalent. As a result of the manufacturing process, trace levels of lead can exist in any metal projectile used for bullets, including copper, resulting in ammunition that is not 100% lead-free, but that is functionally nontoxic to wildlife and humans. The U.S. Fish and Wildlife Service ("USFWS") definition of "nontoxic" shot to be used in waterfowl hunting specifies in 50 C.F.R. 20.21(j) several alloys containing not more than 1% lead. Steel shot can be coated with metals such as zinc (which always contains lead as an impurity) as long as the coating does not exceed 1% of the weight of the shot. The California Department of Fish and Game has established a maximum

amount of lead content in projectiles considered to be nontoxic at 1% by weight, given scientific consensus that this threshold for lead content will preclude risk from lead fragmentation to California condors, which are typically more sensitive to lead than other taxa. Toxicological modeling of this amount of lead impurity in bullet fragments indicates that even if condors consume major fragments of bullets, the dissolution of lead is unlikely to raise the blood lead levels above 1 µg/dL, a low level equivalent to the blood lead levels of condors being raised in Los Angeles or San Diego Zoos on a lead-free diet (Fry et al. 2009). Other metals used for manufacturing ammunition can have risk of toxicity, which is a function of exposure and concentrations, and the resulting dose encountered by wildlife or humans that ingest ammunition fragments or shot pellets. For example, tungsten, although considerably less toxic than lead, can be oxidized in the environment forming tungstate and can migrate into ground water. Tungstate can cause immuno-suppression at high concentrations. Although tungstate and tungstate alloys (with the exception of tungsten/nickel/cobalt, which when imbedded can cause a rare cancer, rhabdomyosarcoma) are much less toxic than lead, they are not truly "non-toxic." Another example is copper-jacketed lead, which can facilitate the galvanic oxidation of metallic lead to more environmentally and bioavailable forms such as lead oxides and carbonates, effecting transport into the food web.

For all but the smallest caliber bullets (those used for varmint hunting), non-lead ammunition is widely available. Currently available alternatives are either made completely of non-lead materials, such as copper; or designed such that a lead interior is "jacketed" by copper and theoretically protected from exposure upon impact. Other designs have been proposed and it is expected that the increase in demand will result in greater options of non-lead ammunition. Non-lead bullets generally have equivalent, if not superior, performance when compared to their lead counterparts. Copper bullets were originally designed for the "premium" market not because of concerns over lead poisoning but rather for their enhanced ballistic capabilities.

Oltrogge (2009) reviewed the success of ammunition manufacturers in developing non-lead, expanding-nose centerfire bullets. The Barnes Bullet Company succeeded in 1985 in designing copper bullets that demonstrate good expansion without shedding copper particles. They have proper rotational moment of inertia, are made in traditional bullet weights, and despite the lower density, the over-all loaded cartridge lengths are within specification. These and other factors make them as capable as traditional lead-cored bullets. They are on the market as the X-Bullet series, in several varieties, chief of which are the Triple Shock and the MRX. The latter is shorthand for Maximum Range X-Bullet, which has an all-metal tungsten-composite core that is more dense than lead. It shoots further, with flatter trajectory, than any other non-lead bullet and surpasses many lead-containing bullets. Oltrogge (2009) reviewed some of the science of achieving these non-lead, centerfire bullets. Nosler and other companies are now making all-copper centerfire bullets, and availability is increasing.

Currently there are a number of copper hunting bullets produced, at least one of which—the Barnes X Bullet—is widely available. The Barnes X is made out of copper, a material that is lighter and more rigid than lead. Barnes produces a number of X-type bullets,

**JA 100**

including the X, XLC, and Triple Shock X, in a wide variety of calibers suitable for hunting game such as deer, elk, pig, and coyote. In order to promote proper expansion, Barnes bullets are designed with a hollow point that is fluted so that the tip peels back to form a mushroom upon impact. Barnes bullets have a ballistic coefficient between .220 and .555, depending upon the caliber and cartridge used. Barnes also reports that its bullets retain close to 100% of their weight after hitting most targets. Thus, Barnes bullets are a non-lead alternative ammunition that offers equivalent or superior performance to that of high-quality lead bullets. Another alternative bullet, composed of tungsten, tin, and bismuth ("TTB") is being developed by various ammunition manufacturers and the military has been experimenting with a so-called "green" bullet that relies on the same metals to replace lead (Mikko 1999).

The California Department of Fish and Game ("CDFG") certifies "nontoxic" ammunition for use while hunting big-game and non-game species in the range of the California condor in California, including deer, bear, wild pig, elk, pronghorn antelope, coyote, ground squirrels, and other nongame wildlife. Such ammunition must use a projectile or bullet which has been certified to contain $\leq 1\%$ lead by weight. As a result of the manufacturing process, trace levels of lead are likely exist in any projectile made of any metal. CDFG established a maximum amount of lead content in projectiles to be 1% by weight, given scientific consensus that this threshold for lead content will preclude risk to the condor from lead fragmentation. Typically, the certified "nontoxic" identified projectiles have far less than 1% lead content. As of April 2010, CDFG had certified "nontoxic" ammunition from 24 manufacturers. A list of CDFG approved "nontoxic" ammunitions can be found at http://www.dfg.ca.gov/wildlife/hunting/condor/certifiedammo.html. The Arizona Game and Fish Department also publishes a list of non-lead rifle ammunition available for big game hunters, including 120 bullets in various calibers produced by 13 ammunition manufacturers, as well as 7 manufacturers who provide custom-loaded non-lead rifle ammunition. The information can be found at http://www.azgfd.gov/pdfs/w_c/condors/Non-LeadAmmo.pdf.

Both rifle bullets and .22 caliber rimfire bullets are currently marketed with non-lead alternatives. Non-lead ammunition in .22 rimfire was made available only after California required the use of "nontoxic" .22 ammunition in the range of California condors. Prior to that time, expert testimony was presented to the California Fish and Game Commission claiming that non-lead .22 caliber rimfire was impossible to produce. However, commercially available non-lead .22 caliber ammunition was available four months after the Commission decision to ban lead .22 ammunition.

In one survey, 90% of hunters and ranchers surveyed approved of the use of copper bullets (Ritter 2006). According to post-hunt survey results in Arizona, 88% of successful hunters who used non-lead ammunition said it performed as well as or better than lead bullets; in addition, 72% of all hunters said they would recommend the all-copper bullets to other hunters (Seng 2006). In general, experts appear to endorse the use of non-lead bullets (AGFD 2010a, 2010b; Rees 2010).

**JA 101**

Non-lead shotgun ammunition is widely available on the market, largely as the result of federal regulations requiring its use while hunting for waterfowl (50 C.F.R. § 20.134). Certification of "nontoxic" shot for waterfowl hunting is conducted by the USFWS, and acceptable alloys must be not more than 1% lead. Shotguns, the dominant firearm used for waterfowl hunting, are also used for upland hunting of small game, such as squirrels, rabbits, and birds, and in many states are used for hunting larger game such as deer and pigs using solid slugs.

Commercially available non-lead shotgun ammunition consists of shot composed either of steel, tungsten (including tungsten-iron, tungsten-bronze, tungsten-nickel-iron, tungsten-matrix, tungsten-nickel-iron, tungsten-tin-iron-nickel, tungsten-tin-bismuth, tungsten-tin-iron, and tungsten polymers), bismuth, or tin (WFGA 2001). It should be noted, however, that non-lead shot is not currently available for all gauges and pellet sizes, particularly smaller shot sizes (#7½ and #8) which are popular for hunting upland game birds (WFGA 2001).

The use of non-lead shot for hunting upland game is mandated on a variety of federal and state lands, and non-lead shot is used by upland hunters across at least 1.33 million acres nationwide (WFGA 2001). For example, a number of individual National Wildlife Refuges require the use of non-lead shot, as do a number of states such as South Dakota, Wisconsin, and Maine.

The performance of non-lead shot is also roughly equivalent to that of lead shot. Non-lead shot, particularly steel, is lighter than lead and thus has reduced velocity at greater distances, whereas bismuth shot has a density almost equivalent to that of lead. Tungsten alloy shot of several compositions is superior to lead and steel shot, and can be used in double barreled shotguns and older steel barreled shotguns which would be damaged by the higher muzzle pressures created by steel shot. Tungsten alloy shot shells are currently more expensive ($2.20-3.50 per cartridge) than either lead ($0.25-0.75 per cartridge) or steel shot ($0.40-$0.60 per cartridge).

After the federal ban on lead shot for hunting waterfowl, there were hunter complaints about the effects of non-lead shot on shotgun barrels. Older shotguns not designed for steel shot have a risk of damage to the barrels due to increased pressure of the hard steel shot which may cause "ring-bulge" deformation of the barrel at the choke of older fixed choke shotguns. Double barrel shotguns are also susceptible to barrel damage with steel shot. "Hevi-shot"®, composed of tungsten, nickel, and iron will not damage barrels of older shotguns, although it is considerably more expensive than steel shot. All modern single barreled shotguns manufactured after 1990 use interchangeable choke tubes designed for steel and other non-lead shot, and will not be damaged by any non-lead shot. The USFWS certifies and approves non-lead shot for use in waterfowl hunting (USFWS 2010). The USFWS has currently approved 12 non-lead shot types. A full list can be found at http://www.fws.gov/migratorybirds/CurrentBirdIssues/nontoxic.htm.

Mandating the use of non-lead ammunition for hunting would impose some additional costs on some in the hunting community. However, the incremental cost of alternative

**JA 102**

ammunition is typically a tiny fraction of the total that hunters spend on their sport. According to the federal government, the average big game hunter in California spends just over $800 per hunting trip; of which approximately $173 dollars is spent on all "hunting equipment" with bullets representing a fraction of that cost (USDOI/DOC 2003). Likewise the cost of shot is a small portion of annual waterfowl or game bird hunting expenses (Scheuhammer and Norris 1995). The Minnesota Department of Natural Resources reports that effective non-lead alternatives to lead shot are now available at costs comparable to lead (Tranel and Kimmel 2009). The price of non-lead ammunition has continued to drop over time as demand has risen. As demand continues to increase and subsequent production costs fall, non-lead bullets and shot will likely become less expensive. On a larger scale, the costs to purchase non-lead ammunition would likely be more than offset by eliminating the societal costs involved in cleaning up and managing lead wastes from lead ammunition.

**JA 103**

## VII.   EXISTING FEDERAL AND STATE REGULATIONS

While TSCA requires the EPA to consider whether actions undertaken under other federal laws adequately address the risk of unreasonably injury in promulgating a rule, this petition presents information on existing regulatory efforts in order to demonstrate that regulation of lead used in hunting ammunition is possible, enforceable and effective, and allows continued hunting; and that despite these efforts, widespread use of lead shot and bullets continues, creating an unreasonable risk of injury to the environment. TSCA does not require a showing of population-level impacts from lead poisonings to regulate toxic lead, only that there is an unreasonable risk of injury to the environment.

There are an increasing number of outreach and education programs by state and federal agencies and non-governmental organizations promoting the voluntary use of non-lead ammunition by hunters. While these programs are important, they have not resulted in a widespread switch to non-lead ammunition by hunters and there is no evidence these programs by themselves have significantly reduced lead exposure to wildlife.

In 1991 the USFWS banned the use or possession of lead shot while hunting waterfowl nationwide (50 C.F.R. § 20.21(j)). This regulation was passed as a result of a lawsuit brought by a coalition of environmental groups, filed under the Endangered Species Act, in response to lead poisoning of waterfowl and secondary poisoning of eagles caused by lead shot. Regulations were phased in nationally over a five year period, with additional zones designated as requiring non-lead shot each year. By September 1, 1991, every state was designated as a non-lead shot zone for hunting waterfowl, coots and certain other species (50 C.F.R. 20.108). While the ban on the use of lead shot for hunting waterfowl has reduced the likelihood of poisoning of raptors that prey on or scavenge waterfowl, it does not prevent the poisoning of raptors that feed on animals hunted away from wetlands or those that feed on a range of avian and mammalian prey. Lead ammunition is still permitted for upland hunting of big game, game birds and non-game mammals on non-federal lands by most states. Continued lead poisoning of condors, eagles, and upland game birds, has prompted some additional restrictions on use of lead ammunition in some National Parks, National Wildlife Refuges, and on public lands in some states. Other than the regulations pertaining to lead shot for waterfowl, the federal government does not regulate the method of take by hunting, deferring to state regulations on federal lands.

A 2006 survey by the Association of Fish and Wildlife Agencies of existing non-lead shot regulations for hunting waterfowl contacted 50 U.S. states, 10 Canadian provinces and 2 Canadian territories (D.J. Case & Associates 2006). The Minnesota Department of Natural Resources also In 2006, 28 states (Alaska, California, Delaware, Florida, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Missouri, Nebraska, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, South Dakota, Tennessee, Utah, Washington, and Wyoming) had non-lead shot regulations for dove, crane, rail, snipe, quail, pheasant and/or other game bird and small game hunting on some state-managed lands that go beyond those required by federal law for waterfowl hunting. Some of these restrictions apply to public, but not

**JA 104**

private land, and in 7 states the restrictions only apply to mourning dove and/or marsh species such as snipe and rails. In general, the regulations are more widespread for species that overlap in habitat with waterfowl (such as crane, rail, and snipe), and to a lesser degree, doves, and are less restrictive for upland game birds such as grouse, quail and pheasant. Most of these state regulations cover a single or few game bird species in very limited geographic areas (an average of 50,000 acres covered per state). Overall, these regulations cover 1.3 million acres, an extremely small fraction of the public and private lands nationwide where lead ammunition can be used for hunting.

Of the 40 states that allow dove hunting, 16 have some level of non-lead shot requirements specific to dove hunting. In fall of 2008 Wisconsin started requiring dove hunters on public lands to use non-lead shot (Eisele 2008). The Iowa Department of Natural Resources (IDNR) in 2011 approved the first mourning dove hunting season in Iowa since 1918. IDNR prohibited the use of lead ammunition for dove hunting anywhere in the state of Iowa, based largely on the concern that since much of the dove hunting occurs over a small area, allowing lead shot would increase the likelihood of concentrations of toxic lead.

There have are only been a few state efforts to restrict use of lead ammunition within the range of special-status species, such as the California condor, spectacled eider and other water birds:

*Alaska*
Lead exposure to the threatened spectacled eider and other water birds led to regulations in Alaska in 2007 that prohibit use of lead shot "T" size and smaller for hunting small game, furbearers, and unclassified game in the Yukon-Kuskokwim Delta.

*California*
The Ridley-Tree Condor Preservation Act was signed into law in California in 2007, effective July 1, 2008, requiring hunters to use non-lead ammunition for hunting big game (such as deer, elk, pigs, and bighorn sheep) and shooting coyotes within the condor range, which encompasses all or portions of 13 central and southern California counties and seven deer-hunting zones. The California Fish and Game Commission approved additional regulations in 2007 expanding the non-lead requirements to hunting of non-game mammals and birds and prohibiting the use of lead .22-caliber and smaller-rimfire cartridges for non-game hunting in the condor range. In February 2010, California state Assembly member Pedro Nava proposed legislation to ban the use of lead shot in California's 627,000 acre network of State Wildlife Areas – this legislation passed the state Assembly but was rejected by the Senate in 2010.

*National Parks*
In March 2009 the National Park Service announced that it would begin to develop regulations to eliminate the use of lead ammunition in all National Parks by the end of 2010, but has yet to initiate any rulemaking. Grand Teton National Park and National Elk Refuge in Wyoming asked hunters to voluntarily switch to non-lead bullets beginning in fall of 2009.

**JA 105**

*International*

Restrictions on lead ammunition in other countries can inform regulations in the United States. As part of the International Update Report on Lead Poisoning in Waterbirds in 2000, 74 of 137 responding countries had implemented regulations on the use of lead shot, and 37 more countries indicated lead shot legislation was being prepared (Beintema 2001). Restrictions range from voluntary measures to partial bans applied to certain species and areas, to outright statutory bans for all water bird hunting. Use of lead shot to hunt any water bird species is banned outright in Canada, Denmark, Finland, Norway and Switzerland (Beintema 2001). Due to extensive lead poisoning of eagles, in 2001 the Ministry of the Environment in Japan mandated use of non-lead rifle bullets or shotgun slugs for hunting on the island of Hokkaido, Japan (Saito 2009). Canadian national regulation in 1999 prohibited the use of lead shot for hunting all migratory birds anywhere in Canada, exempting upland species such as American woodcock, mourning doves, and rock doves (Scheuhammer 2009).

Avery and Watson (2009b) summarized international lead ammunition legislation, noting that 29 countries have implemented voluntary or legislative restrictions on the use of lead ammunition. The types of bans varied widely and ranged from partial, voluntary restrictions of the use of lead shot to a total ban on the use and import of lead ammunition. Two counties have banned all forms of lead ammunition. Six countries have a partial ban on the use of lead bullets in addition to full bans on lead shot. Four countries have banned the use of lead shot for all hunting. Fourteen countries and some Australian territories have banned the use of lead shot in wetlands or for waterfowl hunting. Two countries have voluntary or recommended restrictions in place. Eleven countries and some Australian territories have a partial ban on lead shot. Seven countries have implemented increasingly strict regulations on lead ammunition over time.

### A.    Effectiveness of Lead Ammunition Regulations

Restrictions on the use of lead shot or bullets for hunting have been remarkably effective in significantly reducing lead exposure to wildlife.

Prior to restrictions on using lead shot for hunting waterfowl, it was estimated that from 1.6 to 3.9 million waterfowl died each year in North America from lead poisoning (Bellrose 1959; Feierabend 1983). Within five to six years following the 1991 nationwide ban on use of lead shot for hunting waterfowl, a large-scale study conducted in the Mississippi flyway demonstrated dramatic reductions in the ingestion of lead shot (Anderson et al. 2000). Of the gizzards containing ingested pellets, 68% of mallards, 45% of ring-necked ducks, 44% of scaup, and 71% of canvasbacks contained only non-lead shot. Anderson et al. (2000) estimated that lead poisoning of mallards was reduced by 64% in the Mississippi flyway. Another approach to assessing exposure to lead shot involving a threshold concentration of 0.2 ppm in blood demonstrated a 44% reduction in lead exposure of black ducks from Tennessee by comparing exposure prevalence in 1986 through 1988 to that in 1997 through 1999 after the ban in lead shot for hunting waterfowl (Friend 1985; Samuel and Bowers 2000). An estimated 1.4 million ducks of

**JA 106**

the North American fall continental flight were spared from fatal lead poisoning by the 1991 waterfowl regulations (Anderson et al. 2000). Samuel and Bowers (2000) suggest that conversion to non-lead shot conservatively reduced lead exposure in waterfowl by 50%. Similarly, in Canada, substantial decreases (52% to 90%, depending on species and location) in mean bone lead concentrations in hatch-year ducklings have occurred since non-lead shot regulations were established (Stevenson et al. 2005).

The U.S. Fish and Wildlife Service provided data on blood lead levels detected in California condors sampled in California during calendar year 2008 to the California Department of Fish and Game. CDFG concluded that this preliminary information, representing the initial year after adoption of the regulation to prohibit lead ammunition in the condor range in California, is not systematically collected in a manner to evaluate the effectiveness of the lead ammunition regulations because the sources of lead in the sampled condors are unknown, relationships of sampled condors to hunting activity are unknown, and as it relates to the regulations in place that prohibit lead projectiles in condor range, the condor feeding habits for this period of time are also unknown (CDFG 2009). Notwithstanding the preliminary nature of the data and lack of knowledge regarding direct causation, blood lead levels of condors as reported were lower during the second half of 2008 (after the regulations went into effect) compared to the first half of 2008. During the period January-June 2008, 59% of condors sampled had blood lead levels that were considered above background (>10 micrograms/deciliter) levels; 45% of condors exhibited blood lead levels above background levels during July-December 2008 (CDFG 2009).

Blood lead levels were subsequently evaluated for 90 condors in California in 2009 (42 in southern California and 48 in central California). During the period January-June 2009, 60% of condors sampled had blood lead levels that were considered above background (>10 micrograms/deciliter) levels; 54% of condors exhibited blood lead levels above background levels during July-December 2009 (CDFG 2010). CDFG concluded that it is too soon to tell whether the ban on lead ammunition for big game and nongame hunting has significantly reduced the frequency and level of lead exposure in condors, and that the data are not yet adequate for in-depth or meaningful comparison or analysis. Factors to consider that can influence blood lead exposure of condors include time in the wild, long range movements, food sources, foraging habits, and exposure to hunting activities during the sampling period. CDFG is initiating a three-year research project to comprehensively address the effectiveness of the California regulations.

Researchers at the University of California, Davis concluded from the results of a more focused study that the 2008 lead-ammunition ban in the California condor range reduced lead exposure in two avian sentinel species, golden eagles and turkey vultures (Kelly et al. 2011). This study assessed the effectiveness of the California regulations in decreasing blood lead concentration in golden eagles and turkey vultures within the condor range in California, comparing blood lead concentration in eagles and vultures prior to the lead ammunition ban and one year following implementation of the ban. Lead exposure in both golden eagles and turkey vultures declined significantly post-ban. Their findings provide evidence that hunter compliance with lead ammunition regulations was sufficient

to reduce lead exposure in predatory and scavenging birds at their study sites (Kelly et al. 2011).

**JA 108**

## VIII.   DESCRIPTION OF FEDERAL REGULATIONS REQUESTED

The petitioners formally request that the EPA:

1) evaluate the risk of injury to the environment, human health and wildlife from lead bullets and shotgun pellets, used in hunting and shooting sports, which have the potential to cause harmful lead exposure; and

2) initiate a proceeding for the issuance of a rulemaking under Section 6(a) of TSCA to adequately protect against such risks (15 U.S.C. § 2620(a); 15 U.S.C. § 2605(a)(2)(A)(i)).

This petition sets forth facts presenting a reasonable basis to conclude that such a rulemaking is necessary to protect wildlife from the ongoing unreasonable risk of injury to health and the environment caused by the use of lead bullets and shot. TSCA grants the EPA the broad authority to regulate chemical substances that "present an unreasonable risk of injury to health or the environment" 15 U.S.C. § 2601. TSCA also mandates that the EPA <u>must</u> regulate chemical substances where there is a "reasonable basis to conclude" that such substances "present an unreasonable risk of injury to health and or the environment" (15 U.S.C. § 2605(a)). The EPA may regulate the manufacture, processing, distribution, use or disposal of such chemical substances. Specific control mechanisms include: prohibitions on an entire or certain use of a chemical substance; limitations on allowable concentration levels; labeling or recordkeeping requirements; and obligations to issue notice of risks of injury. (15 U.S.C. § 2605(a)). Regulations may be achieved through a range of alternatives, up to and including the EPA prohibiting the manufacture, processing, or distribution in commerce of a chemical substance for a particular use (15 U.S.C. § 2605(a)(2)(A)(i)).

Although petitioners advocate for a complete ban on bullets and shot containing lead for use in hunting and shooting sports, with specific exceptions for military and law enforcement uses, with this petition, petitioners request that the EPA evaluate and consider a range of alternatives for rulemaking or revision of rules governing toxic substances, one of which may or may not be a complete ban, to eliminate the potential for harmful lead exposure to wildlife and humans.

**JA 109**

## IX.    CONCLUSION

Section 6 of TSCA requires only that the EPA find that there is "a reasonable basis to conclude" that "the manufacture, processing, distribution in commerce, use, or disposal of" a substance presents an unreasonable risk to the environment or human health in order for the agency to take action. The data presented in this petition provides a reasonable basis to conclude that the risk is such that lead bullets and shot used in hunting and shooting sports should be regulated under TSCA to protect against unreasonable risk of injury to the environment.

This petition has set forth the facts establishing the indisputable toxicity of spent lead bullets and shotgun pellets from hunting and shooting activities to wildlife and to humans. The scientific literature on the sources, quantities, and pathways of exposure of lead in the environment from hunting and shooting sports is comprehensive and conclusive, as is information on the toxic effects and health risk of lead ammunition on wildlife and humans. The banning of lead shot for hunting waterfowl has greatly reduced the massive former mortalities of waterfowl and correspondingly reduced lead consumption by predators and scavengers of waterfowl, such as bald eagles, as well as humans. However, other uses of lead ammunition have continued unabated, causing unnecessary widespread incidental mortality of many bird and mammal species.

Lead-based bullets fragment on impact, distributing toxic lead particles widely throughout carcasses, and making it impossible for scavenging animals or humans to avoid ingesting lead along with meat. Normal butchering processes do not remove this lead. This health risk potentially affects large numbers of people, particularly hunters and their families and in areas where wild game is a significant part of the diet. Lead has been shown to affect adults and children at far lower concentrations in body tissues than formerly thought, and at lower concentrations than current regulations acknowledge.

Many species of wildlife ingest spent lead shot pellets, while others ingest lead fragments from the carcasses and gut piles of shot animals on which they feed. More than 130 species of wildlife are affected by lead from these sources, and in some species thousands or tens of thousands of individuals die from lead ingestion every year in North America. For most species there has been no assessment of the effect of lead-caused mortality on population levels. However, population level effects have been shown in well-studied species such as the California condor, bald eagle, trumpeter swan, sandhill crane and spectacled eider.

The widespread poisoning of many species of wildlife requires a response from the EPA to regulate lead ammunition. This petition presents strong evidence that lead shot and bullets pose an unreasonable risk to health and the environment and that this risk cannot be prevented through action under other federal laws. In evaluating unreasonable risk the EPA must consider: a) the effects of the chemical on health and the magnitude of human exposure; b) the effects of the chemical on the environment and the magnitude of environmental exposure; c) the benefits of the chemical for various uses and the ability of substitutes for such uses; and d) the reasonably ascertainable economic consequences of

the rule, after consideration of the effect on the national economy, small business, technological innovation, the environment, and public health (15 U.S.C. § 2605(c)(1)). Regulation under section 2605 of the Toxic Substances Control Act requires only "a reasonable basis to conclude" that a risk is unreasonable. Scientific theories, projections of trends from currently available data, modeling using reasonable assumptions, and extrapolations from limited data may help to establish risk (H.R. Rep. No. 1341, 94th Cong., 2d Sess. 32 (1976)). The data presented in the petition supports the conclusion that the risk is such that lead shot and bullets should be regulated under the Act. The recent granting of a Section 21 petition to ban lead wheel-balancing weights is further evidence that the EPA is aware of the environmental hazards of lead.  This petition demonstrates that commercially available non-lead alternatives to lead ammunition are or can be made available to replace toxic lead ammunition currently on the market.

**JA 111**

## X.    REFERENCES

Adler, F.E.W. 1944. Chemical analyses of organs from lead-poisoned Canada geese. Journal of Wildlife Management 8(1):83-85.

African-Eurasian Water Bird Agreement (AEMA). 2002. Special Edition: Lead poisoning in waterbirds through the ingestion of spent lead shot. AEMA Newsletter, Special Issue #1. 28 pp.

Agency for Toxic Substances and Disease Registry (ATSDR). 2007. Toxicological Profile for Pb. http://www.atsdr.cdc.gov/substances/toxsubstance.asp?toxid=22.

Akoshegyi, I. 1997. Lead poisoning of pheasants caused by lead shots. Magyar Allatorvasok Lapja 119(6):328-336.

Ancora, S., N. Bianchi, C. Leonzio, and A. Renzoni. 2008. Heavy metals in flamingos (*Phoenicopterus ruber*) from Italian wetlands: The problem of ingestion of lead shot. Environmental Research. In press.

Anderson, W.L. 1975. Lead poisoning in waterfowl at Rice Lake, Illinois. Journal of Wildlife Management 39:264-270.

Anderson, W.L., and S. P. Havera. 1985. Blood lead, protoporphyrin, and ingested shot for detecting lead poisoning in waterfowl. Wildlife Society Bulletin 13(1):26- 31.

Anderson, W.L. and S.P. Havera. 1989. Lead poisoning in Illinois waterfowl (1977-1988) and implementation of nontoxic shot regulations.  Illinois Natural History Survey Biological Notes 133.

Anderson, W.L., S.P. Havera, and B.W. Zercher. 2000. Ingestion of Lead and Non-Toxic Shotgun Pellets by Ducks in the Mississippi Flyway. Journal of Wildlife Management 64:848-857.

ANZECC (Australian and New Zealand Environment and Conservation Council). 1994. Report to the Australian and New Zealand Environment and Conservation Council on alternative shot to lead in hunting. Prepared by NSW National Parks and Wildlife Service, April. 32 pp.

Arizona Game and Fish Department (AGFD). 2010a. Non-Lead Brochure. Available at www.azgfd.gov/pdfs/w_c/condors/nonlead_brochure.pdf.

Arizona Game and Fish Department (AGFD). 2010b. What the Experts Say About Non-Lead Bullets. Available at http://condorinfo.org/What_the_Experts_Say.pdf.

Artmann, J.W. and E.M. Martin. 1975. Incidence of ingested lead shot in sora rails. Journal of Wildlife Management 39(3):514-519.

**JA 112**

Avery, D., and R.T. Watson. 2009a. Distribution of Venison to Humanitarian Organizations in the USA and Canada. *In* R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Avery, D., and R.T. Watson. 2009b. Regulation of lead-based ammunition around the world. *In* R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Bagchi, D. and H.G. Preuss. 2005. Effects of Acute and Chronic Oval Exposure of Lead on Blood Pressure and Bone Mineral Density in Rats. Journal of Inorganic Biochemistry 99:1155-1164.

Bagley, G.E. and L.N. Locke. 1967. The occurrence of lead in tissues of wild birds. Bulletin of Environmental Contamination and Toxicology 2:297-305.

Baksi, S.N. and A.D. Kenny. 1978. Effect of Lead Ingestion on Vitamin D3 Metabolism in Japanese Quail, Res. Commun. Chem. Path. Pharmacol. 21, 375-378.

Bates, F.Y., D.M. Barnes, and J.M. Higbee. 1968. Lead Toxicosis in Mallard Ducks. Bull. Wildl. Dis. Assoc. 4:116-125.

Battaglia, A., S. Ghidini, G. Campanini, and R. Spaggiari. 2005. Heavy metal contamination in little owl (*Athene noctua*) and common buzzard (*Buteo buteo*) from northern Italy. Ecotoxicology and Environmental Safety 60(1):61-66.

Baxter, G.S., C. Melzer, D. Byrne, D. Fielder, and R. Loutit. 1998. The prevalence of spent lead shot in wetland sediments and ingested by wild ducks in coastal Queensland. The Sunbird 28(2):21-25.

Beaven, L. 2004. Army reconsiders green bullets in light of new studies. Army Times, August 2, 2004.

Beck, N. 1997. Lead shot ingestion by the common snipe (*Gallinago gallinago*) and the jacky snipe (*Lymnocryptes minimus*) in northwestern France. Gibier Faune Sauvage (France):65-70.

Bedrosian, B., and D. Craighead. 2009. Blood lead levels of Bald and Golden Eagles sampled during and after hunting seasons in the Greater Yellowstone Ecosystem. Extended abstract *in* R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

**JA 113**

Beintema, N.H. 2001. Lead Poisoning in Waterbirds. International Update Report 2000. Wetlands International Wageningen. www.unep-aewa.org.

Beintema, N. (compiler). 2004. Non-toxic shot: A path towards sustainable use of the waterbird resource. African- Eurasian Waterbird Agreement, Technical series No. 3. Accessed Feb. 8, 2007. Available online: http://www.unep-aewa.org/publications/technical_series/ts3_non-toxic_shot_english.pdf.

Bellrose, F.C. 1959. Lead Poisoning as a Mortality Factor in Waterfowl Populations. Ill. Nat. Hist. Surv. Bull. 27:2335-288.

Bengtson, F.L. 1984. Studies of lead toxicity in Bald eagles at the Lac Qui Parle Wildlife Refuge. Master's thesis. University of Minnesota. 106 pp.

Best, T.L., T.E. Garrison, and C.G. Schmidt. 1992. Ingestion of lead pellets by scaled quail (*Callieppla squamata*) and northern bobwhite (*Colinus virginianus*) in southeastern New Mexico. Texas Journal of Science 44:99-107.

Best, T.L., T.E. Garrison, and C.G. Schmitt. 1992. Availability and Ingestion of Lead Shot by Mourning Doves (*Zenaida macroura*) in Southeastern New Mexico. The Southwestern naturalist 37:287-292.

Beyer, W.N., J.W. Spann, L. Sileo, and J.C. Franson. 1988. Lead Poisoning in Six Captive Avian Species. Arch. Environ. Contam. Toxicol. 17:121-130.

Beyer, W.N., J.C. Franson, L.N. Locke, R.K. Stroud, and L. Sileo. 1998. Retrospective study of the diagnostic criteria in a lead-poisoning survey of waterfowl. Archives of Environmental Contamination and Toxicology 35(3):506-512.

Bihrle, C. 1999. Testing new ground - Steel shot study finds facts for pheasant hunters. North Dakota Outdoors Magazine, September-October 1999:1-7.

Bingham, R.J., R.T. Larsen, J.A. Bissonette, and J.T. Flinders. 2009. Causes and consequences of ingested lead pellets in Chukars. Extended abstract *in* R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Bjerregaard, P., P. Johansen, G. Mulvad, H.S. Pedersen, and J.C. Hansen. 2004. Lead sources in human diet in Greenland. Environmental Health Perspectives 112(15):1496-1498.

Bjorn, H., N. Gyrd-Hansen, and I. Kraul. 1982. Birdshooting lead pellets and grazing cattle. Bulletin of Environmental Contamination and Toxicology 29:174-176.

**JA 114**

Blus, L.J., C.J. Henry, D.J. Hoffman, and R.A. Grove. 1991. Lead Toxicosis in Tundra Swans Near a Mining and Smelting Complex in Northern Idaho. Arch. Environ. Contam. Toxicol. 21:549-555.

Blus, L.J.,C.J. Henry, D.J. Hoffman, and R.A. Grove. 1995. Persistence of High Lead Concentrations and Associated Effects in Tundra Swans Captured Near a Mining and Smelting Complex in Northern Idaho. Ecotoxicology (8)2: 125-132.

Borja-Aburto, V. H., I. Hertz-Picciotto, M. R. Lopez, P. Farias, C. Rios, and J. Blanco. 1999. Blood lead levels measured prospectively and risk of spontaneous abortion. American Journal of Epidemiology 150:590-597.

Bowles, J.H. 1908. Lead poisoning in ducks. Auk 25(3):312-313.

Braun, J.M., R.S. Kahn, T. Froelich, P. Auinger, and B. Lamphear. 2006. Exposures to Environmental Toxicants and Attention Deficit Hyperactivity Disorder in U.S. Children. Environmental Health Perspectives 114;1904-1909.

Brown, C.S., J.Luebbert, D. Mulcahy, J. Schamber, and D.H. Rosenberg. 2006. Blood lead levels of wild Steller's eiders (*Polysticta stelleri*) and black scoters (*Melanitta nigra*) in Alaska using a portable blood lead analyzer. Journal of Zoo and Wildlife Medicine 37(3):361-365.

Brownlee, W.C., K. Brown, and L.A. Johnson. 1985. Steel vs. lead shot: a ten-year evaluation on Murphree Wildlife Management Area. Unpublished mimeo. Texas Parks and Wildlife Federal Aid Project W-106-R. 12 pp.

Bruell, R., N.P. Nikolaidis, and R.P. Long. 1999. Evaluation of Remedial Alternatives of Lead From Shooting Range Soil. Environmental Engineering Science 16:403-414.

Buerger, T.T., R.E. Mirarchi and M.E. Lisano.1983. Lead shot ingestion in a sample of Alabama mourning doves. Journal of Alaska Academy of Science 54:119.

Buerger, T. 1984. Effect of lead shot ingestion on captive mourning dove survivability and reproduction. M.S. thesis. Auburn University, Auburn, Alabama. 39 pp.

Buerger, T., R.E. Mirarchi, and M.E. Lisano. 1986. Effects of lead shot ingestion on captive mourning dove survivability and reproduction. Journal of Wildlife Management 50(1):1-8.

Burger, J., R.A. Kennamer, I.L. Brisbin, and M. Gochfeld. 1997. Metal levels in Mourning doves from South Carolina: Potential hazards to doves and hunters. Environmental Research 75(2):173-186.

Burger, J., R.A. Kennamer, I.L. Brisbin, and M. Gochfeld. 1998. A risk assessment for consumers of mourning doves. Risk Analysis 18(5):563-573.

JA 115

Burger, J. and M. Gochfeld. 2000. Metals in Albatross Feathers From Midway Atoll: Influence of Species, Age, and Nest Location. Environ. Res. 82(3): 207-21.

Butler, D. A. 1990. The incidence of lead shot ingestion by waterfowl in Ireland. Irish Naturalists' Journal Belfast 309-131.

Butler, D.A. 2005. Incidence of lead shot ingestion in red-legged partridges (*Alectoris rufa*) in Great Britain. Veterinary Record: Journal of the British Veterinary Association 157(21):661.

Butler, D.A., R.B. Sage, R.A.H. Draycott, J.P. Carroll, and D. Pottis. 2005. Lead exposure in ring-necked pheasants on shooting estates in Great Britain. Wildlife Society Bulletin 33(2):583-589.

Cade, T.J. 2007. Exposure of California condors to lead from spent ammunition. Journal of Wildlife Management 71(1):2125-2133.

Calle, P.P., D.F. Kowalczyk, F.J. Delin, and F.E. Hartman. 1982. Effect of hunters' switch from lead to steel shot on potential for oral lead poisoning in ducks. Journal of American Veterinary Medical Association 181(11):1299-1301.

Calvert, H.S. 1876. Pheasants poisoned by swallowing shot. The Field 47:189.

California Department of Fish and Game. 2009. Report on the Levels of Lead Found in California Condors During 2008. Report to the California Fish and Game Commission.

California Department of Fish and Game. 2010. Report on the Levels of Lead Found in California Condors During 2009. Report to the California Fish and Game Commission.

Campbell, H. 1950. Quail picking up lead shot. Journal of Wildlife Management 14:243-244.

Camus, A.C., M.M. Mitchell, J.F. Williams, and P.L.H. Jowett. 1998. Elevated Lead Levels in Farmed American Alligators *Alligator mississippiensis* Consuming *Myocastor coypus* Meat Contaminated by Lead Bullets. Journal of World Aquaculture Society 29:370-376.

Canfield, R. L., C.R. Henderson, Jr., D.A. Cory-Slechta, C. Cox, T.A. Jusko, and B.P. Lanphear. 2003. Intellectual Impairment in Children with Blood Lead Concentrations Below 10 micrograms Per Deciliter. New England Journal of Medicine 348:1517-26.

Cantarow, H.O. and M. Trumper. 1944. Lead poisoning. Williams and Wilkins Co. Baltimore.

JA 116

Cao, X., L.Q. Ma, M. Chen, D.W. Hardison, and W.G. Harris. 2003. Lead Transformation and Distribution in the Soils of Shooting Ranges in Florida, USA. Science of the Total Environment 307:179-189.

Cao, X., L.Q. Ma, M. Chen, D.W. Hardison, and W.G. Harris. 2003. Weathering of Lead Bullets and Their Environmental Effects at Outdoor Shooting Ranges. Journal of Environmental Quality 32:526-534.

Carey, L.S. 1977. Lead shot appendicitis in northern native people. Journal of Canadian Association of Radiology 28:171-174.

Carlisle, J.C., K.C. Dowling, D.M. Siegel, and G.V. Alexeeff. 2009. A blood lead benchmark for assessing risks from childhood lead exposure. J Environ Sci Health A Tox Hazard Subst Environ Eng. 2009 Oct;44(12):1200-8.

Carpenter, J.W., O.H. Pattee, S.H. Fritts, B.A. Rattner, S.N. Wiemeyerr, J.A. Royle, and M.R. Smith. 2003. Experimental Lead Poisoning in Turkey Vultures (*Cathartes aura*). J. Wildl. Dis. 39(1):96-104.

Carrington, M.E. and R.E. Mirarchi. 1989. Effects of lead shot ingestion on free-ranging mourning doves. Bulletin of Environmental Contamination and Toxicology 14:89-95.

Case, D.J. and Associates. 2006. Non-toxic shot regulation inventory of the United States and Canada. D.J. Case and Associates, Mishawaka, IN. 29 pp.

Castrale, J.S. 1989. Availability of spent lead shot in fields managed for mourning dove hunting. Wildlife Society Bulletin 17:184-189.

Cecil, K. M., C. J. Brubaker, C. M. Adler, K. N. Dietrich, M. Altaye, J. C. Egelhoff, S.Wessel, I. Elangovan, R. Hornung, K. Jarvis, and B. Lanphear. 2008. Decreased brain volume in adults with childhood lead exposure. PLoS Medicine 5:741-750.

Centers for Disease Control and Prevention (CDC). 2005. Preventing lead poisoning in young children.

Cheatum, E.L., and D. Benson. 1945. Effects of lead poisoning on reproduction of mallard drakes. Journal of Wildlife Management 9(1):26-29.

Chen, M., S. Daroub, L.Q. Ma, W.G. Harris, and X. Cao. 2002. Characterization of Lead in Soils of a Rifle/Pistol Range in Central Florida, USA. Soil and Sediment Contamination 111:1-17.

Chesley, J., P. Reinthal, C. Parish, K. Sullivan, and R. Sieg. 2009. Evidence for the source of lead contamination within the California Condor. Abstract *in* R.T. Watson, M.

JA 117

Fuller, M. Pokras, and W.G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Chiba, A., N. Shibuya, and R. Honma. 1999. Description of a Lead-poisoned Middendorff's Bean Goose, *Anser fabalis middendorffii*, Found at Fukushima-gata, Niigata Prefecture, Japan. Japanese Journal of Ornithology 47:87-96.

Chisolm, J.J., Jr. 1971. Lead poisoning. Scientific American 224(2):15-23.

Chisholm, J.J. 1988. Blood Lead Levels and Indoor Target Practice. Journal of the American Medical Association 259:1385.

Church, M.E., R. Gwiazda, R.W. Risebrough, K. Sorenson, C.P. Chamberlain, S. Farry, W. Heinrich, B.A. Rideout, and D.R. Smith. 2006. Ammunition is the principal source of lead accumulated by California condors re-introduced to the wild. Environmental Science and Technology 40(19):6143-6150.

Church, M.E., R. Gwiazda, R.W. Risebrough, K. Sorenson, C.P. Chamberlain, S. Farry, W. Heinrich, B.A. Rideout, and D.R. Smith. 2008. Response on "Ammunition is the principal source of lead accumulated by California condors re-introduced to the wild". Environmental Science and Technology, Web release date: 1/31/2008. Available online: http://pubs.acs.org/cgi-bin/abstract.cgi/esthag/asap/abs/es702174r.html.

Church, M., K. Rosenthal, D. R. Smith, K. Parmentier, K. Aron, and D. Hoag. 2009. Blood chemistry values of California Condors exposed to lead. Abstract *in* R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Clark, A.J. and A.M. Scheuhammer. 2003. Lead Poisoning in Upland-Foraging Birds of Prey in Canada. Ecotoxicology 12(1-4):23-30.

Clausen, B., K. Haarbo, and C. Wolstrup. 1981. Lead pellets in Danish cattle. Nordisk Veterinary Medicine 33:65-70.

Clausen, B., and C. Wolstrup. 1979. Lead poisoning in game from Denmark. Denmark Review of Game Biology 11:1-22.

CNN. 2009. Should Hunters Switch to 'Green' Bullets?

Coburn, D.R., D.W. Metzler, and R. Treichler. 1951. A study of absorption and retention of lead in wild waterfowl in relation to clinical evidence of lead poisoning. Journal of Wildlife Management 15(2):186-192.

Cornatzer, W.E., E.F. Fogarty, and E.W. Cornatzer. 2009. Qualitative and quantitative detection of lead bullet fragments in random venison packages donated to the Community Action Food Centers of North Dakota, 2007. *In* R. T. Watson, M. Fuller, M. Pokras, and

**JA 118**

W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Cornicelli, L. and M. Grund. 2009. Examining Variability Associated With Bullet Fragmentation and Deposition in White-Tailed Deer and Domestic Sheep: Preliminary Results. Minnesota Department of Natural Resources.

Craig, J.R., D. Edwards, J.D. Rimstidt, P.F. Scanlon, Y.K. Collins, O. Schabenberger, and J.B. Birch. 2002. Lead Distribution on a Public Shotgun Range. Environmental Geology 41:873-882.

Craig, J.R., J.D. Rimstidt, C.A. Bonnaffon, T.K. Collins, and P.F. Scalon. 1999. Surface Water Transport of Lead at a Shooting Range. Bulletin of Environmental Contamination and Toxicology 63:312-319.

Craig, T.H., J.W. Connelly, E.H. Craig, and T.L. Parker. 1990. Lead concentrations in Golden and Bald eagles. Wilson Bulletin 102(1):130-133.

Craighead, D. and B. Bedrosian. 2008. Blood lead levels of Common ravens with access to big-game offal. Journal of Wildlife Management 72(1):240-245.

Craighead, D. and B. Bedrosian. 2009. A relationship between blood lead levels of Common Ravens and the hunting season in the southern Yellowstone Ecosystem. In R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Custer, T.W., and B.L. Mulhern. 1983. Heavy metal residues in pre-fledgling black-crowned night-herons from three Atlantic Coast colonies. Bulletin of Environmental Contamination and Toxicology 30:178-185.

Custer, T.W., J.C. Franson, and O.H. Pattee. 1984. Tissue Lead Distribution and Hematologic Effects in American Kestrels (*Falco sparverius*) Fed Biologically Incorporated Lead. J. Wildlife Dis. 20, 39-43.

Damron, B.L., and H.R. Wilson. 1975. Lead toxicity of bobwhite quail. Bulletin Environmental Contamination Toxicology 14:489-496.

Darling, C.T.R. and V.G. Thomas. 2003. The Distribution of Outdoor Shooting Ranges in Ontario and the Potential for Lead Pollution of Soil and Water. Science of the Total Environment 313:235-243.

Darling, C.T.R. and V.G. Thomas. 2005. Lead bioaccumulation in earthworms, *Lumbricus terrestris*, from exposure to lead compounds of differing solubility. Science of the Total Environment 346(1-3):70-80.

JA 119

Daury, R.W., F.E. Schwab, and M.C. Bateman. 1994. Prevalence of ingested lead shot in American black duck (*Anas rubripes*) and ring-necked duck (*Aythya collaris*) gizzards from Nova Scotia and Prince Edward Island. Canadian Field-Naturalist 108(1):26-30.

Decker, R.A., A.M. McDermid, and J.W. Prideaux. 1979. Lead poisoning in two captive king vultures. Journal of American Veterinary Medial Association 175:1009.

Degernes, L., S. Heilman, M. Trogdon, M. Jordan, M. Davison, D. Kraege, M. Correa, and P. Cowen. 2006. Epidemiologic Investigation of lead Poisoning in Trumpeter and Tundra Swans in Western Washington State, USA, 2000-2002. Journal of Wildlife Diseases 42:345-358.

DeLong, J. P. 2004. Effects of management practices on grassland birds: Golden Eagle. Northern Prairie Wildlife Research Center, Jamestown, ND. 22 pages.

Demayo, A., M.C. Taylor, K.W. Taylor, and P.V. Hodson. 1982. Toxic effects of lead and lead compounds on human health, aquatic life, wildlife, plants, and livestock. CRC Critical Reviews in Environmental Control 12(4):257-305.

DeMent, S.H., J.J. Chisolm, Jr., J.C. Barber, and J.D. Strandberg. 1986. Lead exposure in an "urban" Peregrine falcon and its avian prey. Journal of Wildlife Diseases 22(2):238-244.

DeMent, S.H., J.J. Chisolm, Jr., M.A. Eckhaus and J.D. Strandberg. 1987. Toxic lead exposure in the urban rock dove. Journal Wildlife Diseases 23:273-278.

Denham, M., Schell, L. M., Deane, G., Gallo, M. V., Ravenscroft, J., and DeCaprio, A. P. 2005. Relationship of lead, mercury, mirex, dichlorodiphenyldichloroethylene, hexachlorobenzene, and polychlorinated biphenyls to timing of menarche among Akwesasne Mohawk girls. *Pediatrics* **115**, e127-134.

Dewaily, E., B. Levesque, J-F. Duchesnes, P. Dumas, A. Scheuhammer, C. Gariepy, M. Rhainds, J-F. Proulx. 2000. Lead shot as a source of lead poisoning in the Canadian Arctic. Epidemiology 11(4):146.

Dewailly E., P.Ayotte, and S. Bruneau. 2001. Exposure of the Inuit population of Nunavik (Arctic Quebec) to lead and mercury. Arch. Environ. Health 56:350-357.

Dieter, M.P. and M.T. Finley. 1978. Erythrocyte δ-Aminolevulinic Acid Dehydrates Activity in Mallard Ducks: Duration of Inhibition After Lead Shot Dosage. Journal of Wildlife Management 42:621-625.

Dilling, W.J. and C.W. Healey. 1926. Influence of lead and the Metallic Ions of Copper, Zinc, Thorium, Beryllium and Thallium on the Germination of Frog's Spawn and on the Growth of Tadpoles. Annals of Applied Biology 13:177-188.

JA 120

D.J. Case & Associates. 2006. Non-Toxic Shot Regulation Inventory of the Untied States and Canada. Report to the Ad Hoc Mourning Dove and Lead Toxicosis Working Group. Final Report, August 2006.

Domenech, R. and H. Langner. 2009. Blood-lead levels of fall migrant Golden Eagles in west-central Montana. Extended abstract *in* R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Donázar, J.A., C.J. Palacios, L. Gangoso, O. Ceballos, M.J. Gonzalez, and F. Hiraldo. 2002. Conservation status and limiting factors in the endangered population of Egyptian vulture (*Neophron percnopterus*) in the Canary Islands. Biological Conservation 107(1):89-97.

Dorgelo, F. 1994. Alternatives for lead shot and fishing sinkers in the Netherlands. Issue Paper presented at the OECD Workshop on Lead Products and Uses, 12-15 September, Toronto, Ontario. 5 pp.

Driver, C. J, and R. J. Kendall. 1984. Lead shot ingestion in Waterfowl in Washington State, 1978-1979. Northwest Sci. 58:103-107.

Edens, F.W. and J.D. Garlich. 1983. Lead-Induced Egg Production Decrease in Leghorn and Japene Quail Hens, Poultry Sci. 62, 1757-1763.

Eisele, T. 2008. Outdoors: Time to Get the Lead Out of All Hunting, Fishing. Special to The Capital Times 3/12/2008.

Eisler, R. 1988. Lead Hazards to Fish, Wildlife and Invertebrates: A Synoptic Review. USFWS Biol. Rep. 8, 1-4.

Ekong, E. B., B. G. Jaar, and V. M. Weaver. 2006. Lead-related nephrotoxicity: a review of the epidemiologic evidence. Kidney International 70:2074-2084.

Elder, W.H. 1954. The effect of lead poisoning on the fertility and fecundity of domestic mallard ducks. Journal of Wildlife Management 18(3):315-323.

Elliott, J.E., K.M. Langelier, A.M. Scheuhammer, P. H. Sinclair, and P. E. Whitehead. 1992. Incidence of lead poisoning in bald eagles and lead shot in waterfowl gizzards from British Columbia, 1988-91.  Canadian Wildlife Service Program Note No. 200. 7 pp.

Engstad, J.E. 1932. Foreign bodies in the appendix. Minnesota Med. 15:603-6xx.

Environment Canada. 1995. A review of the environmental impacts of lead shotshell ammunition and lead fishing weights in Canada. Canadian Wildlife Service. Occasional Paper No. 88. Hull, Quebec.

**JA 121**

Erickson, D.W., and J.S. Lindsey. 1983. Lead and cadmium in muskrat and cattail tissues. Journal of Wildlife Management 47(2):550-555.

Erne, K., and K. Borg. 1969. Lead poisoning in Swedish wildlife. In: metals and ecology. Swedish Natural Science Council, Ecology Research Commissioners Bulletin 5:31-33.

Estabrooks, S.R. 1987. Ingested lead shot in Northern red-billed whistling ducks (*Dendrocygna autumnalis*) and northern pintails (*Anas acuta*) in Sinaloa, Mexico. Journal of Wildlife Diseases 23(1):169.

Ethier, A.L.M., B.M. Braune, A.M. Scheuhammer, and D.E. Bond. 2007. Comparison of lead residues among avian bones. Environmental Pollution 145(3):915-919.

Evers, D.C. 2004. Status assessment and conservation plan for the Common Loon (Gavia immer) in North America. U.S. Fish and Wildlife Service, Hadley, MA.

Fawcett, D. and J. van Vessem. 1995. Lead poisoning in waterfowl: international update report 1995. JNCC Report, No. 252. Joint Nature Conservation Committee, Peterborough, UK.

Feierabend, J.S. 1983. Steel Shot and Lead Poisoning in Waterfowl. National Wildlife Federation Science and technical Series Number 8. 62 pp.

Fimreite, N. 1984. Effects of lead shot ingestion in willow grouse. Bulletin of Environmental Contamination and Toxicology 33(1):121-126.

Finkelstein, M.E., D. George, S. Scherbinski, R. Gwiazda, M. Johnson, J. Burnett, J. Brandt, S. Lawrey, A.P. Pessier, M. Clark, J. Wynne, J. Grantham, and D.R. Smith. 2010. Feather Lead Concentrations and [207]Pb/[206]Pb Ratios Reveal Lead Exposure History of California Condors (*Gymnogyps californianus*). Environ. Sci. Technol. 2010, 44, 2639–2647.

Finkelstein M.E. et al. 2011. Lead Poisoning from Ingested Ammunition is Precluding Recovery of the Endangered California Condor. Presentation at Society of Toxicology annual meeting, March 2011.

Finley, M.T., and M.P. Dieter. 1978. Influence of laying on lead accumulation in bone of mallard ducks. Journal of Toxicology and Environmental Health 4:123-129.

Fischbein, A., C. Rice, L. Sakozi, S.H. Kon, M. Petrocci, and I.J. Selikoff. 1979. Exposure to Lead at Firing Ranges. Journal of the American Medical Association 241:1141-1144.

Fisher, I.J., D.J. Pain, and V.G. Thomas. 2006. A Review of Lead Poisoning From Ammunition Sources in Terrestrial Birds. Biological Conservation 131:421-432.

**JA 122**

Flint, P.L. and J.B. Grand. 1997. Survival of Spectacled Eider Adult Females and Ducklings During Brood Rearing. Journal of Wildlife Management 61:217-221.

Flint, P.L., M.R. Petersen, and J.B. Grand. 1997. Exposure of Spectacled Eiders and Other Diving Ducks to Lead in Western Alaska. Canadian Journal of Zoology 75:439-443.

Florida State University College of Medicine (FSUCM). 2004. Firearms tutorial. Internet Pathology Laboratory for Medical Education (available at http://medlib.med.utah.edu/WebPath/ TUTORIAL/GUNS/GUNBLST.html).

Frank, A. 1986. Lead fragments in tissues from wild birds: a cause of misleading results. *Sci. Total Environ.* 54:275–281.

Franson, J.C. and S.G. Hereford. 1994. Lead Poisoning in a Mississippi Sandhill Crane. Wilson Bulletin 106:766-768.

Franson, J.C., L. Sileo, O.H. Pattee, and J.F. Moore. 1983. Effects of Chronic Dietary Lead in American Kestrels (*Falco spaverius*). J. Wildlife Dis. 19,110-113.

Franson, J.C., M.R. Petersen, C.U. Meteyer, and M.R. Smith. 1995. Lead Poisoning of Spectacled Eiders (*Somateria fischeri*) and of a Common Eider (*Somateria mollissima*) in Alaska. Journal of Wildlife Diseases 31:268-271.

Franson, J.C., N.J. Thomas, M.R. Smith, A.H. Robbins, S. Newman, and P.C. McCartin. 1996. A Retrospective Study of Post-Mortem Findings in Red-Tailed Hawks, J. Raptor Res. 30, 7-14.

Franson, J.C., M.R. Petersen, L.H. Creekmore, P.L. Flint, and M.R. Smith. 1998. Blood Lead Concentrations of Spectacled Eiders Near the Kashunuk River, Yukon Delta National Wildlife Refuge, Alaska. Ecotoxicology 7:175-181.

Franson, J.C., S.P. Hansen, and J.H. Schulz. 2009. Ingested shot and tissue lead concentrations in Mourning Doves. *In* R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Fredrickson, L.H., T.S. Baskett, G.K. Brakhage, and V.C. Cravens. 1977. Evaluating Cultivation Near Duck Blinds to Reduce Lead Poisoning Hazard. Journal of Wildlife Management 41:624-631.

Friend, M. 1987. Field Guide to Wildlife Diseases. USFWS.

Friend, M. 1999. Lead. Pages 317-334 *in* M. Friend and J.C. Franson, editors. Field Manual of Wildlife Diseases: General Field Procedures and Diseases of Birds. U.S.

**JA 123**

Geological Survey, Biological resources Division. Information and technology Report 1999-2001. Washington, D.C.

Fry, D.M. 2003. Assessment of Lead Contamination Sources Exposing California Condors. Species conservation and recovery report 2003, California Department of Fish and Game: San Diego, Calif.

Fry, M., K. Sorenson, J. Grantham, J. Burnett, J. Brandt, and M. Koenig. 2009. Lead intoxication kinetics in condors from California. Abstract *in* R.T. Watson, M. Fuller, M. Pokras, and W.G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Gangoso, L., P. Alvarez-Lloret, A.A.B. Rodriguez-Navarro, R. Mateo, F. Hiraldo, and J.A. Donazar. 2009. Long-Term Effects of Lead Poisoning on Bone Mineralization in Vultures Exposed to Ammunition Sources. Environmental Pollution 157 569-574.

Garcia-Fernandez, A.J., E. Martinez-Lopez, D. Romero, P. Maria-Mojica, A. Godino, and P. Jimenez. 2005. High levels of blood lead in griffon vultures (Gyps fulvus) from Cazorla Natural Park (southern Spain). Environmental Toxicology 20(4):459-463.

Garcia Fernandez, A. J., M. Motas Guzman, I. Navas, P. Maria Mojica, A. Luna, and J. A. Sanchez Garcia. 1997. Environmental exposure and distribution of lead in four species of raptors in southeastern Spain. Archives of Environmental Contamination and Toxicology 33:76-82.

Godin, A. J. 1967. Test of grit types in alleviating lead poisoning in mallards. U.S. Fish Wildlife Service, Spec. Scientific Report- Wildlife 107. Washington, D.C. 9 pp.

Goyer, R.A. 1996. Toxic Effects of Metals. Pages 691-736 *in* C.D. Klaassen, M.O. Amdur, and J. Doull, editors. Cassarett and Doull's Toxicology: The Basic Science of Poisons. 5th ed. McGraw-Hill, New York.

Grand, J.B., P.L. Flint, M.R. Petersen, and C.L. Moran. 1998. Effect of Lead Poisoning on Spectacled Eider Survival Rates. Journal of Wildlife Management 62:1103-1109.

Grandjean, P. 1976. Possible effect of lead on egg-shell thickness in kestrels 1874-1974. Bulletin of Environmental Contamination and Toxicology 16(1):101-106.

Grandy, J.W. IV, L.N. Locke, and G.E. Bagley. 1968. Relative Toxicity of Lead and Five Proposed Substitute Shot Types to Pen-Reared Mallards. Journal of Wildlife Management 32:483-488.

Grasman, K.A., and P.F. Scanlon. 1995. Effects of acute lead ingestion and diet on antibody and T-cell-mediated immunity in Japanese quail. Arch. Environ. Contam. Toxicol. 28, 161–167.

**JA 124**

Grinnell, G.B. 1894. Lead-poisoning. Forest and Stream 42(6):117-118.

Guitart, R., J. Serratosa, V.G. Thomas. 2002. Lead poisoned wildfowl in Spain: A significant threat for human consumers. International Journal of Environmental Health Research 12(4):301-309.

Guitart, R., J. To-Figueras, R. Mateo, A. Bertolero, S. Cerradelo, and A. Martinez-Vilalta. 1994. Lead poisoning in waterfowl from Ebro delta, Spain: calculation of lead exposure thresholds for mallards. Archives of Environmental Contamination and Toxicology 27:289-293.

Gulson, B.L., J.M. Palmer, and A. Bryce. 2002. Changes in the Blood Lead of a Recreational Shooter. The Science of the Total Environment 293:143-150.

Haldimann, M., A. Baumgartner, and B. Zimmerli. 2002. Intake of lead from game meat – a risk to consumers' health. European Food Research and Technology 215(5):375-379.

Hall, M., J. Grantham, R. Posey, and A. Mee. 2007. Lead Exposure Among Reintroduced California Condors in Southern California. California Condors in the 21st Century, American Ornithologists Union and Nuttall Ornithological Club. A. Mee, L.S. Hall and J. Grantham (eds.).

Hall, S. L., and F. M. Fisher. 1984. Lead concentrations in tissues of marsh birds: relationship of feeding habits and grit preference to spent shot ingestion. Department of Biology, Rice Univ., Houston, Texas. Mimeo, 8 pp.

Hall, S. L., and F. M. Fisher. 1985. Lead concentrations in tissues of marsh birds: relationship of feeding habits and grit preference to spent shot ingestion. Bulletin of Environmental Contamination and Toxicology 35:1-8.

Hammerton, K.M., N. Jayasinghe, R.A. Jeffree, and R.P. Lim. 2003. Experimental Study of Blood Lead Kinetics in Estuarine Crocodiles (*Crocodylus porosus*) Exposed to Ingested Lead Shot. Archives of Environmental Contamination and Toxicology 45:390-398.

Hanning, R.M., R. Sandhu, A. MacMillan, L. Moss, L.J.S. Tsuji, and E. Nieboer Jr. 2003. Impact on blood Pb levels of maternal and early infant feeding practices of First Nation Cree in the Mushkegowuk Territory of northern Ontario, Canada. Journal of Environmental Monitoring 5:241 – 245.

Hanzlik, P. J. 1923. Experimental plumbism in pigeons from the administration of metallic lead. Archiv für experimentelle Pathologie und Pharmakologie 97:183-201.

Hardison, D.W. Jr., L.Q. Ma, T. Luongo, and W.G. Harris. 2004. Lead Contamination in Shooting Range Soils From Abrasion of lead Bullets and Subsequent Weathering. Science of the Total Environment 328:175-183.

**JA 125**

Harmata, A.R. and M. Restani. 1995. Environmental contaminants and cholinesterase in blood of vernal migrant bald and golden eagles in Montana. Intermountain Journal of Sciences 1(1):1-15.

Harper, M.J. and M. Hindmarsh. 1990. Lead poisoning in magpie geese *Anseranas semipalmata* from ingested lead pellets at Bool Lagoon Game Reserve (South Australia). Australia Wildlife Research 17:141-145.

Hass, G. H. 1977. Unretrieved shooting loss of mourning doves in north central South Carolina. Wildlife Society Bulletin 5:123-125.

Hatch, C. 2006. Lead Bullets Poison Ravens, Maybe People. Jackson Hole News & Guide, September 16, 2006.

Hatch, C. 2010. Lead in Ravens Drops With Copper Bullets. Jackson Hole News & Guide, February 24, 2010.

Hauser, R., O. Sergeyev, S. Korrick, M. M. Leem B. Revich, E. Gitin, J. S. Burns, and P. L.Williams. 2008. Association of blood lead levels with onset of puberty in Russian boys. Environmental Health Perspectives 116:976-980.

Hawkins, A. S. 1965. The lead poisoning problem in the four flyways. Pages 21-60 in N. A. Cox, (Chair), Wasted Waterfowl.  Report by Mississippi Flyway Central Planning Committee.

Hennes, S.K. 1985. Lead shot ingestion and lead residues in migrant bald eagles at the Lac Qui Parle Wildlife Management Area, Minnesota. Master's thesis. University of Minnesota.

Henny, C.J., L.J. Blus, D.J. Hoffman, R.A. Grove, and J.S. Hatfield. 1991. Lead Accumulation and Osprey Production Near a Mining Site in the Coeur d' Alene River, Idaho. Arch. Environ. Contam. Toxicol. 21, 415-424.

Herbert, C. E., V. L. Wright, P. J. Zwank, J. D. Newson, and R. L. Kasul. 1984. Hunter performance using steel and lead loads for hunting ducks in coastal Louisiana. Journal Wildlife Management 48(2):388-398.

Hernberg, S. 2000. Lead Poisoning in Historical Perspective. American Journal of Industrial Medicine 38:244-254.

Hoffman, D.J., O.H. Pattee, S.N. Wiemeyer, and B. Mulhern. 1981. Effects of Lead Shot Ingestion on Delta-Aminolevulinic Acid Dehyratase Activity, Hemoglobin Concentration, and Serum Chemistry in Bald Eagles. J. Wildl. Dis. 17:423-431.

**JA 126**

Hoffman, D.J., J.C. Franson, O.H. Pattee, C.M. Bunck, and A. Anderson. 1985. Survival, Growth and Accumulation of Ingested Lead in Nestling American Kestrels (*Falco sparverius*). Arch. Environ. Contam. Toxicol. 14, 89-94.

Hoffman, D.J., J.C. Franson, O.H. Pattee, C.M. Bunck, and H.C. Murray. 1985. Biochemical and Hematological Effects of Lead Ingestion in Nestling American Kestrels (*Falco sparverius*). Comp. Biochem. Physiol. 80C, 431-439.

Hohman, W. L., J. L. Moore, and J. C. Franson. 1995. "Winter survival of immature Canvasbacks in inland Louisiana." Journal of Wildlife Management 59(2):384-392.

Holland, G. 1882. Pheasant poisoning by swallowing shot. The Field 59:232.

Holmes, R. S. 1975. Lead poisoning in waterfowl: dosage and dietary study. Summary of Illinois Natural History Survey Study- 1948-1953. Joint Report of Illinois Natural History Survey and Olin Corporation, Winchester Group. 70 pp.

Holt, G., A. Froslie, and G. Norheim. 1978. Lead poisoning in Norwegian waterfowl (author's translation). 1978. Nordisk Veterinaer Medicin. 30(9):380-386.

Honda, K., D. P. Lee, and R. Tasukawa. 1990. Lead poisoning in swans in Japan. Environmental Pollution 65(3):209-218.

Horton, B.T. 1933. Bird shot in verminform appendix: a cause of chronic appendicitis. Surgical Clinics of North America 13:1005-1006.

Hui, C.A. 2002. Lead Distribution Throughout Soil, Flora and an Invertebrate at a Wetland Skeet Range. Journal of Toxicology and Environmental Health 65:1093-1107.

Humburg, D. D., S. L. Sheriff, P. H. Geissler, and T. Roster. 1982. Shot shell and shooter effectiveness: lead vs. steel shot for duck hunting. Wildlife Society Bulletin 10(2):121-126.

Humburg, D.D., D. Graber, S. Sheriff, and T. Miller. 1983. Estimating autumn-spring waterfowl nonhunting mortality in north Missouri. North American Wildlife and Natural Resources Conference Transactions 48:241-256.

Hunt, W.G., W. Burnham, C.N. Parish, and K. Burnham. 2006. Bullet Fragments in Deer Remains: Implications for Lead Exposure in Scavengers, Wildlife Society Bulletin 34:168-171.

Hunt, W.C., C.N. Parish, S.C. Farry, T.G. Lord, and R. Sieg. 2007. Movements of Introduced Condors in Arizona in Relation to Lead Exposure. California Condors in the 21st Century, American Ornithologists Union and Nuttall Ornithological Club. A. Mee, L.S. Hall and J. Grantham (eds.).

**JA 127**

Hunt, W.G., R.T. Watson, J.L. Oaks, C.N. Parish, K.K. Burnham, R.L. Tucker, J.R. Belthoff, and G. Hart. 2009. Lead Bullet Fragments in Venison from Rifle-Killed Deer: Potential for Human Dietary Exposure. PLoS ONE.

Hunt, G., W. Burnham, C. Parish, K. Burnham, B. Mutch, and J. L. Oaks. 2009a. Bullet fragments in deer remains: Implications for lead exposure in scavengers. *In* R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Hunt, W.G., R.T. Watson, J.L. Oaks, C.N. Parish, K.K. Burnham, R.L. Tucker, J.R. Belthoff, and G. Hart. 2009b. Lead bullet fragments in venison from rifle-killed deer: potential for human dietary exposure. Reproduced *in* R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Hunter, B. F., and M. N. Rosen. 1965. Occurrence of lead poisoning in a wild pheasant (Phasianus colchicus). California Fish and Game 51:207.

International Programme on Chemical Safety (IPCS). 1989. Lead Environmental Aspects. Environmental health Criteria 85. World Health Organization, International Programme on Chemical Safety, Geneva, Switzerland.

Iowa Department of Natural Resources, "Trends in Iowa Wildlife Populations and Harvest 2007."

Irwin, J.C. and L.H. Karstad. 1972. The toxicity for Ducks of Disintegrated Lead Shot in a Stimulated Marsh Environment. J. Wildl. Dis. 8:149-154.

Janssen, D. L., J. E. Oosterhuis, J. L. Allen, M. P. Anderson, D. G. Kelts, and S. N. Wiemeyer. 1986. Lead poisoning in free ranging California condors. J. Amer. Vet. Med. Assoc. 189:1115-1117.

Jeffrey, R. G. 1977. Incidence of ingested shot in waterfowl taken during the 1973-74 and 1976-77 season in Washington. Washington Det. Game, Game Manage. Div. Rep. 8 pp.

Johansen, P., G. Asmund, and F. Riget. 2001. Lead contamination of seabirds harvested with lead shot — implications to human diet in Greenland. Environmental Pollution 112(3):501-504.

Johansen, P., G. Asmund, and F. Riget. 2004. High Human Exposure to Lead Through Consumption of Birds Hunted With Lead Shot. Environmental Pollution 127:125-129.

Johansen, P., H.S. Pedersen, G. Asmund, and F. Riget. 2005. Lead shot from hunting as a source of lead in human blood. Environmental Pollution 142(1):93-7.

**JA 128**

Johns, F. M. 1934. A study of punctate stippling as found in the lead poisoning of wild ducks. Journal of Laboratory and Clinical Medicine 19:514-517.

Johnsgard, P.A. 1983. Cranes of the World.

Johnson, C.K., T. Vodovoz, W.M. Boyce, and J.A.K. Mazet. 2007. Lead Exposure in California Condors and Sentinel Species in California. Report prepared for the California Department of Fish and Game. University of California, Davis, February 2007.

Jorgensen, S.S. and M. Willems. 1987. The Fate of Lead in Soils: The Transformation of Lead Pellets in Shooting Range Soils. Ambio 16:11-15.

Jones, J. C. 1939. On the occurrence of lead shot in stomachs of North American gruiformes. Journal of Wildlife Management 3:353-357.

Jordan, J. S. 1951. Lead poisoning in wild waterfowl. Illinois National History Survey Biology Notes 26:18.

Jordan, J. S., and F. C. Bellrose. 1950. Shot alloys and lead poisoning in waterfowl. Transactions of North American Wildlife Conference 15:155-170.

Kaiser, G. W., K. Fry, and J. G. Ireland. 1980. Ingestion of lead shot by dunlin. The Murrelet 61(1):37.

KDHE (Kansas Department of Health and Environment). 2004. Adult blood lead epidemiology and surveillance program. http://www.kdhe.state.ks.us/ables/hobby.html#hunting/.

Kaplan, H.M., T.J. Arnholt, and J.E. Payne. 1967. Toxicity of Lead Nitrate Solutions for Frogs (*Rana pipiens*). Lab Animal Care 17:240-246.

Keel, M.K., W.R. Davidson, G.L. Doster, and L.A. Lewis. 2002. Northern bobwhite and lead shot deposition in an upland habitat. Archives of Environmental Contamination and Toxicology 43:318-322.

Kelly, A. and S. Kelly. 2000. Are Mute Swans With Elevated Blood Levels More Likely to Collide With Overhead Powerlines? Waterbirds 28:331-334.

Kelly T.R. and C.K. Johnson. 2011. Lead Exposure in Free-Flying Turkey Vultures Is Associated with Big Game Hunting in California. PLoS ONE 6(4): e15350. doi:10.1371/journal.pone.0015350

Kelly T.R., P.H. Bloom, S.G. Torres, Y.Z. Hernandez and R.H. Poppenga. 2011. Impact of the California Lead Ammunition Ban on Reducing Lead Exposure in Golden Eagles and Turkey Vultures. PLoS ONE 6(4): e17656. doi:10.1371/journal.pone.0017656

**JA 129**

Kendall, R. J. 1980. The toxicology of lead shot and environmental lead ingestion in avian species with emphasis on the biological significance in mourning dove populations. Ph.D. thesis. Virginia Polytech Institute and State University, Blacksburg. 289 pp.

Kendall, R. J., G. R. Norman, and P. F. Scanlon. 1980. Lead concentrations in ruffed grouse (Bonasa umbellus) collected from southwestern Virginia, USA. Virginia Journal of Science 31(4):100.

Kendall, R.J. and P.F. Scanlon. 1981. Effects of Chronic Lead Ingestion on Reproductive Characteristics of Ringed Turtle Doves (*Streptopelia risoria*) and on Tissue Lead Concentrations of Adults and Their Progeny. Environ. Pollut. Series A 26, 203-214.

Kendall, R.J., G.W. Norman, and P.F Scanlon. 1984. Lead concentration in ruffed grouse collected from Southwestern Virginia. Northwest Science 58:14-14.

Kendall, R.J. and P.F. Scanlon. 1979a. Lead concentrations in mourning doves collected from middle Atlantic game management areas. Proceedings of the Annual Conference of Southeast Association Fish Wildlife Agencies 33:165-172.

Kendall, R. J., and P. F. Scanlon. 1979b. Lead levels in mourning doves collected from Mid-Atlantic States in 1977. Virginia Journal of Science 30:69.

Kendall, R.J., T.E. Lacher, C. Bunck, B. Daniel, C.E. Driver, C.E. Grue, F. Leighton, W. Stansley, P.G. Watanabe, and M. Whitworth. 1996. An Ecological Risk Assessment of Lead Shot Exposure in Non-Waterfowl Avian Species: Upland Game Birds and Raptors. Environmental Toxicology and Chemistry 15:4-20.

Kennedy, J. A., and S. Nadeau. 1993. Lead shot contamination of waterfowl and their habitats in Canada. Canadian Wildlife Service Technical Report Ser. No. 164, Canadian Wildlife Service, Ottawa. 109 pp.

Kennedy, S., J. P. Crisler, E. Smith, and M. Bush. 1979. Lead poisoning in sandhill cranes. Journal of American Veterinary Medical Association 171:955-958.

Kenntner, N., Y. Crettenand, H-J. Fünfstück, M. J. Janovsky, and F. Tataruch. 2007. Lead poisoning and heavy metal exposure of golden eagles (*Aquila chrysaetos*) from the European Alps. Journal of Ornithology 148(2):173-177.

Kenntner, N., F. Tataruch, and O. Krone. 2001. Heavy metals in soft tissue of white-tailed eagles found dead or moribund in Germany and Austria from 1993 to 2000. Environmental Toxicology and Chemistry 20(8):1831-1837.

Khan, A.N. 2005. Lead Poisoning. Emedicine instant access to the minds of medicine. www.emedicine.com/radio/topic386.htm.

**JA 130**

Khangarot, B.S., A. Sehgal, and M.K. Bhasin. 1985. Man and Biosphere – Studies on the Sikkim Himalayas. Part 5: acute toxicity of selected heavy metals on the tadpoles of *Rana hexadactyla*. Acta Hydrochimica et Hydrobiologica 13:259-263.

Kimball, W. H. and Z. A. Munir. 1971. The corrosion of lead shot in a simulated waterfowl gizzard. Journal of Wildlife Management 35(2):360-365.

King, M. 1993. Bismuth shot now established as a legal alternative to steel in the Northern Territory. Australian Shooters Journal, January 1993:56-57.

Kingsford, R. T., J. Flanjak, and S. Black. 1989. Lead shot and ducks on Lake Cowal. Australian Wildlife Research 16:167-172.

Kingsford, R.T., J. L. Kacprzak, and J. Ziaziaris. 1994. Lead in livers and gizzards of waterfowl shot in New South Wales, Australia. Environmental Pollution 85(3):329-335.

Knopper, L.D., P. Mineau, A.M. Scheuhammer, D.E. Bond, and D.T. McKinnon. 2006. Carcasses of Shot Richardson's Ground Squirrels May Pose Lead Hazards to Scavenging Hawks. The Journal of Wildlife Management 70(1).

Koh, T.S. and M.J. Harper. 1988. Lead-poisoning in Black Swans, *Cygnus atratus*, exposed to lead shot at Bool lagoon Game Reserve, South Australia. Australian Wildlife Research 15:395-403.

Kosnett, M.J. 2009. Health effects of low dose lead exposure in adults and children, and preventable risk posed by the consumption of game meat harvested with lead ammunition. *In* R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Kramer, J.L. and P.T. Redig. 1997. Sixteen Years of Lead Poisoning in Eagles, 1980-1995: An Epizootiologic View. J.E. Cooper and A.G. Greenwood (eds.). Journal of Raptor Research 31:327-332.

Kringer, F., W. L. Anderson, and J. A. Ellis. 1980. Effectiveness of steel shot in 2 ¾ in 12 gauge shells for hunting mourning doves. Illinois Department of Conservation Management Notes No. 3. Springfield, Illinois. 10 pp.

Krone, O., F. Willie, N. Kenntner, D. Boertmann, and F. Tataruch. 2004. Mortality factors, environmental contaminants, and parasites of white-tailed sea eagles from Greenland. Avian Diseases 48:417-424.

Krone, O., N. Kenntner, A. Trinogga, M. Nadjafzadeh, F. Scholz, J. Sulawa, K. Totschek, P. Schuck-Wersig, and R. Zieschank. 2009. Lead poisoning in White-tailed Sea Eagles: Causes and approaches to solutions in Germany. *In* R.T. Watson, M. Fuller, M. Pokras,

**JA 131**

and W.G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Kurosawa, N. 2000. Lead poisoning in Steller's sea eagles and White-tailed sea eagles. Pages 107-109 in Ueta, M. and McGrady, M.J. (eds). First Symposium on Steller's and White-tailed sea eagles in East Asia.

Labare, M.P., M.A. Butkus, D. Riegner, N. Schommer, and J. Atkinson. 2004. Evaluation of Lead Movement from the Abiotic to Biotic at a Small-Arms Firing Range. Environmental Geology 46:750-754.

Lagerquist, J.E., M. Davison, and W.J. Foreyt. 1994. Lead Poisoning and Other Causes of Mortality in Trumpeter (*Cygnus buccinator*) and Tundra (*C. columbianus*) Swans in Western Washington. Journal of Wildlife Diseases 30:60-64.

Lakhani, H. 1982. Benefit-cost analysis: Substituting iron for lead shot in waterfowl hunting in Maryland. Journal of Environmental Management 14:201-208.

Lance, V.A., T.R. Horn, R.M. Elsey and A. de Peyster. 2006. Chronic incidental lead ingestion in a group of captive-reared alligators (*Alligator mississippiensis*): possible contribution to reproductive failure. Toxicology and Pharmacology 142:30–35.

Langelier, K. 1994. Lead shot poisoning in Canadian wildlife. Prepared for the Animal Welfare Foundation of Canada, Vancouver, B.C.  46 pp.

Langelier, K. M., J. E. Elliott, and A. M. Scheuhammer. 1991. Bioaccumulation and toxicity of lead in bald eagles (Haliaeetus leucocephalus) of British Columbia. Western Canada Wildlife Health Workshop, 15-16 February, Victoria, B.C.

Lanphear, B.P., K.N. Dietrich, and O. Berger. 2003. Prevention of lead toxicity in US children. Ambul. Pediatr. 3(1):27-36.

Lanphear, B.P., R. Hornung, J. Khoury, K. Yolton, P. Baghurst, D.C. Bellinger, R.L. Canfield, K.N. Dietrich, R. Bornschein, T. Greene, S.J. Rothenberg, H.L. Needleham, L. Schnaas, G. Wasserman, J. Graziano, and R. Roberts. 2005. Low-level environmental lead exposure and children's intellectual function: an international pooled analysis. Environ Health Perspect. 2005 Jul;113(7):894-9.

Lanphear, B.P., R. Hornung, J. Khoury, K. Yolton, and K.N. Dietrich. 2006. Lead and IQ in Children: Lanphear et al. Respond. Environ Health Perspect. 2006 February; 114(2): A86–A87.

LaRoe, E.T., G.S. Farris, C.E. Puckett, P.D. Doran, and M.J. Mac. 1995. Our Living Resources. A Report to the Nation on the Distribution, Abundance, and Health of U.S. Plants, Animals, and Ecosystems. U.S. Dept. Interior, National Biological Service.

**JA 132**

Levesque, B., J. F. Duchesne, C. Gariepy, M. Rhainds, P. Dumas, A. M. Scheuhammer, J. F. Proulx, S. Dery, G. Muckle, F. Dallaire, and E. Dewailly. 2003. Monitoring of umbilical cord blood lead levels and sources assessment among the Inuit. Occupational and Environmental Medicine 60:693-695.

Lewis, J. C. and E. Legler, Jr. 1968. Lead shot ingestion by mourning doves and incidence in soil. Journal of Wildlife Management 32(3):476-482.

Lewis, L.A., R.J. Poppenga, W.R. Davidson, J.R. Fischer, and K.A. Morgan. 2001. Lead Toxicosis and Trace Elements in Wild Birds and Mammals at a Firearms Training Facility. Arch. Environ. Contam. Toxicol. 41:208-214.

Locke, L. N. and G. E. Bagley. 1967a. Case report: coccidiosis and lead poisoning in Canada geese. Chesapeake Science 8(1):68-69.

Locke, L.N., M.R. Smith, R.M. Windingstad, and S.J. Martin. 1991. Lead poisoning of a marbled godwit. Prairie Naturalist 23(1):21-24.

Locke, L.N. and M. Friend. 1992. Lead Poisoning of Avian Species Other Than Waterfowl. Lead Poisoning in Waterfowl, D.J. Pain (ed.), pp. 19-22.

Lustberg M. and E. Silbergeld. 2002. Blood lead levels and mortality. Archives of Internal Medicine 162:2443-2449.

Ma, W. 1989. Effect of Soil Pollution With Metallic Lead Pellets on Bioaccumulation and Organ/Body Weight Alterations in Small Mammals. Archives of Environmental Contamination and Toxicology 18:617-622.

Maedgen, J. L., C. S. Hacker, G. D. Schroder, and F. W. Weir. 1982. Bioaccumulation of lead and cadmium in the royal tern and sandwich tern. Archives of Environmental Contamination and Toxicology 11:99-102.

Manninen, S. and N. Tanskanen. 1993. Transfer of lead from shotgun pellets to humus and three plant species in Finnish shooting range. Archives of Environmental Contamination and Toxicology 24:410-414.

Mateo, R. R. Molina, J. Grifols, and R. Guitart. 1997. Lead Poisoning in a Free Ranking Griffin Culture (*Gyps fulvus*). Vet. Rec. 140:47-48.

Mateo, R. 1998. La Intoxicacion Por Ingestion de Objtos de Polmo en Aves: Una Revision de Los Aspectos Epidemiologicos y Clinicos. La Intoxicacion por Ingestion de Perdigones de Plomo en Aves Silvestres: Aspectos Epidemiologicos y Propuestas para su Prevencion en Espana, Doctoral Thesis, Univertat Autonoma de Barcelona, Barcelona, pp. 5-44.

JA 133

Mateo, R. J. Estrada, J.Y. Paquet, X. Riera, L. Domingues, R. Guitart, and A. Martinez-Vilata. 1999. Lead Shot Ingestión by Marsh Harriers (*Circus aeruginosus*) From the Ebro Delta, Spain. Environ. Pollut. 104, 435-440.

Mateo, R., J.C. Doltz, J.M. Aguilar Serrano, J. Belliure, and R. Guitart. 1997. An epizootic of lead poisoning in greater flamingos (*Phoenicopterus ruber roseus*) in Spain. Journal of Wildlife Diseases 33(1):131-134.

Mateo, R., R., A.J. Green, C.W. Jeske, V. Urios, and C. Gerique. 2001. Lead poisoning in the globally threatened marbled teal and white-headed duck in Spain. Environmental Toxicology Chemistry 20(12):2860-2868.

Mateo, R., M. Taggard, and A.A. Meharg. 2003. Lead and Arsenic in Bones of Birds of Prey From Spain, Env. Poll. 126:107-114.

Mateo, R., R., A.J. Green, H. Lefranc, R. Baos, and J. Figuerola. 2007. Lead poisoning in wild birds from southern Spain: a comparative study of wetland areas and species affected, and trends over time. Ecotoxicological Environmental Science 66(1):119-126.

Mateo, R., M. Rodríguez-de la Cruz, M. Reglero, and P. Camarero. 2007. Transfer of lead from shot pellets to game meat during cooking. Science of the Total Environment 372(2-3):480-485.

Matz, A. and P. Flint. 2009. Lead isotopes indicate lead shot exposure in Alaska-breeding waterfowl. Abstract *in* R.T. Watson, M. Fuller, M. Pokras, and W.G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

McAtee, W. L. 1908. Lead poisoning in ducks. Auk. 25(4):472.

Mellor, A. and C. McCartney. 1994. The Effects of Lead Shot Deposition on Soil and Crops at a Clay Pigeon Shooting Site in Northern England. Soil Use and Management 10:124-129.

Menke, A., P. Muntner, V. Batuman, E. K. Silbergeld, and E. Guallar. 2006. Blood lead below 0.48 µmol/L (10µg/dL) and mortality among US adults. Circulation 114:1388-1394.

Meretsky, V. J., N. F. R. Snyder, S. R. Beissinger, D. A. Clendenen, and J. W. Wiley. 2000. Demography of the California condor: Implications for reestablishment. Conservation Biology 14:4:957-967.

Mikko, D. 1999. U.S. Military "Green Bullet." Association of Firearm and Tool Mark Examiners Journal, Volume 31 Number 4, Fall 1999. U. S. Army Criminal Investigation Laboratory, Forest Park Georgia.

**JA 134**

Miller, M.J.R., M. Restani, A.R. Harmata, G.R. Bortolotti, and M.E. Wayland. 1998. A Comparison of Blood Lead Levels in Bald Eagles From Two Regions on the Plains of North America. Journal of Wildlife Diseases 34:704-714.

Miller, M.J.R., M.E. Waylands, and G.R. Bortolotti. 2001. Hemograms for and Nutritional Condition of Migrant Bald Eagles Tested for Exposure to Lead. J. Wildl. Dis. 37(3):481-488.

Mohler, L. 1945. Lead poisoning of geese near Lincoln. Nebraska Bird Review 13(2):49-50.

Mörner, T. and L. Petersson. 1999. Lead poisoning in woodpeckers in Sweden. Journal of Wildlife Diseases 35(4):763-765.

Mudge, G.P. 1983. The Incidence and Significance of Ingested Lead Pellet Poisoning in British Waterfowl. Biological Conservation 27:333-372.

Munro, J. A. 1925. Lead poisoning in trumpeter swans. Canadian Field-Naturalist 39(7):160-162.

Murray, K., A. Bazzi, C. Carter, A. Ehlert, A. Harris, M. Kopec, J. Richardson, and H. Sokol. 1997. Distribution and Mobility of Lead in Soils at an Outdoor Shooting Range. Journal of Soil Contamination 6:79-93.

Nakade, T., Y. Tomura, K. Jin, H. Taniyama, M. Yamamoto, A. Kikkawa, K. Miyagi, E. Uchida, M. Asakawa, T. Mukai, M. Shirasawa, and M. Yamaguchi. 2005. Lead poisoning in Whooper and Tundra swans. Journal of Wildlife Diseases 41(1):253-256.

National Toxicology Program (NTP). 2011. Draft NTP Monograph on Health Effects of Low-Level Lead. U.S. Department of Health and Human Services.

National Wildlife Health Laboratory. 1985. Bald eagle mortality from lead poisoning and other causes 1963-84. Unpublished report. U.S. Fish and Wildlife Service, Washington, D.C. 48 pp.

Needleman, H.L., A. Schell, D.M. Bellinger, A. Leviton, and E.N. Allred. 1990. The long-term effects of exposure to low doses of lead in childhood. An 11-Year follow up report. New England Journal of Medicine 322(2):83-88.

Needleman, H.L. and D.M. Bellinger. 1991. The health effects of low level exposure to lead. Annual Review of Public Health12:111-140.

Needleman, H.L. 1999. History of Lead Poisoning in the World. International Conference on lead Poisoning Prevention and Treatment, Bangalore, February 8-10, 1999. Bangalore, India: The George Foundation. www.leadpoisoning.net/general/history.htm.

**JA 135**

Needleman, H.L. 2004. Lead Poisoning. Annual Review of Medicine 55:209-222.

Needleman, H.L., C. McFarland, R.B. Ness, S.E. Fienberg, and M.J. Tobin. 2002. Bone Lead Levels in Adjudicated Delinquents: A Case Control Study. Neurotoxicology and Teratology 24:711-717.

Neumann, K. 2009. Bald Eagle lead poisoning in winter. *In* R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Nevin, R. 2000. How Lead Exposure Relates to Temporal Changes in IQ, Violent Crime, and Unwed Pregnancy. Environmental research Section A 83:1-22.

Nieboer, E. 2001. The definitive identification of lead shotshell as a major source of lead exposure in native communities. Health Canada and Environment Canada, Toxic Substances Research Initiative # 287.

Nordic Council of Ministers (NCM). 2003. Lead Review. Nordic Council of Ministers Report 1, Issue 4. www.norden.org/pub/miljo/miljo/sk/US20031308.pdf.

Novotny, T., M. Cook, J. Hughes, and S.A. Lee. 1987. Lead Exposure on a Firing Range. American Journal of Public health 77:1225-1226.

Nriagu, J.O. 1983. Lead and Lead Poisoning in Antiquity. John Wiley and Sons. New York.

Nraigu, J.O. 2009. History in lead and lead poisoning in history. Abstract *in* R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Ochiai, K., T. Kimura, K. Uematsu, Umematsu, and C. Itakura. 1999. Lead poisoning in wild waterfowl in Japan. Journal of Wildlife Diseases 35(4):766-769.

Ochiai, K., K. Hoshiko, K. Jin, T. Tsuuzuki, and C. Itakura. 1993. A survey of lead poisoning in wild waterfowl in Japan. Journal of Wildlife Diseases 29(2):349-352.

Ochiai, K., K. Jin, C. Itakura, M. Goryo, K. Yamashita, N. Mizuno, T. Fujinaga, and T. Tsuzuki. 1992. Pathological study of lead poisoning in whooper swans (*Cygnus cygnus*) in Japan. Avian Diseases 36(2):313-323.

Odland et al. 1999. Elevated blood lead concentrations in children living in isolated communities of the Kola Peninsula, Russia. Ecosystem Health 5(2):75-81.

O'Halloran, J., A. A. Myers, and P. F. Duggan. 1988. Lead poisoning in swans and sources of contamination in Ireland. Journal of Zoology (London) 216:211-223.

**JA 136**

Old Deer Hunter Association (ODHA). 2004. The Importance of Ballistic Coefficient When Selecting Ammo and Bullets (available at http://www.clcweb.net/Shooting/Ballistics/ ballistics.html).

Oltrogge, V. 2009. Success in developing lead-free, expanding nose centerfire bullets. *In* R.T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Osmer, T.L.G. 1940. Lead shot: its danger to water-fowl. The Scientific Monthly 50(5):455-459.

Oswkttera, GD, W.B. Bucka, and W.E. Lloyda. 1973. Epidemiology of Lead Poisoning in Cattle- A Five-Year Study in Iowa.  Clinical Toxicology, Volume 6(3): 367 – 376.

Owen, M. 1992. Progress on Lead Shot in the UK: 1991. Wildfowl 43:223.

Pain, D.J. 1991. Lead shot densities and settlement rates in Camargue marshes, France. Biological Conservation 57:273-286.

Pain, D. J. (ed.) 1992a. Lead poisoning of waterfowl: a review. IWRB Special Publication No. 16, Slimbridge, United Kingdom.

Pain, D.J. 1992b. Lead poisoning in birds: a southern European perspective. Pages 109-114 in C M. Finlayson, G. E. Hollis and T. J. Davis (eds), Managing Mediterranean Wetlands and Their Birds, Proceedings of an IWRB International Symposium, Grado, Italy, 1991. IWRB Special publication, Slimbridge, United Kingdom.

Pain, D.J. 1992. Lead Poisoning of Waterfowl: A Review. Pages 7-13 *in* D.J. Pain, editor. Lead Poisoning in Waterfowl. Proceedings of the International Waterfowl and Wetlands Research Bureau Workshop, Brussels, Belgium 1991. IWRB Special Publication 16, Slimbridge, U.K.

Pain, D. J., and C. Amiard-Triquet. 1993. Lead poisoning of raptors in France and elsewhere. Ecotoxicology and Environmental Safety 25:183-192.

Pain, D. J., C. Bavoux, G. Burneleau, L. Eon, and P. Nicolau-Guillaum. 1993. Lead poisoning in wild populations of marsh harriers (Circus aeruginosus) in the Camargue and Charente-Maritime, France. Ibis 135:379-386.

Pain, D. J., J. Sears, and I. Newton. 1994. Lead concentrations in birds of prey in Britain. Environmental Pollution 87:173-180.

**JA 137**

Pain, D.J. 1996. Lead in Waterfowl. *Environmental Contaminants in Wildlife: Interpreting Tissue Concentrations*. W.M. Beyer, G.H. Heinz, and A.W. Redman-Norwood (eds.), pp. 251-262.

Pain, D. J., C. Bavoux, and G. Burneleau. 1997. Seasonal blood lead concentrations in marsh harriers *Circus aeruginosus* from Charente-Maritime, France: Relationship with the hunting season.

Pain, D.J. and B.A. Rattner. 1988. Mortality and Hematology Associated With the Ingestion of One Number Four Lead Shot in Black Ducks, Anas rubripes. Bull. Environ. Contam. Toxicol. 40, 159-164.

Pain, D.J., C. Amiard-Triquet, C. Bavoux, G. Burneleau, and P. Nicolau-Guillaumet. 1993. Lead Poisoning in Wild Populations of Marsh Harrier (*Circus aeruginosus*) in the Camargue and Charente-Maritime, France. Ibis 135, 379-386.

Pain, D.J., I.J. Fisher, and V.G. Thomas. 2009. A global update of lead poisoning in terrestrial birds from ammunition sources. *In* R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Pain, D.J., R.L. Cromie, J. Newth, M.J. Brown, E. Crutcher, P. Hardman, L. Hurst, R. Mateo, A.A. Meharg, A.C. Moran, A. Raab, M.A. Taggart, and R.E. Green. 2010. Potential Hazard to Human Health from Exposure to Fragments of Lead Bullets and Shot in the Tissues of Game Animals. Plos One, 5 (4): e10315 DOI: 10.1371/journal.pone.0010315.

Parish, C.N., W.G. Hunt, E. Feltes, R. Sieg, and K. Orr. 2009. Lead exposure among a reintroduced population of California Condors in northern Arizona and southern Utah. *In* R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Parmentier, K., R. Gwiazda, J. Burnett, K. Sorenson, S. Scherbinski, C. Vantassell, A. Welch, M. Koenig, J. Brandt, J. Petterson, J. Grantham, R. Risebrough, and D. Smith. 2009. Feather Pb isotopes reflect exposure history and ALAD inhibition shows sub-clinical toxicity in California Condors. Abstract *in* R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Pattee, O.H., S.N. Wiemeyer, B. Mulhern, L. Sileo, and J.W. Carpenter. 1981. Experimental Leadshot Poisoning in Bald Eagles. J. Wildl. Manage. 45:806-810.

Pattee, O.H., P.H. Bloom, J.M. Scott, and M.R. Smith. 1990. Lead Hazards Within the Range of the California Condor. The Condor 92:931-937.

**JA 138**

Pattee, O.H. and D.J. Pain. 2003. Lead in the Environment. Handbook of Ecotoxicology, D.J. .Hoffman, B.A. Rattner, G.A. Burton, and J. Cairns (eds.), pp. 373-408.

Pauli, J.N. and S.W. Buskirk. 2007. Recreational Shooting of Prairie Dogs: A Portal for Lead Entering Wildlife Food Chains. Journal of Wildlife Management 71:103-108.

Peddicord, R.K. and J.S. LaKind. 2000. Ecological and Human Health Risks at an Outdoor Firing Range. Environmental Toxicology and Chemistry 19:2602-2613.

The Peregrine Fund. 2010. California Condor Releases in Arizona--Notes from the Field. Available at http://www.peregrinefund.org/archived_notes.asp?category=California%20Condor%20Releases%20in%20Arizona&cnoteid=272.

Perez-Coll, C.S., J. Herkovitz, and A. Salibian. 1988. Embryotoxicity of Lead to *Bufo arenarum*. Bulletin of Environmental Contamination and Toxicology 41:247-252.

Perry, M. C. and J. W. Artmann. 1979. Incidence of embedded shot and ingested shot in oiled ruddy ducks. Journal of Wildlife Management 43(1):266-269.

Peterson, S., R. Kim, and C. McCoy. 1993. Ecological Risks of Lead Contamination at a Gun Club: Waterfowl Exposure Via Multiple Dietary Pathways. 14th Annual Meeting of the Society of Environmental Toxicology and Chemistry. Abstract.

Petterson, J.R., K.J. Sorenson, C. Vantassell, J. Burnett, S. Scherbinski, A. Welch, and S. Flannagan. 2009. Blood-lead concentrations in California Condors released at Pinnacles National Monument, California. Abstract *in* R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Platt, S.R., K.E. Helmick, J. Graham, R.A. Bennett, L. Phillips, C.L. Chrisman, and P.E. Ginn. 1999. Peripheral neuropathy in a turkey vulture with lead toxicosis. Journal of the American Veterinary Medical Association 8:1218-1220.

Pokras, M.A., M.R. Kneeland, A. Major, R. Miconi, and R.H. Poppenga. 2009. Lead objects ingested by Common Loons in New England. Extended abstract *in* R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Potts, G.R. 2004. Incidence of ingested lead gunshot in wild grey partridges (*Perdix perdix*) from the UK. European Journal of Wildlife Research 51(1):31-34.

Quortrup, E.R. and J.E. Shillinger. 1941. 3,000 wild bird autopsies on western lake areas. American Veterinary Medical Association Journal.

**JA 139**

Raptor Research Foundation (RRF). 2011. Scientific Research Shows That Lead (Pb) From Spent Ammunition Causes Death and Sickness to Bald Eagles, Golden Eagles and Other Wildlife, and Limits the Reestablishment of the California Condor Population.

Rattner, B.A., W.J. Fleming, and C.E. Bunck. 1989. Comparative Toxicity of Lead Shot in Black Ducks (*Anas rubripes*) and Mallards (*Anas platyrhynchos*). Journal of Wildlife Diseases 25:175-183.

Rattner, B.A. 2007. Contaminant Exposure and Effects--Terrestrial Vertebrates (CEE-TV) Database. Version 7.0. [Updated May 2007; Accessed Feb. 4, 2008]. U.S. Geological Survey, Patuxent Wildlife Research Center , Laurel, Maryland. Available online: http://www.pwrc.usgs.gov/contaminants-online.

Redig, P. T. 1979. Lead poisoning in raptors. Hawk Chalk 18(2):29-30.

Redig, P.T. 1984. An investigation into the effects of lead poisoning on bald eagles and other raptors: Final report. Endangered Species Program. Study 100A-100B. University of Minnesota, St. Paul, Minnesota. Unpublished report. 41 pp.

Redig, P. T. 1985. A report on lead toxicosis studies in bald eagles. Final Report, U. S. Dept. of Interior, Fish and Wildlife Service Project No. BPO #30181-0906.

Redig P.T, D.R. Smith, and L. Cruz-Martinez. 2009. Potential sources of lead exposure for Bald Eagles:  A retrospective study. Extended abstract in R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt  (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Redig, P.T., C.M. Stowe, D.M. Barnes, and T.D. Arent. 1980. Lead Toxicosis in Raptors. J. Am. Vet. Assoc. 177:941-943.

Redig, P.T., E.M. Lawler, S. Schwartz, J.L. Dunnette, B. Stephenson, and G.E. Duke. 1991. Effects of Chronic Exposure to Sublethal Concentrations of Lead Acetate on Heme Synthesis and Immune Function in Red-Tailed Hawks. Arch. Environ. Contam. Toxicol. 21:72-77.

Rees, C. 2010. Triple-Shock X-Bullet. Petersen's Rifle Shooter. Available at http://www.rifleshootermag.com/ammunition/triple_0723/index.html.

Reid, V.H. 1948. Lead shot in Minnesota waterfowl. Journal of Wildlife Management 12(2):123-127.

Reiser, M.H. and S.A. Temple. 1981. Effects of Chronic Lead Intoxication on Birds of Prey. Recent advances in the study of raptor diseases, 21-25. J.E. Cooper and A.G. Greenwood (eds.), pp. 21-25.

**JA 140**

Rice, D.A., M.F. McLoughlin, W.J. Blanchflower, and T.R. Thompson. 1987. Chronic lead poisoning in steers eating silage contaminated with lead shot – diagnostic criteria. Bulletin of Environmental Contaminant Toxicology 39(4):622–629.

Rice, T.M., B.J. Blackstone, W.L. Nixdorf, and D.H. Taylor. 1999. Exposure to Lead Induces Hypoxia-Like Responses in Bullfrog Larvae (*Rana catesbeiana*). Environmental Toxicology and Chemistry 18:2283-2288.

Ris, M. D., K.N. Dietrich, P.A. Succop, O.G. Berger and R.L. Bornschein. 2004. Early exposure to lead and neuropsychological outcome in Adolescence. Journal International Neuropsychological Society 10: 261-270.

Ritter, J. 2006. Lead Poisoning Eyed as Threat to California Condor,. *USA Today* (10/23/2006). Available at http://www.usatoday.com/news/nation/2006-10-23-condor_x.htm.

Rocke, T.E., C.J. Brand, and J.G. Mensik. 1997. Site-Specific Lead Exposure From Lead Pellet Ingestion in Sentinel Mallards. Journal of Wildlife Management 61:228-234.

Rodrigue, J., R. McNicoll, D. Leclair, and J. F. Duchesne. 2005. Lead concentrations in ruffed grouse, rock ptarmigan, and willow ptarmigan in Quebec. Archives of Environmental Contamination and Toxicology 49(1):334-340.

Rogers, T., B. Bedrosian, D. Craighead, H. Quigley, and K. Foresman. 2009. Lead ingestion by scavenging mammalian carnivores in the Yellowstone ecosystem. Extended abstract *in* R.T. Watson, M. Fuller, M. Pokras, and W.G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Rooney, C.P., RG. McLaren, and R.J. Creswell. 1999. Distribution and Phytoavailability of Lead in a Soil Contaminated With Lead Shot. Water, Air, and Soil Pollution 116:535-548.

Roscoe, D.E., S.W. Nielsen, A.A. Lamola, and D. Zuckerman. 1979. A Simple, Quantitative Test for Erythrocytic Protoporphyrin in Lead-Poisoned Ducks. Journal of Wildlife Diseases 15:127-136.

Saito, K. 2009. Lead poisoning of Steller's Sea-Eagle (*Haliaeetus pelagicus*) and White-tailed Eagle (*Haliaeetus albicilla*) caused by the ingestion of lead bullets and slugs, in Hokkaido Japan. *In* R.T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Sanderson, G.C. and F.C. Bellrose. 1986. A Review of the Problem of Lead Poisoning in Waterfowl. Ill. Nat. Hist. Surv. Spec. Publ. 4.

**JA 141**

Scheuhammer, A. M. 1987. The chronic toxicity of aluminum, cadmium, mercury, and lead in birds: a review. Environmental Pollution 46:263-295.

Scheuhammer, A.M. 2009. Historical perspective on the hazards of environmental lead from ammunition and fishing weights in Canada. *In* R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Scheuhammer, A.M. and S. L. Norris. 1995. A review of the environmental impacts of lead shotshell ammunition and lead fishing weights in Canada. Canadian Wildlife Service, Environment Canada, Ottawa.

Scheuhammer, A.M. and S.L. Norris. 1996. The Ecotoxicology of Lead Shot and Lead Fishing Weights. Ecotoxicology 5:279-295.

Scheuhammer, A. M., J. A. Perrault, E. Routhier, B. M. Braune, and G. D. Campbell. 1998. Elevated lead concentrations in edible portions of game birds harvested with lead shot. Environmental Pollution 102:251-257.

Scheuhammer, A. M., C. A. Rogers, and D. Bond. 1999. Elevated lead exposure in American woodcock (*Scolopax minor*) in eastern Canada. Archives of Environmental Contamination and Toxicology 36:334-340.

Schnaas, L., S. J. Rothenberg , M-F. Flores, S. Martinez, C. Hernandez, C. Osorio, et al. 2006. Reduced intellectual development in children with prenatal lead exposure. Environmental Health Perspectives 114:791-797.

Schulz, J.H., J.J. Millspaugh, B.E. Washburn, G.R. Wester, J.T. Lanigan III, and J.C Franson. 2002. Spent-Shot Availability and Ingestion on Areas Managed for Mourning Doves. Wildlife Society Bulletin 30:112-120.

Schulz, J.H., J.J. Millspaugh, A.J. Bermudez, X. Gao, T.W. Bonnot, L.G. Britt, and M. Paine. 2006. Acute Lead Toxicosis in Mourning Doves. Journal of Wildlife Management 70:413-421.

Schulz, J. H., J. J. Millspaugh, X. Gao, and A. J. Bermudez. 2007. Experimental lead pellet ingestion in mourning doves (*Zenaida macroura*). American Midland Naturalist 158:177-190.

Schulz, J. H., P. I. Padding, and J. J. Millspaugh. 2006. Will mourning dove crippling rates increase with nontoxic-shot regulations? Wildlife Society Bulletin 34(3), 861-864.

Schulz, J.R., R.A. Reitz, S.L. Sheriff, and J.J. Millspaugh. 2007. Attitudes of Missouri Small Game Hunters Toward Nontoxic-Shot Regulations. J. Wildlife Management 71(2):628–633; 2007).

**JA 142**

Schulz, J. R., G. E. Potts, J. E. Cornely, J.J. Millspaugh, and M.A. Johnson. 2009. The Question of Lead: Considerations for Mourning Dove Nontoxic-shot Regulation. The wildlife Professional 2009: 46-49. The Wildlife Society.

Schulz J.H. R.A. Reitz, S.L. Sheriff, J.J. Millspaugh, and P.I. Padding. 2009. Small game hunter attitudes toward nontoxic shot, and crippling rates with nontoxic shot. In: M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Schulz J.H, J.J. Millspaugh, and L.D. Vangilder. 2009. Policy considerations for a Mourning Dove non-toxic shot regulation. In: R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Schulz, J.H., X. Gao, J.J. Millspaugh, and A.J. Bermudez. 2009. Acute lead toxicosis and experimental lead pellet ingestion in Mourning Doves. Extended abstract *in* R.T. Watson, M. Fuller, M. Pokras, and W.G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Seng, P.T. 2006. Non-Lead Ammunition Program Hunter Survey. *Final Report to the Arizona Game and Fish Department*. Available at www.azgfd.gov/w_c/documents/AmmoSurveyFINALReport2-23-06_001.pdf.

Shillinger, J. E., and C. C. Cottam. 1937. The importance of lead poisoning in waterfowl. Transactions of the North American Wildlife Conference 2:398-403.

Shore, R. 2009. Mystery of the Toxic Swans: Explores the Fraser Valley's Avian Eco-Disaster. Canadian Television documentary.

Sileo, L., L. H. Creekmore, D. J. Audet, M. R. Snyder, C. U. Meteyer, J. C. Franson, L. N. Locke, M. R. Smith, and D. L. Finley. 2001. Lead poisoning of waterfowl by contaminated sediment in the Coeur d'Alene River. Archives of Environmental Contamination and Toxicology 41:364–368.

Smith, M.C., M.A. Davison, C.M. Schexnider, L. Wilson, J. Bohannon, J.M. Grassley, D. K. Kraege, W.S. Boyd, B.D. Smith, M. Jordan, and C. Grue. 2009. Lead shot poisoning in swans: Sources of pellets within Whatcom County, WA, USA, and Sumas Prairie, BC, Canada. Extended abstract *in* R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA. DOI 10.4080/ilsa.2009.0201.

Snyder, N.F., H.A. Snyder, J.L. Lincer, and R.T. Reynolds. 1973. Organochlorines, Heavy Metals, and the Biology of North American Accipiters. Bioscience 23, 300-305.

JA 143

Soeder, D.J. and C.V. Miller. 2003. Ground-Water Contamination From Lead Shot at Prime Hook National Wildlife Refuge, Sussex County, Delaware. Water resources Investigation Report 02-4282. U.S. Geological Survey, Baltimore, Maryland. 26 pp.

Sorenson K.J. and J. Burnett. 2007. Lead concentrations in the blood of Big Sur California Condors. Pages 185-195 *in* California Condors in the 21st Century (A. Mee and L.S. Hall, Eds.). Series in Ornithology No. 2.

Sorvai, J., R. Anitikainen, and O. Pyy. 2006. Environmental Contamination at Finnish Shooting Ranges – the Scope of the Problem and Management Options. Science of the Total Environment 333:21-31.

Sparling, D.W., S. Krest, and M. Ortiz-Santaliestra. 2006. Effects of Lead-Contaminated Sediment on *Rana sphenocephala* Tadpoles. Archives of Environmental Contamination and Toxicology 51:458-466.

Staessen, J.A., R.R. Lauwerys, C.J. Bulpitt, R. Fagard, P. Linjen, H. Roels, L. Thijs, and A. Amery. 1994. Is a Positive Association Between Lead Exposure and Blood Pressure Supported by Animal Experiments? Current Opinion in Nephrology and Hypertension 3:257-263.

Stansley, W. and D.E. Roscoe. 1996. The Uptake and Effects of Lead in Small Mammals and Frogs at a Trap and Skeet Range. Archives of Environmental Contamination and Toxicology 30:220-226.

Stansley, W., L. Widjeskog, and D.E. Roscoe. 1992. Lead Contamination and Mobility in Surface Water at Trap and Skeet Ranges. Bulletin of Environmental Contamination and Toxicology 49:640-647.

Stansley, W., M.A. Kosenak, J.E. Huffman, and D.E. Roscoe. 1997.Effects of Lead-Contaminated Surface Water From a Trap and Skeet Range on Frog Hatching and Development. Environmental Pollution 96:69-74.

Stevenson, A.L., A.M. Scheuhammer, and H.M. Chan. 2005. Effects of Nontoxic Shot regulations on lead Accumulation in Ducks and American Woodcock in Canada. Archives of Environmental Contamination and Toxicology 48:405-413.

Stein, S. 1979. Lead shot poisoning in red-tailed hawks. 77 pp.

Strom, S.M., J.A. Langenberg, N.K. Businga, and J.K. Batten. 2009. Lead exposure in Wisconsin birds. *In* R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Stroud, R.K., and W.G. Hunt. 2009. Gunshot wounds: A source of lead in the environment. *In* R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of

**JA 144**

Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Stutzenbaker, C.D., K. Brown, and D. Lobpries. 1983. An assessment of the accuracy of documenting waterfowl die-offs in a Texas coastal marsh. Special Report. Federal Aid Project W-106-R, Texas Parks and Wildlife Department, Austin, Tex. 21 p.

Tanskanen, H., I. Kukkonen, and J. Kaija. 1991. Heavy Metal Pollution in the Environment of a Shooting Range. Geological Survey of Finland, Special Paper 12:187-193.

Tataruch, F. and K. Onderscheka. 1981. Levels of environmental pollutants in wild animals in Austria (II)- amounts of lead and cadmium in the organs of European brown hare. Zeitschrift for Jagdwissenschaft 27:153-160.

Tavecchia, G., R. Pradel, J. Lebreton, A.R. Johnson, and J. Mondain-Monval. 2001. The effect of lead exposure on survival of adult mallards in the Camargue, southern France. Journal of Applied Ecology 38(6):1197-1207.

Thomas, V.G. 1997. The environmental and ethical implications of lead shot contamination of rural lands in North America. Journal of Agricultural and Environmental Ethics 10(1):41-54.

Thomas, V.G. 2003. Harmonizing approval of nontoxic shot and sinkers in North America. Wildlife Society Bulletin 31(1):292-295.

Thomas, V.G. and Guitart, R. 2003a. Evaluating non-toxic substitutes for lead shot and fishing weights. Environmental Policy and Law 33(3-4):150-154.

Thomas, V.G. and Guitart, R. 2003b. Lead pollution from shooting and angling, and a common regulative approach. Environmental Policy and Law 33(3-4):143-149.

Thomas, V.G. and Guitart, R. 2005. Role of international conventions in promoting avian conservation through reduced lead toxicosis: progression towards a non-toxic agenda. Bird Conservation International 15:147-160.

Thomas, V.G. and M. Owen. 1996. Preventing lead toxicosis of European waterfowl by regulatory and non-regulatory means. Environmental Conservation 23(4):358-364.

Titus, K., T.L. Haynes, and T.F. Paragi. 2009. The importance of Moose, Caribou, deer and small game in the diet of Alaskans. *In* R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

**JA 145**

Tong, S., Y.E. von Schirnding, and T. Prapamontol. 2000. Environmental Lead Exposure: A Public Health Problem of Global Dimensions. Bulletin of the World Health Organization 78:1068-1077.

Trainer, D.O. and R. A. Hunt. 1965. Lead poisoning of waterfowl in Wisconsin. Journal of Wildlife Management . 29(1):95-103.

Trainer, D.O. and R. A. Hunt. 1965. Lead poisoning of whistling swans in Wisconsin. Avian Diseases 9(2):252-264.

Tranel, M.A. and R.O. Kimmel. 2009. Impacts of lead ammunition on wildlife, the environment, and human health—A literature review and implications for Minnesota. *In* R.T. Watson, M. Fuller, M. Pokras, and W.G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Trautman, M.B., W.E. Bills, and E.L. Wickliff. 1939. Winter losses from starvation and exposure of waterfowl and upland game birds in Ohio and other Northern states. The Wilson Bulletin 51(2):86-104.

Tsuji, L.J.S. and E. Nieboer. 1997. Lead Pellet Ingestion in the First Cree Nation of the Western James Bay Region of Northern Ontario, Canada; Implications for a Nontoxic Shot Alternative. Ecosystem Health 3:54-61.

Tsuji, L.J.S., E. Nieboer, J.D. Karagatzides, and D.R. Kozlovic. 1997. Elevated dentine lead levels in adult teeth of First Nation people from an isolated region of northern Ontario, Canada. Bulletin of Environmental Contamination and Toxicology 59:854-860.

Tsuji, L.J.S., E. Nieboer, J.D. Karagatzides, R.M. Hanning, and B. Katapatuk. 1999. Lead Shot Contamination in Edible Portions of Game Birds and its Dietary Implications. Ecosystem Health 5:183-192.

United States Department of Health and Human Services (USDHHS). 1999. Toxicological profile for lead. Agency for Toxic Substances and Disease Registry, July 1999. Available at http://www.atsdr.cdc.gov/toxprofiles/tp13.pdf/.

United States Environmental Protection Agency (USEPA). 1994. Lead Fishing Sinkers: Response to Citizens' Petition and Proposed Ban; Proposed Rule. Federal Register Part III, Volume 40, part 745:11121-11143.

United States Environmental Protection Agency (USEPA). 1999. 1999-2000 Refuge-Specific Hunting and Sport Fishing Regulations: Proposed Rule. Federal Register Volume 64, Number 154:43834-43854.

United States Environmental Protection Agency (USEPA). 2001. Best Management Practices for Lead at Outdoor Shooting Ranges, EPA-902-B-01-001. U.S. Environmental

**JA 146**

Protection Agency, Division of Enforcement and Compliance Assistance, RCRA Compliance Branch, New York. www.epa.gov/region02/waste/leadshot/epa_bmp.pdf.

United States Environmental Protection Agency (USEPA). 2009. Lead Wheel Weights; Regulatory Investigation. Available at http://yosemite.epa.gov/opei/rulegate.nsf/byRIN/2070-AJ64?opendocument.

United States Environmental Protection Agency (USEPA). 2010. Request for comments on petition to phase out leaded aviation gasoline. http://www.epa.gov/otaq/aviation.htm.

United States Fish and Wildlife Service (USFWS). 2010. Nontoxic shot regulations for hunting waterfowl and coots in the U.S. Division of Migratory and Bird Management. http://www.fws.gov/migratorybirds/CurrentBirdIssues/nontoxic.htm.

United States Fish and Wildlife Service (USFWS). 2011. Spectacled Eider Recovery.

United States Geological Survey (USGS). 2008 Lead Shot and Sinkers: Weighty Implications for Fish and Wildlife Health. USGS Press Release 7/11/2008.

Valway, S.E., J.W. Martyny, J.R. Miller, M. Cook, and E.J. Mangione. 1989. Lead Absorption in Indoor Firing Range Users. American Journal of Public Health 79:1029-1032.

Veit, H.P., R.J. Kendall, and P.F. Scanlon. 1982. The Effect of Lead Shot Ingestion on the Testes of Adult Ringed Turtle Doves (*Streptophelia risoria*). Avian Dis. 27, 442-452.

Ventana Wildlife Society (VWS). 2010. Condor Reintroduction Notes from the Field. Available at http://www.ventanaws.org/species_condors_fieldnotes/.

Verbrugge, L.A., S.G. Wenzel, J.E. Berner, and A.C. Matz. 2009. Human exposure to lead from ammunition in the circumpolar north. *In* R.T. Watson, M. Fuller, M. Pokras, and W.G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Victery, W. 1988. Evidence for Effects of Chronic Lead Exposure on Blood Pressure in Experimental Animals: An Overview, Environmental Health Perspectives 78:71-76.

Vyas, N.B., J.W. Spann, and G.H. Heinz. 2001. Lead shot toxicity to passerines. Environmental Pollution 111 (1):135-138.

Vyas, N.B., J.W. Spann, G.H. Heinz, W.N. Beyer, J.A. Jaquette, and J.M. Mengelkoch. 2000. Lead poisoning of passerines at a trap and skeet range. Environmental Pollution 107 (1):159-166.

Vermeer, K. and D.B. Peakall. 1979. Trace metals in seaducks of the Fraser River Delta intertidal area, British Columbia. Marine Pollution Bulletin 10(7):189-193.

JA 147

Wallace, B.M., R.J. Warren, and G.D. Gaines. 1983. Lead shot incidence in sandhill cranes collected from Alaska, Canada, and Texas. Prairie Naturalist 15(4):155-156.

Walters J.R., S. R. Derickson, D. M. Fry, S.M. Haig, J.M. Marzluff, and J.M. Wunderle, Jr. 2010. Status of the California Condor and Efforts to Achieve its Recovery. Auk. In Press.

Washington Department of Fish and Wildlife (WDFW) 2000. Unpublished data. Available at http://wdfw.wa.gov/fish/papers/lead_fishing_gear/index.htm.

Washington Fish and Game Association (WFGA). 2001. Report to the Washington Fish and Wildlife Commission: the use of nontoxic shot for hunting in Washington. Washington Department of Fish and Wildlife Nontoxic Shot Working Group.

Watson, R.T. and D. Avery. 2009. Hunters and anglers at risk of lead exposure in the United States. *In* R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Wayland, M. and T. Bollinger. 1999. Lead exposure and poisoning in bald eagles and golden eagles in the Canadian prairie provinces. Environmental Pollution 104:341-350.

Wayland, M., E. Neugebauer, and T. Bollinger. 1999.Concentrations of lead in liver, kidney, and bone of Bald and Golden eagles. Archives of Environmental Contamination and Toxicology 37(2):267-272.

Weimeyer, S.N., A.J. Krynitsky, and S.R. Wilbur. 1983. Environmental contaminants in tissues, foods, and feces of California condors. Pages 428-439 in S. R. Wilbur and J. A. Jackson (eds), Vulture Biology and Management. University of California Press, Berkeley, California.

Weimeyer, S.N., J.M. Scott, M.P. Anderson, P.H. Bloom, and C.J. Stafford. 1988. Environmental Contaminants in California Condors, Journal of Wildlife Management 52:238-247.

Wetmore, A. 1919. Lead poisoning in waterfowl. U.S. Department Agr. Bulletin 793. 12 pp.

Whitehead, P.J. and K. Tschirner. 1991. Lead shot ingestion and lead poisoning of magpie geese *Anseranas semipalmata* foraging in a northern Australian hunting reserve. Biological Conservation 58:99-118.

Wilson, I.D. 1937. An early report of lead poisoning in waterfowl. Science, New Series 86(2236):423.

**JA 148**

Wilson, L.K., G. Grigg, R. Forsyth, M. Tolksdorf, V. Bowes, M. Smith, and A. Scheuhammer. 2009. Lead poisoning of Trumpeter Swans in the Pacific Northwest – Can recovered shot pellets help to elucidate the source? Extended abstract *in* R. T. Watson, M. Fuller, M. Pokras, and W. G. Hunt (Eds.). Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans. The Peregrine Fund, Boise, Idaho, USA.

Windingstad, R.M., S.M. Kerr, L.N. Locke, and J.J. Hunt. 1984. Lead Poisoning of Sandhill Cranes (*Grus Canadensis*). Prairie Nat. 16, 21-24.

Wingstad, R.M. 1988. Nonhunting mortality in sandhill cranes. Journal of Wildlife Management 52(2):260-263.

Woolf, A., J.R. Smith, and L. Small. 1982. Metals in livers of white-tailed deer in Illinois. Bulletin Environmental Contamination Toxicology 28:189-194.

Wright, J.P., K. N. Dietrich, M. D. Ris, R. W. Hornung, S. D. Wessel, B. P. Lanphear, et al. 2008. Association of prenatal and childhood blood lead concentrations with criminal arrests in early adulthood. PLoS Med 5:732-740.

Wu, T., Buck, G. M., and Mendola, P. 2003. Blood lead levels and sexual maturation in U.S. girls: the Third National Health and Nutrition Examination Survey, 1988-1994. *Environ Health Perspect* **111**, 737-741.

Yamamoto, K., M. Hayashi, M. Yoshimura, H. Hayashi, A. Hiratsuka, and Y. Isii. 1993. The prevalence and retention of lead pellets in Japanese quail. Archives of Environmental Contamination and Toxicology 24:478-482.

Zwank, P.J., V.L. Wright, P.M. Shealy, and J.D. Newsom. 1985. Lead toxicosis in waterfowl in two major wintering areas in Louisiana. Wildlife Society Bulletin 13(1):17-26.

JA 149



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C.  20460

APR 0 9 2012

OFFICE OF CHEMICAL SAFETY
AND POLLUTION PREVENTION

Mr. Jeff Miller
Center for Biological Diversity
351 California Street, Suite 600
San Francisco, CA  94104

Dear Mr. Miller:

This letter is to inform you that EPA has concluded its review of your recent submission ("Petition to the Environmental Protection Agency to Regulate Lead Bullets and Shot under the Toxic Substances Control Act," dated March 13, 2012). As an initial matter, EPA notes that the Center for Biological Diversity (CBD) and Project Gutpile (together with several other organizations) previously submitted an almost identical petition request under section 21 of TSCA, dated August 3, 2010, seeking among other things that EPA regulate lead in ammunition pursuant to section 6(a) of TSCA by prohibiting the manufacture, processing and distribution in commerce of lead bullets and shot. EPA denied that petition request on August 27, 2010, for lack of jurisdiction. Specifically, EPA determined that the statutory exclusion found in TSCA § 3(2)(B)(v) precludes EPA from regulating lead in ammunition under TSCA. CBD and Project Gutpile sought judicial review of EPA's denial. CBD's judicial challenge to EPA's denial of its petition on lead bullets and shot was dismissed as untimely.

The 2012 submission is substantially the same as the petition to regulate lead bullets and shot submitted in 2010. To the extent that there are differences, they are not substantive. Therefore, EPA does not consider the 2012 submission to be a new petition cognizable under section 21. As with the original 2010 petition, the 2012 submission recognizes the exclusion in TSCA § 3(2)(B)(v) but argues that TSCA nonetheless provides EPA with the authority to regulate bullets and shot. While the 2012 submission does argue the issue of EPA's statutory authority slightly differently (including references to the legislative history from 1976), on this issue, the 2012 submission contains no new information that was not previously available to CBD and Project Gutpile. Moreover, EPA was aware of, and considered, the cited legislative history in reaching its decision on the 2010 petition.

The relief requested in the 2012 submission differs somewhat from that requested in the 2010 petition. Both request EPA to initiate a rulemaking under TSCA section 6(a), but where the 2010 petition specifically requested a nationwide ban, the 2012 submission presents a more open-ended request for a section 6(a) rule, while at the same time advocating for a nationwide ban. In light of EPA's previous denial explaining that EPA does not have the authority to pursue any regulatory alternative, this change is a distinction without a substantive difference. As further evidence that the 2012 submission is in essence the same as the 2010 petition, the 2012 submission presents almost verbatim the same information regarding toxicity and exposure with respect to lead bullets and shot as the 2010 petition.

Overall, with respect to the more than 400 separate citations, only 20 citations were not included in the 2010 petition, and, of those, only six citations appear to post-date the 2010 petition.  For these reasons, EPA does not consider the 2012 submission to be a new petition cognizable under TSCA section 21. [1] Even if the 2012 submission could be understood to be a request that EPA reconsider its earlier decision, as explained above, it does not present any new (i.e., previously unavailable, non-cumulative) information or data that would cause EPA to reconsider its earlier denial. Accordingly, even if the 2012 submission could be considered to be a request for reconsideration, EPA would deny it because the 2012 submission does not present significant newly discovered, non-cumulative material.

Finally, even if the 2012 submission were considered to be a new or different petition cognizable under section 21 of TSCA, EPA would deny it for the same reasons it denied the 2010 petition. See *Lead in Ammunition and Fishing Sinkers; Disposition of TSCA Section 21 Petition*, 75 Fed. Reg. 58,377 at 58,378 (Sept. 24, 2010); Defendants' Partial Motion to Dismiss for Lack of Jurisdiction under Rule 12(B)(1) and Failure to State a Claim under Rule 12(B)(6), *Center for Biological Diversity e al., v. Jackson*, No. 10-2007 (D. DC 2010). Nonetheless, because EPA does not consider this to be a cognizable section 21 petition and because EPA has already published its reasons for denying the request to regulate bullets and shot under TSCA, EPA does not intend to publish its response to the 2012 submission in the Federal Register.

Sincerely,

James J. Jones
Acting Assistant Administrator

---

[1] EPA also does not believe that the statutory time bar in section 21 on judicial review of a denial can be avoided by re-submitting virtually the same petition, with the addition of parties, less than two years after the submission of the first petition.

IMPORTANT: Before completing this form, please read the accompanying instructions carefully.  *Form Approved: OMB No. 2070-0054*

| **EPA** U.S. ENVIRONMENTAL PROTECTION AGENCY 1200 Pennsylvania Avenue, N.W. Washington, D.C. 20460 **MANUFACTURER'S REPORT PRELIMINARY ASSESSMENT INFORMATION** This information is required under the authority of Section 8(a), Toxic Substances Control Act. 15 U.S.C. 2607. | Send completed form to: Document Control Office (7407M) Office of Pollution Prevention and Toxics U.S. EPA Room 6438 EPA East 1200 Pennsylvania Avenue, N.W. Washington, D.C. 20460 Attn: 8(a) PAIR Reporting | CONTROL NUMBER PERIOD COVERED FROM: Mo. Yr.  TO: Mo. Yr. |
|---|---|---|

## Section I -- CERTIFICATION

**TECHNICAL CERTIFICATION STATEMENT**

I hereby certify that, to the best of my knowledge and belief, all information entered on this form is complete and accurate.  I agree to permit access to, and the copying of records by, a duly authorized representative of the EPA Administrator, in accordance with the Toxic Substances Control Act, to document any information reported here.

| Signature | Date |
|---|---|
| Name and title     *Please print or type* | |

**CONCERNING EPA DISCLOSURE OF INFORMATION**

Any person who submits information to EPA under the Preliminary Assessment Information Rule (40 CFR 712) should be aware of EPA regulations (40 CFR Part 2) which govern the disclosure of such information.  Those regulations provide that any such person may, if he or she desires, assert a confidentiality claim covering part or all of the information submitted.  Information covered by such a claim will be publicly disclosed by EPA only to the extent, and by means of the procedures, set forth in 40 CFR Part 2.  However, if no such claim accompanies the information when it is received, EPA may make that information public without notifying the submitter.

**CONFIDENTIALITY STATEMENTS**

Information disclosed to EPA on this form may be claimed confidential by marking the appropriate boxes below.  The person signing the Confidentiality Certification Statement attests to the truth of the following four statements concerning all information that is claimed confidential.  Note that chemical substance identity may not be claimed confidential for this rule.

1. My company has taken measures to protect the confidentiality of the information, and intends to continue to take such measures.
2. The information is not, and has not been, reasonably obtainable without our consent by other persons (other than governmental bodies) by use of legitimate means (other than discovery based on a showing of special need in a judicial or quasi-judicial proceeding).
3. The information is not publicly available elsewhere.
4. Disclosure of the information would cause substantial harm to our competitive position.

**CONFIDENTIALITY CERTIFICATION STATEMENT**

I hereby certify that the Confidentiality Statements on this form are true as to that information below for which I have asserted a confidentiality claim.

| Signature | Date |
|---|---|
| Name and title     *Please print or type* | |

## Section II – CHEMICAL IDENTIFICATION

| ► Part A | ► Part B |
|---|---|
| CAS No. | Category name (first 15 characters) |
| Chemical name (first 15 characters) | Inventory Form C number |

## Section III -- RESPONDENT IDENTIFICATION

☐ *MARK THIS BOX TO CLAIM THIS SECTION CONFIDENTIAL*

| ► Part A --- Plant Site --- Physical location | ► Part B --- Mailing Address of: |
|---|---|
| Name | ☐ Corporate headquarters          ☐ Plant Site |
| Number and street | Name |
| City | Number and street |
| County | City |
| State                                ZIP Code | State                                ZIP Code |
| Dun and Bradstreet number      ---        --- | Dun and Bradstreet number (for corporate headquarters only)      ---        --- |

| ► Part C --- Technical contact | ► Part D --- Acknowledgement |
|---|---|
| Name and title                              ☐ At headquarters Telephone (*Area code/number*)            ☐ At plant site | EPA will send acknowledgement to – *Name and title* |

EPA Form 7710-35 (01/2005)                                                                                                      **JA 152**

## Section IV – PRELIMINARY ASSESSMENT INFORMATION

**NOTE**   Mark the box to the left of the item to claim the answer to the item as confidential.  Report all quantities in kilograms
(1 kilogram equals 2.2 pounds). Enter N/A for any item that does not apply to you; do not leave any blanks.

▶ **Part A – Plant Site Activities** – Information in part A must be your best estimate from readily obtainable data.
*For items 3b, 3c, and 3d, specify the accuracy of your answers.*

| | | | |
|---|---|---|---|
| ☐ **1.** Total quantity imported | kg | ☐ **2.** Quantity manufactured for sale or use | kg |
| ☐ **3 a.** Quantity lost during manufacture *(3b + 3c + 3d must equal 3a)* | kg | **3 c.** Quantity in wastes treated to destroy the chemical | kg |
| **3 b.** Quantity lost to the environment | kg±      % | **3 d.** Quantity in wastes not treated to destroy the chemical | kg±      % |

| Activity (1) | Process category (2) | Quantity (kilograms) (3) | Total worker-hours (4) | Total workers (5) |
|---|---|---|---|---|
| ☐ **4.** Manufacture of the chemical | **a.** Enclosed | | | |
| | **b.** Controlled release | | | |
| | **c.** Open | | | |
| ☐ **5.** On-site use as a reactant | **a.** Enclosed | | | |
| | **b.** Controlled release | | | |
| **Total Quantity** _____ kg | **c.** Open | | | |
| ☐ **6.** On-site nonreactant use of the chemical substance | **a.** Enclosed | | | |
| | **b.** Controlled release | | | |
| **Total Quantity** _____ kg | **c.** Open | | | |
| ☐ **7.** On-site preparation of products | **a.** Enclosed | | | |
| | **b.** Controlled release | | | |
| **Total Quantity** _____ kg | **c.** Open | | | |

☐ **8.** MANUFACTURER'S PRODUCTS – Report on the quantity of the chemical substance that you prepare for each of the following

| **INDUSTRIAL PRODUCTS (domestic)** | **a.** Chemical or mixture | kg | **CONSUMER PRODUCTS (domestic)** | **d.** Chemical or mixture | kg |
|---|---|---|---|---|---|
| | **b.** Article with some release | kg | | **e.** Article with some release | kg |
| | **c.** Article with no release | kg | | **f.** Article with no release | kg |
| **g.** Products for export | | | ⟶ | | kg |

▶ **Part B – Chemical Substance Processing by Customers** – *Information in part B must be accurate within ± 50%.*

☐ **9.** CUSTOMERS' USES AND PRODUCTS – Estimate the quantity of the chemical substance that your customers use or prepare for each of the following.

| **INDUSTRIAL PRODUCTS (domestic)** | **a.** Chemical or mixture | kg | **CONSUMER PRODUCTS (domestic)** | **d.** Chemical or mixture | kg |
|---|---|---|---|---|---|
| | **b.** Article with some release | kg | | **e.** Article with some release | kg |
| | **c.** Article with no release | kg | | **f.** Article with no release | kg |
| **g.** Products for export | | | ⟶ | | kg |
| **h.** Quantity of chemical consumed as reactant | | | ⟶ | | kg |
| **i.** Unknown customer uses | | | ⟶ | | kg |

☐ **10.** MARKET NAMES – If you report your customers' uses as unknown (9i above) for more than 20% of the total quantity of the chemical substance that you manufacture and import (20% of items 1 and 2 above), list the market names under which you distribute the chemical (if you need more space, attach an additional sheet.)

| **a.** | **c.** |
|---|---|
| **b.** | **d.** |

☐ **11.** CUSTOMERS' PROCESS CATEGORIES – Based on your knowledge of general industry practices, estimate the quantity of the chemical substance that you sell to customers as the chemical and that your customers further process in each of the following categories.

| **a.** Enclosed processes | kg | **c.** Open processes | kg |
|---|---|---|---|
| **b.** Controlled release processes | kg | **d.** Unknown | kg |

**EPA Form 7710-35 (01/2005) Reverse**

**JA 153**

# INSTRUCTIONS FOR MANUFACTURER'S REPORT FORM
## PRELIMINARY ASSESSMENT INFORMATION

**What chemicals to report** – This form applies to substances that are listed in 40 CFR 712.30.

Do not report on listed chemical substances if these are manufactured or imported incidentally as a byproduct, non-isolated intermediate, or impurity.

A byproduct or co-product must be reported if it's marketed or used as a subject (listed) chemical.

Do not report a listed chemical substance if it is a component of a mixture (imported or manufactured). Note, though, that the mixture itself may be listed as a reportable substance. Reporting is required, however, if the chemical is manufactured separately by a given company, and then blended into a mixture. In such a case, the blending step(s) would be reported as processing activities. Reporting is also required if the manufactured or imported chemical is (1) in aqueous solution; (2) in a solution containing an additive (such as a stabilizer or other chemical) to maintain the integrity or physical form of the substance; or (3) present in any grade or purity.

**Reporting Period** – Enter the months and years beginning and ending the 12-month period for which you report (e.g., July 81 - June 82). This reporting period is listed with the chemical substance in 40 CFR 712.30.

**Who must report** – Manufacturers and importers must report. See 40 CFR 712.25 for exemptions from reporting. In addition to the actual synthesis of a compound, all refining, extracting, and purifying activities of a listed chemical substance are considered manufacturing activities under Section 3(7) of TSCA (15 U.S.C. 2602(7)). Reporting is required for all companies involved in any of these activities.

Repackaging is considered a processing activity and should not be reported as manufacture. A company that only repackages a listed chemical substance is considered only a processor. Note, however, that if the company imports the chemical prior to repackaging it is considered a manufacturer and must report.

**How many forms to complete** – For each chemical, complete a separate form for each plant site that manufactured the chemical.

If a site manufactured and imported the chemical, report both manufacture and import data on a single form.

A company that imported the chemical, but did not process the imported quantity or manufacture an additional quantity, may submit a separate form for each import site or may submit a single form with the total data for all import sites.

**Who may submit forms** – Companies may choose to complete and submit forms to EPA from each plant site directly, or through company headquarters.

## IV. PRELIMINARY ASSESSMENT INFORMATION

**TSCA Regulable Quantities –** Except under items 4 and 5, do not report any quantity of chemical substance that is manufactured or processed solely for use as: a pesticide; tobacco or any tobacco product; any source material, special nuclear material, or byproduct material (as terms defined in the Atomic Energy Act of 1954 and regulations issued under such Act); firearms or ammunition; or food, food additives, drug, cosmetic, or device (as such terms are defined in section 201 of the Federal Food, Drug and Cosmetic Act).  The above are not TSCA regulable.

Some of the chemical substances are manufactured for both TSCA and non-TSCA regulable purposes.  If a chemical from a given manufacturing stream is solely for a non-TSCA use, no reporting is required.  However, if a company produces a chemical from the same stream that will be used for both TSCA and non-TSCA purposes, the total quantity must be reported under items 4 and 5. Note that the quantity produced for TSCA purposes only is entered under item 2.

## PART A: PLANT SITE ACTIVITIES

**Accuracy –** For each item, provide numbers that represent your best estimates based on readily obtainable data.

**Item 1 –** Enter the total quantity of the chemical substance imported in bulk during the reporting period.  For a given compound, if a company is not involved in any manufacturing activity, and imports a chemical at one site and processes it at another facility, answers need to be provided only for item 1 and items 9 through 11 (Part B). Note that the transfer of chemical to another site of the same company for processing is treated as if it were a customer use.

**Item 2 –** Enter the total quantity of chemical domestically manufactured for TSCA use during the reporting period, not counting the losses reported in item 3.

**Item 3a–3d –** In 3a, report the total quantity lost in manufacture of the substance during the reporting period.  Report only routine losses.  Do not report unusual spills or accidents.  In calculating estimates for quantities not recovered you may: (1) use measured losses, if available, or emission factors and other calculated releases from individual sources; or (2) if these are not available, or only account for a portion of the total loss, you may make a simple mass balance estimate of the expected yield minus actual yield, where actual yield is the value reported in item 2.  This quantity in 3a should then be broken down into three categories below (i.e., 3b + 3c + 3d = 3a). Specify the accuracy you report for 3b, 3c, and 3d, e.g., $1000 \, kg \pm 30\%$.

    **3b. Quantity lost to the environment** – This covers fugitive emissions to the atmosphere and other losses not described in 3c and 3d.

    **3c. Quantity in wastes treated to destroy the chemical.**

# PUBLIC SUBMISSION

**As of:** 9/9/12 5:24 PM
**Tracking No.** 80b3a4b2
**Comments Due:** September 15, 2010

**Docket:** EPA-HQ-OPPT-2010-0681
Lead Fishing Sinkers and Ammunition Components

**Comment On:** EPA-HQ-OPPT-2010-0681-0001
Memorandum to open docket for public access

**Document:** EPA-HQ-OPPT-2010-0681-0019
Comment submitted by Mau Ly, Range Master, Maryland-National Capital Park Police, Montgomery County Division

---

## Submitter Information

---

## General Comment

As range master and firearms instructor, I feel banning the type of ammunition outlined would hurt many law enforcement agencies/military units who rely on target/skills/tactical practice. The cost to use non-toxic ammunition is very cost prohibitive to many agencies. Our agency is balancing on using 80% non-toxic and 20% leaded ammunition. In addition, there may be state mandated requirements to shoot a certain amount of leaded ammunition. As an experienced shooter and range administrator, I am asking that you not pass thiis regulation.

**JA 156**

# PUBLIC SUBMISSION

**As of:** 9/9/12 5:33 PM
**Tracking No.** 80b3de7f
**Comments Due:** September 15, 2010

**Docket:** EPA-HQ-OPPT-2010-0681
Lead Fishing Sinkers and Ammunition Components

**Comment On:** EPA-HQ-OPPT-2010-0681-0001
Memorandum to open docket for public access

**Document:** EPA-HQ-OPPT-2010-0681-4143
Comment submitted by M. Crawford

---

# Submitter Information

---

# General Comment

Please, do not ban traditional ammunition. This would adversely affect all law enforcement Federal, State, County, and Municipal officers as well as the United States Military and National Guards.

**JA 157**





# Groups want to get lead out of hunting, fishing

## Say it contributes to poisoning in animals and humans

Aug. 4, 2010

Environmental groups Tuesday filed a petition with the Environmental Protection Agency seeking a nationwide ban on lead-based sporting ammunition and fishing tackle.

According to the petitioners, "it is now incontrovertible fact" lead fragments are "a serious source of lead exposure to scavenging animals" and a health risk to humans who eat game killed with lead bullets. In addition, they claim numerous alternatives to lead are available.

The petition was filed under Section 21 of the Toxic Substances Control Act. The petitioners are the Center for Biological Diversity, American Bird Conservancy, Association of Avian Veterinarians, Project Gutpile and Public Employees for Environmental Responsibility.

"It's long past time to do something about this deadly - and preventable - epidemic of lead poisoning in the wild," said Jeff Miller of the Center for Biological Diversity. "Over the past several decades we've wisely taken steps to get lead out of our gasoline, paint, water pipes and other sources that are dangerous to people. Now it's time to get the lead out of hunting and fishing sports to save wildlife from needless poisoning."

The petition prompted strong reactions from many sporting groups that oppose the ban as an attack on hunting and fishing or because they feel it lacks justification.

"There is simply no scientific evidence that the use of traditional ammunition is having an adverse impact on wildlife populations that would require restricting or banning the use of traditional ammunition beyond current limitations, such as the scientifically based restriction on waterfowl hunting," said Steve Sanetti, president of the National Shooting Sports Foundation.

As an example, the number of breeding pairs of bald eagles, a species known to die from lead poisoning, increased 724% from 1981 to 2006 in the U.S., according to the U.S. Fish and Wildlife Service.

The toxic nature of lead has long been acknowledged, however.

An estimated 10 million to 20 million birds and other animals die each year from lead poisoning in the United States, according to the Center for Biological Diversity.

In Wisconsin, lead poisoning caused the death of 16% of 583 bald eagles necropsied between 2000 and 2007, 25% of 143 trumpeter swans between 1991 and 2007 and 29% of 26 loons beginning in 2006, according to the Department of Natural Resources.

The DNR study found lead fishing tackle in all loons that died of lead poisoning.

Eagles typically ingest lead bullet fragments when scavenging on deer carcasses or gut piles.

The American Sportfishing Association acknowledges lead can kill water birds, and lead sinkers may be part of the cause. But based on a review of the effect of lead sinkers on water bird populations, ASA has found "that insufficient data exists to

warrant state or federal bans on lead sinkers used for fishing."

The group cites stable and increasing populations of loons in the lower 48 states and Canada. In general, loon populations, as well as other waterfowl species, are subject to much more substantial threats such as habitat loss through shoreline development, according to the ASA's position statement on lead in fishing tackle.

Depending on the alternative metal and current prevailing raw material costs, non-lead fishing tackle products can cost from six to 20 times more than lead products, according to the ASA, and non-lead products may not be as available and most do not perform as well.

Mandatory transitioning to non-lead fishing tackle would require significant changes from both the industry and anglers.

ASA recommends that before additional laws are enacted to restrict lead sinkers for fishing on a state or national basis, sufficient data must exist to demonstrate that discarded lead sinkers are an actual threat to the sustainability of loons or other water bird populations.

The group leaves room, however, for local regulations on "hot spots" if sound science supports such action.

Changes to the use of lead in traditional outdoor sports have precedent. Waterfowl hunters made the transition to non-lead shot nearly two decades ago.

And several northeastern states, starting with New Hampshire in 2000 and then Maine (2002), New York (2004) and Vermont (2007), have total or partial bans on lead sinkers for fishing.

Wisconsin will likely see a ban of lead sinkers in the Horicon National Wildlife Refuge beginning next year. The ban would apply only to sinkers of less than 1 ounce and within the borders of the federal refuge.

State residents gave passing approval to a wider ban on lead fishing tackle at the Wisconsin Conservation Congress meetings in April.

A congress advisory question from its air, waste and water committee asked: Would you support efforts by the state to phase out the use of lead fishing tackle less than one inch in length and less than one ounce in weight for use in Wisconsin waters?

The vote was 1,980 for and 1,818 against. Whether the DNR advances the idea will be learned in the coming months.

The petition to the EPA is by no means a sure thing. A similar petition in 1992 dealing only with fishing tackle was not approved by the agency.

And the Toxic Substances Control Act exempts ammunition, said Larry Keane, senior vice president and general counsel of the National Shooting Sports Foundation.

"That's been the law since it was enacted in 1976," Keane said. "So we think the EPA won't have legal authority to do what is proposed in the petition."

Additionally, since the petition applies to civilian target shooting and military and law enforcement uses of ammunition, it will encounter extra heavy opposition, Keane said.

Miller said he didn't believe, if successful, the petition would result in a drop in hunting and fishing. Hunter numbers haven't fallen in the condor range of California, he said, where lead bullets are now prohibited.

He also said the price of non-lead alternatives would come down if the petition were successful.

"Compact florescent light bulbs were prohibitively expensive when they first came out," Miller said. "Now they are almost the same cost as conventional light bulbs."

JA 159

Miller said he thinks the petition has a chance if it is evaluated on its merits. He believes the EPA has the ability to regulate

the components like lead in ammunition.

"There will be pressure put on the EPA, no question," Miller said. "But with the opportunity to help our wildlife and with alternatives to hunters and anglers available, I think it is time."

The Toxic Substance Controls Act requires the EPA to grant or deny the petition within 90 days of filing.

**Trappers meeting:** The 51st annual National Trapper's Convention and Sports Show is being held Thursday through Sunday in Marshfield. It's the first time in 14 years the event has been held in Wisconsin.

More than 100 vendors have reserved booth space at the Central Wisconsin State Fairgrounds; the show includes seminars and workshops on topics such as fur handling, rodent control, predator calling and crafts.

The Marshfield Convention & Visitors Bureau estimates 5,000 visitors will come to the show, and the local economic impact will be $513,000.

For more information on the show, visit *www.nationaltrappers.com/2010nat.html*.

*Send e-mail to psmith@journalsentinel.com*

**Find this article at:**
http://www.jsonline.com/sports/outdoors/99994269.html

☐ Check the box to include the list of links referenced in the article.



# Real hunters get the lead out

By Paul W. Hansen

Thursday, January 20, 2011

It is time for those of us who hunt to quit using outdated lead bullets and start moving toward high-tech copper bullets – even if they are more expensive.

Lead bullets are bad for everyone: They contaminate the meat we bring home as well as the gut piles we leave behind, and they also poison any scavengers that consume the contaminated meat.

Moreover, the evidence against lead bullets is now solid. In a North Dakota study of 738 people whose blood was tested, those who ate a lot of wild game had higher lead levels than those who ate little or none. And the more recent the consumption of wild game harvested with lead bullets, the higher the level of lead in the blood. That is why the federal government now urges pregnant women and children under the age of 6 not to consume any game shot with lead bullets.

In Jackson Hole, Wyo., the Beringia South Research Institute has found that 50 percent of ravens have elevated blood levels during the hunting season, compared to only 2 percent during the non-hunting season. In the greater Yellowstone area, 85 percent of the bald eagles tested had elevated levels of lead in their bodies – more than half of them at levels that can cause impairment or death.

What happens after a bullet kills a big game animal is surprising. According to a Minnesota Game and Fish study, an average of 141 bullet fragments per carcass dispersed far from the wound channel, for an average maximum distance of 11 inches. That means that routine trimming of a bullet wound will not remove all of the lead. Because most lead particles in venison are too small to see, feel or sense when chewing, they're liable to be unknowingly consumed.

For centuries, lead has been known to be a broad-spectrum poison for humans and wildlife, and recently the Environmental Protection Agency described it as "one of the most dangerous neurotoxins in the environment." The young of all species are at higher risk because their growing bodies absorb more lead than adults do and their developing brains are more easily damaged by it.

Lead has been banned from paint, gasoline, toys, and even tire-balancing weights. In 1991, the U.S. Fish and Wildlife Service ordered a ban on lead shot for hunting migratory waterfowl. The agency took action because about 1 million to 2 million ducks, geese and swans were dying each year from eating spent lead-shot pellets. Now, the Wildlife Society – the professional association of the nation's leading wildlife biologists – advocates replacing all lead-based bullets used in the field.

Hunters already have alternatives. They can either buy bullets with no exposed lead – a heavy copper case surrounds the lead core – or they can buy a solid copper bullet that fragments very little and leaves no lead behind.

Hunters contribute a great deal to wildlife conservation through license fees, an excise tax on gear, the purchase of habitat conservation stamps and donations to wildlife conservation groups. Given this great conservation legacy, it makes no sense to contaminate our hunt by bringing home tainted meat or leaving toxic lead in the field. When informed of the problem, 90 percent of Arizona hunters in regions critical to the endangered California condor voluntarily switched to copper.

Unfortunately, this issue has become unnecessarily polarized. After making a well-referenced case for banning lead in the field, the nonprofit Center for Biological Diversity then overreached by petitioning the EPA to ban the manufacture of all

JA 161

lead bullets. The group is now suing the agency. The lawsuit overreaches because most lead bullets are fired in target practice, which presents little hazard for people. It is what happens during hunting, and that is where federal and state governments should take a stand and eliminate lead bullets.

This fall, I made a killing shot on an elk using the lead-core copper-case bullet. I found the bullet, with the lead core intact within the copper case. Advanced ballistics make these bullets very accurate and more likely to make a clean kill.

It was nice to come home and process the elk with no second thoughts about the lead I brought home, or left behind.

Hansen, a resident of Jackson, Wyo., is a contributor to Writers on the Range, a service of High Country News (hcn.org

© Copyright 2012 The San Diego Union-Tribune, LLC. An MLIM LLC Company. All rights reserved.



WITH THEIR MOST RECENT EFFORT THWARTED BY A
GRASSROOTS NRA VICTORY, ANTI-HUNTING GROUPS
ARE NOW TARGETING LEAD AMMUNITION
THROUGH THE FEDERAL COURT SYSTEM.

# THE PLAN TO
# GET THE
# LEAD OUT





**COVER STORY**

*by* DAVE KOPEL

**S**uppose you went to the gun store to pick up a box of rifle ammunition for target practice on a friend's farm. Or maybe you needed a box of handgun ammo for use at your local outdoor range.

But when you got there, you were told that traditional ammunition, using lead bullets, was now illegal. Instead, you could buy alternative ammunition that cost much more. The store had a good supply of alternative ammunition for shotguns, and some of it was reasonably priced. But the store had hardly anything for rifles or handguns.

That's what nearly happened in 2010. And it may happen yet.

### Some Background

LAST AUGUST, THE Center for Biological Diversity, an environmental organization based in California, filed a petition with the Environmental Protection Agency asking for a ban on all lead ammunition and lead in fishing tackle.

Under the Toxic Substances Control Act (TSCA—pronounced "tosca"), the EPA has the authority to outlaw almost anything. The petition requested the EPA "ban the manufacture, processing and distribution in commerce of lead shot, bullets and fishing sinkers." This was not a request to ban the use of lead ammunition for hunting. It was a request for a total ban on the sale of lead ammunition.

The federal TSCA statute (volume 15 of the United States Code, starting at § 2601) gives the EPA broad authority to ban or restrict whatever the EPA determines to "present an unreasonable risk of injury to health or the environment."

When Congress was enacting TSCA in 1976, pro-gun lawmakers, such as Idaho Sen. James McClure, and the NRA were aware of the risk that bureaucrats might one day attempt to use TSCA's open-ended language to prohibit guns or ammunition. At both the federal and state level, there is a long record of anti-gun organizations trying to use bureaucratic agencies to enact gun bans that could never pass in a legislature.

So the Congress, with NRA's support, did with TSCA what it has done with other general regulatory statutes: added specific language prohibiting TSCA from being used to regulate firearms or ammunition (15 U.S.C. § 2602(B)).

The CBD, however, argued that the EPA could ban lead ammunition anyway. Supposedly, the EPA would not be regulating ammunition, but merely the "toxic components of ammunition."

Notably, the requested ban would even forbid lead ammunition from being sold for use at indoor shooting ranges, although nobody makes a serious claim that lead from indoor ranges accumulates in the environment in such a way as to harm wildlife.

JA 165



# THE PLAN TO GET THE LEAD OUT

## THE ONE "HUNTING ORGANIZATION" THAT WORKS WITH CBD, AND WHICH JOINED THE CBD LAWSUIT, CALLS ITSELF PROJECT GUTPILE ... THE ORGANIZATION APPARENTLY HAS FOUR MEMBERS.

Rather oddly, the CBD put out a fact sheet that claimed, "The petitioners support exceptions to allow continued use of lead pistol ammunition for home defense and non-hunting activities. This petition will not affect law enforcement or the military. The petition does not address the use of lead at either indoor or outdoor shooting ranges."

Simply put, this was not true. Nothing in the CBD's 100-page petition to the EPA asked for any kind of exceptions to the ban. Despite what the CBD's fact sheet claimed, the CBD's petition included a page arguing that lead accumulation at outdoor shooting ranges is harmful to wildlife.

Shortly after the CBD's petition was filed on Aug. 3, 2010, NRA and other grassroots activists went into action.

Concerned citizens flooded the EPA with requests to deny the petition. On Aug. 20, 2010, NRA sent the EPA a letter detailing the legal analysis of why the agency has no authority to ban lead in ammunition.

As NRA-ILA Executive Director Chris W. Cox explained that the CBD's argument that the EPA could regulate lead in ammunition—even though the EPA could not regulate ammunition—was implausible: "If Congress exempts a cow from regulation, one could hardly argue that it would nevertheless allow for regulation of the hide attached to the cow's body."

Moreover, "If EPA can regulate each individual component of ammunition, then EPA can effectively regulate shells and cartridges themselves." Such a result would be contrary to the plain language of the statute.

The EPA agreed, and on Aug. 27 announced that it did not have legal authority over ammunition. For good measure, the EPA added: "Nor is the agency seeking such authority."

As for fishing tackle, there is no specific exemption from TSCA. Indeed, in 1994 the EPA, under President Clinton, announced a plan to outlaw lead or zinc sinkers smaller than 25 mm. Probably as a result of pressure from the public and Capitol Hill, the EPA never went forward in writing the regulations for the proposed rule. On the other hand, the EPA has never withdrawn the proposed rule either, despite announcing plans to do so in 2005.

However, just because the EPA has the legal power to regulate something does not mean it must do so. The EPA has considerable discretion and can take into account the seriousness of a particular problem, and other factors.

In September 2010, 78 members of the Congressional Sportsmen's Caucus sent a joint letter to the EPA urging that the fishing sinker ban be rejected. A similar letter came from the Executive Council of the National Assembly of Sportsmen's Caucuses. This is the umbrella group for sportsmen's caucuses in the state legislatures.

Most importantly, the Association of Fish and Wildlife Agencies, which represents all 50 state fish and wildlife

agencies, se[...] that there [...] a national b[...] infringe on [...]

So on N[...] rejected CBD[...] sinkers. Ac[...] on lead sin[...] TSCA requi[...] the "least r[...] the extent t[...] The EPA de[...] national ba[...] alternative. [...] and federal [...] impose rest[...] educationa[...] many fishe[...] sinkers, wh[...] the market[...]

**Continuin[...]**
REJECTED [...] its allies re[...] court askin[...] requiring th[...] The suit is [...] for the Dist[...] where most [...] rulemakin[...]

Notably, [...] had suppor[...] (the Associ[...] and the Am[...] not join the[...]

Almost [...] filed, NRA a[...] announced [...] motion to i[...] that the cou[...] arguments [...] gun owner[...] Shooting S[...] motion to i[...]

The CBD [...] outlaw lead[...] hunting." T[...] however, d[...] got some b[...] as local cha[...] Society, to [...] CBD has no[...] hunting or[...]

Rather [...] groups then[...] Unlimited, [...] Rocky Mou[...]

JA 166

agencies, sent the EPA a letter explaining that there was no good scientific basis for a national ban, and that such a ban would infringe on the state agencies' jurisdiction.

So on Nov. 4, the EPA formally rejected CBD's petition to ban lead sinkers. According to the EPA, a ban on lead sinkers was not "necessary." TSCA requires that EPA regulations be the "least restrictive alternative," to the extent that there are alternatives. The EPA determined that a uniform national ban was not the least restrictive alternative. Instead, state regulators and federal land managers can impose restrictions when needed, and educational campaigns have convinced many fishermen to choose alternative sinkers, which are widely available on the market.

## Continuing The Crusade

REJECTED BY THE EPA, the CBD and its allies recently filed suit in federal court asking a judge to issue an order requiring that the EPA impose a ban. The suit is in the federal district court for the District of Columbia, which is where most lawsuits involving federal rulemaking must be brought.

Notably, two of the five groups that had supported the petition to the EPA (the Association of Avian Veterinarians and the American Bird Conservancy) did not join the CBD's suit against the EPA.

Almost as soon as the lawsuit was filed, NRA and Safari Club International announced that they would file a motion to intervene in the suit so that the court will hear the strongest arguments in support of hunters and gun owners. Likewise, the National Shooting Sports Foundation has filed a motion to intervene.

The CBD claims that its effort to outlaw lead ammunition is not "anti-hunting." The hunting organizations, however, do not agree. Although CBD got some bird watching groups, such as local chapters of the Audubon Society, to sign a letter to the EPA, the CBD has no support from established hunting organizations.

Rather notably, it's the hunting groups themselves, such as Ducks Unlimited, Pheasants Forever and the Rocky Mountain Elk Foundation, who

have the strongest records in successful conservation of species and habitats.

Unlike organizations such as the misnamed Humane Society of the United States, the CBD is not opposed to hunting under all circumstances. However, the CBD has clashed with mainstream hunters in its opposition to the hunting of wolves in the northern Rocky Mountain states, the greater sage grouse in Nevada and mountain lions in Arizona.

The one "hunting organization" that works with the CBD, and which joined the CBD lawsuit, calls itself Project Gutpile. The group appears to be the project of just one California hunter. Besides lending its name to the CBD's campaign and speaking to the media and in California public hearings, Project Gutpile appears to consist of nothing more than a blog that was fairly active from 2006 to 2008, but since then has had only a single post. The organization apparently has four members. No doubt the man who runs Project Gutpile is sincere, but his support of the CBD is not exactly proof of the CBD's claims that its lead ban agenda is supported by "hunters"—or least not by more than a microscopically small number of them.

The CBD's other ally in the lawsuit is Public Employees for Environmental Responsibility. This organization was at the forefront in opposing the federal law reforms that now allow American citizens to carry firearms in national parks.

## A Long-Term Battle

THE CONTROVERSY OVER traditional ammunition has been going on for a long time. In 1991, the U.S. Fish and Wildlife Service prohibited use or possession of lead shot during the hunting of waterfowl. The ban was accomplished by an administrative regulation, based on powers granted by the Endangered Species Act. It still seems uncertain, however, that the protection of endangered avian predators required an all-out ban in every waterfowl hunting area in every state, and NRA was in the forefront of opposition to this overly broad rule at the time.

Twenty-three states impose some type of additional, but limited, restrictions on the use of lead shot in the hunting

of some upland game bird species.

Perhaps one consequence of Barack Obama's election as president was that in March 2009, the National Park Service announced that it would prohibit all use of lead ammunition in national parks. Such a ban would affect much more than hunting; indeed, most national parks do not allow recreational hunting.

But thanks to a 2009 law backed by NRA, guns are legal in national parks under the same rules as the host state applies to state parks. So, for example, if you go camping or hiking in Rocky Mountain National Park in Colorado, you can carry a handgun for protection since Colorado law allows defensive carry in state parks.

But if a lead ban were implemented, then you wouldn't be able to carry traditional ammunition in your defensive gun. Instead, you would have to carry much more expensive alternative ammunition, which might not perform as well for self-defense—and only if you could even find such ammunition in your handgun's caliber.

Fortunately, after NRA and Second Amendment activists complained, the Park Service refined its policy so that the lead ammunition ban now applies only to Park Service employees.

According to the prohibitionists such as the CBD, the factual basis for the necessity of a nationwide ban is the claim that environmental lead from hunting and shooting ranges is killing wildlife. They cite figures claiming that 20 million animals die each year from lead poisoning.

Birds of prey, because they are high on the food chain, are said to be especially imperiled. Yet the data suggest otherwise. For example, from 1981 to 2006, according to the United States Fish and Wildlife Service, there was a 724 percent increase in the number of bald eagle breeding pairs. Other raptor species are also thriving—thanks in significant part to the habitat conservation that is made possible by the dedicated 11 percent federal excise tax on firearms, bows and ammunition.

Some say the California condor is particularly threatened by environmental lead as well. As a result, lead

Continued on page 53

JA 167

**Get The Lead Out**
*from page 33*

ammunition has been sharply restricted for most hunting in the 14 California counties where the condor lives. The restrictions—although many, including the NRA, disagree with them—show that state wildlife agencies are capable of addressing lead when they consider it to be a problem.

Besides claiming that lead endangers wildlife, the lead-ban advocates attempt to frighten hunters into believing they are poisoning themselves. Yet in 2008, the U.S. Centers for Disease Control and Prevention studied lead levels in the blood of North Dakota hunters who used traditional lead ammunition and found no human health risk. Indeed, the average North Dakota hunter has a lower level of blood lead than the average American. Likewise, North Dakota children had less than half the average for American children, far below any scientific level of concern.

Similarly, the Iowa Department of Public Health (IDPH) has been testing the blood lead levels of Iowans for nearly two decades. In response to a panic about lead in venison, the department explained, "IDPH maintains that if lead in venison were a serious health risk, it would likely have surfaced within extensive blood lead testing since 1992 with 500,000 youth under 6 and 25,000 adults having been screened."

In fact, despite all the misconceptions pushed by anti-hunting groups, no one has ever found a single case in the United States of someone who had a dangerously elevated level of lead in their blood due to consuming game.

### No End In Sight

THE BATTLE IS not going to go away. The CBD is pressing its court case by pointing to a congressional committee report on the TSCA bill that said the EPA could regulate "chemical components of ammunition." Judges differ in how much weight they give to such reports. Justice Scalia argues that the reports, which are not adopted by Congress, merely express the feelings of the staffers who wrote them and not the will of Congress as a whole.

To clear up any possible ambiguity,

U.S. Rep. Paul Broun, R-Ga., has introduced H.R. 6284 to plainly put lead ammunition out of EPA's regulatory reach. The bill has already garnered 36 co-sponsors, and it is only one sentence long: "The administrator of the Environmental Protection Agency may not prohibit, limit or control, based on material composition, any type of firearm ammunition or fishing tackle."

Rep. Broun, who co-chairs the Second Amendment Task Force in Congress, has also introduced a separate bill, H.R. 5672, to prevent any new and unscientific bans on lead on federal lands. The bill would only allow bans "if the best scientific evidence available demonstrates that the material composition of the ammunition or fishing tackle is having, or is likely to have, a substantially detrimental effect on the health of a local fish or wildlife population."

The anti-gunners in Congress are working on their own offensive. Most Second Amendment supporters know Rep. Bobby Rush, D-Chicago, as the sponsor of H.R. 45, a draconian anti-gun law that Rush introduced in the last Congress. Rush has also sponsored a bill to eliminate TSCA's rule against the EPA banning ammunition.

In the last Congress, that bill was H.R. 5820, a massive revision of federal environmental law. It garnered over three-dozen co-sponsors and a subcommittee hearing. Undoubtedly Rush's bill will return in the new Congress, including his attempt to get rid of the ammunition protection in section 2602 of TSCA.

The current attempts to outlaw lead ammunition, according to professor Nicholas Johnson, are just one of many ways in which environmental laws can be misused to threaten Second Amendment rights. Johnson teaches environmental law and Second Amendment law at Fordham Law School in Manhattan.

As Johnson explains, three federal environmental laws have been used against outdoor shooting ranges: the Clean Water Act (which is so broadly written that it applies to land which

is dry year-round); the Resource Conservation and Recovery Act (which regulates the disposal of hazardous waste); and the Comprehensive Environmental Cleanup and Recovery Act ("Superfund," for the cleanup of "hazardous substances," which includes anything made from copper or lead).

So far, the EPA has taken the sensible approach of educating ranges, in a publication entitled "Best Management Practices for Lead at Outdoor Shooting Ranges," rather than trying to shut down ranges wholesale. But the EPA's forbearance doesn't stop the private lawsuits that the laws authorize.

Unlike TSCA, the other federal environmental laws do not have specific protections for firearms and ammunition.

Johnson details the problems in his 2005 article in the *Indiana Law Review*, "Testing the States' Rights Second Amendment for Content: A Showdown Between Federal Environmental Closure of Firing Ranges and Protective State Legislation."

The EPA did the right thing by rejecting the petition to outlaw lead ammunition. But there's no guarantee that a future EPA will always have such good judgment concerning lead bans or shooting range closures. The federal environmental laws are very broadly written, and courts tend to be highly deferential to agency decisions.

Because administrative agencies usually try not to raise the ire of Congress, continuing to elect solid pro-rights, pro-sportsman majorities in Congress provides some protection against misuse of environmental laws to restrict Second Amendment rights. In the long term, the agenda for securing Second Amendment rights will have to include statutory changes in federal environmental laws and their many state counterparts. 🔴

---

*Frequent* America's 1st Freedom *contributor Dave Kopel was formerly a Colorado assistant attorney general responsible for enforcing hazardous waste laws. He is co-author of the book "RCRA Demystified: The Professional's Guide to Hazardous Waste Law."*

**JA 168**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
                                   )
THE TRUMPETER SWAN SOCIETY,        )
et. al                             )
                                   )
        Plaintiffs,                )
                                   )
     v.                            )
ENVIRONMENTAL PROTECTION AGENCY    )
and                                )
LISA P. JACKSON                    )
                                   ) Civil Action No. 12-929 (EGS)
        Defendants,                )
                                   )
     and                           )
                                   )
NATIONAL SHOOTING SPORTS           )
FOUNDATION, INC., ASSOCIATION      )
OF BATTERY RECYCLERS, INC.,        )
NATIONAL RIFLE ASSOCIATION OF      )
AMERICA, and SAFARI CLUB           )
INTERNATIONAL,                     )
                                   )
        Intervenor-Defendants.)
_____)
```

**ORDER**

For the reasons stated on the record during a hearing held on May 23, 2013, it is by the Court hereby

**ORDERED** that defendant's and defendant intervenors' motions to dismiss the amended complaint are hereby **GRANTED** and plaintiffs' amended complaint is hereby **DISMISSED.**

**SO ORDERED.**

```
Signed:   Emmet G. Sullivan
          United States District Judge
          July 22, 2013
```

**JA 169**

5

1          MR. SNARR:  Good afternoon, Your Honor.  My name
2     is Mike Snarr, and I represent the Association of Battery
3     Recyclers.
4          THE COURT:  All right.  Let me invite government
5     counsel to the microphone.
6          How do these folks get -- how do the plaintiffs
7     get this issue back before the agency?
8          MR. HEMINGER:  Your Honor, if you are referring to
9     the procedural history here, Your Honor decided that --
10         THE COURT:  I know what I decided.  Just answer my
11    question.
12         How do they get this -- the government is claiming
13    that this is a reconsideration of something that was
14    resolved by the court, and I am well aware of what I
15    resolved.  The question is, if they are not properly before
16    the agency now, how in the world do they ever properly get
17    before the agency again with this issue?  That is the
18    question.
19         MR. HEMINGER:  Your Honor, the hypothetical would
20    be circumstances that we do not have here.  So it would be a
21    situation where the Center had presented new evidence that
22    was non-cumulative, that was changed circumstances.  It
23    might be a situation where there are --
24         THE COURT:  So they are not forever barred from
25    getting this issue back before the agency?

9

1    we have here, so I think that the EPA would have to consider

2    that as an important factor, Your Honor.

3         THE COURT:  All right.  So then I assume that

4    the answer to my first question is that if the two

5    participants who participated in the previous litigation

6    withdrew, then the remaining parties would be properly

7    before the agency?

8         MR. KEATS:  Your Honor, that would be a different

9    case, and I am sorry that the agency would consider that as

10   a factor, and very well could end up considering the

11   substance.

12        THE COURT:  I'm just trying to determine how these

13   folks ever get their day before the agency.  All they want

14   is consideration by the agency.  I recognize the original

15   one was time-barred, and I said so, and that was not

16   challenged in this circuit.

17        I will ask that question also of plaintiffs when

18   it is their time.

19        Given the ambiguity in the statute, would it make

20   more sense for the -- would it be more prudent for the

21   agency to follow the plane letter of the law, which does not

22   provide for petition for reconsideration, and grant or deny

23   every petition that comes before the court?

24        I mean there is no standard for a petition for

25   reconsideration or even classifying of a request that is a

46

1          Thank you, Your Honor.

2          THE COURT:  I can't get you up to the podium.  All

3   right, nothing further?  Okay, let me take a 15 minute

4   recess.

5      **(Recess.)**

6          THE COURT:  All right, counsel, I am going issue

7   my ruling today.

8          On March 13, 2012, the plaintiffs, Trumpeter Swan

9   Society, the Cascades Raptor Center, the Center for

10  Biological Diversity, the Loon Lake Loon Association, the

11  Preserve Our Wildlife Organization, the Tennessee

12  Ornithological Society, and Western Nebraska Resources

13  Council, collectively referred to as the plaintiffs in this

14  ruling, along with 94 other organizations, submitted a

15  petition, and I will refer to it as the 2012 submission, to

16  the United States Environmental Protection Agency, and it

17  will be referred to either as EPA or agency, seeking the

18  regulation of lead bullets and shot pursuant to the Toxic

19  Substances Control Act, 15 U.S.C. Section 2601, et seq., and

20  I will refer to that as either TSCA or the act.

21          The EPA denied the petition in a letter dated

22  April 19 of last year on the grounds that it did not, quote:

23          "Consider the 2012 submission

24          to be a new petition cognizable

25          Under section 21."

1   End quote.

2          Instead, the EPA explained that it regarded the

3   2012 submission as a request for reconsideration of a

4   petition submitted by the Center for Biological Diversity

5   and two other organizations on August 3, 2010, which was

6   denied on August 27, of that year.

7          Plaintiffs filed this action on June 7, 2012, and

8   filed an amended complaint on July 10 -- strike that -- on

9   June 7, 2012, and filed an amended complaint on July 10,

10  2012 against Lisa P. Jackson, the administrator of the EPA,

11  acting in her official capacity, as well as the agency

12  itself, and I will collectively refer to the agency as the

13  federal defendants, challenging the EPA's denial of the

14  rulemaking petition and the agency's decision to treat the

15  March, 2012, petition as a petition for reconsideration

16  rather than as a new petition for rulemaking.

17         The National Shooting Sports Foundation, Inc.,

18  NSSF, the Association of Battery Recyclers, Inc., the ABR,

19  and the National Rifle Association and Safari Club

20  International, collectively NRA/SCI, were permitted to

21  intervene as defendants.

22         Pending before the court are the federal and

23  intervenor defendants' motions to dismiss the case.

24  Defendants argue that plaintiffs' amended complaint should

25  be dismissed one, for lack of subject matter jurisdiction

1    under Rule 12(b)(1) of the Federal Rules of Civil

2    Procedure; and two, for failure to state a claim under Rule

3    12(b)(6).

4         Upon consideration of the motions, the responses

5    and replies, the applicable law, and for the reasons that

6    will follow, the court will grant the motions to dismiss for

7    lack of jurisdiction under 12(b)(1).

8         The court therefore does not need to reach the

9    analysis under 12(b)(6) as to whether plaintiffs have failed

10   to state a claim that the EPA has the authority to regulate

11   lead shot and bullets.

12        Now insofar as the background is concerned, the

13   court will say the following:

14        On August 3, 2010, plaintiffs Center for

15   Biological Diversity, along with Project Guptile, and Public

16   Employees for Environmental Responsibility submitted a

17   rulemaking petition to the EPA entitled, and I quote:

18            "Petition to the Environmental

19            Protection Agency to ban lead

20            shot bullets and fishing sinkers

21            under the Toxic Substances

22            Control Act."

23   End quote, and in that regard see Center for Biological

24   Diversity versus Jackson, 815 Fed. Supp. 2nd, 85, my

25   decision of 2011.

 1          Citing the effect of lead on wildlife and the

 2   environment, plaintiffs' requested that the EPA prohibit the

 3   manufacture, processing and distribution of lead shot

 4   bullets and fishing sinkers.

 5          The agency denied the portion of the petition

 6   seeking regulation of lead shot and bullets by letter dated

 7   August 27, 2010, and subsequently published the reasons for

 8   the denial in the Federal Register on September 24, 2010.

 9          The EPA explained that it was denying that portion

10   of the petition because, quote:

11                "TSCA does not provide the

12                agency with authority to

13                address lead shot and bullets

14                due to the exclusion found

15                in TSCA Section 3(2)(B)(v)"

16   Which excludes from regulation by reference to Section 4181

17   of the Internal Revenue Code, quote:

18                "Pistols, revolvers, firearms

19                (other than pistols and

20                revolvers), shells and

21                cartridges."

22   End quote.

23          On November 4, 2010, the EPA sent plaintiffs a

24   second letter denying the portion of their petition seeking

25   regulation of fishing sinkers and published the reasons for

1    denial of that portion in the Federal Register on November

2    17, 2010.

3            Plaintiffs filed suit on November 23, 2010,

4    seeking de novo review of the final agency decision pursuant

5    to 15 U.S. Code, Section 2620(b)(4)(B).

6            EPA and defendant intervenor, NSSF, filed partial

7    motions to dismiss pursuant to Federal Rules of Civil

8    Procedure 12(b)(1) and 12(b)(6), arguing that the court

9    lacked jurisdiction because the plaintiffs had failed to

10   adhere to TSCA's 60-day statute of limitations.

11           According to defendant, the EPA's August 27, 2010

12   letter denying the portion of the petition regarding lead

13   shot and bullets was a formal denial, one that severed the

14   August, 2010, petition and triggered a separate statutory

15   period of limitations.  Because the letter was sent 88 days

16   before plaintiffs filed suit, defendants argued that

17   plaintiffs' suit was untimely.

18           After determining that the TSCA does not define

19   the term, quote, petition, end quote, the court found that

20   the agency's interpretation of Section 21 was persuasive

21   under the Skidmore standard.

22           The court held that TSCA's statute of limitations

23   was jurisdictional and upheld the agency's decision to sever

24   plaintiffs' rulemaking petitioner, and issued two separate

25   denials, thus triggering two separate 60-day periods within

1    which plaintiffs were required to bring an action in the

2    District Court.  On that basis, the court granted

3    defendants' motion to dismiss on September 29, 2011.

4           On March 13, 2012, CBD and Project Guptile, along

5    with 99 other entities, submitted a petition asking that

6    the, quote:

7           "EPA initiate rulemaking

8           for regulations that

9           adequately protect wildlife,

10          human health and the

11          environment against the

12          unreasonable risk of injury

13          from bullets and shot

14          containing lead used in

15          hunting and sports."

16   End quote -- on the basis that the lead in bullets and

17   shots, quote:

18          "Have the potential to cause

19          harmful lead exposure to

20          wildlife and humans."

21   End quote.

22          Specifically, plaintiffs requested that the EPA,

23   one, evaluate the risk of injury to the environment, human

24   health and wildlife from lead bullets and shotgun pellets

25   used in hunting and shooting sports, which have the

1    potential to cause harmful lead exposure.

2            And two, initiate a proceeding for the issuance of

3    rulemaking under Section 6(a) of TSCA to adequately protect

4    against such risks.

5            The 2012 submission specifically noted that it

6    differed, quote:

7            "Significantly from a 2010

8            petition seeking a complete

9            ban on all lead ammunition.

10           The current petition seeks

11           different relief under TSCA.

12           It is brought by a different

13           and much large group of

14           petitioners, and introduces

15           significant new information

16           regarding the toxic effects

17           of lead ammunition on wildlife

18           and human health."

19   End quote.

20           Moreover, the petitioners noted that the petition

21   included, quote:

22           "Significant new information

23           repudiating the EPA's conclusion

24           that TSCA does not provide

25           the agency with authority to

1            address lead shot and bullets."

2  End quote.

3            The EPA denied the 2012 submission by letter dated

4  April 9, 2012 because the agency found that the, quote:

5            "2012 submission was

6            substantially the same as

7            the petition to regulate

8            lead bullets and shots

9            submitted 2010."

10  End quote.

11            It did, quote:

12            "-- not consider the 2012

13            submission to be a new petitioner

14            cognizable under Section 21."

15  End quote.

16            In making this determination, the EPA discussed

17  the differences between the 2010 and the 2012 petitions, but

18  found them to be insubstantial.  The agency noted that,

19  quote:

20            "Even if the 2012 submission

21            were considered to be new or

22            different petition cognizable

23            under Section 21 of TSCA, EPA

24            would deny it for the same

25            reasons it denied the 2010

1          petition."

2  End quote.

3          Namely, that the agency did not have the

4  authority to regulate lead bullets and shot because of the

5  exception in the statute.  Because the EPA did not consider

6  the 2012 submission to be a cognizable petition, it

7  published its reason for denial on its website, not the

8  Federal Register.

9          Now with respect to the legal standards under Rule

10  12(b)(1), as we know, Federal District Courts are courts of

11  limited jurisdiction, and it is citing -- we are relying on

12  Kokkonen, K-O-K-K-O-N-E-N, versus Guardian Life Insurance

13  Company of America, 511 U.S. 375, 377, and a motion to

14  dismiss pursuant to 12(b)(1) presents the threshold

15  challenge to the jurisdiction of the court, relying on Hasse

16  versus Sessions, 835 Fed. 2nd, 902, 906.

17          When a motion to dismiss for lack of subject

18  matter jurisdiction under Rule 12(b)(1), the plaintiff

19  bears the burden of establishing that the court has

20  jurisdiction.  See Lujan versus Defenders of Wildlife,

21  504,U.S. 555, 561.

22          In evaluating the motion, the court must accept

23  all of the factual allegations in the complaint as true and

24  give the plaintiff the benefit of all inferences that can be

25  drawn from the facts alleged.  In that regard, see Thomas

1    versus Principi, 394 Fed. 3rd, 970, 972, from our D. C.

2    Circuit.

3            However, because subject matter jurisdiction is

4    an inquiry concerning the court's very power to hear the

5    claim, the court must get the plaintiffs' factual

6    allegations closer scrutiny when resolving a 12(b)(1) motion

7    than would be required for a 12(b)(6) motion, and in that

8    regard relying on -- the court relies on Macharia versus

9    United States, 334 Fed. 3rd, 61, 64, another D.C. Circuit

10   opinion.

11           In determining whether it has jurisdiction over a

12   particular, the court may consider materials outside the

13   pleadings where necessary to resolve disputed jurisdictional

14   facts, relying on Herbert versus National Academy of

15   Sciences, 974 Fed. 2nd, 192, 197.

16           And these are all D. C. Circuit opinions for the

17   most part.

18           When faced with motions to dismiss pursuant to

19   both  Rule 12(b)(1) and 12(b)(6), the court should first

20   consider the 12(b)(1) motion, because, quote:

21               "Once a court determines that

22               it lacks subject matter

23               jurisdiction, it can proceed

24               no further."

25   End quote, again relying on decisions from this court,

1  <u>Sledge versus United States</u>, 720 Fed. Supp. 2nd, 87, 91, and

2  quoting the <u>Simpkins</u> decision, 108 Fed. 3rd, 366.

3            When considering a challenge to an agency's

4  construction of a statute that it is employed with

5  administering, the court must apply the two-step standard

6  articulated in <u>Chevron U.S.A., Inc. versus NRDC</u>, 467 U.S.

7  837.

8            First, the court must assess, quote:

9            "Whether Congress has directly

10           spoken to the precise question

11           at issue."

12  End quote.  And that is the <u>Chevron</u> decision, 842.

13           To do so, courts use traditional -- strike that.

14           To do so courts, quote:

15           "Use traditional tools of

16           statutory construction to

17           determine whether Congress

18           has unambiguously expressed

19           its intent."

20  End quote, relying on <u>Serono Labs versus Shalala</u>, 158 Fed.

21  3rd, 1313, 1319, another circuit opinion quoting the <u>Chevron</u>

22  case.

23           This involves an examination of the text,

24  structure, purpose and legislative history of the statute.

25  In that regard see the <u>Shays</u> decision.  <u>Shays</u>, S-H-A-Y-S,

1    versus FEC, 414 Fed. 3rd, 76, another D.C. Circuit opinion,

2    and the Bell Atlantic Telephone Company versus FCC, another

3    circuit opinion from this circuit, 131 Fed. 3rd, 1044,

4    1047.

5           Quote:

6           "If the intent of Congress

7           is clear, that is end of the

8           matter, for the court, as

9           well as the agency, must

10          give effect to the unambiguously

11          expressed intent of Congress."

12   Again, relying on the Chevron decision.

13          If, however, quote:

14          "The statute is silent or

15          ambiguous with respect to the

16          specific issue --"

17   End quote, then the court must, quote:

18          "Determine the deference, if

19          any, it owes the agency's

20          interpretation of the statute."

21   End quote.   Again, a D.C. Circuit opinion, Mount Royal

22   Joint Venture versus Kempthorne, 477 Fed. 3rd, 745, 754,

23   relying on Supreme Court precedents in the Mead case, 533

24   U.S. 218.

25          In the second step of the Chevron analysis, the

```
 1  court will look to the interpretation of the statute
 2  proffered by the agency and decide whether the
 3  interpretation is, quote:
 4          "Based on a permissible
 5          construction of the statute."
 6  End quote.  Chevron at 843.
 7          At this stage the court must, quote:
 8          "Accord considerable weight."
 9  End quote, to the agency's construction of the statute.
10  Indeed, the court is, quote:
11          "Bound to uphold an agency
12          interpretation as long as it
13          is reasonable, regardless
14          whether there may be other
15          reasonable or even more
16          reasonable views."
17  Again, relying on the Serono decision.
18          As a general matter, quote:
19          "If the agency enunciates
20          its interpretation through
21          notice and comment rulemaking
22          or formal adjudication,
23          courts give and should give
24          the agency's interpretation
25          Chevron deference."
```

```
1   Again, relying on Mount Royal Joint Venture, 477 Fed. 3rd,
2   754.
3           However, if the agency's interpretation is in
4   something less than the formal notice and common procedure,
5   the court is obligated to accept its interpretation --
6   strike that.  Obligated to accept its, quote:
7           "Interpretation only if it
8           is persuasive."
9   End quote.  The Mount Royal Joint Venture case relying on --
10  or citing Mead.
11          Interpretations in such formats are, quote:
12  Entitled to respect, end quote, to the extent that they have
13  the, quote, power to persuade, again relying on Christensen
14  versus Harris City, 529 U.S. 576, 587, citing the Skidmore
15  case, 323 U.S. 134.
16          Whether the interpretation has such, quote:
17          "Power to persuade--"
18  End quote, is determined by the thoroughness of the agency's
19  consideration of the issue, the validity of its reasoning,
20  and its consistency with earlier pronouncements.  Again,
21  relying on Skidmore at 140.
22          An agency's interpretation, quote:
23          "May merit some deference
24          whenever --"
25  Strike that.
```

 1           An agency's interpretation, quote:

 2           "May merit some deference,

 3           whatever its form, given the

 4           specialized experience and

 5           broader investigations and

 6           information available to the

 7           agency, and given the value

 8           of uniformity and its

 9           administrative and judicial

10           understandings of what a

11           national law requires."

12   And that's from the Mead decision at 234.

13           Now here the defendants argued that plaintiffs are

14   attempting to circumvent the 60-day time limit set forth in

15   section 21 of TSCA, which this court has already determined

16   is jurisdictional.

17           Therefore, defendants contend that the court

18   lacks subject matter jurisdiction to entertain plaintiffs'

19   claims regarding their March 12 -- their March, 2012,

20   submission.

21           Defendants further argue that the EPA acted well

22   within its discretion to construe plaintiffs' March, 2012,

23   submission as a petition for reconsideration rather than as

24   a new petition for rulemaking.

25           According to the defendants, this Court's decision

1   in CBD versus Jackson is consistent with their

2   interpretation of the statute as the court there observed

3   that, quote:

4           "TSCA nowhere defines the term

5           petition."

6   And that's in this court's opinion at 815 Fed. Supp., 2nd at

7   92.

8           The court must begin its inquire with the plain

9   language of Section 21 of TSCA.  As the Supreme Court has

10  noted, if the plain language of the statute addresses,

11  quote:

12          "The precise question at issue"

13  end quote, then, quote:

14          "That is in the matter, for

15          the court, as well as the

16          agency must give effect to

17          the unambiguously expressed

18          intent of Congress."

19  End quote.  Chevron at 842, 43.

20          In order for a citizen to submit a petition

21  pursuant to the TSCA, the petition must be, quote:

22          "Filed in the principal office

23          of the administrator and shall

24          set forth the facts which it

25          is claimed established that

1              it is necessary to issue,

2              amend or repeal a rule under

3              the applicable provisions of

4              TSCA."

5    And that is the Federal statute, 15 U.S. Code, Section

6    2620(b)(1).

7              Within 90 days of the date of filing, quote:

8              "The administrator shall either

9              grant or deny the petition."

10   End quote.

11             If the petition is denied, and that is section

12   2620(b)(3).

13             If the petition is denied, the administrator must

14   publish the reasons for denial in the Federal Register.

15   Thereafter upon denial, quote:

16             "A petitioner may commence a

17             civil action in a District

18             Court of the United States

19             to compel the administrator to

20             to initiate the rulemaking

21             proceeding as requested in the

22             petition within 60 days after

23             the denial."

24   Again, 2620(b)(4)(A).

25             The courts review is de novo only if the petition

1   is for the issuance of a rule under the relevant portions of

2   TSCA, again citing the statute 2620(b)(4)(B).   Petitions to

3   amend or repeal a rule by contrast are subject to less,

4   quote:

5           "Less hospital treatment"

6   end quote, under the APA in a Federal Court of Appeals,

7   again relying on D. C. Circuit precedent in the case of

8   Environmental Defense Fund versus Reilly, 909 Fed. 2nd,

9   1497, 1503.

10          As the court indicated previously in CBD versus

11  Jackson, TSCA does not define, quote, petition, end quote,

12  nor does it define, quote, motion for reconsideration, end

13  quote.   The legislative history similarly provides little

14  guidance on how the agency is to treat similar petitions for

15  rulemaking made by some of the same parties.

16          The EPA has apparently determined that plaintiffs'

17  March, 2012, submission asks the agency to reconsider its

18  decision, not to initiate rulemaking 2010.   Plaintiffs argue

19  to the contrary that they were making a separate request for

20  new rulemaking on the basis of new information as well as

21  legislative history.

22          Moreover, they argue that the plain language of

23  Section 21 is clear:   if the correct prerequisites of 15

24  U.S. Code Section 2620(b)(1) are met, the agency only has

25  two options to, quote:

1          "Either grant or deny the

2          petition."

3    End quote.  Again, relying on the federal statute,

4    2620(b)(3).

5          Plaintiffs contend that if the agency determines

6    that, quote:

7          "A petition is identical to a

8          previously submitted and

9          rejected petition, it should

10         deny the petition and publish

11         that reason for its denial in

12         the Federal Registry."

13   End quote.

14         Congress has not spoken on the issue of when the

15   EPA may determine that a petition pursuant to Section 21 of

16   TSCA is a petition for reconsideration rather than a new

17   petition.  However, in discussing the purpose of the citizen

18   petition provision, the House Committee noted that de novo

19   review is only available with respect to agency denials of

20   petitions for new rulemaking and not, quote:

21         "With respect to civil actions

22         respecting petitions for

23         amendment or repeal of rules."

24         According to the Senate Committee, such

25   differential treatment is warranted because, quote:

1           "In a judicial review of the

2           agency's denial of a citizen's

3           petition or failure to act,

4           there would be no record upon

5           which the agency could be

6           based, and therefore a de novo

7           procedure is essential to

8           provide the opportunity to

9           develop such a record."

10   End quote.

11          That concern is absent when the court considers a

12   petition to amend or repeal an existing rule.  Presumably,

13   with respect to a petition for reconsideration, the

14   reviewing court could similarly review the record from the

15   agency's denial or failure to act on the original petition.

16          Because neither the statute nor the legislative

17   history specifically discuss a petition for reconsideration

18   or the agency's options if certain parties file multiple

19   citizen petitions that seek similar relief, the court finds

20   that the text of the statute and the legislative history is

21   ambiguous.

22          Because the plain meaning of TSCA is ambiguous,

23   the court must next determine what, if any, deference it

24   should give to the EPA's interpretation of the statute.  In

25   that regard for guidance see the Mount Royal Joint Venture

1  case, 477 Fed. 3rd, at 754.

2      Plaintiffs and the EPA differ as to whether the

3  court should apply Chevron or Skidmore deference to the

4  agency's decision to treat plaintiffs' 2012 submission as a

5  petition for reconsideration.

6      The EPA argues that the court should apply Chevron

7  even though its decision was contained in a letter.

8  Plaintiffs argue to the contrary, because the EPA's decision

9  was not articulated through formal notice and comment

10 rulemaking, it should be afforded Skidmore deference and be

11 assessed on the basis of whether it has the, quote:

12      "Power to persuade."

13 End quote.

14      While the Supreme Court has held that an agency

15 interpretation embodied in something less formal than notice

16 and comment rulemaking can warrant Chevron deference in

17 certain circumstances, in that regard see Barnhart versus

18 Walton, 535 U.S. 212, the court need not reach the question,

19 because the EPA's interpretation is persuasive under either

20 standard.

21      Here, the EPA chose to treat plaintiffs' 2012

22 submission as a petition for reconsideration rather than as

23 a cognizable petition because of numerous similarities to

24 the 2010 petition.

25      Defendants argue that this decision was well

1   reasoned and based on a number of factors:

2           One, the essentially identical exposure and

3   toxicity information presented in the two petitions.

4           Two, the 2012 submission presented little new

5   information.  Of the over 400 citations, only 20 were not

6   included in the 2010 petition, and only six postdated it.

7           Three, the legal conclusions in the two positions

8   were the same.

9           Four, the 2012 submission cited to the legislative

10  history of the TSCA, which the EPA considered in denying the

11  2010 petition.

12          Five, the relief requested in the 2012 submission

13  was an open ended request for a Section 6(a) rule regarding

14  -- strike that -- for a Section 6(a) rule regulating lead

15  shot and bullets, not the complete prohibition requested in

16  the 2010 petition, but plaintiffs continued to advocate for

17  a nationwide ban.

18          Defendants contend that these conclusions, quote:

19          "Could only be arrived at

20          by close review and comparison

21          of the two petitions -- strike

22          that."

23          Defendants contend that these conclusions, quote:

24          "Could only be arrived at

25          by a close review and

```
 1          comparison."
 2  End quote, of the two petitions, and thus are evidence that,
 3  quote:
 4          "The agency clearly did not
 5          reject the 2012 submission
 6          out of hand."
 7  End quote.
 8          Moreover, according to the defendants, plaintiffs'
 9  2012 submission was an attempt to circumvent the
10  jurisdictional requirements of Section 21, the court cannot
11  let stand.  If the court were to accept plaintiffs' reading
12  of the statute, the EPA claims that, quote:
13          "The exact same parties
14          could file a submission
15          exactly the same as the
16          previous petition, and EPA
17          would be forced to treat
18          it as a new petition,
19          once again subject to
20          judicial review under
21          Section 21, even if the
22          agency's denial of the
23          previous petition has not
24          been timely challenged."
25  End quote.
```

1          The agency further argues that its decision is

2     consistent with the statutory scheme, which does not provide

3     for de novo review of petitions to amend or repeal an

4     existing rule.   Indeed, when discussing the statute, the

5     House Conference specifically indicated it that did not,

6     quote:

7                    "Intend for the administrator

8                    to be subjected to constant

9                    petitions challenging rules

10                   or orders for which adequate

11                   judicial review is provided

12                   under Section 19."

13    End quote, which allows for challenges to rulemaking

14    initiated by the agency, and are thus reviewed under the

15    less rigorous standard of the APA.

16          Defendants claim that all of this supports the

17    agency's interpretation of Section 21, and that this

18    interpretation is reasonable under either Chevron or

19    Skidmore.

20          Defendants acknowledge that there is very little

21    precedent to support their position.   However they cite an

22    unpublished 1990 decision, Walker versus EPA, No. H-87-3552.

23    It is a slip opinion from the Southern District of Texas

24    issued October 15, 1990.   The government relies -- or the

25    cite says, instructive.

1          Now in <u>Walker</u> the plaintiff submitted a petition

2     to amend an existing rule to the EPA on March 27, 1987,

3     which was denied on June 24 of that year.  Plaintiff did not

4     file suit ion a District Court within 60 days as required by

5     Section 21, and instead filed a second petition requesting

6     an identical rule change on July 31, 1987.

7          The EPA sent plaintiff a letter on September 11,

8     1987, and explained that because of the identical nature of

9     the rulemaking request, it considered the July submission to

10    be a refiling of the March petition.

11         Plaintiff filed suit arguing that the July

12    submission was, quote:

13              "A separate and distinct

14              petition that must be

15              accepted or denied pursuant

16              to Section 2620."

17    End quote.

18         In ruling for the agency, the court noted, as this

19    court also has, that the TSCA does not define petition, and

20    articulate or four factors that a court should consider in

21    determining, quote:

22              "Whether a subsequent

23              submission is sufficiently

24              different from another to

25              qualify as a separate

1          petition."

2    End quote.

3          One, the relief requested.

4          Two, the identity of the parties.

5          Three, the temporal relationship between the

6    submissions.

7          And four, the new information presented, if any.

8          Based on these factors, the court upheld the EPA's

9    decision not to treat the July submission as a cognizable

10   petition.

11         Though the petition at issue in Walker was one to

12   amend an existing rule and therefore subject to the

13   arbitrary and capricious standard of review under APA, the

14   four-part test articulated in that case presents a useful

15   framework for determining whether the EPA's decision in the

16   instant matter is persuasive under Skidmore.

17         Therefore, applying Walker, the court finds that

18   the EPA's decision to treat the 2012 submission as a

19   petition for reconsideration was persuasive under Skidmore.

20         The agency determined that the relief requested in

21   the two petitions was nearly identical and contained little

22   new information.  Moreover, the 2012 submission was filed

23   approximately 6 months after this court granted partial

24   motions to dismiss in CBD versus Jackson.

25         Though plaintiffs argue that the EPA's decision to

1    treat the 2012 submission as a petition for reconsideration

2    is inconsistent with the EPA's decision to treat as

3    cognizable a third petition to amend filed in the Walker

4    matter four months after the unpublished Walker decision was

5    issued, the circumstances of the Walker case were entirely

6    different.

7         While the plaintiff in Walker filed a third

8    petition four months after the court's unpublished decision,

9    that was over three years after the challenged second

10   petition was submitted and ultimately denied.

11        The only factor that weighs in favor of

12   plaintiffs' position is the second Walker factor regarding

13   the identity of the parties.  Plaintiffs' 2012 submission

14   was submitted by 101 parties.  The 2010 petition was

15   submitted by five, and only two signed on to both petitions,

16   CBD and Project Guptile.  However, defendants argue that

17   plaintiffs' insistence on the new parties to the 2012

18   submission is a ruse.

19        The salient issue is not how many parties have

20   been added but rather which parties remain the same.

21   Defendants point to the fact that CBD was the lead party on

22   the 2010 petition and subsequent litigation, and it is lead

23   party in this litigation as well.

24        This, according to defendants, is fatal to

25   plaintiffs' claims that the 2012 submission was a cognizable

1  petition in its own right, rather than a barely disguised

2  attempt to circumvent the jurisdictional requirements of

3  that prevented judicial review of the 2010 petition.

4         The court agrees.  A contrary holding recognizing

5  plaintiffs' argument, would, quote:

6              "Render the statute of

7              limitations in Section 21

8              meaningless."

9  End quote, and would permit, quote:

10             "A plaintiff to circumvent

11             the limitations period by

12             submitting a repetitive

13             request for identical

14             action on the identical

15             issue long after the time

16             period has expired."

17 That is what the Walker court recognized in its slip opinion

18 at page 3.

19        Now whether an agency's interpretation of a

20 statute is persuasive depends on the thoroughness evident in

21 its consideration of the issue, the validity of its

22 reasoning, and its own internal consistency with earlier

23 pronouncements, relying on the Skidmore case at 140.

24        Applying this standard, the court concludes that

25 the EPA did thoroughly consider how to address plaintiffs'

1  2012 submission and that the agency's reasoning was sound.

2  In making its determination, the EPA assessed the

3  differences and similarities between the two petitions and

4  concluded that, quote:

5          "To the extent that there

6          are differences between the

7          two, they are not substantive."

8  End quote.

9          It also based its decision on a determination that

10 the substantive factors underlying the denial of the 2010

11 petition would result in the denial of the 2012 submission

12 even if it were considered as a petition cognizable under

13 Section 21 of TSCA.

14         As the decision in Walker makes clear, the EPA has

15 treated successive petitions in this manner before.  That it

16 has also reached a contrary conclusion in other situations

17 as plaintiffs argued does not dictate the results here.  The

18 court agrees with the agency that, quote:

19         "Just as the EPA has the

20         discretion to consider

21         a submission not to be a

22         new section 21 petition

23         where it duplicates a

24         previously filed petition,

25         so too may the agency

1            decide that a second or

2            third submission should

3            be addressed on its merits

4            as an independent petition."

5   End quote.

6            The only case that plaintiffs cite in support of

7   their argument, Citizens for a <u>Better Environment versus</u>

8   <u>Reilly</u>, is inapplicable -- is not applicable to this case

9   because the success of petitions at issue there requested

10  rulemaking under different sections of TSCA, and requested

11  different, not just more specific relief, and that is

12  addressed at pages 1 to 3 of that decision.  It is a

13  Northern District of Illinois District Court decision issued

14  May 29, 1991.

15           Indeed, all of the examples cited by plaintiffs

16  are inapposite, because for each example the EPA first

17  determined that it had jurisdiction to consider the issue.

18  Here, in this case, the EPA has determined that it does not

19  have jurisdiction to regulate lead in bullets and shot

20  because of TSCA's exemption of shells and cartridges from

21  the definition of a, quote: chemical substance, end quote,

22  and as the Supreme Court held this week in the <u>City of</u>

23  <u>Arlington Texas, et al, versus the Federal Communications</u>

24  <u>Commission</u>, an agency's determination of the limits of its

25  jurisdiction is entitled to <u>Chevron</u> deference.

1          Plaintiffs argue that the EPA can only grant or

2    deny any submission and that it does not have the discretion

3    to classify a submission as a motion for reconsideration.

4    They also submit that in assessing whether the 2012

5    submission presented any, quote:

6               "Newly discovered, noncomulative

7               material"

8    End quote, the quote:

9               "EPA applied a standard in

10              excess of that established

11              by TSCA."

12   End quote.

13         Further, plaintiffs argue that citations to the

14   legislative history in its 2012 submission constituted new

15   information.  However, the legislative history of TSCA is

16   over 30 years old and cannot hardly be considered new.

17         Moreover, plaintiffs do not explain what the

18   standard of the TSCA is how the EPA exceeded it, and note

19   only that requiring new information is the standard for a

20   petition to repeal or amend it.

21         However, given that a motion for reconsideration

22   is more likely a petition to amend or repeal than a new

23   petition for rulemaking, the court finds that the EPA's

24   decision to employ the standard for a motion to amend or

25   repeal is persuasive and not inconsistent with the standards

1   set forth in the Walker decision.

2          And finally, the court also notes that an agency,

3   quote:

4              "Has broad discretion to

5              determine when and how to

6              hear and decide matters

7              that come before it."

8   End quote, relying upon precedent of long-standing, the

9   Tennessee Valley Municipal Gas Association versus Federal

10  Energy Regulation Commission decision, 140 Fed. 3rd, 1085,

11  yet another D.C. Circuit opinion at 1088.

12         The EPA has expertise in deciding TSCA petitions,

13  and the court defers in this case to the agency's

14  determination that a particular petition is not cognizable

15  under section 21.

16         Because the EPA's determination that the 2012

17  submission was a petition for reconsideration rather than a

18  petition for rulemaking cognizable under Section 21 was

19  persuasive under Skidmore, the court grants defendants'

20  motion to dismiss.

21         And that is all I have to say.  I will issue an

22  appropriate order.  That is the court's opinion.  The court

23  is not going to issue a written opinion.  That is it.  I

24  will issue an appropriate order essentially dismissing the

25  complaint for the reasons stated during this session.

1          That is all I have to say.  Thank you.  Have a

2   wonderful weekend.

3          Anything further before I leave?

4          MR. KEATS:  No, Your Honor.

5          MR. HEMINGER:  No, Your Honor.

6          THE COURT:  Enjoy your weekend.  Thank you.

7       **(Whereupon, the proceedings were adjourned.)**

8                      - - - - -

9               CERTIFICATE OF COURT REPORTER

10      I certify that the foregoing is a correct transcript of

11   the proceedings in the above-captioned case.

12

13                    _____

14                    SUSAN PAGE TYNER, CVR-CM

15                    OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25

1          That is all I have to say.  Thank you.  Have a

2   wonderful weekend.

3          Anything further before I leave?

4          MR. KEATS:  No, Your Honor.

5          MR. HEMINGER:  No, Your Honor.

6          THE COURT:  Enjoy your weekend.  Thank you.

7          **(Whereupon, the proceedings were adjourned.)**

8                    - - - - -

9                CERTIFICATE OF COURT REPORTER

10      I certify that the foregoing is a correct transcript of

11  the proceedings in the above-captioned case.

12

13

14            SUSAN PAGE TYNER, CVR-CM

15            OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 25, 2014, I electronically transmitted the documents described below to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to CM/ECF registrants listed below.

**Joint Appendix**

**For Appellees Environmental Protection Agency and Lisa P. Jackson:**
Jennifer Scheller Neumann            John David Gunter, II
Jennifer.neumann@usdoj.gov       David.Gunter2@usdoj.gov
efile_app.enrd@usdoj.gov             efile_eds.enrd@usdoj.gov

**For Appellees National Shooting Sports Foundation, Inc.:**
Roger R. Martella, Jr.                    Christopher L. Bell
rmartella@sidley.com                   cbell@sidley.com

**For Appellees American Battery Recyclers:**
Michael Steven Snarr                    Robert N. Steinwurtzel
msnarr@bakerlaw.com                 rsteinwurtzel@bakerlaw.com

**For Appellees Safari Club International and National Rifle Association, Inc.**
Anna Margo Seidman
aseidman@safariclub.org


DATED: March 25, 2014        BY: ___/s/_____
                                                      Adam Keats