ORAL ARGUMENT NOT YET SCHEDULED

Case No. 13-5228

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

THE TRUMPETER SWAN SOCIETY, et al.
Appellants

v.

ENVIRONMENTAL PROTECTION AGENCY, et al
Appellees

and

NATIONAL SHOOTING SPORTS FOUNDATION, INC.,
ASSOCIATION OF BATTERY RECYCLERS, INC.,
NATIONAL RIFLE ASSOCIATION OF AMERICA, and
SAFARI CLUB INTERNATIONAL

Intervenor-Appellees

Appeal From The U.S. District Court For The District Of Columbia,
No. 1:12c.929
(Hon. Emmet G. Sullivan)

FINAL JOINT BRIEF OF INTERVENOR-APPELLEES
NATIONAL SHOOTING SPORTS FOUNDATION, INC.,
ASSOCIATION OF BATTERY RECYCLERS, INC.,
SAFARI CLUB INTERNATIONAL, AND
NATIONAL RIFLE ASSOCIATION OF AMERICA

*Counsel for parties listed inside cover.*

Robert N. Steinwurtzel
Michael Steven Snarr
Thomas Edward Hogan
Baker & Hostetler LLP
1050 Connecticut Avenue NW
Suite 1100
Washington, DC 20036
202-861-1500
rsteinwurtzel@bakerlaw.com
thogan@bakerlaw.com
msnarr@bakerlaw.com

*Attorneys for Intervenor-Appellee*
*Association of Battery Recyclers, Inc.*

Christopher L. Bell
Greenberg Traurig LLP
1000 Louisiana Street, Suite 1700
Houston, TX 77002
(713)374-3556
bellc@gtlaw.com

*Attorney for Intervenor-Appellee*
*National Shooting Sports Foundation,*
*Inc.*

*Of Counsel*
Lawrence G. Keane
General Counsel
National Shooting Sports Foundation
11 Mile High Road
Newton, CT 06470-2359
(203)426-1320

Anna M. Seidman
Safari Club International
501 2nd Street NE
Washington, DC 20002
202-543-8733
aseidman@safariclub.org

*Attorney for Intervenor-Appellee*
*Safari Club International*

Christopher A. Conte
National Rifle Association
11250 Waples Mill Road, Suite 5N
Fairfax, VA 22030
703-267-1166
cconte@nrahq.org

*Attorney for Intervenor-Appellee*
*National Rifle Association*

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES, AND CORPORATE DISCLOSURE STATEMENTS

Pursuant to FED. R. APP. P. 26.1 and D.C. CIRCUIT RULES 26.1 and 28(a)(1), Intervenors hereby certify as follows:

### 1.    Parties

The Trumpeter Swan Society, Cascades Raptor Center, Center for Biological Diversity, Loon Lake Loon Association, Preserve Our Wildlife Organization, Tennessee Ornithological Society, and Western Nebraska Resources Council were plaintiffs before the district court and appear as appellants before this court.

United States Environmental Protection Agency ("EPA") and the EPA Administrator Lisa P. Jackson (now Regina McCarthy) were defendants before the district court and appear as appellees before this court.

National Shooting Sports Foundation, Inc., Association of Battery Recyclers, Inc., National Rifle Association of America, and Safari Club International were intervenor-defendants before the district court and appear as intervenor-appellees before this court.

### 2.    Ruling Under Review

The ruling under review is the July 22, 2013 order of the District Court for the District of Columbia (Sullivan, J.) in Civil Action No. 12-929 (EGS), granting

Defendants' and Intervenor-Defendants' motions to dismiss Plaintiffs' amended complaint. JA169.

### 3.  Related Cases

Undersigned counsel is not aware of any related cases pending in this court or any other court. This matter is related to a case that has been dismissed and is not pending titled *Center for Biological Diversity v. Jackson*, 815 F. Supp. 2d 85 (D.D.C. 2011).

### 4.  Corporate Disclosure Statements

The National Shooting Sports Foundation, Inc. ("NSSF") is a Connecticut non-profit tax-exempt corporation with a membership of more than 6,000 federally-licensed firearms manufacturers, distributors, and retailers; companies manufacturing, distributing, and selling shooting and hunting-related goods and services; sportsmen's organizations; public and private shooting ranges; gun clubs; publishers; and individual recreational target shooters and hunters. NSSF's mission is to promote, protect and preserve hunting and the shooting sports, and support America's traditional hunting heritage and firearms freedoms. NSSF is a "trade association" within the meaning of Circuit Rule 26.1(b). It has no parent corporation, and no publicly held company owns a 10% or greater interest in NSSF.

Safari Club International ("SCI") is a non-profit corporation incorporated in the State of Arizona, operating under § 501(c)(4) of the Internal Revenue Code, with principal offices and place of business in Tucson, Arizona. Its membership includes approximately 50,000 individuals from the United States and many of the countries around the world. Its missions are the conservation of wildlife, protection of the hunter, and education of the public concerning hunting and its use as a conservation tool. SCI's advocacy and conservation interests focus on the concept of "sustainable use" of wildlife. "Sustainable use" recognizes that the utilization of wildlife often produces benefits that provide incentives for conservation. Well-managed hunting has been a valuable tool in conservation and protection of many game species and associated habitats and biodiversity. SCI has no parent corporation and no publicly held company owns a 10% or greater interest in SCI.

The Association of Battery Recyclers, Inc. ("ABR") is a non-profit trade association of companies that are involved in recycling lead-acid batteries and other lead bearing materials. Members of the ABR include companies that own and/or operate battery manufacturers, lead chemical manufacturers, secondary lead smelters, lead fabricators, and consultants and vendors to the lead recycling industry. ABR has no parent company, subsidiary, or affiliate that has issued shares or debt securities to the public.

The National Rifle Association of America (NRA) is a not-for-profit membership organization that was incorporated in New York in 1871, with its principal offices in Fairfax, Virginia.  The founders of the NRA desired to create an organization dedicated to marksmanship, or in the parlance of the time, to promote and encourage rifle shooting on a scientific basis.  Today the NRA has over five million members and promotes recreational and competitive shooting programs across the country for civilians and law enforcement.  In addition, one of the NRA's key functions is to preserve the tradition of hunting by protecting it from unreasonable and unnecessary restrictions.  Article II, Section 5 of the NRA Bylaws states that the NRA is "[t]o promote hunter safety, and to promote and defend hunting as a shooting sport and as a viable and necessary method of fostering the propagation, growth and conservation, and wise use of our renewable wildlife resources."  NRA has no parent corporation and no publicly held company owns a 10% or greater interest in NRA.

# TABLE OF CONTENTS

Table Of Authorities ................................................................. iii

Glossary ................................................................................. vii

Statement Of Issues ................................................................. 1

Statute And Regulations ........................................................... 2

Statement Of Facts ................................................................... 3

Introduction And Summary Of Argument ................................... 6

Argument ................................................................................. 7

    I.    Statutory And Factual Background ................................... 7

        A.    Overview Of Domestic Ammunition Manufacturing ............... 7

        B.    The Limited Jurisdiction Of The Toxic Substances Control Act ................................................................. 8

        C.    TSCA Section 21 Petition Process ........................................... 9

        D.    The Use Of FAET Funds For Wildlife Conservation ............ 10

    II.    EPA Properly Exercised Its Discretion When It Determined That Appellants' 2012 Submission Was Not A New Petition Under Section Of TSCA ................................................................. 12

        A.    EPA Must Have Discretion To Determine What Constitutes A TSCA § 21 Petition ......................................... 14

        B.    EPA Reasonably Exercised Its Discretion In Rejecting The 2012 Submission ............................................... 15

            1. The Submissions Concern The Same Subject Matter ....... 17

            2. Appellants Did Not Seek Different Relief ........................ 17

            3. The Identity Of The Essential Parties Is The Same .......... 18

            4. The 2012 Submission Did Not Present Significant or Relevant New Information ............................................... 20

            5. Temporal Relationship Between Submissions ................. 21

III.   EPA Correctly Concluded That It Does Not Have TSCA
Jurisdiction To Regulate Ammunition ............................................. 21

     A.    Congress Expressly Excluded Cartridges And Shells
From The Jurisdiction Of TSCA ............................................ 22

     B.    EPA's Conclusion That It Does Not Have The Authority
To Regulate Ammunition Under TSCA Is A Reasonable
Interpretation Of Its Jurisdiction Under The Statute ............. 26

     C.    The Legislative History Is Clear That Congress Did Not
Intend To Allow EPA To Regulate Traditional
Ammunition .......................................................................... 28

     D.    CBD's Reading Of TSCA Is Unreasonable ........................... 33

     E.    Appellants' Reading Of The FAET Is Unreasonable ............ 34

Conclusion ....................................................................................... 37

Certificate Of Compliance ................................................................ 39

Certificate Of Service ....................................................................... 40

# TABLE OF AUTHORITIES

**Cases**

*Cargill, Inc. v. United States,*
   173 F.3d 323 (5th Cir. 1999) ............................................................... 13

*Center for Biological Diversity v. Jackson*,
   815 F. Supp. 2d 85 (D.D.C. 2011) ........................................... 4, 3, 12

\*  *Chevron v. NRDC*,
   467 U.S. 837 (1984) ............................................................. 12, 26, 27

\*  *City of Arlington v. FCC*,
   133 S. Ct. 1863 (2013) ............................................................ 22, 27

*Comm. for Hand Gun Control, Inc. v. Consumer Prod.*
   *Safety Comm'n*, 388 F. Supp. 216 (D.D.C. 1974) ............................ 31

*Consumer Elecs. Ass'n v. FCC*,
   347 F.3d 291 (D.C. Cir. 2003) ............................................................ 26

*Demby v. Schweiker*,
   671 F.2d 507 (D.C. Cir. 1981) ............................................................ 29

*Dept. of Health and Welfare v. Block,*
   784 F.2d 895 (9th Cir. 1986) ............................................................ 29

*Envtl. Def. Fund v. Reilly*,
   909 F.2d 1497 (D.C. Cir. 1990) ........................................................... 8

*Envtl. Def. Fund v. Thomas*,
   657 F. Supp. 302 (D.D.C. 1987) ....................................................... 16

*Flatow v. Islamic Republic of Iran*,
   201 F.R.D. 5 (D.D.C. 2001) ............................................................. 34

\*  Authorities upon which we chiefly rely are marked with asterisks.

*HUD v. Rucker*,
    535 U.S. 125 (2002) ................................................................. 26

*In re Telxon Corp. Sec. Litig.*,
    67 F. Supp. 2d 803 (N.D. Ohio. 1999) ................................. 29

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................. 13

*Miller v. United States*,
    531 F.2d 510 (Ct. Cl. 1976) ................................................... 13

*Mobil Oil Exploration & Producing Southeast Inc.
    v. United Distribution Cos.*, 498 U.S. 211 (1991) ............... 14

*Northwest Forest Res. Council v. Glickman*,
    82 F.3d 825 (9th Cir. 1996) ................................................... 29

\* *Pharm. Research and Mfrs. of Am. v. Thompson*,
    362 F.3d 817 (D.C. Cir. 2004) ......................................... 12, 14

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) ................................................................. 13

*Udall v. States of Wisc., Colo., and Minn.*,
    306 F.2d 790 (D.C. Cir. 1962) ............................................... 10

*W. Fuels-Utah, Inc. v. Fed. Mine Safety & Health
    Review Comm'n*, 870 F.2d 711 (D.C. Cir. 1989) ............... 26

\* *Walker v. EPA*,
    802 F. Supp. 1568 (S.D. Tex. 1992) ..................................... 16

*Williams Cos. v. FERC*, 345 F.3d 910 (D.C. Cir. 2003) ....................... 26

**Statutes**

15 U.S.C. § 2052(a)(5) ............................................................................. 31

15 U.S.C. § 2052(a)(5)(E) ........................................................................ 30

\* 15 U.S.C. §§ 2601-2629 ........................................................................ vii

15 U.S.C. § 2602(2)(A) ......................................................................... 8

15 U.S.C. § 2602(2)(B)(i) ...................................................................... 8

15 U.S.C. § 2602(2)(B)(ii) ..................................................................... 8

15 U.S.C. § 2602(2)(B)(iii) .................................................................... 8

15 U.S.C. § 2602(2)(B)(iv) .................................................................... 8

15 U.S.C. § 2602(2)(B)(v) ........................................................... 6, 9, 22

15 U.S.C. § 2602(2)(B)(vi) .................................................................... 8

15 U.S.C. § 2605(a) ............................................................................... 8

15 U.S.C. § 2620 ................................................................................ 1, 9

15 U.S.C. § 2620(b)(3) .......................................................................... 9

15 U.S.C. § 2620(b)(4)(A) .................................................................. 3, 9

15 U.S.C. § 2620(b)(4)(B)(ii) .............................................................. 10

16 U.S.C. § 669b(a)(1) ........................................................................ 10

16 U.S.C. § 669b(c)(2) ........................................................................ 10

16 U.S.C. § 669b(c)(3) ........................................................................ 10

16 U.S.C. §§ 669-669i ................................................................. vii, 10

26 U.S.C. § 4181 ........................................................................... 9, 22

## Other Authorities

Dennis B. Wilson, *What You Can't Have Won't Hurt You! The Real Safety Objective of the Firearms Safety and Consumer Protection Act*, 53 CLEV. ST. L. REV. 225 (2006) ................................................................................ 31

H.R. REP. NO. 94-1341 (1976), *reprinted in* 5 Environmental and Natural Resources Policy Division, Library of Congress, *Legislative History of the Toxic Substances Control Act* (1976) ............................................... 28, 32

H.R. Rep. No. 94-1679 (1976), *reprinted in* 5 Environmental and Natural
  Resources Policy Division, Library of Congress, *Legislative History of the Toxic
  Substances Act* (1976)............................................................................... 29

Merriam-Webster. *available at* http://www.merriam-webster.com/dictionary/.... 23

The United States Department Of The Interior, Fish And Wildlife
  Service, Budget Justifications And Performance Information, Fiscal
  Year 2011 ........................................................................................ 11

The United States Department Of The Interior, Fish And Wildlife
  Service, Budget Justifications And Performance Information, Fiscal
  Year 2013 .............................................................................. vii, 11, 12

Webster's Third New International Dictionary of the English Language
  (1993) ............................................................................................ 23

**Rules**

Rev. Rul. 68-463, 1968-2 C.B. 507 ..................................................... 36

**Regulations**

27 C.F.R. § 53.11 .......................................................................... 22, 27

27 C.F.R. § 53.61(b)(2)......................................................................... 28

75 Fed. Reg. 58,377 (Sept. 24, 2010) ....................................... vii, 3, 27

# GLOSSARY

"2010 Petition" means the August 3, 2010 TSCA Section 21 petition, 75 Fed. Reg. 58377 (Sept. 24, 2010).

"2012 Submission" means the second submission filed March 13, 2012 by CBD, along with 100 other organizations, to EPA.

"2013 Budget" means THE UNITED STATES DEPARTMENT OF THE INTERIOR BUDGET JUSTIFICATIONS AND PERFORMANCE INFORMATION FISCAL YEAR 2013.

"ATTTB" means the Alcohol and Tobacco Tax and Trade Bureau in the United States Department of the Treasury.

"CBD" means the Center for Biological Diversity.

"CPSA" means the Consumer Protection Safety Act.

"CPSC" means the Consumer Protection Safety Commission.

"EPA" means the United States Environmental Protection Agency.

"FAET" means Section 4181 of the IRS Code, also known as the firearms and ammunition excise tax.

"FWS" means the Fish and Wildlife Service.

"IRS" means the Internal Revenue Service.

"PR Act" means the Federal Aid in Wildlife Restoration Act (16 U.S.C. §§ 669-669i; 50 Stat. 917) of September 2, 1937, also known as the Pittman-Robertson Act.

"TSCA" means the Toxic Substances Control Act, 15 U.S.C. §§ 2601-2629.

"Wildlife Restoration Act" means the Federal Aid in Wildlife Restoration Act (16 U.S.C. §§ 669-669i; 50 Stat. 917) of September 2, 1937, also known as the Pittman-Robertson Act.

## <u>STATEMENT OF ISSUES</u>

1.      Whether EPA properly exercised its discretion when it determined that a submission to EPA that was almost identical to a petition for a rulemaking under Section 21 of the Toxic Substances Control Act ("TSCA") that EPA had recently denied did not have to be treated as a new TSCA § 21 petition.

2.      Alternatively, whether EPA properly concluded that it did not have jurisdiction under TSCA to regulate cartridges and shells containing lead bullets and shot.

## STATUTE AND REGULATIONS

The pertinent statute and regulations are set forth in the Addenda to the Opening Briefs of the Appellants and Appellees.

On August 3, 2010, Appellant Center for Biological Diversity ("CBD"), along with several other organizations, petitioned EPA under Section 21 of the Toxic Substances Control Act ("TSCA"), demanding that EPA prohibit the manufacture, processing, and distribution in commerce of lead shot, bullets, and fishing sinkers. 75 Fed. Reg. 58,377 (Sept. 24, 2010) (the "*2010 Petition*"). On August 27, 2010, EPA denied the portion of the petition seeking to ban lead in cartridges and shells (i.e., ammunition) on the grounds the Agency did not have the legal authority to regulate ammunition under TSCA. 75 Fed. Reg. at 58,378. CBD challenged EPA's denial of the *2010 Petition* in the Federal District Court for the District of Columbia on November 23, 2010, eighty-eight days after EPA's denial.

On September 29, 2011, the District Court dismissed CBD's challenge because it was filed after TSCA's 60-day statute of limitations set forth in 15 U.S.C. § 2620(b)(4)(A). *Center for Biological Diversity v. Jackson*, 815 F. Supp. 2d 85 (D.D.C. 2011) ("*CBD I*"). Judge Sullivan held that the 60-day limitations period was jurisdictional, that EPA's interpretation of what constituted a "petition" was due deference, and that EPA had "broad discretion" to determine how to address TSCA § 21 petitions. 815 F. Supp. 2d at 91-94 (citations omitted).

Judge Sullivan's decision was not appealed (the last day for appeal was November 28, 2011).

On March 13, 2012, less than four months after the time to appeal Judge Sullivan's decision had passed, CBD, along with 100 other organizations, filed a second, nearly identical submission that again demanded that EPA regulate traditional cartridges and shells containing lead bullets and shot under TSCA, including advocating a nationwide ban of such ammunition (the "*2012 Submission*").  EPA rejected the *2012 Submission* on April 9, 2012, concluding that it was substantially the same as the *2010 Petition* and therefore was not a "new" petition cognizable under Section 21 of TSCA.  EPA observed that it did not "believe that the statutory time bar in section 21 [of TSCA] on judicial review can be avoided by resubmitting virtually the same petition, with the addition of parties, less than two years after the submission of the first petition."  JA150-151. EPA concluded that even if the *2012 Submission* was cognizable under TSCA § 21, EPA would deny it for the same reason it denied the *2010 Petition*: i.e. that EPA does not have TSCA jurisdiction over ammunition.  JA151.

On June 7, 2012, just seven of the 101 petitioners named on the *2012 Submission*, once more led and represented by CBD, challenged EPA's rejection of their *2012 Submission* in district court.  In June and July, 2012, the National Shooting Sports Foundation, Inc., Association of Battery Recyclers, Inc., National

Rifle Association of America, and Safari Club International all successfully intervened to defend the EPA's actions. JA006-007. On May 23, 2013, ruling at length from the bench after oral argument, Judge Sullivan granted EPA's and Defendant-Intervenors' motions to dismiss JA008-009. The court's decision was entered in an order dated July 22, 2013, JA169, from which those seven co-plaintiffs (hereinafter referred to as "CBD") now appeal.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case is CBD's second bite at the apple, demanding yet again that EPA regulate and even prohibit cartridges and shells from containing lead shot and bullets under TSCA, even though Congress expressly excluded cartridges and shells from the reach of TSCA. CBD's claims fail for two reasons.

First, EPA reasonably exercised its discretion in concluding that the *2012 Submission* was not a valid TSCA § 21 "petition" but, at most, a request to reconsider its denial of the substantially identical *2010 Petition*. CBD had every opportunity to litigate the merits of EPA's denial of the *2010 Petition* and is now unwilling to accept the consequences of its failure. They cannot re-set the statute of limitations clock merely by resubmitting to EPA a substantially similar filing. To permit this action would enable any party to defeat the TSCA petition process established by Congress and entrusted to EPA's discretion to manage by re-filing the same paperwork over and over again.

Second, EPA correctly recognized that Congress unambiguously excluded cartridges and shells from the Agency's regulatory authority under TSCA, and EPA therefore had no jurisdiction to act on CBD's request to regulate what materials cartridges and shells may contain. 15 U.S.C. § 2602(2)(B)(v). CBD cannot force EPA to regulate ammunition under TSCA under the guise of seeking to regulate the necessary components of cartridges and shells (*i.e.*, bullets and

shot).  The Agency's TSCA jurisdiction does not turn on the semantics of whether EPA is regulating lead bullets by prohibiting their use in cartridges, or regulating cartridges by prohibiting their use of lead bullets.  Because cartridges and shells are simply the sum of their individual components, forcing EPA to regulate each individual component under TSCA would force EPA to regulate cartridges and shells themselves, a result that Congress, through TSCA, specifically prohibited.

## ARGUMENT

## I.      STATUTORY AND FACTUAL BACKGROUND.

### A.      Overview Of Domestic Ammunition Manufacturing.

Traditional recreational ammunition is made of a primer, propellant, projectile, and casing.  Shotgun shells use shot for projectiles, while cartridges use bullets.  Approximately 95% of the domestically manufactured ammunition is made with lead bullets or shot.  JA011.  Ammunition is produced in high speed and high volume automated processes using expensive, close-tolerance, and purpose-built machinery.  JA011.  It is not possible to simply replace lead with alternative raw materials in existing manufacturing processes: those processes would have to either significantly re-structured or replaced to use alternative raw materials.  JA011.  As a general matter, ammunition manufactured with alternative materials is more costly to produce and sell than traditional ammunition.

The ammunition and firearms industry as a whole, provides approximately 185,000 jobs in the U.S., and has an overall annual economic impact of more than $27.5 billion.  More than 50 million hunters and target shooters in America purchase and use traditional ammunition containing lead components.  JA010-11. Imports comprise approximately 20% of the domestic ammunition market. JA012.

**B.**     **The Limited Jurisdiction Of The Toxic Substances Control Act.**

Congress enacted TSCA in 1976 in an effort to provide a framework for regulating "chemical substances." *Envtl. Def. Fund v. Reilly*, 909 F.2d 1497, 1498 (D.C. Cir. 1990).  TSCA directs the EPA to regulate chemical substances "to the extent necessary to protect adequately against such risk using the least burdensome requirements."  15 U.S.C. § 2605(a).  A "chemical substance" is defined as "any organic or inorganic substance of a particular molecular identity." 15 U.S.C. § 2602(2)(A).  However, Congress expressly excluded from TSCA jurisdiction a number of widely used materials that would otherwise be considered "chemical substances," including drugs and medical devices, tobacco, food and food additives, and nuclear material.  15 U.S.C. § 2602(2)(B)(i)-(iv), (vi).

Congress also expressly excluded ammunition from TSCA's definition of "chemical substances" by excluding "any article the sale of which is subject to the tax imposed by section 4181 of the Internal Revenue Code of 1986."  15 U.S.C.

§ 2602(2)(B)(v).  Section 4181 of the Internal Revenue Service ("IRS") Code,

also known as the firearms and excise tax ("FAET"), imposes a tax "upon the sale

by the manufacturer, producer, or importer" of "shells, and cartridges."  26 U.S.C.

§ 4181.  Shells and cartridges are assembled products that are composed of a

casing, propellant, and either a bullet or shot.  When Congress exempted

ammunition from TSCA regulation, virtually all ammunition was made with lead

bullets or shot, and that remains true today.

###### C.  TSCA Section 21 Petition Process.

TSCA § 21 provides a process by which citizens may petition EPA to

initiate rule makings to protect human health or the environment against

unreasonable risks caused by "chemical substances" as defined by TSCA.  15

U.S.C. § 2620.  Accordingly, TSCA § 21 petitions are not available for materials

that are excluded from the definition of "chemical substances."

EPA has ninety days to either grant or deny § 21 petitions.  *Id*. at

§ 2620(b)(3).  If EPA denies the petition, the petitioner may, within sixty days of

the denial, file a claim in a United States District Court "to compel the

Administrator to initiate a rulemaking proceeding as requested in the petition."  *Id*.

at § 2620(b)(4)(A).  The petitioner must demonstrate to the district court, by a

preponderance of the evidence in a *de novo* proceeding, that "there is a reasonable

basis to conclude that the issuance of such a rule or order is necessary to protect

health or the environment against an unreasonable risk of injury to health or the environment." *Id*. at § 2620(b)(4)(B)(ii). If the petitioner successfully meets that burden, then the "court shall order the Administrator to initiate the action requested by the petitioner." *Id*.

**D.    The Use Of FAET Funds For Wildlife Conservation.**

The purposes to which funds collected by the FAET are put include the conservation of the very wildlife species upon which Appellants base their assertions of harm in this litigation. Pursuant to the Federal Aid in Wildlife Restoration Act (16 U.S.C. §§ 669-669i; 50 Stat. 917) of September 2, 1937, also known as the Pittman-Robertson Act ("Wildlife Restoration Act" or "PR Act"), the funds collected by the FAET go into "the Federal aid to wildlife restoration fund in the Treasury" (16 U.S.C. § 669b(a)(1)) and are distributed to the states for "the planning and implementation of [their] wildlife conservation and restoration program[s] and wildlife conservation strateg[ies]." *Id*. § 669b(c)(2).[1] "Priority for funding from the Wildlife Conservation and Restoration Account shall be for those species with the greatest conservation need as defined by the State wildlife conservation and restoration program." *Id.* § 669b(c)(3).

---

[1] Judge Wright summarized the funding mechanisms for the Wildlife Restoration Act in *Udall v. States of Wisc., Colo., and Minn.*, 306 F.2d 790, 791 (D.C. Cir. 1962).

Since Congress established the Pittman-Robertson Wildlife Restoration program approximately 75 years ago, the federal government has collected more than $7.15 billion through the FAET, and the several states have collectively provided a required match of over $1.78 billion.[2] The Fish and Wildlife Service ("FWS") estimates that states use approximately 60% of Wildlife Restoration Program funds for the purchase, lease, development, maintenance and operation of wildlife management areas. 2013 Budget at WR-3. States have acquired about five million acres of land using these funds. *Id.* Approximately 26% of the Wildlife Restoration Program funds are used annually by states for wildlife surveys and research. *Id.* In addition, states have used Pittman-Robertson funds to improve over 38.6 million acres of habitat, *id.*, develop over 43,700 acres of waterfowl impoundments and improve 604,700 acres for waterfowl.[3] These funds have been used to help restore many species to their native ranges, including the "Eastern and Rio Grande turkey, white-tailed deer, pronghorn antelope, wood duck, beaver, black bear, giant Canada goose, American elk, desert and Rocky

---

[2] THE UNITED STATES DEPARTMENT OF THE INTERIOR, FISH AND WILDLIFE SERVICE, BUDGET JUSTIFICATIONS AND PERFORMANCE INFORMATION, FISCAL YEAR 2013 at WR-4 ("2013 Budget").

[3] THE UNITED STATES DEPARTMENT OF THE INTERIOR, FISH AND WILDLIFE SERVICE, BUDGET JUSTIFICATIONS AND PERFORMANCE INFORMATION, FISCAL YEAR 2011, at WR-3.

Mountain bighorn sheep, bobcat, mountain lion, and several species of birds."

2013 Budget at WR-3.

## II. EPA PROPERLY EXERCISED ITS DISCRETION WHEN IT DETERMINED THAT APPELLANTS' 2012 SUBMISSION WAS NOT A NEW PETITION UNDER SECTION OF TSCA.

EPA properly and reasonably exercised its discretion in concluding that the *2012 Submission* essentially repeated the unsuccessful *2010 Petition* and thus was not a separately cognizable "petition" under TSCA § 21. As the district court observed in *CBD 1*, "TSCA nowhere defines the term 'petition'" and there is no legislative history clarifying what the term might mean in the context of TSCA. 815 F. Supp. 2d at 92. Accordingly, under "step two" of *Chevron*, the court is then to give deference to EPA's interpretation of what constitutes a "petition" under TSCA § 21 and the Agency's management of that process, since Congress has charged EPA with the administration of TSCA. *Chevron v. NRDC*, 467 U.S. 837, 843 (1984); *Pharm. Research and Mfrs. of Am. v. Thompson*, 362 F.3d 817, 821-22 (D.C. Cir. 2004) (applying *Chevron* deference to Medicaid decisions made by the Secretary of the Department of Human Health and Services where Congress had delegated implementation authority to the Secretary).[4]

---

[4] *Pharm. Research* rejected the argument, made by the Appellants here that *Chevron* deference was applicable only to agency decisions made through notice and comment rulemaking, extending *Chevron* deference to interpretations enunciated through decisions made by agencies in administrative processes they were entrusted by Congress to administer. However, EPA's determination that

EPA acted within its discretion when it determined that the *2012 Submission* was not a valid "petition" but, at most, a request to reconsider its denial of the substantially identical *2010 Petition*. CBD offers no substantive response to the question which is presented here: whether Appellants' duplicative *2012 Submission*, which merely re-pled the *2010 Petition*, failed to rise to the level of a new "petition" within the meaning of TSCA.[5]

---

the *2012 Submission* was not a TSCA § 21 "petition" is also "persuasive" under the standard enunciated in *Skidmore v. Swift & Co*., 323 U.S. 134 (1944) even though, for the reasons set forth in *Pharm. Research*, *Skidmore* is not applicable in this case.

[5] This court lacks jurisdiction over Appellants' third claim that EPA should have published its rejection of the *2012 Submission* in the Federal Register rather than deliver it by letter because Appellants failed to demonstrate the "injury in fact" requisite for Article III standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted). CBD did not allege any injury as a result of their receiving notice of the EPA's rejection of the *2012 Submission* in a letter rather than from a Federal Register notice. Appellants never disputed they received actual notice of EPA's rejection and never demonstrated that the letter notice harmed or prejudiced them in any way. Courts in other jurisdictions have dismissed similar claims because a plaintiff who had actual notice of the information required for publication could not establish injury in fact when an agency failed to publish notice of that information. *See Cargill, Inc. v. United States,* 173 F.3d 323, 332 (5th Cir. 1999) (mine owners with actual notice lacked standing to claim National Institute for Occupational Safety and Health's Board of Scientific Counselors authorization was not properly renewed, without evidence of injury in fact stemming from failure to comply with notice rules); *Miller v. United States*, 531 F.2d 510, 515 (Ct. Cl. 1976) (plaintiffs with actual notice lacked standing to challenge the Secretary's failure to publish in the Federal Register as required under the Redwood National Park Act).

CBD's view of the TSCA § 21 process would obligate EPA to review countless identical submissions without limitation, and would impose similar burdens on the courts to engage in *de novo* judicial review of each EPA determination addressing a duplicative petition. That interpretation would frustrate EPA's role in the reasonable and efficient administration of TSCA and the courts' efficient administration of judicial review. The court must preserve EPA's reasonable discretion to administer TSCA § 21 process, including determining what constitutes a cognizable "petition" under TSCA § 21.

A. **EPA Must Have Discretion To Determine What Constitutes A TSCA § 21 Petition.**

EPA's conclusion that the *2012 Submission* was not a new or legitimate TSCA § 21 "petition" reflected the reasoned exercise of the Agency's discretion over the administrative processes entrusted to it by Congress. *See Mobil Oil Exploration & Producing Southeast Inc. v. United Distribution Cos*., 498 U.S. 211, 230 (1991) ("An agency enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures and priorities." (citations omitted)). EPA is entitled to *Chevron* deference in its interpretation of what is not a "petition" under § 21 of TSCA because Congress did not define "petition," thus delegating the authority to EPA to interpret and apply that term and the TSCA § 21 process generally. *Pharm. Research*, 362 F.3d at 821-22.

EPA is entitled to take reasonable steps to administer the TSCA § 21 process, including making determinations as to when a submission might be considered a new petition, a request for reconsideration regarding an earlier petition, or perhaps not a petition at all. CBD attempted to avoid the consequences of its failed *2010 Petition* by re-filing essentially the same papers in 2012. CBD does not have the authority to dictate to EPA what is or is not a "petition" under this process. In this matter, EPA exercised that discretion reasonably, supporting its decision with clearly articulated factual and legal findings based on a close reading of the *2012 Submission*.

### B. EPA Reasonably Exercised Its Discretion In Rejecting The 2012 Submission.

EPA reasonably exercised its discretion by rejecting the *2012 Submission*. Proper management of the TSCA § 21 administrative process is necessary to avoid parties serially re-filing essentially the same petitions, and seeking *de novo* judicial review of EPA's denial of such petitions. When successive petitions are submitted simply by incrementally adding non-essential parties or cumulative, redundant or irrelevant information, agency and judicial resources are wasted and the redundant petitions serve none of the TSCA purposes intended by Congress.

EPA's actions in this matter could hardly be characterized as the "bureaucratic lethargy" that could "prevent the appropriate administration" of TSCA that was a concern voiced in *Envtl. Def. Fund*, 909 F.2d at 1499. To the

contrary, EPA acted more promptly in response to Appellants' submissions than the 90 days required by statute, denying the *2010 Petition* barely three weeks after it was filed, and ruling on the *2012 Submission* in less than three weeks.[6]

CBD's effort to rely on the criteria suggested by the court in *Walker v. EPA*, 802 F. Supp. 1568, 1572, n.6 (S.D. Tex. 1992) is to no avail. EPA is not constrained by the *Walker* criteria in the reasonable exercise of its discretion, and the criteria, as applied, do not help CBD's case.

In *Walker*, the court rejected the TSCA § 21 petitioner's attempt to evade the 60-day statute of limitations for challenging EPA's denial of a petition by making a subsequent submission and filing for judicial review of EPA's determination that a new petition had not been filed. *Walker v. EPA*, Civ. No. H-87-3552 (S.D. Tex. Oct. 15, 1990), USBr. at Add.32. *Walker* held that EPA acted within its discretion in determining that the second submission was not a new petition, taking into account the subject matter, the relief sought, the identity of the requesting parties, the presence of new information and the temporal relationship between the submissions. While not controlling criteria in this matter, their application here supports EPA's conclusion.

---

[6] Appellants refer to *Envtl. Def. Fund v. Thomas*, 657 F. Supp. 302 (D.D.C. 1987) for the proposition that the statute of limitations should not be narrowly construed in TSCA § 21 cases. However, the litigants chose not to appeal Judge Sullivan's decision in *CBD 1* that their claims were time-barred, and should not be heard to raise this issue now.

1. <u>The Submissions Concern The Same Subject Matter</u>.

Both the *2010 Petition* and the *2012 Submission* concern the exact same subject matter: the regulation under TSCA of cartridges and shells.

2. <u>Appellants Did Not Seek Different Relief</u>.

The *2010 Petition* and *2012 Submission* sought the same relief. CBD's assertion that it sought markedly different relief in the *2012 Submission* than it had in the *2010 Petition* is contradicted by the plain statements in the two submissions. The *2010 Petition* expressly requested EPA to ban ammunition containing lead. JA023. The *2012 Submission* explicitly established the same objective: "Petitioners believe the <u>necessary</u> and most effective regulation would be a <u>complete ban</u> on bullets and shot containing lead for use in hunting and shooting sports." JA058. (emphasis supplied). CBD's clear advocacy for a ban is repeated throughout the *2012 Submission*. *See, e.g.*, JA044, JA060, and JA109. Thus, CBD's starting and ending points in 2010 and 2012 were the same: a ban on the availability and thus use of traditional ammunition by hunters and sports shooters.

CBD's concession that, while they continue to advocate a complete ban, they also ask EPA in the *2012 Submission* to consider other measures that might be less than a ban, simply recognizes that they might not get the full remedy that they really want (*i.e.*, "we will take what we can get"). Their recognition that law

17

enforcement and national defense may have special needs is similarly not a markedly different remedy, since the focus in both the *2010 Petition* and the *2012 Submission* was always the use of ammunition for recreational hunting and target shooting. Lastly, the relief sought in the *2012 Submission* was not "directly responsive to the agency's concerns" (App. Br. at 17) because EPA's denial of the *2010 Petition* was based on the Agency's correct determination that it could not exercise TSCA jurisdiction over ammunition, as opposed to any fundamental concerns about the relief requested.

3. <u>The Identity Of The Essential Parties Is The Same</u>.

CBD's effort to round up new entities to sign on to the *2012 Submission* was a transparent attempt to resuscitate the failed *2010 Petition*. Those additional organizations brought nothing new to the *2012 Submission* and failed to change the fact that one party orchestrated both submissions:

- The *2010 Petition* and the *2012 Submission* share the same lead petitioner: CBD.
- Though the *2012 Submission* was styled as jointly submitted with 99 other conservation organizations, the sole point of contact listed for all of these organizations was CBD.
- CBD's in-house counsel was lead counsel for the *2010 Petition,* the unsuccessful litigation regarding that petition, the *2012 Submission*, and this litigation.

The addition of 98 organizations to the *2012 Submission* (one of the organizations on the *2012 Submission*, Project Gutpile, also participated in the *2010 Petition*)

made no material difference to the content of the two documents. EPA properly determined that because the factual and legal content of the two submissions were "almost identical," the *2012 Submission* did not reflect any new or unique interests or concerns raised by those 98 organizations. Appellants do not point to any new specific factual content, legal argument or policy interest in the *2012 Submission* that was attributable to the presence of these additional parties.

The peripheral nature of these additional petitioners is reflected in the fact that the vast majority of them have not participated in this litigation, with only 6 out of the 98 new petitioners being parties to this litigation, all of whom are represented by CBD's counsel. Therefore, not only did these additional parties not bring any new issues to the table, almost all of them decided not to challenge EPA's decision.[7]

Lastly, the addition of more organizations to the *2012 Submission* was not relevant to EPA's disposition of CBD's requests. The criteria for ruling on TSCA § 21 petitions do not include the number of parties named in the petition: a

---

[7] Appellants assert that the "poignant" question at issue is whether they will ever get "their day before the Agency." App. Br. at 5, n.1. CBD has already had two "days" before the Agency, where EPA promptly responded to its submissions and clearly explained the basis for its actions including, in both cases, stating that EPA did not have jurisdiction under TSCA to hear their claims. Further, if, as asserted by CBD, these additional petitioners are vitally interested in these issues, nothing prevented them from participating in the *2010 Petition* or intervening in the subsequent litigation (as did the Intervenors-Appellees in both this case and in *CBD I*.).

petition does not become more persuasive by adding names. The number of parties clamoring for EPA to regulate ammunition under TSCA is not relevant to the legal conclusion that EPA may not exercise such jurisdiction.

    4.    <u>The 2012 Submission Did Not Present Significant or Relevant New Information</u>.

The *2012 Submission* did not present significant new or relevant information.[8] EPA denied the *2010 Petition* because the Agency correctly concluded that it did not have the jurisdiction to regulate ammunition under TSCA, and did not make any findings based on the alleged adverse effects of the use of ammunition. Therefore, CBD's inclusion in the *2012 Submission* of additional references to a handful of cumulative and redundant studies on the alleged effects of lead-containing ammunition was not relevant or responsive to the grounds upon which the *2010 Petition* was denied.

Further, the inclusion of a few citations to 40 year-old legislative history of TSCA was certainly not "new" information that transformed the *2012 Submission* into a new petition. As the agency charged by Congress with the authority to implement TSCA, EPA does not need to be instructed as to the legislative history

---

[8] The *2010 Petition* included over 400 citations to literature that Appellants believed supported their allegations. The *2012 Submission* repeated all of these references, and included 20 more, all but six of which were publicly available when the *2010 Petition* was filed. EPA correctly exercised its jurisdiction in concluding that this small amount of cumulative information did not transform the *2012 Submission* into a "new" TSCA § 21 petition.

of the statute.  In any event, as discussed in more detail below, the legislative

history provided by Appellants does not change the conclusion that EPA cannot

exercise TSCA jurisdiction over ammunition.

5.    Temporal Relationship Between Submissions.

CBD filed the *2012 Submission* less than 4 months after the time for

appealing *CBD 1* had passed, a time period CBD concedes that both the *Walker*

court and EPA consider insufficient.  CBD's assertion that this was time for "100

motivated organizations to form a coalition" strains credulity, given that CBD is

the lead petitioner and lead counsel on both the *2010 Petition* and *2012*

*Submission* and related litigation.  Furthermore, as CBD is identified in the *2012*

*Submission* as the sole point of contact for the 98 "motivated organizations" added

to the submission, there is no evidence in the *2012 Submission* that these

"motivated organizations" added any new content, and over 90% of these

motivated organizations are not parties to this litigation.  The more reasonable

conclusion to draw is that it took CBD some three months to find additional

entities to agree to put their name to CBD's submission, in an effort to cure

CBD's failure to challenge EPA's denial of the *2010 Petition* in a timely manner.

## III.    EPA CORRECTLY CONCLUDED THAT IT DOES NOT HAVE TSCA JURISDICTION TO REGULATE AMMUNITION.

Should this court reach the merits of CBD's claims, it should affirm EPA's

decision under the first step of *Chevron*, because Congress directly addressed the

precise question at issue by excluding cartridges and shells from EPA's regulatory jurisdiction under TSCA. In the alternative, EPA's determinations can be affirmed under the second prong of *Chevron* because EPA, charged by Congress with implementing TSCA, determined that it did not have the jurisdiction to regulate ammunition under the statute, and the court should give deference to such jurisdictional determinations. *City of Arlington v. FCC*, 133 S. Ct. 1863 (2013).

A. **Congress Expressly Excluded Cartridges And Shells From The Jurisdiction Of TSCA.**

EPA properly concluded that it had no authority to regulate lead bullets and shot under TSCA. EPA's jurisdiction under TSCA is constrained by the definition of the term "chemical substance." TSCA excludes from the definition of "chemical substance," and prohibits EPA from regulating "any article the sale of which is subject to the tax imposed by section 4181 of the Internal Revenue Code of 1986." 15 U.S.C. § 2602(2)(B)(v). Section 4181 of the IRS Code, also known as the firearms and ammunition excise tax ("FAET"), imposes a tax on the sale of "shells" and "cartridges." 26 U.S.C. § 4181. The Alcohol and Tobacco Tax and Trade Bureau ("ATTTB") in the Department of the Treasury, which administers the FAET, defines "shells and cartridges" to "[i]nclude any article consisting of a projectile, explosive, and container that is designed, assembled, and ready for use without further manufacture in firearms, pistols or revolvers." 27 C.F.R. § 53.11. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE

22

ENGLISH LANGUAGE at 344 (1993) defines "cartridge" as "a tube of metal, paper, or a combination of both containing a complete charge for a firearm …"); *id.* at 2092 (1993) (defining "shell" as "a metal or paper case which holds the charge of powder and shot or bullet …"). A cartridge without a bullet is not a cartridge, but a blank.[9] Therefore, cartridges and shells necessarily include the "projectile" (a bullet in the case of a cartridge; shot for shotgun shells).[10]

CBD has twice requested EPA to prohibit cartridges and shells from containing lead bullets and shot. That request cannot be granted because EPA lacks jurisdiction to regulate cartridges and shells under TSCA. EPA's rejection of the *2012 Submission* must be affirmed because EPA cannot regulate shot and bullets without regulating cartridges and shells. Bullets and shot are, by definition, the "projectiles" integral and necessary to cartridges and shells which Congress forbade EPA to regulate under TSCA.

CBD concedes that EPA does not have TSCA jurisdiction to regulate ammunition: "If appellants had petitioned EPA to regulate lead shells and

---

[9] See Merriam-Webster.com (defining a blank as "a cartridge loaded with propellant and a seal but no projectile"), *available at* http://www.merriam-webster.com/dictionary/blank.

[10] CBD's assertion that shot and bullets are not mentioned in Section 4181 of the Internal Revenue Code as excluded items is too facile. App. Br. at 24. In defining cartridges and shells as necessarily including a "projectile," the implementing regulations for the FAET clearly include shot and bullets, since those are projectiles.

cartridges, EPA would be justified in claiming that it lacks the authority to regulate such products." App. Br. at 23. However, the only way one can have "lead shells and cartridges" is if the shot and bullets contain lead. This necessary concession forces CBD into the sophistry of arguing that EPA can regulate all of the components of cartridges and shells without ever having crossed the jurisdictional line of regulating cartridges and shells. This theory is contradicted by CBD's own campaign against traditional ammunition, which is based on the inextricable linkage between shot and bullets and their use as a necessary component of ammunition.

CBD is concerned with lead bullets and shot precisely because of their use in cartridges and shells (i.e., bullets and shot have no function other than their use in cartridges and shells). CBD does not claim that lead bullets and shot pose an unreasonable risk to health or the environment apart from their use in cartridges and shells (i.e., the 400+ studies in the *2012 Submission* do not allege that bullets in inventory at an ammunition factory have caused any environmental damage). Rather, they state plainly that their interest in shot and bullets lies in their "use," which can only occur by virtue of these "projectiles" being fired from shells and cartridges: "Petitioners believe the necessary and most effective regulation would be a complete ban on bullets and shot containing lead <u>for use in hunting and shooting sports</u>." JA058 (emphasis supplied). CBD focuses exclusively on the

alleged risk to health and the environment from "spent" lead bullets and shot; that is, bullets and shot that were part of assembled cartridges and shells discharged from firearms. *See generally 2012 Submission* (containing more than 30 references to "spent" lead ammunition). CBD is clear that it seeks to regulate ammunition (i.e., shells and cartridges) and not merely lead bullets and shot apart from their use in cartridges and shells. *See*, *e.g.*, *2012 Submission* at p. 20 (seeking regulation under TSCA of "ammunition manufactured with lead projectiles"). Thus, while they advance an arid semantic argument that EPA may freely exercise TSCA jurisdiction over every component of ammunition without stepping over the line to regulate ammunition itself, the *2012 Submission* is based solely on the use of those projectiles in ammunition. Thus, it is clear that CBD wants EPA to prohibit domestic companies from manufacturing, and hunters and sportsmen from using, cartridges and shells that contain lead bullets and shot; which is precisely what TSCA forbids and what CBD has conceded EPA cannot do.

CBD argues that a few lines of legislative history suggest that Congress intended EPA to be able to regulate the components of shells and cartridges under TSCA. App. Br. at p. 24. However, in light of Congress' clear intent that manufactured ammunition is exempt from regulation under TSCA, as well as EPA's reasonable interpretation to which deference is owed, it is unnecessary to resort to a review of legislative history. *HUD v. Rucker*, 535 U.S. 125, 132-33

(2002) ("[R]eference to legislative history is inappropriate when the text of the statute is unambiguous.").  This court "should not resort to legislative history to cloud a statutory text that is clear," nor should it "read legislative history to create otherwise non-existent ambiguities."  *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 299 (D.C. Cir. 2003) (internal quotation marks and citations omitted); *Williams Cos. v. FERC*, 345 F.3d 910, 914-15 (D.C. Cir. 2003) (refusing to reinterpret a clear statute because of language in a House Report because, while "history can be used to clarify congressional intent even when a statute is superficially unambiguous, the bar is high"); *W. Fuels-Utah, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 870 F.2d 711, 717 (D.C. Cir. 1989) ("Ambiguous legislative history does not becloud a clear statutory command.").

Since "Congress has directly spoken to the . . . issue," no further analysis is necessary and CBD's appeal should be rejected under the first step of Chevron. *Chevron*, 467 U.S. at 842.  EPA has no jurisdiction under TSCA to regulate ammunition, and CBD's attempt to use TSCA to limit lawful activities protected under the Second Amendment must be denied.

**B.     EPA's Conclusion That It Does Not Have The Authority To Regulate Ammunition Under TSCA Is A Reasonable Interpretation Of Its Jurisdiction Under The Statute.**

If this court concludes that Congress has not directly addressed the issue of whether TSCA exempts the regulation of traditional ammunition, then under the

second step of *Chevron* this court should defer to EPA's determination that it lacks jurisdiction under TSCA to regulate traditional ammunition (or its component parts). *City of Arlington,* 133 S. Ct. 1863; *Chevron*, 467 U.S. at 842.

In rejecting the *2012 Submission*, EPA correctly concluded, as it did when it denied the *2010 Petition*, that bullets and shot that are manufactured into shells and cartridges are excluded from TSCA's definition of "chemical substance." 75 Fed. Reg. at 58,377-78. EPA's interpretation is not merely reasonable, but compelling: if shells and cartridges are subject to the FAET tax, then the components of those articles are also effectively being taxed, and therefore are excluded from the definition of a "chemical substance" under TSCA. ATTTB's regulations define the "shells and cartridges" that are subject to the FAET to "[i]nclude any article consisting of a projectile, explosive, and container that is designed, assembled, and ready for use without further manufacture in firearms, pistols or revolvers." 27 C.F.R. § 53.11. This definition makes clear that components of manufactured "shells and cartridges" are effectively being taxed under the FAET.[11]  EPA further correctly concluded that its "plain reading of

---

[11] The court should also defer to the interpretations of the ATTTB regarding the FAET, which is the agency that currently administers the FAET.  In the context of applying the FAET to firearms, the ATTTB's regulations are explicit about this common sense point: "all component parts for firearms are includible in the price for which the article is sold." 27 C.F.R. § 53.61(b)(2).  Under CBD's theory, both the price and the resulting tax on cartridges and shells are arrived at without any reference to the cost of the components of the ammunition.

TSCA is consistent with EPA's long-standing interpretation of TSCA's definition of 'chemical substance' and with the purpose of the exemption." *Id*.

**C. The Legislative History Is Clear That Congress Did Not Intend To Allow EPA To Regulate Traditional Ammunition.**

The few lines of legislative history on which CBD relies cannot upend the clear language of the statute and do not accurately reflect Congressional intent. At the outset, the isolated text relied on by CBD is ambiguous at best, and can only be found in one report from the House Committee on Interstate and Foreign Commerce that was issued July 14, 1976, months before the passage of TSCA. H.R. REP. NO. 94-1341, at 10 (1976), *reprinted in* 5 Environmental and Natural Resources Policy Division, Library of Congress, *Legislative History of the Toxic Substances Control Act*, 407, 418 (1976) ("House Committee Report"). The language to which CBD attributes such importance never appeared again, and no reference to that discussion was made in the Conference Report that was published on September 23, 1976, just 2½ weeks before TSCA's passage on October 11, 1976. H.R. REP. NO. 94-1679 (1976), *reprinted in* 5 Environmental and Natural Resources Policy Division, Library of Congress, *Legislative History of the Toxic Substances Act*, 667 (1976) (Conf. Rep.). When given the choice of seeking guidance from individual committee reports as opposed to conference reports, courts regularly choose the latter as the far more reliable indicator of the will of the legislators. "[A] congressional conference report is recognized as the

most reliable evidence of congressional intent because it 'represents the final statement of the terms agreed to by both houses.'" *Northwest Forest Res. Council v. Glickman,* 82 F.3d 825, 835 (9th Cir. 1996) (citing *Dept. of Health and Welfare v. Block,* 784 F.2d 895, 901 (9th Cir. 1986) (citation omitted) (discussing primary role of conference reports in courts' resources to determine meaning of statutory language when analyzing provisions of appropriations bill affecting timber sales)). Other courts, including the D.C. Circuit Court of Appeals, have recognized the value of conference reports over other forms of legislative history:

> Conference Reports generally are viewed with less suspicion and are deemed more reliable than other sources of legislative history, like committee reports or floor statements of individual legislators. One court has even said of conference reports that, "next to the statute itself [,] it is the most persuasive evidence of congressional intent."

*In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 820 n.30 (N.D. Ohio. 1999) (Court rejected legislative history that contradicted plain language of the statute) citing *Demby v. Schweiker*, 671 F.2d 507, 510 (D.C. Cir. 1981). The absence of any suggestion in TSCA's Conference Report that Congress intended to give the EPA jurisdiction over ammunition overrides any individual ambiguous statement in a single committee report.

In any event, CBD's reading of even this limited legislative history is incorrect—the context makes clear that Congress did not intend to give EPA the

authority to eliminate domestically-manufactured traditional lead-containing ammunition from the marketplace, which is CBD's fundamental demand.

When Congress was deliberating on the text of TSCA in 1975 and 1976, Congress was also actively engaged in ensuring that gun control or the regulation of ammunition did not unintentionally get addressed through the backdoor of similar statutes. In 1972, Congress, in the Consumer Protection Safety Act ("CPSA"), excluded ammunition from the regulatory jurisdiction of the Consumer Protection Safety Commission ("CPSC").[12] However, in 1974, the CPSC was nonetheless petitioned by a citizens' group to regulate ammunition pursuant to the Federal Hazardous Substances Act (which governs the labeling of hazardous household products and authorizes the CPSC to issue regulations regarding such

---

[12] The CPSA excludes from the definition of "consumer product":

> (E) any article which, if sold by the manufacturer, producer, or importer, would be subject to the tax imposed by section 4181 of the Internal Revenue Code of 1986 [26 U.S.C. 4181] (determined without regard to any exemptions from such tax provided by section 4182 or 4221, or any other provision of such Code), or any component of any such article[.]

15 U.S.C. § 2052(a)(5)(E). The use of the term "component[s]" in the CPSA exclusion makes sense, given that the definition of "consumer product", to which the ammunition exclusion applies, also explicitly includes "component parts." 15 U.S.C. § 2052(a)(5) (defining the term "consumer product" as "any article, or component part thereof, produced or distributed" under certain conditions). Thus the text of the CPSA exclusion parallels the definition of consumer product. Since "chemical substance" is defined by TSCA "any organic or inorganic substance of a particular molecular identity," and does not include the concept of "component[s]" (i.e., one does not have a "component" of a chemical substance), it is understandable that an exclusion from the definition of "chemical substance" in TSCA would not be framed in terms of "component[s]."

labels), and an ensuing court decision suggested that the CPSC might have had the requisite authority to regulate ammunition under that Act.[13]  In response, Congress amended the CPSA in 1976, the same year TSCA was enacted, to make it clear that the CPSC did not have the authority to regulate firearms or ammunition.  15 U.S.C. § 2052(a)(5).[14]

It was in this context of clear Congressional efforts to prohibit agencies from regulating ammunition that Congress, also in 1976, prohibited EPA from using TSCA to regulate ammunition. It is unreasonable to conclude that, at the same time Congress was taking vigorous action to ensure that the CPSC could not regulate ammunition, the very same Congress was also authorizing EPA to ban the only generally available ammunition through the regulation of shot and bullets under TSCA.

The House legislative committee report cited by CBD makes clear that, "[a]lthough the language of the bill is clear on its face as to the exemption for pistols, revolvers, firearms, shells, and cartridges, the Committee wishes to emphasize that it does not intend that the legislation be used as a vehicle for gun

---

[13] *Comm. for Hand Gun Control, Inc. v. Consumer Prod. Safety Comm'n*, 388 F. Supp. 216, 217 (D.D.C. 1974).

[14] For a discussion of this history, *see* Dennis B. Wilson, *What You Can't Have Won't Hurt You! The Real Safety Objective of the Firearms Safety and Consumer Protection Act*, 53 Clev. St. L. Rev. 225, 232–235 (2006).

control." House Report at 10. This prohibited result, however, is exactly what would be accomplished if EPA was directed to regulate and ultimately ban, under TSCA, the domestic manufacture, processing, distribution and recreational use of traditional ammunition.

CBD also misconstrues the House legislative committee statement that the TSCA "does not exclude from regulation under the bill chemical components of ammunition which could be hazardous because of their chemical properties." House Report at 10. This language was intended to make clear that the use of a chemical substance (such as lead) in ammunition did not deprive EPA of its general authority to regulate that substance in other contexts that are not within the exclusion for ammunition. For example, while EPA cannot use TSCA to prohibit the use of lead in ammunition, it retains the authority to regulate the use of lead in other contexts (e.g., paint). CBD's interpretation—to allow EPA to use TSCA to regulate the shot and bullets in ammunition even though TSCA expressly prohibits the regulation of ammunition (i.e., shells and cartridges)—is not reasonable because it would eviscerate TSCA's exemption of "shells" and "cartridges" by allowing EPA to regulate those products through each of their component parts.

The importance of the use of lead in shells and cartridges was well known to Congress when it passed TSCA. Even today, almost 40 years after the

enactment of TSCA, approximately 95% of domestically manufactured ammunition is traditional ammunition made with lead bullets or shot. JA011. It is unreasonable to conclude, based on a single line in a House legislative committee report, that while Congress did not want TSCA to be used as a vehicle for gun control and expressly prohibited EPA from using TSCA to regulate ammunition, Congress nonetheless intended for EPA to have the authority to regulate out of existence the only ammunition that was generally available at the time of passage and is still the primary type of ammunition available on the U.S. market.

### D. CBD's Reading Of TSCA Is Unreasonable.

CBD's attempt to decouple bullets and shot from cartridges and shells, if adopted, would disrupt the U.S. market for ammunition in ways that Congress never intended. Imported ammunition comes into the United States in the form of finished shells and cartridges subject to the FAET. Therefore, under Appellants' incorrect view of TSCA, EPA could regulate and even ban the domestic manufacture of lead bullets and shot, while foreign-manufactured "finished" ammunition containing lead projectiles could continue to be imported and used in the United States. Thus the banned domestically produced ammunition could be replaced with the identical imported ammunition, producing no results other than destroying a domestic industry. Such a reading of TSCA flies in the face of the

well-established canon of statutory construction that disfavors interpretations that arrive at "absurd results." *See, e.g., Flatow v. Islamic Republic of Iran*, 201 F.R.D. 5, 10 (D.D.C. 2001).

Further, an abrupt ban on the most significant share of the ammunition market would remove one of the major sources of revenue fueling federal and state wildlife and habitat conservation.[15]  If hunters are deprived of the ability to purchase the most available and affordable ammunition, the states that rely on the FAET funds derived from the sales of those products for Wildlife Restoration Program funding will be deprived of the revenue they use to purchase and restore wildlife habitat, research wildlife health, and plan and implement conservation programs and projects.  Thus, if CBD achieves the relief they seek, they will sabotage rather than protect the wildlife species in which they claim a conservation interest, and disrupt the long-standing system of conservation funding established by Congress.

### E.  Appellants' Reading Of The FAET Is Unreasonable.

CBD concedes that shells and cartridges are exempt from TSCA, but tries to avoid TSCA's plain language by engaging in a semantic tax argument.  They assert that EPA has TSCA jurisdiction over the lead shot and bullets used to manufacture shells and cartridges because additional FAET taxes are not

---

[15] *See* discussion *supra* pp. 10-12 above; Declaration of Lawrence Keane at ¶6(d), JA011-12.

separately collected on them.  This interpretation ignores the fact that ammunition is simply the sum total of its components (i.e., there would not be any shells and cartridges to tax without bullets or shot), and that by applying the FAET to finished ammunition, the components that make up the ammunition have been taxed as well. Taxing the components and the finished ammunition separately would impose a double tax on the ammunition.  Further, CBD's interpretation is contrary to Congress' express intent, since CBD seeks to force EPA to use TSCA to ban domestically-manufactured traditional ammunition – precisely the outcome Congress intended to prohibit.

CBD also incorrectly relies on an Internal Revenue Service ("IRS") Revenue Ruling to the effect that FAET taxes cannot be imposed on the components of ammunition as support for CBD's claim that those components may be regulated as chemical substances under TSCA.  In 1968, eight years prior to the passage of TSCA, the IRS stated: "The manufacturers excise tax imposed upon sales of shells and cartridges by section 4181 of the Internal Revenue Code of 1954 does not apply to sales of separate parts of ammunition such as cartridge cases, primers, bullets and powder."  Rev. Rul. 68-463, 1968-2 C.B. 507.  CBD's reliance on this revenue ruling is misplaced, as it only addresses the applicability of the FAET to the "sales of separate parts of ammunition" (i.e., not as components of finished ammunition).  However, the *2010 Petition* and the *2012*

*Submission* reveal that the Appellants' objective is to force EPA to use TSCA to regulate finished ammunition: *i.e.*, the cartridges and shells used by hunters and target shooters that are explicitly subject to the FAET, not the shot and bullets that are sold separately as individual components (i.e., the "spent" shot and bullets about which Appellants express concern come from shells and cartridges).

Furthermore, CBD's narrative omits that the IRS, in that same ruling, explicitly concluded that the FAET does apply to the "component[s]" of shells and cartridges that are sold in "knock-down" (unassembled) kits. Rev. Rul. 68-463, 1968-2 C.B. 507. This demonstrates that the tax on finished cartridges and shells is, in effect, a tax on the components that go into those products. In the case of commercially-manufactured ammunition, this is accomplished by taxing the finished ammunition and not the components used to assemble that ammunition, while in the case of kits selling ammunition in "knock-down" condition, this is accomplished by taxing the kit that contains components before they are assembled into finished ammunition. Because finished shells and cartridges are subject to the FAET, and the FAET is not a double tax on both the components of finished ammunition and the finished ammunition itself, it follows that the components used to create the finished ammunition are effectively taxed by the FAET. TSCA therefore unambiguously exempts bullets and shot contained in shells and cartridges from regulation as "chemical substances" under TSCA.

## CONCLUSION

For the reasons set forth above, this court should affirm the District Court's decision to dismiss CBD's claims. Alternatively, this court should find that EPA reasonably exercised its discretion in rejecting *CBD's 2012 Submission* and that, because EPA does not have jurisdiction under TSCA to regulate ammunition.

April 1, 2014                              Respectfully submitted,


/s/ Robert N. Steinwurtzel_____          /s/Christopher L. Bell_____
Robert N. Steinwurtzel                   Christopher L. Bell
Michael Steven Snarr                     Greenberg Traurig LLP
Thomas Edward Hogan                      1000 Louisiana Street, Suite 1700
Baker & Hostetler LLP                    Houston, TX 77002
1050 Connecticut Avenue NW               (713)374-3556
Suite 1100                               bellc@gtlaw.com
Washington, DC 20036
202-861-1500                             *Attorney for Intervenor-Appellee*
rsteinwurtzel@bakerlaw.com               *National Shooting Sports Foundation*
thogan@bakerlaw.com
msnarr@bakerlaw.com                      *Of Counsel*
                                         Lawrence G. Keane
                                         General Counsel
*Attorneys for Intervenor-Appellee*      National Shooting Sports Foundation
*Association of Battery Recyclers, Inc.* 11 Mile High Road
                                         Newton, CT 06470-2359
                                         (203)426-1320



/s/ Anna M. Seidman_____             /s/ Christopher A. Conte_____
Anna M. Seidman                          Christopher A. Conte
Safari Club International                 National Rifle Association
501 2nd Street NE                        11250 Waples Mill Road, Suite 5N
Washington, DC 20002                     Fairfax, VA 22030
202-543-8733                             703-267-1166
aseidman@safariclub.org                  cconte@nrahq.org

*Attorney for Intervenor-Appellee*       *Attorney for Intervenor-Appellee*
*Safari Club International*               *National Rifle Association*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this brief contains 8,283 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14 pt. Times New Roman font.

        /s/Christopher L. Bell
        Christopher L. Bell

## CERTIFICATE OF SERVICE

I hereby certify that on April 1, 2014, I filed and served the foregoing with the Clerk of the Court by causing a copy to be electronically filed via the appellate CM/ECF system. I also hereby certify that the participants in the case are registered CM/ECF users and will be served via the CM/ECF system.

    /s/ Christopher L. Bell
Christopher L. Bell